LESTER J. MARSTON
California State Bar No. 081030
LAW OFFICES OF RAPPORT AND MARSTON,
SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Plaintiff Buena Vista Rancheria of Me-Wuk Indians*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BUENA VISTA RANCHERIA OF ME-WUK INDIANS,<br><br>                      Plaintiff,<br><br>v.<br><br>GAVIN NEWSOM, Governor of California, and STATE OF CALIFORNIA,<br><br>                      Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

This is an action brought by the Buena Vista Rancheria of Me-Wuk Indians ("Tribe"), a federally recognized Indian Tribe, against the Governor of the State of California ("Governor") and the State of California ("State"). The Tribe seeks an order from the Court: (1) declaring that certain provisions of the Tribe's 2016 Tribal-State class III gaming compact ("2016 Compact" or "Compact") are invalid and unenforceable as a result of the United States Court of Appeals for the Ninth Circuit's decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022) ("*Chicken Ranch*"); (2) declaring that certain provisions of the 2016 Compact that violate the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.* ("IGRA"), are not in effect because the 2016 Compact was not affirmatively approved by the Secretary of the Interior— rather, the 2016 Compact was "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [the IGRA]," 25 U.S.C. § 2710(d)(8)(C);

(3) severing from the 2016 Compact the provisions that were invalidated by *Chicken Ranch* and which violate the IGRA; (4) declaring that the Governor and the State breached Section 13 of the the Compact by failing to negotiate with the Tribe in good faith to determine which provisions in the Compact were invalidated by *Chicken Ranch,* and (5) directing the State to provide the Tribe with an accounting of the actual costs incurred by the State in regulating the Tribe's gaming under the 2016 Compact from the effective date the 2016 Compact to the present.

## JURISDICTION

1.     This Court has jurisdiction over the Tribe's claims based upon the following:

(a)     28 U.S.C § 1331, in that this action arises under the Constitution and laws of the United States, specifically the IGRA;

(b)     28 U.S.C. § 1362, in that the Tribe is federally recognized Indian tribe asserting that the State's actions violate the Constitution and laws of the United States, including federal common law;

(c)     28 U.S.C. § 1367, in that the Governor, violated California law, including but not limited to breach of contract or compact by failing to negotiate with the Tribe in good faith to determine which provisions in the Compact, consistent with *Chicken Ranch*, violated the IGRA;

(d)     The State has waived its' sovereign immunity with regard to disputes between the State and the Tribe concerning whether provisions in the Compact are valid and enforceable pursuant to the dispute resolution provisions of the Compact, specifically Sections 13.4 and 14.2 of the Compact; and

(e)     The State has affirmatively waived its sovereign immunity pursuant to Calif. Gov't. Code § 98005.

## VENUE

2.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, in that:

(a)     The State's seat of government is located within the Eastern District of California ("District");

(b)     The Attorney General of California maintains an office within the District;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(c)     A substantial part of the events or omissions giving rise to the Tribe's claims occurred in this District; and

(d)     The parties agreed in Sections 13.1(e) of the 2016 Compact to file any action arising from the Compact's dispute resolution provisions in this District.

## PARTIES

3.     Plaintiff, Buena Vista Rancheria of Me-Wuk Indians of California, is a federally recognized Indian tribe. The Tribe is included on the Department of the Interior's list of recognized Indian tribes, 88 Fed. Reg 2112 (January 12, 2023), and has been included on every version of the list since approximately 1985. The Tribe is the beneficial owner of the Buena Vista Rancheria ("Reservation"), which is located in Amador County, California. The Tribe is a sovereign governmental entity that exercises inherent powers of self-government on its' Reservation.

4.     Defendant Gavin Newsom is the duly elected Governor and chief executive officer of the State and is sued in that capacity.

5.     Defendant the State of California is a quasi-sovereign governmental entity and a state of the United States.

## THE INDIAN GAMING REGULATORY ACT

6.     In 1988, Congress enacted IGRA to create a framework for Indian tribes, states, and the federal government to regulate on-reservation tribal gaming.

7.     IGRA divides Indian gaming into three classes, with different regulatory requirements for each class. Class I gaming consists of traditional tribal games for prizes of minimal value connected with tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Class I gaming is within the exclusive regulatory jurisdiction of the tribes. Class II gaming consists of bingo, "whether or not electronic, computer, or other technological aids are used in connection therewith," including "pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo." 25 U.S.C. § 2703(7)(A)(i). Also included in class II gaming are non-banked card games either explicitly authorized by state law or not prohibited by state law and played in conformity with state regulations regarding hours of play and limits on wagers and pot sizes. 25 U.S.C. § 2703(7)(A)(i)-(ii) and (7)(B). Class III gaming is defined as "all forms of gaming that are not class

I gaming or class II gaming." 25 U.S.C. § 2703(8). Class II and class III gaming fall within the regulatory jurisdiction of the tribes and the National Indian Gaming Commission ("NIGC"), a federal regulatory agency created under the IGRA.

8.     The most lucrative form of gaming is class III gaming. It includes the games played in a typical casino in Las Vegas, such as slot machines, craps, roulette, and percentage and banked card games, like blackjack. See 25 U.S.C. § 2703(8). Under Section § 2710(d)(1) of the IGRA, in order for a tribe to be authorized to conduct class III gaming: (1) the tribe must have adopted a tribal ordinance that authorizes the playing of the class III games and the ordinance must have been approved by the Chairman of the NIGC; (2) the state in which the class III gaming will be conducted must "permit" such gaming for any purpose by any person, organization, or entity; and (3) the class III gaming must be conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state, pursuant to 25 U.S.C. § 2710(d)(3).

9.     Section 2710(d)(3) sets forth the procedures that a tribe and a state must follow in order to negotiate and enter into a compact.

10.     Section 2710(d)(3)(A) requires that the State conduct compact negotiations in good faith.

11.     Section 2710(d)(3)(C) provides a list of seven subjects that a class III gaming compact negotiated between a tribe and a state may address. The seven subjects listed in Section 2710(d)(3)(C) are:

(i)     the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii)     the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii)     the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv)     taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v)     remedies for breach of contract;

(vi)    standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii)   any other subjects that are directly related to the operation of gaming activities. (Collectively the "Proper Subjects of Negotiation").

12.     With respect to 25 U.S.C. § 2710(d)(3)(C)(iii), IGRA provides that, "[e]xcept for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in [the IGRA] shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4).

13.     All class III gaming compacts must be reviewed and approved by the Secretary of the Interior in order to take effect. 25 U.S.C. § 2710(d)(3)(B).

14.     A class III gaming compact may be affirmatively approved by the Secretary. 25 U.S.C. § 2710(d)(8)(A).

15.     A class III gaming compact may be disapproved by the Secretary "only if such compact violates—(i) any provision of [IGRA], (ii) any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. § 2710(d)(8)(B).

16.     A class III gaming compact may also be approved by operation of law with no action on the part of the Secretary. Where the Secretary neither approves nor disapproves a compact "before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." 25 U.S.C. § 2710(d)(8)(C). Such compacts are commonly referred to as "deemed approved" compacts.

17.     25 U.S.C. § 2710(d)(7) provides a remedial process where a tribe asserts that a state has failed to negotiate a compact in good faith, including a cause of action in federal court where a state has failed to negotiate in good faith.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

18.     Under California law, all gaming compacts and amendments must be ratified by the State Legislature. Cal. Con., art. IV, sec. 19(f) and once ratified constitute state law.

**FACTUAL ALLEGATIONS**

19.     Ancestors of the Me-Wuk Indians have occupied what is now Amador County and the surrounding areas since time immemorial. Despite generations of abuse and neglect, the Mission period, the Gold Rush, and destructive federal policies toward Indian tribes, all of which stripped away land ownership, the Me-Wuk Indians survived. In the early 20th Century, the United States purchased or set aside by executive order a network of small land parcels called "Rancherias" for Indian tribes who had been unlawfully dispossessed of their lands as a result of the United States failure to ratify the 18 treaties negotiated and signed by the President with California Tribes and by the State's passage of laws authorizing the murder and enslavement of California Indians. The United States purchased the lands constituting the Buena Vista Rancheria in 1927 with money appropriated by the Acts of June 21, 1906 (34 Stat. 325-328), and April 30, 1908 (35 Stat. 70-76). The government's purchase was intended to establish the Rancheria as a reservation for the Tribe to be held in trust for the benefit of the Tribe and its members in perpetuity.

20.     As an outgrowth of the 1950s federal termination policy, during which the government terminated  the legal status of many Indian tribes and their reservations across the country, Congress enacted the 1958 "California Rancheria Act," Pub. L. 85-671 at 72 Stat. 619, amended in 1964 by 78 Stat. 390 (the "Termination Act"). The Termination Act disestablished many California Indian Rancherias, including the Buena Vista Rancheria, and terminated the legal status of the related Indian tribes and their members as Indians under federal law. The United States subdivided the Rancheria, distributed Buena Vista Rancheria lands (a single 67.5-acre parcel) to the Tribe's members and withdrew the trust status of the Rancheria parcels and dissolved the Rancheria boundaries. The Termination Act required the United States to improve or construct roads serving the terminated Rancheria lands, to upgrade the related irrigation, sanitation, and domestic water systems, and to provide certain educational and other benefits and services to the terminated Tribe and its members. The government failed to fulfill its commitments to the

terminated California tribes and litigation ensued (*Tillie Hardwick v. United States, et al.*, Case No.: 5:79-CV-01710) against the United States and various California counties to restore the affected tribes to their pre-termination status.

21.     The case was settled by stipulated judgment between the plaintiff Indians and restored tribes and Rancherias, on the one hand, and the federal and county defendants (including, with respect to the Tribe, and Amador County), on the other hand. Settlement generally took the form, first, of a stipulation to restore the terminated tribes and Indians legal status as a federally recognized Indian Tribe and, second, a stipulated judgment to restore the boundaries of the terminated reservations and declare all the land within those boundaries "Indian country".

22.     In the case of Buena Vista, a stipulated judgment entered in 1983 restored the individual Indian plaintiffs to their status as Indians under federal law, restored the recognized status of the Tribe, and required the United States to add the restored Tribe to the Bureau of Indian Affairs' Federal Register list of recognized Indian tribes.

23.     A second stipulated judgment, in 1987, provided that the Rancheria was "never and [is] not now lawfully terminated," restored the Rancheria's original boundaries, and further declared that all land within the restored Rancheria boundaries is "Indian country" (the legal term of art for lands subject to federal and tribal jurisdiction, as defined by 18 U.S.C. § 1151).

24.     The 1987 stipulated judgment further required the United States and Amador County to treat the Rancheria "as any other federally recognized Indian Reservation," and provided that "all of the laws of the United States that pertain to federally recognized Indian Tribes and Indians" shall apply to the Rancheria.

25.     Since restoration, the Tribe has sought to generate revenue to fund its tribal government and essential governmental services on the Reservation through a variety of means, including, but not limited to, tribal governmental gaming.

26.     Towards that end, on September 10, 1999, the Tribe entered a class III Tribal-State gaming compact with the State (1999 Compact) pursuant to IGRA. The compact was ratified by the California State Legislature by statute. Cal. Gov't Code § 12012.25(a)(7). On May 5, 2000,

the compact was affirmatively approved by Assistant Secretary – Indian Affairs Kevin Gover. 65 Fed. Reg. 31189 (May 16, 2000).

27.     On August 23, 2004, the Tribe and the State amended the 1999 Compact (2004 Amendment). The amendment was ratified by the California State Legislature by statute. Cal. Gov't Code § 12012.45(a)(1). The 2004 Amendment went into effect by operation of law pursuant to Section 2710(d)(8)(C). 69 Fed. Reg. 76004 (December 20, 2004).

28.     On June 28, 2016, the Tribe and the State entered into the current 2016 Compact. The 2016 Compact was ratified by the California State Legislature by statute. Cal. Gov't Code § 12012.76(a). The 2016 Compact was deemed approved by operation of law after the Secretary took no action upon receipt of the Compact. 81 Fed. Reg. 87585 (December 5, 2016). A true and correct copy of the 2016 Compact is hereby incorporated by this reference and is attached hereto as **Exhibit** A.

29.     In 2019, five California tribes filed suit against the State pursuant to 25 U.S.C. § 2710(d)(7)(A)(i), alleging that the State failed to negotiate tribal-state gaming compacts in good faith as a result of the State's insistence on including provisions in the tribes' compacts that did not fall within the seven Proper Subjects of Negotiation listed in 25 U.S.C. § 2710(d)(3)(C).

30.     The United States District Court for the Eastern District of California ruled in favor of the tribes, concluding that the State had failed to negotiate in good faith by insisting on the negotiation of topics that are not directly related to class III gaming activities. *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 530 F. Supp. 3d 970 (E.D. Cal. 2021).

31.     On July 28, 2022, the United States Court of Appeals for the Ninth Circuit affirmed the District Court's conclusion that the State had failed to negotiate in good faith. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022).

32.     In its opinion, the Ninth Circuit specifically identified at least four provisions that it concluded did not fall within IGRA's Proper Subjects of Negotiation and, therefore, could not be included in a valid IGRA compact, as they were not directly related to gaming. *Id.* at 1035 ("Thus, a tribal-state compact *may* include provisions relating to the seven identified topics

(though it is not necessarily required to), but it *may not* include provisions that do not relate to the topics listed.") (Emphasis in original).

33.     The provisions that the Ninth Circuit specifically concluded could not be included in a class III gaming compact addressed the application of state child and spousal support laws, state environmental laws, and state tort laws. In addition, the Ninth Circuit held that a state demand for the payment of a fee, beyond what was necessary to reimburse the state for the costs it incurs to regulate the gaming, was not per se bad faith if the state offers the tribe some meaningful consideration of value in exchange for the fee. *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th at 1048-49.

34.     The provisions struck down by the *Chicken Ranch* Court are, for all intents and purposes, identical to provisions in the Tribe's 2016 Compact. A true and correct copy of the State's compact offer that was at issue in the *Chicken Ranch* litigation is hereby incorporated by this reference and attached hereto as **Exhibit B**.

35.     The Ninth Circuit did not address a number of other provisions that the District Court found were not permissible topics of negotiation, concluding that it was not necessary to rule on those provisions in order to conclude that the State had failed to negotiate in good faith. *Id.* at 1040, fn. 4.

36.     In a letter dated January 31, 2023, to Nathan Voegeli, Governor Newsom's Senior Advisor for Tribal Negotiations, the Tribe requested that the State engage in negotiations to amend the 2016 Compact, pursuant to Section 15 of the Compact, to remove the provisions that violate IGRA and are inconsistent with the Ninth Circuit's decision in *Chicken Ranch*. A true and correct copy of the January 31, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit C**.

37.     On March 20, 2023, Voegeli responded by letter, stating: "None of the conditions under section 15.3 are met and the State respectfully declines to enter into negotiations to amend or replace the 2016 Compact." A true and correct copy of the March 20, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit D**.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

38.     In a letter dated March 30, 2023, to Voegeli, the Tribe notified the State that the Tribe was initiating the dispute resolution process under Section 13 ("Section 13") of the Compact, because a dispute had arisen between the Tribe and the State as to whether the *Chicken Ranch* decision had the effect of invalidating or rendering unenforceable certain provisions of the Compact. Section 13 imposes a duty upon the Governor and the State to negotiate with the Tribe in good faith to resolve the dispute: "In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by **good faith negotiations** whenever possible." Compact, Section 13.1. (Emphasis added). A true and correct copy of the March 30, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit E**.

39.     In a letter dated April 14, 2023, the State agreed to engage in dispute resolution pursuant to Section 13, stating that "[t]he State agrees to dispute resolution under section 13.0 of the 2016 Compact as the appropriate way to address any issues regarding provisions in the 2016 Compact that may be inconsistent with the *Chicken Ranch* decision." April 14, 2023, letter, p. 1. A true and correct copy of the April 14, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit F**.

40.     In the April 14, 2023, letter, Voegeli identified what the State regarded as the provisions of the 2016 Compact that were subject to dispute resolution: "The State's position is that the provisions decided by *Chicken Ranch* circumscribe the 2016 Compact terms subject to dispute. Those terms are limited to the Gaming Facility definition in section 2.12, section 11.0 environmental review requirements, section 12.5 tort protections, and recognition of child and spousal support orders under section 12.6, subdivision (e)." *Id.*, p. 2.

41.     The State further took the position that none of the other provisions that the Tribe had identified as requiring modification were affected by *Chicken Ranch* and were not proper subjects of the dispute resolution process: "The other provisions cited in your January 31, 2023 letter—the definitions of Gaming Employee and Gaming Operation, State regulatory costs, revenue sharing, exclusivity, and workplace health and safety protections—were not addressed by the *Chicken Ranch* holding." *Id.*, p. 2.

42.     On May 16, 2023, representatives of the Tribe and the State, pursuant to Section 13, met to confer about potential resolution of the dispute. At the meeting, the Tribe's representatives provided the State's representatives with a list of the provisions of the Compact that the Tribe believes are inconsistent with the *Chicken Ranch* decision and/or IGRA.

43.     In a letter dated May 26, 2023, Voegeli  stated, with respect to the May 16, 2023, meeting: "After the State and Tribe went through that list [of provisions that the Tribe maintains are implicated by the *Chicken Ranch* decision], I agreed to confirm by letter the provisions the State considers to be implicated by the *Chicken Ranch* decision. The State agreed only to identify implicated provisions. It did not agree that any particular provision was invalidated or to any specific approach for resolving an issue." May 26, 2023, letter, p. 1. A true and correct copy of the May 26, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit G**.

44.     In a letter dated June 2, 2023, the Tribe stated that it disagreed with the State's assertion that only nine provisions of the Compact were subject to the dispute resolution process as a result of the *Chicken Ranch* decision.  The letter further stated that it was the Tribe's position that, as a result of the *Chicken Ranch* decision: "the State has an obligation to meet and confer with the Tribe over: (1) all of the fee provisions contained in the Compact, with the exception of the payment into the Revenue Sharing Trust Fund, because the Tribe never received any meaningful concession from the State in exchange for the payment of the fees; and (2) any subject in the 2016 Compact that is not directly connected to the playing of the games on the Tribe's Casino floor." June 2, 2023, letter, p. 1-2. A true and correct copy of the June 2, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit H**.

45.     On June 15, representatives of the Tribe and the State met again, pursuant to Section 13, to address the dispute. At that meeting, the State's representatives stated that the State would not engage in negotiations to address the disputed provisions until the scope of negotiations — i.e., the provisions that are subject to the dispute resolution process — was agreed to.

46.     At the June 15 meeting, the Tribe argued that the parties should negotiate over those provisions that the parties agree are in dispute because of *Chicken Ranch* and address the issue of whether the other provisions are subject to the dispute resolution process later. The Tribe's

representatives further argued that the State cannot refuse to negotiate over all substantive issues in dispute until the parties agree on the entire "scope of negotiations" — *i.e.*, the provisions that are subject to the dispute resolution process under Section 13 of the Compact.

47.     In a letter dated July 12, 2023, the Tribe sought to "clarify the legal position of the State of California regarding the requirements of the dispute resolution process for issues arising under" the Tribe's Compact. July 12, 2023, letter, p. 1. A true and correct copy of the July 12, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit I**.

48.     The July 12, 2023 letter identified four major issues: (1) whether Section 13 requires agreement on the scope of disputed provisions before negotiations can go forward; (2) whether the State's refusal to negotiate until the scope of all disputed provisions is agreed upon violates the good faith standard of conduct required by Section 13; (3) whether the State's refusing to negotiate when an affirmative duty to negotiate exists under Section 13 constitutes a violation of the Compact that is subject to the provisions of Section 14; and (4) whether amendment pursuant to the requirements of Section 15 is the applicable mechanism for resolving disputes arising under Section 13. *Id.*, pp. 2-4.

49.     The letter further stated: "the Tribe remains open to good faith negotiations to resolve the current dispute. It is the Tribe's sincere hope that, on July 13, 2023, the State's representatives will be willing and able to engage in substantive, good faith negotiations concerning the impact of *Chicken Ranch* on the validity of the provisions of the Compact. Those negotiations should begin with the provisions that both the State and the Tribe agree are implicated by *Chicken Ranch*. Once those provisions are addressed, the parties can address the other provisions that the Tribe believe are implicated by *Chicken Ranch*." *Id.*, p. 4.

50.     The parties met again, pursuant to Section 13 of the Compact, on July 13, 2023. At the beginning of the meeting, the State's representative stated that the State would not negotiate any of the issues in dispute unless the Tribe agreed to limit negotiations to the topics that the State asserts are within the scope of provisions at issue.

51.     In a letter dated July 28, 2023, the State stated its version of the course of events relating to the dispute.  A true and correct copy of the July 28, 2023, letter is hereby incorporated

by this reference and attached hereto as **Exhibit J**. The July 28 letter stated that: "the parties appear to agree that the following Compact sections are reasonably implicated by the Chicken Ranch decision: 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e)." July 12, 2023, letter, p. 2. The letter further stated: "The State believes substantive negotiations to amend the Compact pursuant to section 15.1 on the topics both parties agree are reasonably implicated would alleviate concerns regarding *Chicken Ranch*." *Id.* The letter then stated: "During our third meet and confer meeting on July 12, 2023, the Tribe said it was not willing to limit substantive negotiations to the set of provisions the parties agree are reasonably implicated by the *Chicken Ranch* decision. The State asks that the Tribe reconsider and agree to negotiate Compact amendments pursuant to section 15.1 for those Compact provisions that the parties jointly identified as reasonably implicated by *Chicken Ranch*." *Id.*, pp. 2-3.

52.     In a letter dated August 3, 2023, the Tribe responded to the State's July 28, 2023, letter, disputing the State's narrative of the course of negotiations.  The letter stated that,  given that the State had initially refused to engage in negotiations pursuant to Section 15, the State's offer to negotiate under Section 15 was designed to delay the resolution of the dispute. August 3, 2023, letter, p. 4. The letter further stated that the State was obligated by the 2016 Compact to engage in the dispute resolution process required by Section 13. *Id.*, p. 2.The letter then stated that the State's actions in the course of negotiations reflected bad faith on the part of the State. *Id.*, p. 4. A true and correct copy of the August 3, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit K**.

53.     The August 3, 2023, letter concluded by stating that the Tribe was willing to continue to negotiate pursuant to Section 13 on the condition that the State reimburse the Tribe for the attorneys' fees it incurred because of participating in the three meet and confer meetings with the Tribe. *Id.*, p. 4-5.

54.     In the letter, the Tribe demanded that the State respond to the Tribe's request by no later than August 11, 2023. On August 11, 2023, the State sent a letter to the Tribe responding to the Tribe's August 3, 2023, letter. In its letter, the State rejected the Tribe's demand that the State pay its attorney's fees as a condition of continuing negotiations and requested that the Tribe resume

negotiations under paragraph 15 of the Compact. A true and correct copy of the August 11, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit L**.

55.     By letter dated August 14, 2023, the Tribe responded to the State's August 11, 2023, letter. In the letter, the Tribe set forth the reasons why if would not resume negotiations with the State under paragraph 15 of the Compact but advised the State that it was willing to resume negotiations with the State under paragraph 13 of the Compact without requiring the State to pay the Tribe's attorney's fees. In the letter the Tribe gave the State until August 16, 2023, to accept the Tribe's offer. In the letter, the Tribe stated that if the offer was not accepted by the State by August 16, 2023, the offer would be revoked. A true and correct copy of the August 14, 2023, letter is hereby incorporated by this reference and attached hereto as **Exhibit M**.

56.     On August 16, 2023, the State sent the Tribe an email stating that it could not respond to the Tribe's offer as set forth in its August 14, 2023, letter by August 16, 2023, but did state in the email that it could respond by Friday, August 18, 2023. A true and correct copy of the August 16, 2023, State email is hereby incorporated by this reference and attached hereto as **Exhibit N**.

57.     By email dated August 16, 2023, the Tribe responded to the State's August 16, 2023, email and advised the State that the time for responding to the Tribe's offer had expired, that the Tribe was going to file a federal court complaint suing the State for violations of the 2016 Compact, but that if the Tribe got a new offer from the State prior to the filing of the federal court complaint, that the Tribe would consider what the State stated in the new offer prior to filing suit. A true and correct copy of the August 16, 2023, Tribal email is hereby incorporated by this reference and attached hereto as **Exhibit O**. As of 4:00 p.m., Pacific Standard Time, the Tribe had not received any new offer from the State.

## **FIRST CAUSE OF ACTION**

### **(Violation of the Indian Gaming Regulatory Act)**

58.     The Tribe realleges each of the allegations set forth in Paragraphs 1 through 57 above and by this reference incorporates each allegation as if set forth herein in full.

59.     In the *Chicken Ranch* decision, the Ninth Circuit concluded that provisions in the State's proposed compact to the plaintiff tribes, namely, provisions requiring mitigation of alleged off-reservation environmental impacts, including the requirement that the plaintiff tribes enter into intergovernmental agreements with local governmental entities relating to payment to local governmental entities for mitigation of alleged off-reservation impacts, provisions relating to tort claims by visitors to the plaintiff tribes' gaming facilities and other tribal commercial enterprises, provisions requiring that the plaintiff tribes honor state court child and spousal support payment orders issued to tribal gaming employees, and demands for fees beyond the amounts necessary to reimburse the State for the actual costs it incurs to perform its regulatory functions under a compact without offering the tribes some meaningful consideration of value to the tribes in exchange for the fee, cannot be included in class III gaming compacts because they do not fall within the topics of compact negotiation set forth in IGRA.

60.     The Tribe's 2016 Compact includes provisions that are functionally identical to the provisions that the Ninth Circuit explicitly concluded may not be included in a class III gaming compact.

61.     The Tribe contends that the effect of the *Chicken Ranch* decision is to render Section 11 (environmental mitigation), Section 12.5 (tort), Section 12.6 (child and spousal support), and Section 4 (payment of fees to the State beyond what is necessary to reimburse the State its' regulatory costs) of the Tribe's 2016 Compact invalid and unenforceable.

62.     25 U.S.C. § 2710(d)(8)(C) provides that, where a class III gaming compact is neither approved nor disapproved by the Secretary within 45 days, "the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."

63.     The *Chicken Ranch* court ruled that the above listed provisions in the compact offered by the State to the plaintiff tribes may not be included in a compact because they are not consistent with the provisions of IGRA. The parallel provisions of the Tribe's 2016 Compact, therefore, are also not consistent with the provisions of IGRA.

64.     Because the Tribe's 2016 Compact went into effect by operation of law only to the extent the Compact is consistent with the IGRA, those provisions were never approved by the Secretary and never went into effect. As a result, are they are void *ab initio* and the Tribe has no obligation to comply with them.

65.     The Tribe initiated, pursued, and exhausted the dispute resolution process mandated by Section 13 of the 2016 Compact for disputes arising under the Compact. The State refused to engage in substantive negotiations to resolve the dispute. Pursuant to Section 13 of the 2016 Compact, the Tribe is authorized to seek court resolution of the dispute and the State has waived its sovereign immunity with regard to court resolution of disputes arising under the Compact pursuant to Section 13.4.

66.     An actual case or controversy exists between the Tribe and the State, in that the Tribe asserts that certain provisions of the Tribe's 2016 Compact are invalid and unenforceable as a result of the *Chicken Ranch* decision and are void *ab initio* because only those provisions of the Tribe's compact that are consistent with the provisions of IGRA were approved by the Secretary, while the State asserts that those provisions remain valid and enforceable.

67.     The Tribe has no adequate remedy at law and desires a judicial determination of the respective rights, duties and interests of the parties under the 2016 Compact pursuant to the Declaratory Relief Act, 28 U.S.C. § 2201. A prompt adjudication of this controversy is necessary and proper at this time so that the parties may ascertain their respective rights, duties, and interests under the Compact and applicable federal law.

WHEREFORE, the Tribe prays as hereinafter set forth below.

## SECOND CAUSE OF ACTION

### (Violation of the Indian Gaming Regulatory Act)

68.     The Tribe realleges each of the allegations set forth in Paragraphs 1 through 67 above and by this reference incorporates each allegation as if set forth herein in full.

69.     In the March 31, 2021 decision of the District Court in *Chicken Ranch*, the District Court ruled that provisions in the compact offered by the State to the plaintiff tribes included provisions regarding labor (the Tribal Labor Relations Ordinance ("TLRO")), application of the

State's minimum wage laws to the tribes, and State anti-workplace discrimination and harassment laws that "are not at the heart of the gaming activity and only somewhat connected (they are not directly related to the class III gaming itself but related to the overall operation of the facilities in which the gaming take place)…." *Chicken Ranch Rancheria of Me-Wuk Indians v. Newsom*, 530 F. Supp. 3d at 978.

70.     The Ninth Circuit affirmed the District Court's decision, without addressing or modifying the District Court's ruling that compact provisions concerning application of the State's minimum wage laws to the tribes, State anti-workplace discrimination and harassment laws, and the TLRO are not directly related to class III gaming activities.

71.     The Ninth Circuit further concluded that: "a meaningful concessions requirement … only applies to demands for taxes, fees, or other revenue-sharing provisions," *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th at 1048, and cannot, therefore, be exchanged for compact provisions that are not directly connected to class III gaming activities.

72.     The Tribe's 2016 Compact includes provisions that are functionally identical to the provisions that the District Court concluded were not directly connected to class III gaming activities.

73.     The Tribe contends that the effect of the District Court decision in *Chicken Ranch* is to render Section 12.10 (obligating the Tribe to adopt the TLRO), Section 12.3(k) (application of the State's minimum wage laws), Section 12.3(f) (application of State laws forbidding harassment and discrimination in the workplace), and the TLRO (appendix C) of the Tribe's 2016 Compact invalid and unenforceable.

74.     25 U.S.C. § 2710(d)(8)(C) provides that, where a class III gaming compact is neither approved nor disapproved by the Secretary within 45 days, "the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."

75.     The District Court in *Chicken Ranch* ruled that the above listed provisions in the compact offered by the State to the plaintiff tribes are not directly related to class III gaming activities. As a result, and coupled with the Ninth Circuit's decision, the above-listed provisions

are not consistent with the provisions of IGRA. The parallel provisions of the Tribe's 2016 Compact, therefore, are also not consistent with the provisions of IGRA.

76.     Because the Tribe's 2016 Compact went into effect by operation of law only to the extent the Compact is consistent with IGRA, those provisions were never approved by the Secretary and never went into effect. As a result, are they are void *ab initio* and the Tribe has no obligation to comply with them.

77.     The Tribe initiated and pursued the dispute resolution process mandated by Section 13 for disputes arising under the Compact. The State refused to engage in substantive negotiations to resolve the dispute. Pursuant to Section 13, the Tribe is authorized to seek court resolution of the dispute and the State has waived its sovereign immunity with regard to court resolution of disputes arising under the Compact pursuant to Section 13.4 .

78.     An actual case or controversy exists between the Tribe and the State, in that the Tribe asserts that certain provisions of the Tribe's 2016 Compact are invalid and unenforceable as a result of the *Chicken Ranch* decision and are void *ab initio* because only those provisions of the Tribe's Compact that are consistent with the provisions of IGRA were approved by the Secretary, while the State asserts that those provisions remain valid and enforceable.

79.     The Tribe has no adequate remedy at law and desires a judicial determination of the respective rights, duties, and interests of the parties under the 2016 Compact pursuant to the Declaratory Relief Act, 28 U.S.C. § 2201. A prompt adjudication of this controversy is necessary and proper at this time so that the parties may ascertain their respective rights, duties, and interests under the Compact and applicable federal law.

WHEREFORE, the Tribe prays as hereinafter set forth below.

### **THIRD CAUSE OF ACTION**

#### **(Violation of the Indian Gaming Regulatory Act)**

80.     The Tribe realleges each of the allegations set forth in Paragraphs 1 through 79 above and by this reference incorporates each allegation as if set forth herein in full.

81.     25 U.S.C. § 2710(d)(3)(C) provides that a tribal-state gaming compact "may include provisions relating to … (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity."

82.     25 U.S.C. § 2710(d)(4) provides that, "[e]xcept for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in [the IGRA] shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity."

83.     Section 4.3 of the Tribe's 2016 Compact requires the Tribe to "pay to the State on a pro rata basis the State's 25 U.S.C. § 2710(d)(3)(C) costs incurred for purposes consistent with IGRA, including the performance of all its duties under this Compact, the administration and implementation of tribal-state gaming compacts, and funding for the Office of Problem Gambling, as determined by the monies appropriated in the annual Budget Act each fiscal year to carry out those purposes."

84.     The "pro rata share" paid by the Tribe to the State under Section 4.3 is not based on what the State spends in regulating the Tribe's class III gaming activities, as provided in the IGRA, but, rather, on what the California Legislature arbitrarily appropriates to the State Gaming Agency.

85.     The Tribe contends that the amounts paid by the Tribe to the State under Section 4.3 are more than is necessary to defray the State's costs of regulating the Tribe's class III gaming activities under the 2016 Compact. Section 4.3, therefore, constitutes an impermissible tax, fee, charge, or other assessment in violation of 25 U.S.C. § 2710(d)(4) and is not consistent with the IGRA.

86.     25 U.S.C. § 2710(d)(8)(C) provides that, where a class III gaming compact is neither approved nor disapproved by the Secretary within 45 days, "the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

87.     Because the Tribe's 2016 Compact went into effect by operation of law only to the extent the Compact is consistent with IGRA, Section 4.3 was never approved by the Secretary and never went into effect. As a result, Section 4.3 is void *ab initio* and the Tribe has no obligation to comply with it.

88.     The Tribe initiated, pursued, and exhausted the dispute resolution process mandated by Section 13 of the Compact for disputes arising under the Compact. The State refused to engage in substantive negotiations to resolve the dispute regarding the Tribe's claim that Section 4.3 requires the Tribe to pay the State more than is necessary for the State to defray the actual costs the State incurs to regulate the Tribe's class III gaming activities, in violation of IGRA.

89.     Pursuant to Section 13 of the Compact, the Tribe is authorized to seek court resolution of the dispute and the State has waived its sovereign immunity regarding court resolution of disputes arising under the Compact pursuant to Section 13.4.

90.     An actual case or controversy exists between the Tribe and the State, in that the Tribe asserts that Section 4.3 of the 2016 Compact violates IGRA and is void *ab initio* because only those provisions of the Tribe's Compact that are consistent with the provisions of IGRA were approved, while the State asserts that Section 4.3 remains valid and enforceable.

91.     The Tribe has no adequate remedy at law and desires a judicial determination of the respective rights, duties, and interests of the parties under the 2016 Compact pursuant to the Declaratory Relief Act, 28 U.S.C. § 2201, and an accounting of the State's actual costs in regulating the Tribes gaming conducted pursuant to its 2016 Compact from the execution of the 2016 Compact until the present. A prompt adjudication of this controversy is necessary and proper at this time so that the parties may ascertain their respective rights, duties, and interests under the Compact and applicable federal law.

## FOURTH CAUSE OF ACTION

### (Breach of Compact)

92.     The Tribe realleges each of the allegations set forth in Paragraphs 1 through 91 above and by this reference incorporates each allegation as if set forth herein in full.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

93.     On June 28, 2016, the Tribe and the State entered the Compact. The Compact was ratified by the California State Legislature by statute. Cal. Gov't Code § 12012.76(a).

94.     Section 13 of the Compact provides: "In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by **good faith negotiations** whenever possible." Section 13.1. (Emphasis added).

95.     From May 16, 2023 to July 13, 2023, the Tribe and the State met, pursuant to Section 13, to resolve a dispute over which provisions of the Compact, if any, where rendered void by *Chicken Ranch*.

96.     Throughout the meet and confer process the State's representatives refused to negotiate with the Tribe over which provisions of the Compact were rendered void or otherwise affected by *Chicken Ranch* unless or until the parties agreed on the "scope of the negotiations, that is, what provisions of the Compact were subject to dispute resolution.

97.     The State refused to engage in substantive negotiations despite the fact that the State agreed that certain provisions were "out" of the Compact or void as a result of the *Chicken Ranch* decision and that Section 13 did not require the parties to reach agreement on the scope of disputed provisions before negotiations could go forward.

98.     The State was obligated under Section 13 of the Compact to engage in the dispute resolution process. *Id.*, p. 2. The State's actions in refusing to negotiate with the Tribe over which provisions, if any, were rendered invalid by *Chicken Ranch*, unless or until the parties reached agreement on the scope of the negotiations, constituted a breach of the "good faith" standard of conduct imposed upon the parties by Section 13.

99.     An actual case or controversy exists between the Tribe and the State, in that the Tribe asserts that the conduct the State engaged in during the meet and confer process violated the "good faith" standard of conduct imposed upon the State under Section 13, while the State asserts that its conduct met the Section 13 "good faith" standard.

100.    The Tribe has no adequate remedy at law and desires a judicial determination of whether the State's conduct during the parties meet and confer constituted "good faith" under

Section 13 of the Compact, pursuant to the Declaratory Relief Act, 28 U.S.C. § 2201. A prompt adjudication of this controversy is necessary and proper at this time so that the parties may ascertain their respective rights, duties, and interests under the Compact and specifically Section 13.

WHEREFORE, the Tribe prays as hereinafter set forth below.

## PRAYER FOR RELIEF

Pursuant to the claims alleged herein, the Tribe prays as follows:

1.      That the Court declare that Compact Sections 4.3, 11, 12.5, 12.6, 12.3(f), 12.3(k), and 12.10 are invalid, unenforceable, and void *ab initio*;

2.      That the Court declare that Compact Sections 4.3, 11, 12.5, 12.6, 12.3(f), 12.3(k), and 12.10 are not approved by the Secretary of the Interior, are not in effect, and that the Tribe, therefore, is not required to comply with them;

3.      That the Court preliminarily and permanently enjoin the State from enforcing Compact Sections 4.3, 11, 12.5, 12.6, 12.3(f), 12.3(k), and 12.10 against the Tribe;

4.      That the Court order the State to provide the Tribe with an accounting of the actual costs incurred by the State in regulating the Tribe's gaming under the 2016 Compact from the effective date the 2016 Compact until the date of the Court's order;

5.      That the Court declares that the State's during the meet and confer process with the Tribe, violated the "good faith" standard of Section 13 of the Compact.

6.      That the Tribe be awarded its costs and reasonable attorney fees; and

7.      That the Court grants such other relief as may be deemed appropriate.

Respectfully Submitted,

DATED: August 22, 2023            LAW OFFICES OF RAPPORT AND MARSTON

By:    /s/ *Lester J. Marston*
_____
LESTER J. MARSTON, Attorney for
Buena Vista Rancheria of Me-Wuk Indians

# EXHIBIT A

# TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# BUENA VISTA RANCHERIA OF

# ME-WUK INDIANS OF CALIFORNIA

# TABLE OF CONTENTS

PREAMBLE                                                                                            1

Sec. 1.0.     Purpose and Objectives.                                                               2

Sec. 2.0.     Definitions.                                                                          3

Sec. 3.0.     Scope of Class III Gaming Authorized.                                                 8

Sec. 3.1.     Authorized Class III Gaming.                                                          8

Sec. 4.0.     Authorized Location of Gaming Facility, Number of Gaming
              Devices, Cost Reimbursement, and Mitigation.                                          9

Sec. 4.1.     Authorized Number of Gaming Devices.                                                  9

Sec. 4.2.     Authorized Gaming Facility.                                                           9

Sec. 4.3.     Special Distribution Fund.                                                            9

Sec. 4.3.1.   Use of Special Distribution Funds.                                                    11

Sec. 4.4.     Quarterly Payments and Quarterly Contribution Report.                                 12

Sec. 4.5.     Exclusivity.                                                                          15

Sec. 5.0.     Revenue Sharing With Non-Gaming and Limited-Gaming
              Tribes.                                                                               16

Sec. 5.1.     Definitions.                                                                          16

Sec. 5.2.     Payments to the Revenue Sharing Trust Fund or the Tribal
              Nation Grant Fund.                                                                    18

Sec. 5.3.     Provision for Credits Related to Payments Due Under
              Section 5.2.                                                                          20

i

Sec. 6.0.      Licensing.                                                          22

Sec. 6.1.    Gaming Ordinance and Regulations.                                     22

Sec. 6.2.    Tribal Ownership, Management, and Control of Gaming
             Operation.                                                            23

Sec. 6.3.    Prohibitions Regarding Minors.                                        23

Sec. 6.4.    Licensing Requirements and Procedures.                               24

Sec. 6.4.1.  Summary of Licensing Principles.                                      24

Sec. 6.4.2.  Gaming Facility.                                                      24

Sec. 6.4.3.  Gaming Employees.                                                     28

Sec. 6.4.4.  Gaming Resource Suppliers.                                            30

Sec. 6.4.5.  Financial Sources.                                                    32

Sec. 6.4.6.  Processing Tribal Gaming License Applications.                        36

Sec. 6.4.7.  Suitability Standard Regarding Gaming Licenses.                       37

Sec. 6.4.8.  Background Investigations of Applicants.                              38

Sec. 6.4.9.  Temporary Licensing of Gaming Employees.                             40

Sec. 6.5.0.  Tribal Gaming License Issuance.                                       41

Sec. 6.5.1.  Denial, Suspension, or Revocation of Licenses.                        41

Sec. 6.5.2.  Renewal of Licenses; Extensions; Further Investigation.               42

Sec. 6.5.3.  Identification Cards.                                                 43

Sec. 6.5.4.  Fees for Tribal Gaming License.                                       43

Sec. 6.5.5.  Summary Suspension of Tribal Gaming License.                          43

Sec. 6.5.6.     State Determination of Suitability Process.                    44

Sec. 6.6.       Submission of New Application.                                 47

Sec. 7.0.       Approval and Testing of Gaming Devices.                        47

Sec. 7.1.       Gaming Device Approval.                                        47

Sec. 7.2.       Gaming Test Laboratory Selection.                             49

Sec. 7.3.       Maintenance of Records of Testing Compliance.                 49

Sec. 7.4.       State Gaming Agency Inspections.                              49

Sec. 7.5.       Technical Standards.                                          50

Sec. 7.6.       Transportation of Gaming Devices.                             51

Sec. 8.0.       Inspections.                                                  51

Sec. 8.1.       Investigation and Sanctions.                                  51

Sec. 8.2.       Assistance by State Gaming Agency.                            52

Sec. 8.3.       Access to Premises by State Gaming Agency; Notification;
                Inspections.                                                  52

Sec. 8.4.       Inspection, Copying and Confidentiality of Documents.        53

Sec. 8.5.       NIGC Audit Reports.                                           56

Sec. 8.6.       Cooperation with Tribal Gaming Agency.                        56

Sec. 8.7.       Compact Compliance Review.                                    56

Sec 8.8         Waiver of Materials                                           57

Sec. 9.0.      Rules and Regulations for the Operation and Management
               of the Gaming Operation and Facility.                    57

Sec. 9.1.      Adoption of Regulations for Operation and Management;
               Minimum Standards.                                       57

Sec. 9.1.1.    Minimum Internal Control Standards (MICS).               60

Sec. 9.2.      Program to Mitigate Problem Gambling.                    62

Sec. 9.3.      Enforcement of Regulations.                             64

Sec. 9.4.      State Civil and Criminal Jurisdiction.                  64

Sec. 9.5.      Tribal Gaming Agency Members.                           64

Sec. 9.6.      Uniform Tribal Gaming Regulations.                      67

Sec. 10.0.     Patron Disputes.                                        69

Sec. 11.0.     Off-Reservation Environmental and Economic Impacts.     71

Sec. 11.1.     Tribal Environmental Impact Report.                     71

Sec. 11.2.     Notice of Preparation of Draft TEIR.                    73

Sec. 11.3.     Notice of Completion of Draft TEIR.                     74

Sec. 11.4.     Issuance of Final TEIR.                                 75

Sec. 11.5.     Cost Reimbursement to County.                          75

Sec. 11.6.     Failure to Prepare Adequate TEIR.                      75

Sec. 11.7.     Intergovernmental Agreement.                           76

Sec. 11.8.     Arbitration.                                           78

Sec. 12.0.    Public and Workplace Health, Safety, and Liability.          79

Sec. 12.1.    General Requirements.                                        79

Sec. 12.2.    Tobacco Smoke.                                               79

Sec. 12.3.    Health and Safety Standards.                                 80

Sec. 12.4.    Tribal Gaming Facility Standards Ordinance.                  88

Sec. 12.5.    Insurance Coverage and Claims.                              88

Sec. 12.6.    Participation in State Statutory Programs Related to
              Employment.                                                  92

Sec. 12.7.    Emergency Services Accessibility.                            94

Sec. 12.8.    Alcoholic Beverage Service.                                  94

Sec. 12.9.    Possession of Firearms.                                      94

Sec. 12.10.   Labor Relations.                                             94

Sec. 13.0.    Dispute Resolution Provisions.                              95

Sec. 13.1.    Voluntary Resolution; Court Resolution.                      95

Sec. 13.2.    Arbitration Rules for the Tribe and the State                96

Sec. 13.3.    No Waiver or Preclusion of Other Means of Dispute
              Resolution.                                                  97

Sec. 13.4.    Limited Waiver of Sovereign Immunity.                        97

Sec. 14.0.    Effective Date and Term of Compact.                         98

Sec. 14.1.    Effective Date.                                              98

Sec. 14.2.    Term of Compact; Termination.                                98

Sec. 15.0.    Amendments; Renegotiations.                    98

Sec. 15.1.    Amendment by Agreement.                        98

Sec. 15.2.    Negotiations for a New Compact.                98

Sec. 15.3     Requests to Amend or to Negotiate a New Compact.    100

Sec. 16.0.    Notices.                                       100

Sec. 17.0.    Changes to IGRA.                               100

Sec. 18.0.    Miscellaneous.                                 101

Sec. 18.1.    Third Party Beneficiaries.                     101

Sec. 18.2.    Complete Agreement.                            101

Sec. 18.3.    Construction.                                  101

Sec. 18.4.    Successor Provisions.                          101

Sec. 18.5.    Ordinances and Regulations.                    101

Sec. 18.6.    Calculation of Time.                           102

Sec. 18.7.    Representations.                               102

APPENDICES

    A.    Description and Map of Buena Vista Rancheria of Me-Wuk Indians
          Reservation                                        A-1

    B.    Off-Reservation Environmental Impact Analysis Checklist    B-1

    C.    Tribal Labor Relations Ordinance                   C-1

# TRIBAL-STATE COMPACT
# BETWEEN THE STATE OF CALIFORNIA AND THE
# BUENA VISTA RANCHERIA OF ME-WUK INDIANS OF CALIFORNIA

The Buena Vista Rancheria of Me-Wuk Indians of California (Tribe), a federally recognized Indian tribe, and the State of California (State) enter into this tribal-state class III gaming compact pursuant to the Indian Gaming Regulatory Act of 1988 (IGRA).

## PREAMBLE

WHEREAS, in 2004, the Tribe and the State entered into the "Amendment to Tribal-State Compact Between the State of California and the Buena Vista Rancheria of Me-Wuk Indians of California," which enabled the Tribe, through revenues generated by its Gaming Operation, to improve the governance, environment, education, health, safety, and general welfare of its citizens, and to promote a strong tribal government, self-sufficiency, and to provide essential government services to its citizens; and

WHEREAS, the Tribe is committed to improving the environment, education status, and the health, safety and general welfare of its members and local residents; and

WHEREAS, the State and the Tribe recognize that the exclusive rights that the Tribe will enjoy under this Tribal-State Compact Between the State of California and the Buena Vista Rancheria of the Me-Wuk Indians of California (Compact) create a unique opportunity for the Tribe to operate a Gaming Facility in an economic environment free of competition from the operation of slot machines and banked card games on non-Indian lands in California and that this unique economic environment is of great value to the Tribe; and

WHEREAS, in consideration of the exclusive rights enjoyed by the Tribe to engage in the Gaming Activities and to operate the number of Gaming Devices specified herein, and the other meaningful concessions offered by the State in good faith negotiations, and pursuant to IGRA, the Tribe reaffirms its commitment, inter alia, to provide to the State, on a sovereign-to-sovereign basis, and to local jurisdictions, fair cost reimbursement and mitigation from revenues from the Gaming Devices operated pursuant to this Compact on a payment schedule; and

WHEREAS, the Tribe and the State have a shared interest in ensuring that the Revenue Sharing Trust Fund is fully solvent and that the Tribal Nation Grant Fund is developed through a process that includes consultation with tribal governments and implemented in a manner to ensure that tribal gaming revenues have a positive impact on tribes throughout California; and

WHEREAS, the Tribe and the State share an interest in mitigating the off-reservation impacts of the Gaming Facility, affording meaningful consumer and employee protections in connection with the operations of the Gaming Facility, fairly regulating the Gaming Activities conducted at the Gaming Facility, and fostering a good-neighbor relationship; and

WHEREAS, the Tribe and the State share a joint sovereign interest in ensuring that Gaming Activities are free from criminal and other undesirable elements; and

WHEREAS, this Compact will afford the Tribe primary responsibility over the regulation of its Gaming Facility and will enhance the Tribe's economic development and self-sufficiency; and

WHEREAS, the State and the Tribe have therefore concluded that this Compact protects the interests of the Tribe and its members, the surrounding community, and the California public, and will promote and secure long-term stability, mutual respect, and mutual benefits; and

WHEREAS, the State and the Tribe agree that all terms of this Compact are intended to be binding and enforceable.

NOW, THEREFORE, the Tribe and the State agree as set forth herein:

## SECTION 1.0.  PURPOSES AND OBJECTIVES.

The terms of this Compact are designed and intended to:

(a)     Evidence the goodwill and cooperation of the Tribe and the State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b)     Enhance and implement a means of regulating Class III Gaming to ensure its fair and honest operation in a way that protects the interests of the Tribe, the State, its citizens, and local communities in

2

accordance with IGRA, and through that regulated Class III Gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and its governmental services and programs.

(c)     Promote ethical practices in conjunction with Class III Gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Gaming Operation, protect against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming, and protect the patrons and employees of the Gaming Operation and the local communities.

(d)     Achieve the objectives set forth in the preamble.

## SECTION 2.0.  DEFINITIONS.

**Sec. 2.1.**  "Applicable Codes" means the California Building Code and the California Public Safety Code applicable to the County, as set forth in titles 19 and 24 of the California Code of Regulations, as those regulations may be amended during the term of this Compact, including, but not limited to, codes for building, electrical, energy, mechanical, plumbing, fire and safety.

**Sec. 2.2.**  "Applicant" means an individual or entity that applies for a tribal gaming license or for a State Gaming Agency determination of suitability.

**Sec. 2.3.**  "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two (2) representatives from each tribal gaming agency of those tribes with whom the State has a gaming compact under IGRA, and up to two (2) delegates each from the state Department of Justice, Bureau of Gambling Control and the California Gambling Control Commission.

**Sec. 2.4.**  "Class III Gaming" means the forms of class III gaming defined in 25 U.S.C. § 2703(8) and by the regulations of the National Indian Gaming Commission.

**Sec. 2.5.**  "Commission" means the California Gambling Control Commission, or any successor agency of the State.

3

**Sec. 2.6.** "Compact" means this Tribal-State Compact Between the State of California and the Buena Vista Rancheria of the Me-Wuk Indians.

**Sec. 2.7.** "County" means the County of Amador, California, a political subdivision of the State.

**Sec. 2.8.** "Financial Source" means any person or entity who, directly or indirectly, extends financing in connection with the Tribe's Gaming Facility or Gaming Operation.

**Sec. 2.9.** "Gaming Activity" or "Gaming Activities" means the Class III Gaming activities authorized under this Compact.

**Sec. 2.10.** "Gaming Device" means any slot machine within the meaning of article IV, section 19, subdivision (f) of the California Constitution. For purposes of calculating the number of Gaming Devices, each player station or terminal on which a game is played constitutes a separate Gaming Device, irrespective of whether it is part of an interconnected system to such terminals or stations. "Gaming Device" includes, but is not limited to, video poker, but does not include electronic, computer, or other technological aids that qualify as class II gaming (as defined under IGRA).

**Sec. 2.11.** "Gaming Employee" means any natural person who (a) conducts, operates, maintains, repairs, accounts for, or assists in any Gaming Activities, or is in any way responsible for supervising such Gaming Activities or persons who conduct, operate, maintain, repair, account for, assist, or supervise any such Gaming Activities, (b) is in a category under federal or tribal gaming law requiring licensing, (c) is an employee of the Tribal Gaming Agency with access to confidential information, or (d) is a person whose employment duties require or authorize access to areas of the Gaming Facility in which Gaming Activities are conducted that are not open to the public.

**Sec. 2.12.** "Gaming Facility" or "Facility" means any building in which Gaming Activities or any Gaming Operations occur, or in which business records, receipts, or funds of the Gaming Operation are maintained (excluding offsite facilities primarily dedicated to storage of those records, and financial institutions), and all rooms, buildings, and areas, including hotels, parking lots, and walkways, a principal purpose of which is to serve the activities of the Gaming Operation rather than providing that operation with an incidental benefit, provided that nothing herein prevents the conduct of class II gaming (as defined under IGRA) therein.

Nothing herein shall be construed to apply in a manner that does not directly relate to the operation of Gaming Activities.

**Sec. 2.13.** "Gaming Operation" means the business enterprise that offers and operates Gaming Activities, whether exclusively or otherwise.

**Sec. 2.14.** "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Gaming Activities on the Tribe's Indian lands in California and approved under IGRA.

**Sec. 2.15.** "Gaming Resources" means any goods or services provided or used in connection with Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, Gaming Devices and ancillary equipment, implements of Gaming Activities such as playing cards, furniture designed primarily for Gaming Activities, maintenance or security equipment and services, and Class III Gaming consulting services. "Gaming Resources" does not include professional accounting and legal services.

**Sec. 2.16.** "Gaming Resource Supplier" means any person or entity who, directly or indirectly, does, or is deemed likely to, manufacture, distribute, supply, vend, lease, purvey, or otherwise provide, to the Gaming Operation or Gaming Facility at least twenty-five thousand dollars ($25,000) in Gaming Resources in any twelve (12)-month period, or who, directly or indirectly, receives, or is deemed likely to receive, in connection with the Gaming Operation or Gaming Facility, at least twenty-five thousand dollars ($25,000) in any consecutive twelve (12)-month period, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if, but for the purveyance, the purveyor is not otherwise a Gaming Resource Supplier as defined herein, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gaming Operation.

**Sec. 2.17.** "IGRA" means the Indian Gaming Regulatory Act of 1988 (PL. 100-497, 18 U.S.C. §§ 1166-1168 and 25 U.S.C. § 2701 et seq.), and any amendments thereto, as interpreted by all regulations promulgated thereunder.

**Sec. 2.18.** "Interested Persons" means (i) all local, state, and federal agencies, which, if a Project were not taking place on Indian lands, would have responsibility for approving the Project or would exercise authority over the

natural resources that may be affected by the Project, (ii) any city in Amador County, and (iii) persons, groups, or agencies that request in writing a notice of preparation of a draft tribal environmental impact report described in section 11.0, or have commented on the Project in writing to the Tribe or the County.

Sec. 2.19.  "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

Sec. 2.20.  "Net Win" means drop from Gaming Devices, plus the redemption value of expired tickets, less fills, less payouts, less that portion of the Gaming Operation's payments to a third-party wide-area progressive jackpot system provider that is contributed only to the progressive jackpot amount.

Sec. 2.21.  "NIGC" means the National Indian Gaming Commission.

Sec. 2.22.  "Project" means any activity occurring on Indian lands, a principal purpose of which is to serve the Gaming Activities or Gaming Operation, and which may cause either a direct physical change in the off-reservation environment, or a reasonably foreseeable indirect physical change in the off-reservation environment.  This definition shall be understood to include, without limitation, the addition of Gaming Devices within an existing Gaming Facility, the impacts of which have not previously been addressed in a tribal environmental impact report described in section 11.0, and construction or planned expansion of any Gaming Facility and related improvement thereto, a principal purpose of which is to serve the Gaming Facility rather than provide that facility with an incidental benefit, as long as such additional Gaming Devices or construction or expansion may cause either a direct or reasonably foreseeable indirect physical change in the off-reservation environment.  For purposes of this definition, section 11.0, and Appendix B, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States.

Sec. 2.23.  "Revenue Sharing Trust Fund" is a fund created by the Legislature and administered by the State Gaming Agency that, as limited trustee, is not a trustee subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under state or federal common law or equitable principles, and has no duties, responsibilities, or obligations hereunder except for the receipt, deposit, and distribution of monies

paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes.

Sec. 2.24.  "Significant Effect(s) on the Off-Reservation Environment" is the same as "Significant Effect(s) on the Environment" and occur(s) if any of the following conditions exist:

(a)     A proposed Project has the potential to degrade the quality of the off-reservation environment, curtail the range of the environment, or achieve short-term, to the disadvantage of long-term, environmental goals.

(b)     The possible effects of a Project on the off-reservation environment are individually limited but cumulatively considerable.  As used herein, "cumulatively considerable" means that the incremental effects of an individual Project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.

(c)     The off-reservation environmental effects of a Project will cause substantial adverse effects on human beings, either directly or indirectly.

For purposes of this definition, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States.

Sec. 2.25.  "State" means the State of California or an authorized official or agency thereof designated by this Compact or by the Governor.

Sec. 2.26.  "State Designated Agency" means the entity or entities designated or to be designated by the Governor to exercise rights and fulfill responsibilities established by this Compact.

Sec. 2.27.  "State Gaming Agency" means the entities authorized to investigate, approve, regulate and license gaming pursuant to the Gambling Control Act (chapter 5 (commencing with section 19800) of division 8 of the California Business and Professions Code), or any successor statutory scheme, and any entity or entities in which that authority may hereafter be vested.

**Sec. 2.28.**  "Tribe" means the Buena Vista Rancheria of Me-Wuk Indians of California, a federally recognized Indian tribe listed in the Federal Register or an authorized official or agency thereof.

**Sec. 2.29.**  "Tribal Chair" means the person duly elected or selected under the Tribe's constitution or governing documents to perform the duties specified therein, including serving as the Tribe's official representative.

**Sec. 2.30.**  "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the NIGC, primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance.  No person employed in, or in connection with, the management, supervision, or conduct of any Gaming Activity may be a member or employee of the Tribal Gaming Agency.

**Sec. 2.31.**  "Tribal Nation Grant Fund" is a fund created by the Legislature to make discretionary distribution of funds to Non-Gaming Tribes and Limited-Gaming Tribes upon application of such tribes for purposes related to effective self-governance, self-determined community, and economic development.

## SECTION 3.0.  SCOPE OF CLASS III GAMING AUTHORIZED.

### Sec. 3.1.  Authorized Class III Gaming.

(a)     The Tribe is hereby authorized and permitted to operate only the following Gaming Activities under the terms and conditions set forth in the Compact:

      (1)     Gaming Devices.

      (2)     Any banking or percentage card games.

      (3)     Any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state not affiliated with or licensed by the California State Lottery are permitted to do so under state and federal law.

(b)     Nothing herein shall be construed to preclude the Tribe from offering class II gaming or preclude the negotiation of a separate compact governing the conduct of off-track wagering at the Tribe's Gaming Facility.

(c)     Nothing herein shall be construed to authorize or permit the operation of any Class III Gaming that the State lacks the power to authorize or permit under article IV, section 19, subdivisions (e) and (f), of the California Constitution.  This includes, but is not limited to, the operation of the game known as roulette, whether or not played with or on a mechanical, electro-mechanical, electrical, or video device, or cards, or any combination of such devices.

(d)     The Tribe shall not engage in Class III Gaming that is not expressly authorized in this Compact.

## SECTION 4.0.  AUTHORIZED LOCATION OF GAMING FACILITY, NUMBER OF GAMING DEVICES, COST REIMBURSEMENT, AND MITIGATION.

### Sec. 4.1.  Authorized Number of Gaming Devices.

The Tribe is entitled to operate up to a total of two thousand (2,000) Gaming Devices pursuant to the conditions set forth in section 3.1 and sections 4.2 through and including section 5.2.

### Sec. 4.2.  Authorized Gaming Facility.

The Tribe may establish and operate not more than one Gaming Facility in which Gaming Activities are conducted and engage in Class III Gaming only on eligible Indian lands located within the boundaries of the Buena Vista Rancheria of Me-Wuk Indians Reservation as those boundaries exist as of the execution date of this Compact, as legally described in, and represented on the map at Appendix A hereto, and on which Class III Gaming may lawfully be conducted under IGRA. Notwithstanding anything contrary in this Compact, however, any independent structures or other improvements ancillary to the Gaming Activities, in which no Class III Gaming is conducted, including any roads, parking lots, storage buildings or walkways, may be on contiguous land to the aforesaid Indian lands (i) where said contiguous land is held in fee or in leasehold by the Tribe but only if the Tribe's activities thereon are subject to the jurisdiction of State law and the State

courts, or (ii) where said contiguous land is Indian lands within the meaning of IGRA.

### Sec. 4.3.  Special Distribution Fund.

The Tribe shall pay to the State on a pro rata basis the State's 25 U.S.C. § 2710(d)(3)(C) costs incurred for purposes consistent with IGRA, including the performance of all its duties under this Compact, the administration and implementation of tribal-state gaming compacts, and funding for the Office of Problem Gambling, as determined by the monies appropriated in the annual Budget Act each fiscal year to carry out those purposes ("Appropriation").  The Appropriation and the maximum number of Gaming Devices operated by all federally recognized tribes in California pursuant to tribal-state Class III Gaming compacts determined to be in operation during the previous State fiscal year shall be reported annually by the State Gaming Agency to the Tribe on or before December 15.  The term "operated" or "operation" as used in this Compact in relation to Gaming Devices describes each and every Gaming Device available to patrons (including slot tournament contestants) for play at any given time.  The Tribe's pro rata share of the State's 25 U.S.C. § 2710(d)(3)(C) regulatory costs in any year this Compact is in effect shall be calculated by the following equation, provided that the Tribe's annual pro rata share payment amount in a year shall be capped at an amount equal to a five (5) percent increase from the Tribe's pro rata share calculated in the immediately preceding year:

The maximum number of Gaming Devices operated in the Tribe's Gaming Facility during the previous State fiscal year as determined by the State Gaming Agency, divided by the maximum number of Gaming Devices operated by all federally recognized tribes in California pursuant to tribal-state Class III Gaming compacts during the previous State fiscal year, multiplied by the Appropriation, equals the Tribe's pro rata share.

(a)     Beginning the first full quarter after Class III Gaming commences under this Compact, the Tribe shall pay its pro rata share to the State Gaming Agency for deposit into the Indian Gaming Special Distribution Fund established by the Legislature (Special Distribution Fund).  The payment shall be made in four (4) equal quarterly installments due on the thirtieth (30th) day following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second quarter, October 30 for the third quarter, and January 30 for

the fourth quarter); provided, however, that in the event this Compact becomes effective during a calendar quarter, payment shall be prorated for the number of days remaining in that initial quarter, in addition to any remaining full quarters in the first calendar year of operation to obtain a full year of full quarterly payments of the Tribe's pro rata share specified above. A payment year will run from January through December. If any portion of the Tribe's quarterly pro rata share payment is overdue, the Tribe shall pay to the State for purposes of deposit into the appropriate fund, the amount overdue plus interest accrued thereon at the rate of one percent (1.0%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less. All quarterly payments shall be accompanied by the report specified in section 4.5, subdivision (b).

(b)    If the Tribe objects to the State's determination of the Tribe's pro rata share, or to the amount of the Appropriation as including matters not consistent with IGRA, the matter shall be resolved in accordance with the dispute resolution provisions of section 13.0. Any State determination of the Tribe's pro rata share challenged by the Tribe shall govern and shall be paid by the Tribe to the State when due, and the Tribe's payment is a condition precedent to invoking the section 13.0 dispute resolution provisions.

(c)    The foregoing payments have been negotiated between the parties as a fair and reasonable contribution, based upon the State's costs of regulating and mitigating certain impacts of tribal Class III Gaming Activities, as well as the Tribe's market conditions, its circumstances, and the rights afforded and consideration provided by this Compact.

**Sec. 4.3.1.  Use of Special Distribution Funds.**

Revenue placed in the Special Distribution Fund shall be available for appropriation by the Legislature for the following purposes:

(a)    Grants, including any administrative costs, for programs designed to address and treat gambling addiction;

11

(b)    Grants, including any administrative costs and environmental review costs, for the support of State and local government agencies impacted by tribal government gaming;

(c)    Compensation for regulatory costs incurred by the State including, but not limited to, the State Gaming Agency, the State Department of Justice, and State Designated Agencies in connection with the implementation and administration of Class III Gaming compacts;

(d)    Compensation to state and local government for law enforcement, fire, public safety, and other emergency response services provided in response to or arising from any threat to the health, welfare and safety of Gaming Facility patrons, employees, tribal members or the public generally, attributable to, or as a consequence of, intra-tribal government disputes; and

(e)    Any other purposes specified by the Legislature that are consistent with IGRA.

**Sec. 4.4.  Quarterly Payments and Quarterly Contribution Report.**

(a)    (1)    The Tribe shall remit quarterly to the State Gaming Agency (i) the payments described in section 4.3, for deposit into the Special Distribution Fund and (ii) the payments described in section 5.2, for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.

(2)    If the Gaming Activities authorized by this Compact commence during a calendar quarter, the first payment shall be due on the thirtieth (30th) day following the end of the first full quarter of the Gaming Activities and shall cover the period from the commencement of the Gaming Activities to the end of the first full calendar quarter.

(3)    All quarterly payments shall be accompanied by the certification specified in subdivision (b).

(b)    At the time each quarterly payment is due, regardless of whether any monies are owed, the Tribe shall submit to the State Gaming Agency

a certification (the "Quarterly Contribution Report") that specifies the following:

(1)     calculation of the maximum number of Gaming Devices operated in the Gaming Facility for each day during the given quarter;

(2)     the Net Win calculation reflecting the quarterly Net Win from the operation of all Gaming Devices in the Facility;

(3)     the amount due pursuant to section 4.3;

(4)     calculation of the amount due pursuant to section 5.2; and

(5)     the total amount of the quarterly payment paid to the State.

The Quarterly Contribution Report shall be prepared by the chief financial officer of the Gaming Operation.

(c)     (l)     At any time after the fourth quarter, but in no event later than April 30 of the following calendar year, the Tribe shall provide to the State Gaming Agency an audited annual certification of its Net Win calculation from the operation of Gaming Devices. The audit shall be conducted in accordance with generally accepted auditing standards, as applied to audits for the gaming industry, by an independent certified public accountant who is not employed by the Tribe, the Tribal Gaming Agency, the Management Contractor, or the Gaming Operation, is only otherwise retained by any of these entities to conduct regulatory audits or independent audits of the Gaming Operation, and has no financial interest in any of these entities.  The auditor used by the Tribe for this purpose shall hold a valid license issued by the California Accountancy Board.

(2)     If the audit shows that the Tribe made an overpayment from its Net Win to the State during the year covered by the audit, the Tribe's next quarterly payment may be reduced by the amount of the overage.  If the audit shows that the Tribe made an underpayment to the State during the year covered by the audit,

13

the Tribe's next quarterly payment shall be increased by the amount of the underpayment.

(3)     The State Gaming Agency shall be authorized to confer with the auditor at the conclusion of the audit process and to review all of the independent certified public accountant's final work papers and documentation relating to the audit.  The Tribal Gaming Agency shall be notified of and provided the opportunity to participate in and attend any such conference or document review.

(d)     The State Gaming Agency may audit the calculations in subdivision (b) and Net Win calculations specified in the audit provided pursuant to subdivision (c).  The State Gaming Agency shall have access to all records deemed necessary by the State Gaming Agency to verify the calculations in subdivision (b) and Net Win calculations, including access to the Gaming Device accounting systems and server-based systems and software, and to the data contained therein on a read only basis.  If the State Gaming Agency determines that the Net Win is understated or the deductions overstated, it will promptly notify the Tribe and provide a copy of the audit.  The Tribe within twenty (20) days will either accept the difference or provide a reconciliation satisfactory to the State Gaming Agency.  If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe must immediately pay the amount of the resulting deficiency, plus accrued interest thereon at the rate of one percent (1%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less.  If the Tribe does not accept the difference but does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe, once payment is made, may commence dispute resolution under section 13.0.  The parties expressly acknowledge that the certifications provided for in subdivision (b) are subject to section 8.4, subdivision (h).

(e)     Notwithstanding anything to the contrary in section 13.0, any failure of the Tribe to remit the payments referenced in subdivision (a), will entitle the State to immediately seek injunctive relief in federal or state court, at the State's election, to compel the payments, plus accrued interest thereon at the rate of one percent (1%) per month, or

14

the maximum rate permitted by State law for delinquent payments owed to the State, whichever is less; and further, the Tribe expressly consents to be sued in either court and waives its right to assert sovereign immunity against the State in any such proceeding.  Failure to make timely payment shall be deemed a material breach of this Compact.

(f)     If any portion of the payments under subdivision (a) of this section is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

**Sec. 4.5.  Exclusivity.**

In recognition of the Tribe's agreement to make the payments specified in sections 4.3 and 5.2, the Tribe shall have the following rights:

(a)     In the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a State statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the State Constitution by a California appellate court after the effective date of this Compact that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe) within California, the Tribe shall have the right to exercise one of the following options:

   (1)     Terminate this Compact, in which case the Tribe will lose the right to operate Gaming Devices and other Class III Gaming authorized by this Compact; or

   (2)     Continue under this Compact with an entitlement to a reduction of the rates specified in section 5.2 following the conclusion of negotiations, to provide for:  (A) compensation to the State for the costs of regulation, as set forth in section 4.3; (B) reasonable payments to local governments impacted by tribal government gaming, the amount to be determined based upon any intergovernmental agreement entered into pursuant to 11.7;

15

(C) grants for programs designed to address and treat gambling addiction; and (D) such assessments as permitted at such time under federal law.  Such negotiations shall commence within thirty (30) days after receipt of a written request by a party to enter into the negotiations, unless both parties agree in writing to an extension of time.  If the Tribe and the State fail to reach agreement on the amount of reduction of such payments within sixty (60) days following commencement of the negotiations specified in this section, the amount shall be determined by arbitration pursuant to section 13.2.

(b)     Nothing in this section is intended to preclude the California State Lottery from offering any lottery games or devices that are currently or may hereafter be authorized by state law.


## SECTION 5.0.  REVENUE SHARING WITH NON-GAMING AND LIMITED-GAMING TRIBES.

### Sec. 5.1.  Definitions.

For purposes of this section 5.0, the following definitions apply:

(a)     The "Revenue Sharing Trust Fund" is a fund created by the Legislature and administered by the State Gaming Agency that, as a limited trustee, is not a trustee subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under state or federal common law or equitable principles, and has no duties, responsibilities, or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes.  The State Gaming Agency shall allocate and disburse the Revenue Sharing Trust Fund monies on a quarterly basis as specified by the Legislature.  Each eligible Non-Gaming Tribe and Limited-Gaming Tribe in the State shall receive the sum of one million one hundred thousand dollars ($1,100,000) per year from the Revenue Sharing Trust Fund.  In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, any available monies in

16

that fund shall be distributed to eligible Non-Gaming Tribes and Limited-Gaming Tribes in equal shares. Monies deposited into the Revenue Sharing Trust Fund in excess of the amount necessary to distribute one million one hundred thousand dollars ($1,100,000) to each eligible Non-Gaming Tribe and Limited-Gaming Tribe shall remain in the Revenue Sharing Trust Fund available for disbursement in future years, or be deposited in the Tribal Nation Grant Fund, but shall not be used for purposes other than the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund. In no event shall the State's general fund be obligated to make up any shortfall in the Revenue Sharing Trust Fund or to pay any unpaid claims connected therewith, and, notwithstanding any provision of law, including any existing provision of law implementing the State Gaming Agency's obligations related to the Revenue Sharing Trust Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling disbursement of any Revenue Sharing Trust Fund monies to them.

(b)     The "Tribal Nation Grant Fund" is a fund created by the Legislature to make discretionary distribution of funds to Non-Gaming Tribes and Limited-Gaming Tribes upon application of such tribes for purposes related to effective self-governance, self-determined community, and economic development. The fiscal operations of the Tribal Nation Grant Fund are administered by the State Gaming Agency, which acts as a limited trustee, not subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under state or federal common law or equitable principles, and with no duties or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes, as those payments are directed by a State Designated Agency. The State Gaming Agency shall allocate and disburse the Tribal Nation Grant Fund monies as specified by a State Designated Agency to one (1) or more eligible Non-Gaming and Limited-Gaming Tribes upon a competitive application basis. The State Gaming Agency shall exercise no discretion or control over, nor bear any responsibility arising from, the recipient tribes' use or disbursement of Tribal Nation Grant Fund monies. The State Designated Agency shall perform any necessary audits to ensure that monies awarded to any tribe are being

17

used in accordance with their disbursement in relation to the purpose of the Tribal Nation Grant Fund.  In no event shall the State's general fund be obligated to pay any monies into the Tribal Nation Grant Fund or to pay any unpaid claims connected therewith, and, notwithstanding any provision of law, including any existing provision of law implementing the State's obligations related to the Tribal Nation Grant Fund or the Revenue Sharing Trust Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling disbursement of any Tribal Nation Grant Fund monies to them.

(c)     A "Non-Gaming Tribe" is a federally recognized tribe in California, with or without a tribal-state Class III Gaming compact, that has not engaged in, or offered, class II gaming or Class III Gaming in any location whether within or without California, as of the date of distribution to such tribe from the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund, or during the immediately preceding three hundred sixty-five (365) days.

(d)     A "Limited-Gaming Tribe" is a federally recognized tribe in California that has a Class III Gaming compact with the State but is operating fewer than a combined total of three hundred fifty (350) Gaming Devices in all of its gaming operations wherever located, or does not have a Class III Gaming compact but is engaged in class II gaming, whether within or without California, during the immediately preceding three hundred sixty-five (365) days.

**Sec. 5.2.  Payments to the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.**

(a)     If the Tribe operates more than three hundred fifty (350) Gaming Devices at any time in a given calendar year, it shall thereafter, including in that calendar year, pay to the State Gaming Agency, for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund, six percent (6%) of its Net Win from its operation of Gaming Devices in excess of three hundred fifty (350).

(b)     The Tribe shall remit the payments referenced in subdivision (a), as may be applicable, to the State Gaming Agency in quarterly

payments, which payments shall be due thirty (30) days following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second quarter, October 30 for the third quarter, and January 30 for the fourth quarter).  While the confidentiality provisions of section 8.4 apply to the individual amount of the Tribe's payments, the State Gaming Agency may as necessary report the amount in the aggregate combined with contributions of other compact tribes.

(c)     The quarterly payments referenced in subdivision (b) required by subdivision (a), as may be appropriate, shall be determined by first determining the total number of all Gaming Devices operated by the Tribe during a given quarter (Quarterly Device Base).  The Quarterly Device Base is equal to the sum of the maximum number of Gaming Devices in operation for each day of the calendar quarter divided by the number of days in the calendar quarter that the Gaming Operation operates any Gaming Devices during the given calendar quarter.

(d)     If any portion of the payments under subdivision (b) is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

(e)     All payments made by the Tribe to the State Gaming Agency pursuant to subdivision (b) shall be deposited into the Revenue Sharing Trust Fund and the Tribal Nation Grant Fund in a proportion to be determined by the Legislature, provided that if there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, the State Gaming Agency shall deposit all payments into the Revenue Sharing Trust Fund.

(f)     Either party may request reopening of negotiations, limited exclusively to the provisions of section 5.2, subdivision (a), if the balance of funds within the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund either exceeds or falls short of the amount reasonably required to meet the long-term obligations of either fund.  Neither party is obligated to accept a request to reopen negotiations

19

under this subdivision and either party may decline the request for any reason.

(g)     Notwithstanding any other provision of this Compact, in no event shall the State's general fund be obligated to make up any shortfall in the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund or to pay any unpaid claims connected therewith.  Notwithstanding any provision of law, including any existing provision of law implementing the State Gaming Agency's obligations related to the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund under any Class III Gaming compact, Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling negotiation under subdivision (f), or disbursement of any Revenue Sharing Trust Fund or Tribal Nation Grant Fund monies to them.

**Sec. 5.3.  Provision for Credits Related to Payments Due Under Section 5.2.**

Notwithstanding anything to the contrary in section 5.2, the State agrees to provide the Tribe with annual credits for up to sixty percent (60%) of the payments otherwise due under section 5.2 for the following:

(a)     Annual payments by the Tribe (not derived from a direct or indirect state or federal funding source) to the County and to local jurisdictions operating facilities or providing services within the County for purposes of improved fire, law enforcement, public transit, education, tourism, and other services and infrastructure improvements intended to include serving off-reservation needs of County residents and not otherwise required by section 11.0 (except as provided herein below).  Such payments shall be subject to approval by the County or local jurisdiction in the County.  Annual payments by the Tribe made pursuant to Exhibit F, "Annual Operating Costs," Exhibit G, and Exhibit H of the Intergovernmental Services Agreement between the County of Amador and the Buena Vista Rancheria of Me-Wuk Indians approved by arbitration on June 11, 2008 and currently in effect are eligible credits under this subdivision and will be deemed to have the approval of the County until the termination of that agreement or its replacement with an amended or new intergovernmental agreement.  If an amended or new

20

intergovernmental agreement is entered by the Tribe and the County, and it provides for the Tribe to make annual payments of the same nature as those referenced above (Exhibit F, "Annual Operating Costs," Exhibit G, and Exhibit H), those payments shall be eligible credits under this subdivision and will be deemed to have the approval of the County until the termination of that amended or new agreement or its replacement with an amended or new intergovernmental agreement.  At least twenty percent (20%) of the annual credits authorized by this section 5.3 shall be utilized for the purposes described in this subdivision (a);

(b)     Payments by the Tribe (not derived from a direct or indirect state or federal funding source) for non-gaming related capital investments and economic development projects by the Tribe on tribal trust lands that the State or State Designated Agency agrees provides mutual benefits to the Tribe and the State because, for instance, they have particular cultural, social or environmental value, or diversify the sources of revenue for the Tribe's general fund;

(c)     Investments and any funds (not derived from a direct or indirect state or federal funding source) paid by the Tribe to the State in renewable energy projects that, in part, serve the Gaming Facility, and in projects that incorporate charging stations for electric or other zero emission vehicles that are available to patrons and employees of the Gaming Facility.  For purposes of this subdivision (c), "renewable energy project" means a project that utilizes a technology other than a conventional power source, as defined in section 2805 of the Public Utilities Code, as it may be amended, and instead uses as a power source biomass, geothermal, small hydroelectric, solar, or wind, as those power sources are defined in section 1391, subdivision (c), of title 20 of the California Code of Regulations, as they may be amended.  The power source must not utilize more than twenty-five percent (25%) fossil fuel;

(d)     Payments by the Tribe (not derived from a direct or indirect state or federal funding source)  to support capital improvements and operating expenses for facilities within California that provide health care services to tribal members, Indians, and non-Indians;

21

(e)     Investments by the Tribe and any funds paid to the State (not derived from a direct or indirect state or federal funding source) for water treatment or conservation projects that, in part, serve the Gaming Facility or any improvements incorporating water conservation or treatment technology on real property owned by the Tribe, or its members and lineal descendants; and

(f)     Payments by the Tribe (not derived from a direct or indirect state or federal funding source) to provide general welfare benefits for, among other things, educational, healthcare, cultural, or vocational purposes, to non-enrolled members of the Tribe and other Native American in the community.

The Tribe shall provide notice to the State of its intent to exercise any of its options under subdivision (b) and (f) of this section 5.2.  The State shall have the right to review proposals under subdivisions (b) through (f), and in the exercise of its reasonable discretion disapprove it for receipt of credit under this section 5.2 within ninety (90) days after receipt of notice if it does not meet the purposes set out above, with such disapproval subject to dispute resolution pursuant to Section 13.0.  Once approved, the State shall not withdraw any approval without the agreement of the Tribe.  All excess eligible credits that cannot be applied in any one (1) year shall carry forward to all following years until completely exhausted.

## SECTION 6.0.  LICENSING.

### Sec. 6.1.  Gaming Ordinance and Regulations.

(a)     All Gaming Activities conducted under this Compact shall, at a minimum, comply (i) with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, (ii) with all rules, regulations, procedures, specifications, and standards duly adopted by the NIGC, the Tribal Gaming Agency, and the State Gaming Agency, and (iii) with the provisions of this Compact.

(b)     The Tribal Gaming Agency shall transmit a copy of the Gaming Ordinance, and all of its rules, regulations, procedures, specifications, ordinances, or standards applicable to the Gaming Activities and Gaming Operation, to the State Gaming Agency within twenty (20) days following execution of this Compact, or within twenty (20) days following their adoption or amendment, whichever is later.

22

(c)    The Tribe and the Tribal Gaming Agency shall make available an electronic or hard copy of the following documents to any member of the public upon request and in the manner requested:  the Gaming Ordinance; the rules of each Class III game operated by the Tribe; the Tribe's constitution or other governing document(s) to the extent they impact the public in relation to the Gaming Activities or Gaming Operation; the tort ordinance specified in section 12.5, subdivision (b); the employment discrimination complaint ordinance specified in section 12.3, subdivision (f); the regulations promulgated by the Tribal Gaming Agency concerning patron disputes pursuant to section 10.0; and the NIGC minimum internal control standards and this Compact, including all appendices hereto, in the event they are not available on the NIGC's or the Commission's website.

### Sec. 6.2.  Tribal Ownership, Management, and Control of Gaming Operation.

The Gaming Operation authorized under this Compact shall be owned solely by the Tribe.

### Sec. 6.3.  Prohibitions Regarding Minors.

(a)    The Tribe shall prohibit persons under the age of twenty-one (21) years from being present in any room or area in which Gaming Activities are being conducted unless the person is en route to a non-gaming area of the Gaming Facility, or is employed at the Gaming Facility in a capacity other than as a Gaming Employee.

(b)    If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe shall prohibit persons under the age of twenty-one (21) years from purchasing, consuming, or possessing alcoholic beverages.  The Tribe shall also prohibit persons under the age of twenty-one (21) years from being present in any room or area in which alcoholic beverages may be consumed, except to the extent permitted by the State Department of Alcoholic Beverage Control for other commercial establishments serving alcoholic beverages.

**Sec. 6.4.  Licensing Requirements and Procedures.**

**Sec. 6.4.1.  Summary of Licensing Principles.**

All persons in any way connected with the Gaming Operation or Gaming Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under this Compact, including, without limitation, all Gaming Employees, Gaming Resource Suppliers, Financial Sources, and any other person having a significant influence over the Gaming Operation, must be licensed by the Tribal Gaming Agency and cannot have had any determination of suitability denied or revoked by the State Gaming Agency. The parties intend that the licensing process provided for in this Compact shall involve joint cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

**Sec. 6.4.2.  Gaming Facility.**

(a)      The Gaming Facility authorized by this Compact shall be licensed by the Tribal Gaming Agency in conformity with the requirements of this Compact, the Tribal Gaming Ordinance, IGRA, and any applicable regulations adopted by the NIGC.  The license shall be reviewed and renewed every two (2) years thereafter.  Verification that this requirement has been met shall be provided by the Tribe to the State by sending a copy of the initial license, either electronically or by hard copy, and each renewal license to the Commission and any State Designated Agency within twenty (20) days after issuance of the license or renewal.  The Tribal Gaming Agency's certification that the Gaming Facility is being operated in conformity with these requirements shall be posted in a conspicuous and public place in the Gaming Facility at all times.

(b)      To assure the protection of the health and safety of all Gaming Facility patrons, guests, and employees, the Tribe shall adopt, or has already adopted, and shall maintain throughout the term of this Compact, an ordinance (Tribal Codes) that requires any Gaming Facility construction to meet or exceed the standards contained within the Applicable Codes.  Gaming Facility construction, expansion, improvement, modification, or renovation will also comply with the federal Americans with Disabilities Act, P.L. 101-336, as amended, 42 U.S.C. § 12101 et seq.  Notwithstanding the foregoing, the Tribal

24

Codes need not include any standard in the Applicable Codes that specifically applies in name or in fact only to tribal facilities. Without limiting the rights of the State under this section, reference to Applicable Codes is not intended to confer jurisdiction upon the State or its political subdivisions. For purposes of this section, the terms "building official" and "code enforcement agency" as used in title 19 and 24 of the California Code of Regulations mean the Tribal Gaming Agency or such other tribal government agency or official as may be designated by the Tribe's laws.

(c)   To assure compliance with the Tribal Codes, in all cases where the Applicable Codes would otherwise require a permit, the Tribe shall require inspections and, in connection therewith, shall employ for any Gaming Facility construction qualified plan checkers or review firms. To be qualified as a plan checker or review firm for purposes of this Compact, plan checkers or review firms must be either California licensed architects or engineers with relevant experience, or California licensed architects or engineers on the list, if any, of approved plan checkers or review firms provided by the city or county in which the Gaming Facility is located. The Tribe shall also employ qualified project inspectors. To be qualified as a project inspector for purposes of this Compact, project inspectors must possess the same qualifications and certifications as project inspectors utilized by the county in which the Gaming Facility is located. The plan checkers, review firms, and project inspectors shall hereinafter be referred to as "Inspectors." The Tribe shall require the Inspectors to report in writing to the Tribal Gaming Agency and the State Gaming Agency any failure to comply with the Tribal Codes within thirty (30) days after giving notice of any failure to comply to the Tribal Gaming Agency, or such other government agency or official as may be designated by the Tribe's laws.

(d)   The Tribe shall cause the design and construction calculations, and plans and specifications that form the basis for the planned construction (the "Design and Building Plans") to be available to the State Gaming Agency for inspection and copying upon its request.

(e)   In the event that material changes to a structural detail of the Design and Building Plans will result from contract change orders or any

25

other changes in the Design and Building Plans, such changes shall be reviewed by the Inspectors for compliance with the Tribal Codes.

(f)   The Tribe shall maintain during construction all contract change orders for inspection and copying by the State Gaming Agency upon its request.

(g)   The Tribe shall maintain the Design and Building Plans depicting the as-built Gaming Facility, which shall be available to the State Gaming Agency for inspection and copying upon its request, for the term of this Compact.

(h)   Upon final certification by the Inspectors that the Gaming Facility meets the Tribal Codes, the Tribal Gaming Agency shall forward the Inspectors' certification to the State Gaming Agency within ten (10) days of issuance.  If the State Gaming Agency objects to that certification, the Tribe shall make a good faith effort to address the State's concerns, but if the State Gaming Agency does not withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of section 13.0.

(i)   Any failure to remedy within a reasonable period of time any material and timely raised deficiency shall be deemed a violation of this Compact, and furthermore, any deficiency that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to a court order until the deficiency is corrected.  The Tribe shall not allow occupancy of any portion of the Gaming Facility that is constructed or maintained in a manner that endangers the health or safety of the occupants.

(j)   The Tribe shall also take all necessary steps to reasonably ensure the ongoing availability of sufficient and qualified fire suppression services to the Gaming Facility, and to reasonably ensure that the Gaming Facility satisfies all standards required by title 19 of the California Code of Regulations, as promulgated in the Tribal Codes, applicable to similar facilities in the County as set forth below:

(1)   Not less than thirty (30) days before the commencement of the Gaming Activities, and not less than biennially thereafter, and

26

upon at least ten (10) days' notice to the State Gaming Agency, the Tribe shall cause, at its expense, the Gaming Facility to be inspected by an independent expert (Independent Expert) for purposes of certifying that the Gaming Facility meets a reasonable standard of fire safety and life safety.

(2)     The State Gaming Agency, at its expense, shall be entitled to designate and have a qualified representative or representatives, which may include local fire suppression entities, present during the inspection.  During such inspection, the State's representative(s) shall specify to the Independent Expert any condition which the representative(s) reasonably believes would preclude certification of the Gaming Facility as meeting a reasonable standard of fire safety and life safety.

(3)     The Independent Expert shall issue to the Tribal Gaming Agency and the State Gaming Agency a report on the inspection within fifteen (15) days after its completion, or within thirty (30) days after commencement of the inspection, whichever first occurs, identifying any deficiency in fire safety or life safety at the Gaming Facility or in the ability of the Tribe to meet reasonably expected fire suppression needs of the Gaming Facility.

(4)     Within twenty-one (21) days after the issuance of the report, the Independent Expert shall also require and approve a specific plan for correcting deficiencies, whether in fire safety or life safety, at the Gaming Facility or in the Tribe's ability to meet the reasonably expected fire suppression needs of the Gaming Facility, including those identified by the State Gaming Agency's representatives.  A copy of the report and the corrective plan shall be delivered to the State Gaming Agency and the Tribal Gaming Agency.

(5)     Immediately upon correction of all deficiencies identified in the report, the Independent Expert shall certify in writing to the Tribal Gaming Agency and the State Gaming Agency that all deficiencies have been corrected.

27

(6)     Any failure to correct all deficiencies identified in the report within a reasonable period of time shall be deemed a violation of this Compact, and any failure to promptly correct those deficiencies that pose a serious or significant risk to the health or safety of any occupants shall be a violation of this Compact and grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to court order until the deficiency is corrected.

(7)     Consistent with its obligation to ensure the safety of those within the Gaming Facility, the Tribe shall promptly notify the State Gaming Agency of circumstances that pose a serious and significant risk to the health or safety of occupants and take prompt action to correct such circumstances.  Any failure to remedy within a reasonable period of time any serious and significant risk to public safety shall be deemed a violation of this Compact, and furthermore, any circumstance that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State Gaming Agency to prohibit occupancy of the affected portion of the Gaming Facility pursuant to a court order until the deficiency is corrected.

### Sec. 6.4.3.  Gaming Employees.

(a)     Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license, and except as provided in subdivision (b), shall obtain, and thereafter maintain current, a State Gaming Agency determination of suitability, which license and determination shall be subject to biennial renewal; provided that in accordance with section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process and the State Gaming Agency determination of suitability.

(b)     A Gaming Employee who is required to obtain and maintain current a valid tribal gaming license under subdivision (a) is not required to obtain or maintain a State Gaming Agency determination of suitability if any of the following applies:

(1)     The employee is subject to the licensing requirement of subdivision (a) solely because he or she is a person who

conducts, operates, maintains, repairs, or assists in Gaming Activities, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, *and* is empowered to make discretionary decisions affecting the conduct of the Gaming Activities.

(2)  The employee is subject to the licensing requirement of subdivision (a) solely because he or she is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, *and* is empowered to make discretionary decisions affecting the conduct of the Gaming Activities.

(3)  The employee is subject to the licensing requirement of subdivision (a) solely because he or she is a Tribal Gaming Agency employee with access to confidential information.

(4)  The State Gaming Agency, in consultation with the Tribal Gaming Agency, exempts the Gaming Employee from the requirement to obtain or maintain current a State Gaming Agency determination of suitability.

(c)  Notwithstanding subdivision (b), where the State Gaming Agency determines it is reasonably necessary, the State Gaming Agency is authorized to review the tribal license application, and all materials and information received by the Tribal Gaming Agency in connection therewith, for any person whom the Tribal Gaming Agency has licensed, or proposes to license, as a Gaming Employee.  If the State Gaming Agency determines that the person would be unsuitable for issuance of a license or permit for a similar level of employment in a gambling establishment subject to the jurisdiction of the State, it shall notify the Tribal Gaming Agency of its determination and the reasons supporting its determination.  The Tribal Gaming Agency shall thereafter conduct a hearing, in accordance with section 6.5.5, to reconsider issuance of the tribal gaming license and shall notify the State Gaming Agency of its determination within three (3) business

29

days after the hearing, which shall be final unless made the subject of dispute resolution pursuant to section 13.0 within thirty (30) days of such notification.

(d)      The Tribe shall not employ, or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability or for a renewal of such a determination has been denied, or whose determination of suitability has expired without renewal.

(e)      At any time after five (5) years following the effective date of this Compact, either party to this Compact may request renegotiation of the scope of coverage of subdivision (b) or (c).

(f)      This section shall not apply to members of the Tribal Gaming Agency.

## Sec. 6.4.4.  Gaming Resource Suppliers.

(a)      Every Gaming Resource Supplier shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility.  Unless the Tribal Gaming Agency licenses the Gaming Resource Supplier pursuant to subdivision (d), the Gaming Resource Supplier shall also apply to, and the Tribe shall require it to apply to, the State Gaming Agency for a determination of suitability at least thirty (30) days, unless such thirty (30) days is shortened by the Tribal Gaming Agency, prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility, except that for Gaming Devices the period specified under section 7.1, subdivision (a), shall govern.  The period during which a determination of suitability as a Gaming Resource Supplier is valid expires on the earlier of (i) the date two (2) years following the date on which the determination is issued, unless a different expiration date is specified by the State Gaming Agency, or (ii) the date of its revocation by the State Gaming Agency.  If the State Gaming Agency denies or revokes a determination of suitability, the Tribal Gaming Agency shall immediately deny or revoke the license and shall not reissue any license to that Gaming Resource Supplier unless and until the State Gaming Agency makes a determination that the Gaming Resource Supplier is suitable.  The

30

license and determination of suitability shall be reviewed at least every two (2) years for continuing compliance.  For purposes of section 6.5.2, such a review shall be deemed to constitute an application for renewal.  In connection with such a review, the Tribal Gaming Agency shall require the Gaming Resource Supplier to update all information provided in the previous application.

(b)     Any agreement between the Tribe and a Gaming Resource Supplier shall include a provision for its termination without further liability on the part of the Tribe, except for the bona fide payment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or non-renewal of the Gaming Resource Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  Except as set forth above, the Tribe shall not enter into, or continue to make payments to a Gaming Resource Supplier pursuant to, any contract or agreement for the provision of Gaming Resources with any person or entity whose application to the State Gaming Agency for a determination of suitability has been denied or revoked or whose determination of suitability has expired without renewal.

(c)     Notwithstanding subdivision (a), the Tribal Gaming Agency may license a Management Contractor for a period of no more than seven (7) years, but the Management Contractor must still apply for renewal of a determination of suitability by the State Gaming Agency at least every two (2) years, and where the State Gaming Agency denies or revokes a determination of suitability, the Tribal Gaming Agency shall immediately deny or revoke the license.  Except for where the State Gaming Agency has denied or revoked its determination of suitability, nothing in this subdivision shall be construed to bar the Tribal Gaming Agency from issuing additional new licenses to the same Management Contractor following the expiration of a seven (7)-year license.

(d)     The Tribal Gaming Agency may elect to license a person or entity as a Gaming Resource Supplier without requiring it to apply to the State Gaming Agency for a determination of suitability under subdivision (a) if the Gaming Resource Supplier has already been issued a determination of suitability that is then valid.  In that case, the Tribal

31

Gaming Agency shall immediately notify the State Gaming Agency of its licensure of the person or entity as a Gaming Resource Supplier, and shall identify in its notification the State Gaming Agency determination of suitability on which the Tribal Gaming Agency has relied in proceeding under this subdivision (d).  Subject to the Tribal Gaming Agency's compliance with the requirements of this subdivision, a Gaming Resource Supplier licensed under this subdivision may, during and only during the period in which the determination of suitability remains valid, engage in the sale, lease, or distribution of Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility, without applying to the State Gaming Agency for a determination of suitability.  The issuance of a license under this subdivision is in all cases subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier is not suitable or to a tribal gaming license suspension or revocation pursuant to section 6.5.1, and does not extend the time during which the determination of suitability relied on by the Tribal Gaming Agency is valid.  A license issued under this subdivision expires upon the revocation or expiration of the determination of suitability relied on by the Tribal Gaming Agency.  Nothing in this subdivision affects the obligations of the Tribal Gaming Agency, or of the Gaming Resource Supplier, under section 6.5.2 and section 6.5.6 of this Compact.

(e)    Except where subdivision (d) applies, within twenty-one (21) days of the issuance of a license to a Gaming Resource Supplier, the Tribal Gaming Agency shall transmit to the State Gaming Agency a copy of the license.  All tribal license application materials and information received by it from the Applicant must be made available to the State Gaming Agency upon request which is not otherwise prohibited or restricted from disclosure under applicable federal law or regulation.

## Sec. 6.4.5.  Financial Sources.

(a)    Subject to subdivision (g) of this section 6.4.5, each Financial Source shall be licensed by the Tribal Gaming Agency prior to the Financial Source extending any financing in connection with the Tribe's Gaming Operation or Facility.

32

(b)     Every Financial Source required to be licensed by the Tribal Gaming Agency shall, contemporaneously with the filing of its tribal license application, apply to the State Gaming Agency for a determination of suitability.  In the event the State Gaming Agency denies the determination of suitability, the Tribal Gaming Agency shall immediately deny or revoke the Financial Source's license.

(c)     A license issued under this section 6.4.5 shall be reviewed at least every two (2) years for continuing compliance.  In connection with that review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the Financial Source's previous application.  For purposes of section 6.5.2, that review shall be deemed to constitute an application for renewal.

(d)     Any agreement between the Tribe and a Financial Source shall include, and shall be deemed to include, a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  The Tribe shall not enter into, or continue to make payments pursuant to, any contract or agreement for the provision of financing with any person whose application to the State Gaming Agency for a determination of suitability has been denied or revoked or has expired without renewal.

(e)     A Gaming Resource Supplier who provides financing exclusively in connection with the provision, sale, or lease of Gaming Resources obtained from that Gaming Resource Supplier may be licensed solely in accordance with the licensing procedures applicable, if at all, to Gaming Resource Suppliers, and need not be separately licensed as a Financial Source under this section.

(f)     Within twenty-one (21) days of the issuance of a license to a Financial Source, the Tribal Gaming Agency shall transmit to the State Gaming Agency a copy of the license.  Upon issuance of a license, the Tribal Gaming Agency shall direct the Financial Source licensee to transmit to the State Gaming Agency within twenty-one (21) days a copy of all

33

license application materials and information submitted to the Tribal Gaming Agency.

(g)  (1)  The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section the following Financial Sources under the circumstances stated:

(A)  Any federally-regulated or state-regulated bank, savings and loan association, or other federally- or state-regulated lender and any fund or other investment vehicle which is administered or managed by any such entity.

(B)  Any entity described in the Commission's Uniform Tribal Gaming Regulation CGCC-2, subdivision (f) (as in effect on July 1, 2006), when that entity is a Financial Source solely by reason of being (i) a purchaser or a holder of debt securities or other forms of indebtedness issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation or (ii) the owner of a participation interest in any amount of indebtedness for which a Financial Source described in subdivision (g)(1)(A), or any fund or other investment vehicle which is administered or managed by any such Financial Source, is the creditor.

(C)  Any investor who, alone or together with any person or persons controlling, controlled by or under common control with such investor, holds less than ten percent (10%) of all outstanding debt securities issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation.

(D)  An agency of the federal, the State, tribal or local government providing financing, together with any person purchasing any debt securities or other forms of indebtedness of the agency to provide such financing.

(E)  A real estate investment trust (as defined in 26 U.S.C. § 856(a)) which is publicly traded on a stock exchange, registered with the Securities and Exchange Commission,

and subject to regulatory oversight of the Securities and Exchange Commission.

(F)   An entity or category of entities that the State Gaming Agency and the Tribal Gaming Agency jointly determine can be excluded from the licensing requirements of this section 6.4.5 without posing a threat to the public interest or the integrity of the Gaming Operation.

(2)   In any case where the Tribal Gaming Agency elects to exclude a Financial Source from the licensing requirements of this section, the Tribal Gaming Agency shall give prompt notice thereof to the State Gaming Agency, shall give reasonable advance notice of any extension of financing by the Financial Source in connection with the Tribe's Gaming Operation or Facility, and upon request of the State Gaming Agency, shall provide it with all documentation supporting the Tribal Gaming Agency's exclusion of the Financial Source from the licensing requirements of this section 6.4.5.  The Tribal Gaming Agency and the State Gaming Agency shall confer and make good faith efforts to promptly resolve any dispute regarding the Tribal Gaming Agency's decision to exclude a Financial Source from the licensing requirements of this section.  Any dispute regarding a decision to exclude a Financial Source from the licensing requirements of this section that cannot be promptly resolved by the Tribal Gaming Agency and the State Gaming Agency shall be resolved through the Dispute Resolution provisions in section 13.0.

(3)   Notwithstanding subdivision (g)(1), the Tribal Gaming Agency and the State Gaming Agency shall work collaboratively to resolve any reasonable concerns regarding the ongoing excludability of an individual or entity as a Financial Source. Any dispute between the Tribal Gaming Agency and the State Gaming Agency pertaining to the excludability of an individual or entity as a Financial Source shall be resolved by the Dispute Resolution provisions in section 13.0.

(4)   The following are not Financial Sources for purposes of this section 6.4.5:

35

(A)     An entity identified by the Commission's Uniform Tribal Gaming Regulation CGCC-2, subdivision (h) (as in effect on July 1, 2006).

(B)     A person or entity whose sole connection with a provision or extension of financing to the Tribe is to provide loan brokerage or debt servicing for a Financial Source at no cost to the Tribe or the Gaming Operation, provided that no portion of any financing provided is an extension of credit to the Tribe or the Gaming Operation by that person or entity.

(h)     In recognition of changing financial circumstances, this section 6.4.5 shall be subject to good faith renegotiation upon request of either party in or after five (5) years from the effective date of this Compact; provided such renegotiation shall not retroactively affect transactions that have already taken place where the Financial Source has been excluded or exempted from licensing requirements.

**Sec. 6.4.6.  Processing Tribal Gaming License Applications.**

(a)     Each Applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency.

(b)     At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including part 556.4 of title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees.

(c)     For Applicants that are business entities, these licensing provisions shall apply to the entity as well as:  (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners, members, or partners, if an unincorporated business; (iv) each of its shareholders who owns more than ten percent (10%) of the shares of the corporation, if a corporation, or who has a direct controlling interest in

36

the Applicant; and (v) each person or entity (other than a Financial Source that the Tribal Gaming Agency has determined does not require a license under section 6.4.5) that, alone or in combination with others, has provided financing in connection with any Gaming Operation or Class III Gaming authorized under this Compact, if that person or entity provided more than ten percent (10%) of either the start-up capital or the operating capital, or of a combination thereof, over a twelve (12)-month period.  For purposes of this subdivision, where there is any commonality of the characteristics identified in this section 6.4.6, subdivision (c)(i) through (c)(v), inclusive, between any two (2) or more entities, those entities may be deemed to be a single entity.  For purposes of this subdivision, a direct controlling interest in the Applicant referred to in subdivision (c)(iv) excludes any passive investor or anyone who has an indirect or only a financial interest and does not have the ability to control, manage, or direct the management decisions of the Applicant.

(d)     Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

**Sec. 6.4.7.  Suitability Standard Regarding Gaming Licenses.**

(a)     In reviewing an application for a tribal gaming license, and in addition to any standards set forth in the Tribe's Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Tribe's Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

(b)     A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the Applicant, and in the case of an entity, each individual identified in section 6.4.6, meets all the following requirements:

(1)     The person is of good character, honesty, and integrity.

(2)     The person's prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of

37

gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gaming, or in the carrying on of business and financial arrangements incidental thereto.

(3)     The person is in all other respects qualified to be licensed as provided, and meets the criteria established in this Compact, IGRA, NIGC regulations, the Tribe's Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe; provided, however, an Applicant shall not be found to be unsuitable solely on the ground that the Applicant was an employee of a tribal gaming operation in California that was conducted prior to May 16, 2000.

## Sec. 6.4.8.  Background Investigations of Applicants.

(a)     The Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the Applicant is qualified for a gaming license under the standards set forth in section 6.4.7, and to fulfill all requirements for licensing under IGRA, NIGC regulations, the Tribe's Gaming Ordinance, and this Compact.  The Tribal Gaming Agency shall not issue a gaming license, other than a temporary license pursuant to section 6.4.9, until a determination is made that those qualifications have been met.

(b)     In lieu of completing its own background investigation, and to the extent that doing so does not conflict with or violate IGRA or the Tribe's Gaming Ordinance, the Tribal Gaming Agency may contract with the State Gaming Agency for the conduct of background investigations, may rely on a State determination of suitability previously issued under a Class III Gaming compact involving another tribe and the State, or may rely on a State Gaming Agency license previously issued to the Applicant, to fulfill some or all of the Tribal Gaming Agency's background investigation obligations.

(c)     If the Tribal Gaming Agency contracts with the State Gaming Agency for the conduct of background investigations, then an Applicant for a tribal gaming license shall be required to provide releases to the State Gaming Agency to make available to the Tribal Gaming Agency

background information regarding the Applicant.  The State Gaming Agency shall cooperate in furnishing to the Tribal Gaming Agency that information, unless doing so would violate state or federal law, would violate any agreement the State Gaming Agency has with a source of the information other than the Applicant, or would impair or impede a criminal investigation, or unless the Tribal Gaming Agency cannot provide sufficient safeguards to assure the State Gaming Agency that the information will remain confidential.

(d)     In lieu of obtaining summary criminal history information from the NIGC, the Tribal Gaming Agency may, pursuant to the provisions in subdivisions (d) through (i), obtain such information from the California Department of Justice.  If the Tribe adopts an ordinance confirming that article 6 (commencing with section 11140) of chapter 1 of title 1 of part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this section, the Tribal Gaming Agency shall be eligible to be considered an entity entitled to request and receive state summary criminal history information, within the meaning of subdivision (b)(13) of section 11105 of the California Penal Code.

(e)     The information received shall be used by the requesting agency solely for the purpose for which it was requested and shall not be reproduced for secondary dissemination to any other employment or licensing agency.  The unauthorized access and misuse of criminal offender record information may affect an individual's civil rights.  Additionally, any person intentionally disclosing information obtained from personal or confidential records maintained by a state agency or from records within a system of records maintained by a government agency may be subject to prosecution.

(f)     The Tribal Gaming Agency shall submit to the California Department of Justice fingerprint images and related information required by the California Department of Justice of all Gaming Employees, as defined by section 2.11, for the purposes of obtaining information as to the existence and content of a record of state or federal convictions and state or federal arrests and also information as to the existence and content of a record of state or federal arrests for which the Department

39

of Justice establishes that the person is free on bail or on his or her recognizance pending trial or appeal.

(g)    When received, the California Department of Justice shall forward to the Federal Bureau of Investigation requests for federal summary criminal history information received pursuant to this section.  The California Department of Justice shall review the information returned from the Federal Bureau of Investigation and compile and disseminate a response to the Tribal Gaming Agency.

(h)    The California Department of Justice shall provide a state or federal level response to the Tribal Gaming Agency pursuant to Penal Code section 11105, subdivision (p)(1).

(i)    The Tribal Gaming Agency shall request from the California Department of Justice subsequent notification service, as provided pursuant to section 11105.2 of the Penal Code, for persons described in subdivision (f) above.

**Sec. 6.4.9.  Temporary Licensing of Gaming Employees.**

(a)    If the Applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the investigation or other information held by that agency does not indicate that the Applicant has a criminal history or other information in his or her background that would either automatically disqualify the Applicant from obtaining a tribal gaming license or cause a reasonable person to investigate further before issuing a license, or that the Applicant is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary tribal gaming license and may impose such specific conditions thereon pending completion of the Applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine.

(b)    Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary tribal gaming license.

(c)    A temporary tribal gaming license shall remain in effect until suspended or revoked, or a final determination is made on the

application, or for a period of up to one (1) year, whichever comes first.

(d)   At any time after issuance of a temporary tribal gaming license, the Tribal Gaming Agency shall or may, as the case may be, suspend or revoke it in accordance with the provisions of sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation before making a determination of unsuitability.

(e)   Nothing herein shall be construed to relieve the Tribe of any obligation under part 558 of title 25 of the Code of Federal Regulations.

## Sec. 6.5.0.  Tribal Gaming License Issuance.

Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a tribal gaming license on a conditional or unconditional basis.  Nothing herein shall create a property or other right of an Applicant in an opportunity to be licensed, or in a tribal gaming license itself, both of which shall be considered to be privileges granted to the Applicant in the sole discretion of the Tribal Gaming Agency.

## Sec. 6.5.1.  Denial, Suspension, or Revocation of Licenses.

(a)   Any Applicant's application for a tribal gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the Applicant is determined to be unsuitable or otherwise unqualified for a tribal gaming license.

(b)   Pending consideration of revocation, the Tribal Gaming Agency may suspend a tribal gaming license in accordance with section 6.5.5.

(c)   All rights to notice and hearing shall be governed by tribal law and comport with federal procedural due process by, for instance, providing the employee with notice reasonably calculated to apprise the employee of the pendency of the determination, an opportunity to review materials upon which the charge is based in such a manner that does not compromise security or regulation of the Gaming Operation, and an opportunity to be heard.  The Applicant shall be notified in

41

writing of the hearing and given notice of any intent to suspend or revoke the tribal gaming license.

(d)    Notwithstanding anything to the contrary herein, upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall deny that person a tribal gaming license and promptly, and in no event more than thirty (30) days from the State Gaming Agency notification, revoke any tribal gaming license that has theretofore been issued to that person; provided that the Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding between the applicant and the State Gaming Agency in state court conducted pursuant to section 1085 of the California Code of Civil Procedure.

**Sec. 6.5.2.  Renewal of Licenses; Extensions; Further Investigation.**

(a)    Except as provided in section 6.4.4, subdivision (c), the term of a tribal gaming license shall not exceed two (2) years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a license shall provide updated material, as requested, on the appropriate renewal forms, but, at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or which is otherwise available to the Tribal Gaming Agency.  At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the Applicant's continuing suitability or eligibility for a license.

(b)    Prior to renewing a license, the Tribal Gaming Agency shall deliver to the State Gaming Agency the licensee's application for a determination of suitability and a summary of any derogatory information, for purposes of the State Gaming Agency's renewal of its determination of suitability.  Copies of all other information and documents received in connection with the application for renewal of the tribal gaming license must be made available to the State Gaming Agency upon request, provided that the materials or information are

42

not otherwise prohibited or restricted from disclosure under applicable federal law or regulation.

(c)    At the discretion of the State Gaming Agency, an additional background investigation may be required if the State Gaming Agency determines the need for further information concerning the Applicant's continuing suitability for a license.

### Sec. 6.5.3.  Identification Cards.

(a)    The Tribal Gaming Agency shall require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency.

(b)    Identification badges must display information, including, but not limited to, a photograph and the person's name, which is adequate to enable members of the public and agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

(c)    Upon request, the Tribe shall provide the State Gaming Agency with the name, badge identification number (if any), and job title of all Gaming Employees.

### Sec. 6.5.4.  Fees for Tribal Gaming License.

The fees for all tribal gaming licenses shall be set by the Tribal Gaming Agency.

### Sec. 6.5.5.  Summary Suspension of Tribal Gaming License.

The Tribal Gaming Agency shall summarily suspend the tribal gaming license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person could constitute a threat to the public health or safety or may summarily suspend the license of any employee if the Tribal Gaming Agency determines that the continued licensing of the person may violate the Tribal Gaming Agency's licensing or other standards.  Any hearing in regard thereto shall be governed by tribal law and comport with federal due process by, for instance, providing the employee with notice reasonably calculated to apprise

43

the employee of the pendency of the determination, an opportunity to review materials upon which the charge is based in such a manner that does not compromise security or regulation of the Gaming Operation, and an opportunity to be heard.

### Sec. 6.5.6.  State Determination of Suitability Process.

(a)     With respect to Gaming Employees, upon receipt of an Applicant's completed license application and a determination to issue either a temporary or permanent license, the Tribal Gaming Agency shall transmit within twenty-one (21) days to the State Gaming Agency for a determination of suitability for licensure under the California Gambling Control Act a notice of intent to license the Applicant, together with all of the following:

(1)     A copy of all tribal license application materials and information received by the Tribal Gaming Agency from the Applicant, which is not otherwise restricted from disclosure under applicable federal law or regulation.

(2)     A complete set of fingerprint impressions, rolled by a certified fingerprint roller, transmitted electronically.

(3)     A current photograph.

(4)     Except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency.

(b)     Upon receipt of a written request from a Gaming Resource Supplier or a Financial Source for a determination of suitability, the State Gaming Agency shall transmit an application package to the Applicant to be completed and returned to the State Gaming Agency for purposes of allowing it to make a determination of suitability for licensure.

(c)     Investigation and disposition of applications for a determination of suitability shall be governed entirely by State law, and the State Gaming Agency shall determine whether the Applicant would be found suitable for licensure in a gambling establishment subject to the

State Gaming Agency's jurisdiction.  Additional information may be required by the State Gaming Agency to assist it in its background investigation, to the extent permitted under State law for licensure in a gambling establishment subject to the State Gaming Agency's jurisdiction.

(d)     The Tribal Gaming Agency shall require a licensee to apply for renewal of a determination of suitability by the State Gaming Agency at such time as the licensee applies for renewal of a tribal gaming license.

(e)     Upon receipt of completed license or license renewal application information from the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the Applicant is suitable to be licensed for association with Class III Gaming operations.  While the Tribal Gaming Agency shall ordinarily be the primary source of application information, the State Gaming Agency is authorized to directly seek application information from the Applicant.  The Tribal Gaming Agency shall provide to the State Gaming Agency summary reports, including any derogatory information, of the background investigations conducted by the Tribal Gaming Agency and the NIGC, written statements by the Applicant, and related applications, if any, for Gaming Employees, Gaming Resource Suppliers, and Financial Sources.  If further investigation is required to supplement the investigation conducted by the Tribal Gaming Agency, the Applicant will be required to pay the application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19951, subdivision (a), but any deposit requested by the State Gaming Agency pursuant to section 19867 of that code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any. Failure to provide information reasonably required by the State Gaming Agency to complete its investigation under State law or failure to pay the application fee or deposit can constitute grounds for denial of the application by the State Gaming Agency.  The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs.

45

(f)     Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the Applicant is suitable, or that the Applicant is unsuitable, for licensure in a Gaming Operation and, if unsuitable, stating the reasons therefore.  Issuance of a determination of suitability does not preclude the State Gaming Agency from a subsequent determination based on newly discovered information that a person or entity is unsuitable for the purpose for which the person or entity is licensed.  Upon receipt of notice that the State Gaming Agency has determined that a person or entity is or would be unsuitable for licensure, the Tribal Gaming Agency shall deny that person or entity a license and promptly, and in no event more than thirty (30) days from the issuance of the State Gaming Agency notification, revoke any tribal gaming license that has theretofore been issued to that person or entity; provided that the Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person or entity following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court between the Applicant and the State Gaming Agency conducted pursuant to section 1085 of the California Code of Civil Procedure.

(g)     Prior to denying an application for a determination of suitability, or to issuing notice to the Tribal Gaming Agency that a person or entity previously determined to be suitable had been determined unsuitable for licensure, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard.  If the State Gaming Agency denies an application for a determination of suitability, or issues notice that a person or entity previously determined suitable has been determined unsuitable for licensure, the State Gaming Agency shall provide that person or entity with written notice of all appeal rights available under state law.

(h)     The Commission, or its successor, shall maintain a roster of Gaming Resource Suppliers and Financial Sources that it has determined to be suitable pursuant to the provisions of this section, or through separate procedures to be adopted by the Commission.  Upon application to the Tribal Gaming Agency for a tribal gaming license, a Gaming Resource Supplier or Financial Source that appears on the

46

Commission's suitability roster may be licensed by the Tribal Gaming Agency in the same manner as a Gaming Resource Supplier under subdivision (d) of section 6.4.4, subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier or Financial Source is not suitable or to a tribal gaming license suspension or revocation pursuant to sections 6.5.1 or 6.5.5; provided that nothing in this subdivision exempts the Gaming Resource Supplier or Financial Source from applying for a renewal of a State determination of suitability.

### Sec. 6.6.  Submission of New Application.

Except as expressly provided otherwise in section 6.4.4, subdivisions (a) and (c), nothing in section 6.0 shall be construed to preclude an Applicant who has been determined to be unsuitable for licensure by the State Gaming Agency, or the Tribe on behalf of such Applicant, from later submitting a new application for a determination of suitability by the State Gaming Agency in accordance with section 6.0.

## SECTION 7.0.  APPROVAL AND TESTING OF GAMING DEVICES.

### Sec. 7.1.  Gaming Device Approval.

(a)     No Gaming Device may be offered for play unless all the following occurs:

(1)     The manufacturer or distributor which sells, leases, or distributes such Gaming Device (i) has applied for a determination of suitability by the State Gaming Agency at least fifteen (15) days before it is offered for play, (ii) has not been found to be unsuitable by the State Gaming Agency, and (iii) has been licensed by the Tribal Gaming Agency;

(2)     The software for the game authorized for play on the Gaming Device has been tested, approved and certified by an independent gaming test laboratory or state governmental gaming test laboratory (Gaming Test Laboratory) as operating in accordance with the standards of Gaming Laboratories International, Inc. known as GLI-11, GLI-12, GLI-13, GLI-21, and GLI-26, or the technical standards approved by the State of

47

Nevada, or such other technical standards as the State Gaming Agency and the Tribal Gaming Agency shall agree upon, which agreement shall not be unreasonably withheld;

(3)     A copy of the certification by the Gaming Test Laboratory, specified in subdivision (a)(2), is provided to the State Gaming Agency by electronic transmission or by mail, unless the State Gaming Agency waives receipt of copies of the certification;

(4)     The software for the game authorized for play on the Gaming Device is tested by the Tribal Gaming Agency to ensure each game authorized for play on the Gaming Device has the correct electronic signature prior to operation of the Gaming Device by the public, or if already inserted, tested prior to being made available for patron play on the gaming floor;

(5)     The hardware and associated equipment for each type of Gaming Device has been tested by the Gaming Test Laboratory prior to operation by the public to ensure operation in accordance with the applicable Gaming Test Laboratory standards; and

(6)     The hardware and associated equipment for the Gaming Device has been verified or tested by the Tribal Gaming Agency to ensure operation in accordance with the manufacturer's specifications.

(b)    Where either the Tribe or the State Gaming Agency requests new standards for testing, approval, and certification of the software for the game authorized for play on the Gaming Device pursuant to subdivision (a)(2), the party requesting the new standards shall provide the other party with a detailed explanation of the reason(s) for the request.  If the party to which the request is made disagrees with the request, the State Gaming Agency and the Tribal Gaming Agency shall meet and confer in a good-faith effort to resolve the disagreement, which meeting and conferring shall include consultation with an independent Gaming Test Laboratory.  If the disagreement is not resolved within one hundred twenty (120) days of the request, either party may submit the matter to dispute resolution under section 13.0 of this Compact.

**Sec. 7.2.  Gaming Test Laboratory Selection.**

(a)     The Gaming Test Laboratory shall be an independent or state governmental gaming test laboratory recognized in the gaming industry which (i) is competent and qualified to conduct scientific tests and evaluations of Gaming Devices, and (ii) is licensed or approved by any of the following states:  Arizona, California, Colorado, Illinois, Indiana, Iowa, Michigan, Missouri, Nevada, New Jersey, or Wisconsin.  The Tribal Gaming Agency shall submit to the State Gaming Agency documentation that demonstrates the Gaming Test Laboratory satisfies (i) and (ii) herein at least thirty (30) days before the commencement of Gaming Activities pursuant to this Compact, or if such use follows the commencement of Gaming Activities, within fifteen (15) days prior to reliance thereon.  If, at any time, the Gaming Test Laboratory license and/or approval required by (ii) herein is suspended or revoked by any of those states or the Gaming Test Laboratory is found unsuitable by the State Gaming Agency, then the State Gaming Agency may reject the use of such Gaming Test Laboratory, and upon such rejection, the Tribal Gaming Agency shall ensure that such Gaming Test Laboratory discontinues its responsibilities under this section.

(b)     The Tribe and the State Gaming Agency shall inform the Gaming Test Laboratory in writing that irrespective of the source of payment of its fees, the Gaming Test Laboratory's duty of loyalty runs equally to the State and the Tribe.

**Sec. 7.3.  Maintenance of Records of Testing Compliance.**

The Tribal Gaming Agency shall prepare and maintain records of its compliance with section 7.1 while any Gaming Device is on the gaming floor and for a period of one (1) year after the Gaming Device is removed from the gaming floor, and shall make those records available for inspection by the State Gaming Agency upon request.

**Sec. 7.4.  State Gaming Agency Inspections.**

(a)     The State Gaming Agency may inspect the Gaming Devices in operation at the Gaming Facility on a random basis not to exceed four

49

(4) times annually to confirm that they operate and play properly pursuant to the manufacturer's technical standards. The State Gaming Agency shall make a good-faith effort to work with the Tribal Gaming Agency to minimize unnecessary disruption to the Gaming Operation including, where appropriate, performing desk audits rather than on-site physical inspections. The inspections may include all Gaming Device software, hardware, associated equipment, software maintenance records, and components critical to the operation of the Gaming Device. The random inspections conducted pursuant to this subdivision shall occur during normal business hours outside of weekends and holidays and shall not remove from play more than five percent (5%) of the Gaming Devices then in operation at the Gaming Facility, provided that the five percent (5%) limitation on removal of Gaming Devices shall not apply where a Gaming Device, including but not limited to a progressive controller, makes limiting removal from play to no more than five percent (5%) infeasible or impossible. Whenever practicable, the State Gaming Agency shall not require removal from play any Gaming Device that the State Gaming Agency determines may be fully and adequately tested while still in play.

(b)     The State Gaming Agency shall provide notice to the Tribal Gaming Agency of such inspection at or prior to the commencement of the random inspection, and the Tribal Gaming Agency may accompany the State Gaming Agency inspector(s).

(c)     The State Gaming Agency may retain and use qualified consultants to perform the functions authorized or specified herein but any such consultants shall be bound by the confidentiality and information use and disclosure provisions applicable to the State Gaming Agency and its employees.

**Sec. 7.5.  Technical Standards.**

The Tribal Gaming Agency shall provide to the State Gaming Agency copies of its regulations for technical standards applicable to the Tribe's Gaming Devices at least thirty (30) days before the commencement of the Gaming Operation and at least thirty (30) days before the effective date of any revisions to the regulations.

**Sec. 7.6.  Transportation of Gaming Devices.**

(a)     Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's Indian lands except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least ten (10) days' notice to the Sheriff's Department for the County.

(b)     Transportation of a Gaming Device from a Gaming Facility within California is permissible only if:

    (1)     The final destination of the Gaming Device is a gaming facility of any tribe in California that has a compact with the State which makes lawful the receipt of such Gaming Device;

    (2)     The final destination of the Gaming Device is any other state in which possession of the Gaming Device is made lawful by state law or by tribal-state compact;

    (3)     The final destination of the Gaming Device is another country, or any state or province of another country, wherein possession of the Gaming Device is lawful; or

    (4)     The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c)     Any Gaming Device transported from or to the Tribe's Indian lands in violation of this section 7.6, or in violation of any permit issued pursuant thereto, is subject to summary seizure by California peace officers in accordance with California law.

## SECTION 8.0.  INSPECTIONS.

**Sec. 8.1.  Investigation and Sanctions.**

(a)     The Tribal Gaming Agency shall investigate any reported violation of this Compact and shall require the Gaming Operation to correct the

violation upon such terms and conditions as the Tribal Gaming
Agency determines are necessary.

(b)     The Tribal Gaming Agency shall be empowered by the Gaming
Ordinance to impose fines or other sanctions within the jurisdiction of
the Tribe against gaming licensees who interfere with or violate the
Tribe's gaming regulatory requirements and obligations under IGRA,
NIGC gaming regulations, the Gaming Ordinance, or this Compact as
long as the fines or sanctions comport with federal due process by, for
instance, providing the licensee with notice reasonably calculated to
apprise the licensee of the pendency of the determination, an
opportunity to review materials upon which the charge is based in
such a manner that does not compromise security or regulation of the
Gaming Operation, and an opportunity to be heard.

(c)     The Tribal Gaming Agency shall report violations of this Compact
that pose a substantial threat to gaming integrity, public health and
safety, or the environment, or continued violations that, if isolated
might not require reporting, but cumulatively pose a threat to gaming
integrity, public health and safety, or the environment, and any
failures to comply with the Tribal Gaming Agency's orders, to the
Commission and the Bureau of Gambling Control in the California
Department of Justice within ten (10) days of discovery.

**Sec. 8.2.  Assistance by State Gaming Agency.**

The Tribe may request the assistance of the State Gaming Agency whenever
it reasonably appears that such assistance may be necessary to carry out the
purposes described in section 8.1, or otherwise to protect public health, safety, or
welfare.

**Sec. 8.3.  Access to Premises by State Gaming Agency; Notification;
Inspections.**

(a)     Notwithstanding that the Tribe and its Tribal Gaming Agency have
the primary responsibility to administer and enforce the regulatory
requirements of this Compact, the State Gaming Agency, including
but not limited to any qualified consultants retained by it, shall have
the right to inspect the Tribe's Gaming Facility, and all Gaming
Operation or Facility records relating to Class III Gaming as is

reasonably necessary to ensure Compact compliance, including such records located in off-site facilities dedicated to their storage subject to the conditions in subdivisions (b), (c), and (d).

(b)     Except as provided in section 7.4, the State Gaming Agency may inspect public areas of the Gaming Facility at any time without prior notice during normal Gaming Facility business hours.

(c)     Inspection of areas of the Gaming Facility not normally accessible to the public may be made at any time the Gaming Facility is open to the public, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility.  The Tribal Gaming Agency, in its sole discretion, may require a member of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility.  If the Tribal Gaming Agency imposes such a requirement, it shall require such member to be available at all times for those purposes and shall ensure that the member has the ability to gain immediate access to all non-public areas of the Gaming Facility.

(d)     Nothing in this Compact shall be construed to limit the State Gaming Agency to one inspector during inspections.

**Sec. 8.4.  Inspection, Copying and Confidentiality of Documents.**

(a)     Inspection and copying of Gaming Operation papers, books, and records, that the State Gaming Agency deems necessary to ensure compliance with the terms of this Compact, may occur at any time, immediately after the State Gaming Agency gives notice to the Tribal Gaming Agency, during the hours from 8:00 a.m. to 5:00 p.m. Monday through Friday, and at any other time that a Tribal Gaming Agency employee, a Gaming Facility employee, or a Gaming Operation employee is available onsite with physical access to offices, including off-site facilities, where the papers, books, and records are kept.  The Tribe shall cooperate with, and cannot refuse, the inspection and copying, provided that the State Gaming Agency inspectors cannot require copies of papers, books, or records in such

volume that it unreasonably interferes with the normal functioning of the Gaming Operation or Facility.

(b)     In lieu of onsite inspection and copying of Gaming Operation papers, books, and records by its inspectors, the State Gaming Agency may request in writing that the Tribal Gaming Agency provide copies of such papers, books, and records as the State Gaming Agency deems necessary to ensure compliance with the terms of this Compact.  The State Gaming Agency's written request shall describe those papers, books, and records requested to be copied with sufficient specificity to reasonably identify the requested documents.  Within ten (10) days after it receives the request, or such other time as the State Gaming Agency may agree in writing, the Tribal Gaming Agency shall provide one (1) copy of the requested papers, books, and records to the requesting State Gaming Agency.  An electronic version of the requested papers, books, and records may be submitted to the State Gaming Agency in lieu of a paper copy so long as the software required to access the electronic version is reasonably available to the State Gaming Agency and the State Gaming Agency does not object.

(c)     Notwithstanding any other provision of California law, any confidential information and records, as defined in subdivision (d), that the State Gaming Agency obtains or copies pursuant to this Compact shall be, and remain, the property solely of the Tribe; provided that such confidential information and records and copies may be retained by the State Gaming Agency as is reasonably necessary to assure the Tribe's compliance with this Compact or to complete any investigation of suspected criminal activity; and provided further that the State Gaming Agency may provide such confidential information and records and copies to federal law enforcement and other state agencies or consultants that the State deems reasonably necessary in order to assure the Tribe's compliance with this Compact, in order to renegotiate any provision thereof, or in order to conduct or complete any investigation of suspected criminal activity in connection with the Gaming Activities or the operation of the Gaming Facility or the Gaming Operation.

(d)     For the purposes of this section 8.4, "confidential information and records" means any and all information and records received from the

Tribe pursuant to the Compact, except for information and documents that are in the public domain.

(e)     The State Gaming Agency and all other state agencies and consultants to which it provides information and records obtained pursuant to subdivisions (a) or (b) of this section, which are confidential pursuant to subdivision (d), will exercise care in the preservation of the confidentiality of such information and records and will apply the highest standards of confidentiality provided under California state law to preserve such information and records from disclosure until such time as the information or record is no longer confidential or disclosure is authorized by the Tribe, by mutual agreement of the Tribe and the State, or pursuant to the arbitration procedures under section 13.2.  The State Gaming Agency and all other state agencies and consultants may disclose confidential information or records as necessary to fully adjudicate or resolve a dispute arising pursuant to the Compact, in which case the State Gaming Agency and all other state agencies and consultants agree to preserve confidentiality to the greatest extent feasible and available.  Before the State Gaming Agency provides confidential information and records to a consultant as authorized under subdivision (c), it shall enter into a confidentiality agreement with that consultant that meets the standards of this subdivision.

(f)     The Tribe may avail itself of any and all remedies under State law for the improper disclosure of confidential information and records.  In the case of any disclosure of confidential information and records compelled by judicial process, the State Gaming Agency will endeavor to give the Tribe prompt notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(g)     The Tribal Gaming Agency and the State Gaming Agency shall confer regarding protocols for the release to law enforcement agencies of information obtained during the course of background investigations.

(h)     Confidential information and records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those

55

confidential records, shall be exempt from disclosure under the
California Public Records Act.

(i)     Notwithstanding any other provision of this Compact, the State
         Gaming Agency shall not be denied access to papers, books, records,
         equipment, or places where such access is reasonably necessary to
         ensure compliance with this Compact or to conduct or complete an
         investigation of suspected criminal activity in connection with the
         Gaming Activities or the operation of the Gaming Facility or the
         Gaming Operation.

### Sec. 8.5.  NIGC Audit Reports.

The Tribe shall provide to the State Gaming Agency, within thirty (30) days
of their submission to the NIGC, copies of the audited financial statements of Class
III Gaming and management letter(s), if any, provided to the NIGC.  All
submissions to the State Gaming Agency made pursuant to this section 8.5 shall be
subject to the confidentiality protections and assurances set forth in section 8.4,
subdivision (h) of this Compact.

### Sec. 8.6.  Cooperation with Tribal Gaming Agency.

The State Gaming Agency shall meet periodically with the Tribal Gaming
Agency and cooperate in all matters relating to the enforcement of the provisions
of this Compact and its Appendices.

### Sec. 8.7.  Compact Compliance Review.

The State Gaming Agency is authorized to conduct an annual
comprehensive Compact compliance review of the Gaming Operation, Gaming
Facility, and Gaming Activities to ensure compliance with all provisions of this
Compact, any applicable appendices hereto, and with all laws, ordinances, codes,
rules, regulations, policies, internal controls, standards, and procedures that are
required to be adopted, implemented, or complied with pursuant to this Compact.
Upon the discovery of an irregularity that the State Gaming Agency reasonably
determines may be a threat to gaming integrity or public safety, and after
consultation with the Tribal Gaming Agency, the State Gaming Agency may
conduct additional periodic reviews of any part of the Gaming Operation, Gaming
Facility, and Gaming Activities and other activities subject to this Compact in
order to ensure compliance with all provisions of this Compact and its appendices.

Nothing in this section shall be construed to supersede any other audits, inspections, investigations, and monitoring authorized by this Compact.

### Sec 8.8  Waiver of Materials

The State Gaming Agency shall retain the discretion to waive, in whole or in part, the right to receive materials otherwise required by this Compact to be provided to the State Gaming Agency by the Tribal Gaming Agency or the Tribe.

## SECTION 9.0.  RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE GAMING OPERATION AND FACILITY.

### Sec. 9.1.  Adoption of Regulations for Operation and Management; Minimum Standards.

It is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Compact, of IGRA, of NIGC gaming regulations, of State Gaming Agency regulations, and of the Gaming Ordinance, to protect the integrity of the Gaming Activities and the Gaming Operation for honesty and fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of fairness and internal controls.  To meet those responsibilities, the Tribal Gaming Agency shall be vested with the authority to promulgate, and shall promulgate, rules and regulations governing, at a minimum, the following subjects pursuant to the standards and conditions set forth therein:

(a)  The enforcement of all relevant laws and rules with respect to the Gaming Activities, Gaming Operation and Gaming Facility, and the conduct of investigations and hearings with respect thereto, and to any other subject within its jurisdiction.

(b)  The physical safety of Gaming Facility patrons and employees, and any other person while in the Gaming Facility.  Except as provided in section 12.2, nothing herein shall be construed, however, to make applicable to the Tribe any State laws, regulations, or standards governing the use of tobacco.

(c)  The physical safeguarding of assets transported to, within, and from the Gaming Facility.

57

(d)    The prevention of illegal activity within the Gaming Facility or with regard to the Gaming Operation or Gaming Activities, including, but not limited to, the maintenance of employee procedures and a surveillance system as provided in subdivision (e).

(e)    Maintenance of a closed-circuit television surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency.  The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and closed-circuit television system at all times.

(f)    The recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereinafter "incidents").  The Tribal Gaming Agency's rules and regulations shall provide that the Tribal Gaming Agency shall transmit copies of incident reports that it believes concern a significant or continued threat to public safety or gaming integrity to the State Gaming Agency within a reasonable period of time, not to exceed seven (7) days, after the incident.  The procedure for recording incidents pursuant to the rules and regulations shall also do all of the following:

    (1)    Specify that security personnel record all incidents, regardless of an employee's determination that the incident may be immaterial (all incidents shall be identified in writing).

    (2)    Require the assignment of a sequential number to each report.

    (3)    Provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page and/or in electronic form, provided the information is recorded in a manner so that, once the information is entered, it cannot be deleted or altered and is available to the State Gaming Agency pursuant to sections 8.3 and 8.4.

    (4)    Require that each report include, at a minimum, all of the following:

  (A) The record number.

  (B) The date.

  (C) The time.

  (D) The location of the incident.

  (E) A detailed description of the incident.

  (F) The persons involved in the incident.

  (G) The security department employee assigned to the incident.

(g) The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

(h) Maintenance of a list of persons permanently excluded from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gaming within the state.  The Tribal Gaming Agency shall transmit a copy of the list to the State Gaming Agency quarterly and shall make a copy of the current list available to the State Gaming Agency upon request.  Notwithstanding anything in this Compact to the contrary, the State Gaming Agency is authorized to make copies of the list available to other tribal gaming agencies, to licensees of the Commission, the California Horse Racing Board, and other law enforcement agencies.  To the extent permissible under law, the State Gaming Agency may share information about individuals permanently excluded from other tribal gaming facilities or other gaming establishments within California with the Tribal Gaming Agency.

(i) The conduct of an audit, at the Tribe's expense, of the annual financial statements of the Gaming Operation.

(j)     Submission to, and prior approval by, the Tribal Gaming Agency of the rules and regulations of each class III game to be operated by the Tribe, and of any changes in those rules and regulations.  No class III game may be played that has not received Tribal Gaming Agency approval.

(k)     The obligation of the Gaming Facility and the Gaming Operation to maintain a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners.

(l)     Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations is visibly displayed or available to patrons in written form in the Gaming Facility and to ensure that betting limits applicable to any gaming station is displayed at that gaming station.

(m)     Maintenance of a cashier's cage in accordance with industry standards for such facilities.

(n)     Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

(o)     Technical standards and specifications in conformity with the requirements of this Compact for the operation of Gaming Devices and other games authorized herein to be conducted by the Tribe.

**Sec. 9.1.1.  Minimum Internal Control Standards (MICS).**

(a)     The Tribe shall conduct its Gaming Activities pursuant to an internal control system that implements minimum internal control standards for Class III Gaming that are no less stringent than those contained in the Minimum Internal Control Standards of the NIGC (25 C.F.R. § 542), as they existed on October 19, 2006, and as they may thereafter be amended, without regard to the NIGC's authority to promulgate, enforce, or audit the standards.  These standards are posted on the State Gaming Agency website(s) and are referred to herein as the "Compact MICS."  This requirement is met through compliance with the provisions set forth in this section and in section 9.1 or in the

alternative by compliance with the statewide uniform regulation CGCC-8, as it exists currently and as it may hereafter be amended.

(b)   Before commencement of Gaming Operations, the Tribal Gaming Agency shall, in accordance with the Gaming Ordinance, establish written internal control standards for the Gaming Facility that shall: (i) provide a level of control that equals or exceeds the minimum internal control standards set forth in the Compact MICS, as they exist currently and as they may be revised; (ii) contain standards for currency transaction reporting that comply with title 31 Code of Federal Regulations part 103, as it exists currently and as it may hereafter be amended; (iii) satisfy the requirements of section 9.1; (iv) be consistent with this Compact; and (v) require the Gaming Operation to comply with the internal control standards.

(c)   The Gaming Operation shall operate the Gaming Facility pursuant to a written internal control system.  The internal control system shall comply with and implement the internal control standards established by the Tribal Gaming Agency pursuant to subdivision (b) of this section 9.1.1.  The internal control system, and any proposed changes to the system, must be approved by the Tribal Gaming Agency prior to implementation.  The internal control system shall be designed to reasonably assure that:  (i) assets are safeguarded and accountability over assets is maintained; (ii) liabilities are properly recorded and contingent liabilities are properly disclosed; (iii) financial records including records relating to revenues, expenses, assets, liabilities, and equity/fund balances are accurate and reliable; (iv) transactions are performed in accordance with the Tribal Gaming Agency's general or specific authorization; (v) access to assets is permitted only in accordance with the Tribal Gaming Agency's approved procedures; (vi) recorded accountability for assets is compared with actual assets at frequent intervals and appropriate action is taken with respect to any discrepancies; and (vii) functions, duties and responsibilities are appropriately segregated and performed in accordance with sound practices by qualified personnel.

(d)   The Tribal Gaming Agency shall provide a copy of its written internal control standards, and any changes to those control standards, to the State Gaming Agency within thirty (30) days of approval by the Tribal Gaming Agency.  The State Gaming Agency will review and

submit to the Tribal Gaming Agency written comments or objections, if any, to the internal control standards and any changes to the standards, within thirty (30) days of receiving them, or by another date agreed upon by the Tribal Gaming Agency and the State Gaming Agency.  The State Gaming Agency's review shall be for the purpose of determining whether the internal control standards and any changes to the standards provide a level of control which equals or exceeds the level of control required by the minimum internal control standards set forth in the Compact MICS, as they exist currently and as they may be revised, and are consistent with this Compact.

(e)     The Compact MICS shall apply to all Gaming Activities, the Gaming Facility and the Gaming Operation; however, the Compact MICS are not applicable to any activities not expressly permitted in this Compact.  Should the terms in the Compact MICS be inconsistent with this Compact, the terms in this Compact shall prevail.

(f)     The Tribal Gaming Agency shall provide the State Gaming Agency with a copy of the "Agreed-Upon Procedures" report prepared annually pursuant to part 542.3(f), of the Compact MICS, as they may be revised, within thirty (30) days after the Tribal Gaming Agency's receipt of the report.  The "Agreed-Upon Procedures" report shall be prepared by an independent auditor, who for the purposes of this section, shall be a certified public accountant licensed in the state of California to practice as an independent certified public accountant or who holds a California practice privilege, as provided in the California Accountancy Act, California Business and Professions Code, section 5000 et seq., who is not employed by the Tribe, the Tribal Gaming Agency, the Management Contractor, or the Gaming Operation, has no financial interest in any of these entities, and is only otherwise retained by any of these entities to conduct regulatory audits, independent audits of the Gaming Operation, or audits under this section.

### Sec. 9.2.  Program to Mitigate Problem Gambling.

The Gaming Operation shall establish a program, approved by the Tribal Gaming Agency, to mitigate pathological and problem gambling by implementing the following measures:

(a)     It shall train Gaming Facility supervisors and gaming floor employees on responsible gaming and to identify and manage problem gambling.

(b)     It shall make available to patrons at conspicuous locations and ATMs in the Gaming Facility educational and informational materials which aim at the prevention of problem gambling and that specify where to find assistance.

(c)     It shall establish self-exclusion programs whereby a self-identified problem gambler may request the halt of promotional mailings, the revocation of privileges for casino services, the denial or restraint on the issuance of credit and check -cashing services, and exclusion from the Gaming Facility.

(d)     It shall establish an involuntary exclusion program that allows the Gaming Operation to halt promotional mailings, deny or restrain the issuance of credit and cash -checking services, and deny access to the Gaming Facility to patrons who have exhibited signs of problem gambling.

(e)     It shall display at conspicuous locations and at ATMs within the Gaming Facility signage bearing a toll-free help-line number where patrons may obtain assistance for gambling problems.

(f)     It shall make diligent efforts to prevent underage individuals from loitering in the area of the Gaming Facility where the Gaming Activities take place.

(g)     It shall assure that advertising and marketing of the Gaming Activities at the Gaming Facility contain a responsible gambling message and a toll-free help-line number for problem gamblers, where practical, and that it make no false or misleading claims.

(h)     It shall adopt a code of conduct, derived, inter alia, from that of the American Gaming Association, that addresses responsible gambling and responsible advertising.

Nothing herein is intended to grant any third party the right to sue based on a perceived violation of these standards.

### Sec. 9.3.  Enforcement of Regulations.

The Tribal Gaming Agency shall ensure the enforcement of the rules, regulations, and specifications promulgated under this Compact, including under section 9.1.

### Sec. 9.4.  State Civil and Criminal Jurisdiction.

Nothing in this Compact expands, modifies, or impairs the civil or criminal jurisdiction of the State, local law enforcement agencies and state courts under Public Law 280 (18 U.S.C. § 1162; 28 U.S.C. § 1360) or IGRA, to the extent applicable.  Except as provided below, all State and local law enforcement agencies and state courts shall exercise jurisdiction to enforce the State's criminal laws on the Tribe's Indian lands, including the Gaming Facility and all related structures, in the same manner and to the same extent, and subject to the same restraints and limitations, imposed by the laws of the State and the United States, as is exercised by State and local law enforcement agencies and state courts elsewhere in the State.  The Tribe hereby consents to such criminal jurisdiction.  However, no Gaming Activity conducted by the Tribe pursuant to this Compact may be deemed to be a civil or criminal violation of any law of the State.  Except for such Gaming Activity conducted pursuant to this Compact, criminal jurisdiction to enforce State gambling laws on the Tribe's Indian lands, and to adjudicate alleged violations thereof, is hereby transferred to the State pursuant to 18 U.S.C. § 1166(d).

### Sec. 9.5.  Tribal Gaming Agency Members.

(a)     The Tribe shall take all reasonable steps to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; shall adopt a conflict-of-interest code to that end and shall ensure its enforcement; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner or to have a conflict of interest.

(b)     The Tribe shall conduct a background investigation on each prospective member of the Tribal Gaming Agency, who shall meet the background requirements of a management contractor under IGRA; provided that if such member is elected through a tribal election

64

process, that member may not participate in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the member has been found to be suitable.  If requested by the Tribe or the Tribal Gaming Agency, the State Gaming Agency may assist in the conduct of such a background investigation and may assist in the investigation of any possible corruption or compromise of a member of the Tribal Gaming Agency.

(c)     In the event that the Tribe requests the assistance of the State Gaming Agency pursuant to subdivision (b) of this section and the State Gaming Agency determines that a member of the Tribal Gaming Agency is unsuitable, the State Gaming Agency shall serve upon the Tribe a written notice of its finding of unsuitability and request the removal of the member. Upon receipt of notice that the State Gaming Agency has determined the member to be unsuitable, the Tribe shall either immediately remove that member from the Tribal Gaming Agency or demand an expedited arbitration pursuant to section 13.2.

(d)     If the Tribe demands an expedited arbitration of the State Gaming Agency's determination of unsuitability pursuant to subdivision (c), the arbitrator shall make a de novo determination as to whether the State Gaming Agency's determination of unsuitability is justified using the following bases for such determination.

(1)     To be found suitable, the member must be all of the following:

(A)     A person of good character, honesty, and integrity.

(B)     A person whose prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat to the public interest of the State, or to the effective regulation and control of controlled gambling, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of controlled gambling or in the carrying on of the business and financial arrangements incidental thereto.

(C)     A person that is in all other respects qualified to be licensed as provided in section 6.4.7 of this Compact.

(2)    A member is deemed unsuitable if any of the following apply:

(A)    The person, any partner, or any officer, director, or shareholder of any corporation in which the person has a controlling interest, has any financial interest in any business or organization that is engaged in any form of gambling prohibited by section 330 of the California Penal Code, whether within or without the State of California, unless such gambling is lawful within the jurisdiction in which it is being conducted.

(B)    The person fails to clearly establish eligibility and qualification in accordance with section 6.4.7 of this Compact.

(C)    The person fails to provide information, documentation, and assurances required by sections 6.4.7, 6.4.8, subdivision (c), or 6.5.6 of this Compact or requested by the Tribal Gaming Agency, or fails to reveal any fact material to qualification, or supplies information that is untrue or misleading as to a material fact pertaining to the qualification criteria.

(D)    The person has been convicted of a felony in any state or federal court, including a conviction by a federal court or by a court in another state for a crime that would constitute a felony if committed in California.

(E)    The person has been convicted of any misdemeanor involving dishonesty or moral turpitude within the ten (10)-year period immediately preceding the beginning of his or her service on the Tribal Gaming Agency, unless the applicant has been granted relief pursuant to section 1203.4, 1203.4a, or 1203.45 of the California Penal Code; provided, however, that the granting of relief pursuant to section 1203.4, 1203.4a, or 1203.45 of the California Penal Code shall not constitute a limitation on the discretion of the arbitrator to determine the person's compliance with the requirements of sections 6.4.7 and 9.5, subdivision (d)(1), of this Compact.

(F)    The person has been associated with criminal profiteering activity or organized crime, as defined by section 186.2 of the California Penal Code.

(G)    The person has exhibited contumacious defiance of any legislative investigatory body, or other official investigatory body of any state or of the United States, when that body is engaged in the investigation of crimes relating to gambling, official corruption related to gambling activities, or criminal profiteering activity or organized crime, as defined by section 186.2 of the California Penal Code.

(H)    The person is less than twenty-one (21) years of age.

In all cases, in coming to a decision, the arbitrator must give due consideration for the proper protection of the health, safety and welfare of the residents of the State, and must take into account whether membership on the Tribal Gaming Agency would undermine public trust that the Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

### Sec. 9.6.  Uniform Tribal Gaming Regulations.

(a)    Uniform Tribal Gaming Regulations CGCC-1, CGCC-2, CGCC-7, and CGCC-8 (as in effect on the date the parties execute this Compact), adopted by the State Gaming Agency and approved by the Association, shall apply to the Gaming Operation until amended or repealed, without further action by the State Gaming Agency, the Tribe, the Tribal Gaming Agency or the Association.

(b)    Any subsequent Uniform Tribal Gaming Regulations adopted by the State Gaming Agency and approved by the Association shall apply to the Gaming Operation until amended or repealed.

(c)    No State Gaming Agency regulation adopted pursuant to this section 9.6 shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation.

(d)     Every State Gaming Agency regulation adopted pursuant to this section 9.6 that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c).  A regulation adopted pursuant to this section 9.6 that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(e)     Except as provided in subdivision (d), no regulation of the State Gaming Agency adopted pursuant to this section 9.6 shall be adopted as a final regulation with respect to the Tribe's Gaming Operation before the expiration of thirty (30) days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(f)     In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately.  Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration.  If the regulation is disapproved by the Association, it shall cease to be effective, but may be re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (e).

(g)     The Tribe may object to a State Gaming Agency regulation adopted pursuant to this section 9.6 on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of section 13.0.

## SECTION 10.0.  PATRON DISPUTES.

The Tribal Gaming Agency shall promulgate regulations governing patron disputes over the play or operation of any game, including any refusal to pay to a patron any alleged winnings from any Gaming Activities, which regulations must meet the following minimum standards:

(a)     A patron who makes an oral or written complaint to personnel of the Gaming Operation over the play or operation of any game within three (3) days of the play or operation at issue shall be notified in writing of the patron's right to request in writing, within fifteen (15) days of the Gaming Operation's written notification to the patron of that right, resolution of the dispute by the Tribal Gaming Agency, and if dissatisfied with the resolution, to seek resolution in either the Tribe's tribal court system, once a tribal court system is established, or through binding arbitration of the dispute before a retired judge pursuant to the terms and provisions in subdivision (c).  If the patron is not provided with the aforesaid notification within thirty (30) days of the patron's complaint, the deadlines herein shall be removed, leaving only the relevant statutes of limitations under California law that would otherwise apply.

(b)     Upon receipt of the patron's written request for a resolution of the patron's complaint pursuant to subdivision (a), the Tribal Gaming Agency shall conduct an appropriate investigation, shall provide to the patron a copy of its regulations concerning patron complaints, and shall render a decision in accordance with industry practice.  The decision shall be issued within sixty (60) days of the patron's written request, shall be in writing, shall be based on the facts surrounding the dispute, and shall set forth the reasons for the decision.

(c)     If the patron is dissatisfied with the decision of the Tribal Gaming Agency issued pursuant to subdivision (b), or no decision is issued within the sixty (60)-day period, the patron may request that the dispute be settled either in the Tribe's tribal court system, once a tribal court system is established, or by binding arbitration before a JAMS arbitrator, in accordance with the Streamlined Arbitration Rules and Procedures of JAMS (or if those rules no longer exist, the closest equivalent) (hereafter "JAMS Streamlined Arbitration").  The decision to choose either the tribal court system or JAMS Streamlined

69

Arbitration shall be at the patron's sole discretion.  Resolution of the patron dispute before the tribal court system shall be at no cost to the patron (excluding patron's attorney's fees).  The cost and expenses of the JAMS Streamlined Arbitration shall be initially borne equally by the Tribe and the patron (for purposes of this section, the "parties") and both parties shall pay their share of the arbitration costs at the time of election of the arbitration option, but the arbitrator shall award to the prevailing party its costs and expenses (but not attorney fees).

(d)     Upon a patron's request pursuant to subdivision (c), the Tribe and its Gaming Operation shall consent to tribal court adjudication or JAMS Streamlined Arbitration of the matter, and agree to abide by the decision of the tribal court or JAMS arbitrator; provided, however, that if any alleged winnings are found to be a result of a mechanical, electronic or electromechanical failure and not due to the intentional acts or gross negligence of the Tribe or its agents, the tribal court or JAMS arbitrator shall deny the patron's claim for the winnings but shall award reimbursement of the amount wagered by the patron which was lost as a result of any said failure.

(e)     Any party dissatisfied with the award of the tribal court or JAMS arbitrator issued pursuant to subdivision (c), may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (and if those rules no longer exist, the closest equivalent); provided that the party making such election shall bear all costs and expenses of JAMS and the JAMS arbitrators associated with the Appeal Procedure, regardless of the outcome.

(f)     To effectuate its consent to the tribal court system or JAMS Streamlined Arbitration and JAMS Optional Arbitration Appeal Procedure in this section 10.0, the Tribe shall, in the exercise of its sovereignty, waive its right to assert sovereign immunity in connection with the tribal court jurisdiction and JAMS arbitrator's jurisdiction and in any action to (i) enforce the Tribe's or the patron's obligation to arbitrate, (ii) confirm, correct, modify, or vacate the tribal court award or the arbitral award rendered in the arbitration, or (iii) enforce or execute a judgment based upon the award.

# SECTION 11.0.  OFF-RESERVATION ENVIRONMENTAL AND ECONOMIC IMPACTS.

### Sec. 11.1.  Tribal Environmental Impact Report.

(a)  Before the commencement of a Project as defined in section 2.22, the Tribe shall cause to be prepared a comprehensive and adequate tribal environmental impact report (TEIR) analyzing the potentially significant off-reservation environmental impacts of the Project pursuant to the process set forth in this section 11.0; provided, however, that information or data that is relevant to the TEIR and is a matter of public record or is generally available to the public need not be repeated in its entirety in the TEIR, but may be specifically cited as the source for conclusions stated therein; and provided further that such information or data shall be briefly described, that its relationship to the TEIR shall be indicated, and that the source thereof shall be reasonably available for inspection at a public place or public building.  The TEIR shall provide detailed information about the Significant Effect(s) on the Environment that the Project is likely to have, including each of the matters set forth in Appendix B, shall list ways in which the Significant Effects on the Environment might be minimized, and shall include a detailed statement setting forth all of the following:

   (1)  A description of the physical environmental conditions in the vicinity of the Project (the environmental setting and existing baseline conditions), as they exist at the time the notice of preparation is issued;

   (2)  All Significant Effects on the Environment of the proposed Project;

   (3)  In a separate section:

      (A)  Any Significant Effect on the Environment that cannot be avoided if the Project is implemented;

      (B)  Any Significant Effect on the Environment that would be irreversible if the Project is implemented;

71

(4)     Mitigation measures proposed to minimize Significant Effects on the Environment, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy;

(5)     Alternatives to the Project; provided that the Tribe need not address alternatives that would cause it to forgo its right to engage in the Gaming Activities authorized by this Compact on its Indian lands;

(6)     Whether any proposed mitigation would be feasible;

(7)     Any direct growth-inducing impacts of the Project; and

(8)     Whether the proposed mitigation would be effective to substantially reduce the potential Significant Effects on the Environment.

(b)     In addition to the information required pursuant to subdivision (a), the TEIR shall also contain a statement indicating the reasons for determining that various effects of the Project on the off-reservation environment are not significant and consequently have not been discussed in detail in the TEIR.  In the TEIR, the direct and indirect Significant Effects on the Environment, including each of the items on Appendix B, shall be clearly identified and described, giving due consideration to both the short-term and long-term effects.  The discussion of mitigation measures shall describe feasible measures that could minimize significant adverse effects, and shall distinguish between the measures that are proposed by the Tribe and other measures proposed by others.  Where several measures are available to mitigate an effect, each should be discussed and the basis for selecting a particular measure should be identified.  Formulation of mitigation measures should not be deferred until some future time.  The TEIR shall also describe a range of reasonable alternatives to the Project or to the location of the Project, which would feasibly attain most of the basic objectives of the Project and which would avoid or substantially lessen any of the Significant Effects on the Environment, and evaluate the comparative merits of the alternatives; provided that the Tribe need not address alternatives that would cause it to forgo its right to engage in the Gaming Activities authorized by this Compact

on its Indian lands.  The TEIR must include sufficient information about each alternative to allow meaningful evaluation, analysis, and comparison.  The TEIR shall also contain an index or table of contents and a summary, which shall identify each Significant Effect on the Environment with proposed measures and alternatives that would reduce or avoid that effect, and issues to be resolved, including the choice among alternatives and whether and how to mitigate the Significant Effects on the Environment.  Previously approved land use documents, including, but not limited to, general plans, specific plans, and local coastal plans, may be used in the cumulative impact analysis.  The Tribe shall consider any recommendations from the County concerning the person or entity to prepare the TEIR.

(c)     To the extent any terms in this section 11.0 are not defined in this Compact, they will be defined as in, or consistent with, the California Environmental Quality Act and its regulations, as construed by the California courts.

**Sec. 11.2.  Notice of Preparation of Draft TEIR.**

(a)     Upon commencing the preparation of the draft TEIR, the Tribe shall issue a Notice of Preparation (Notice) to the State Clearinghouse in the State Office of Planning and Research (State Clearinghouse) and to the County for distribution to the public.  The Notice shall provide all Interested Persons with information describing the Project and its potential Significant Effects on the Environment sufficient to enable Interested Persons to make a meaningful response or comment.  At a minimum, the Notice shall include all of the following information:

(1)     A description of the Project;

(2)     The location of the Project shown on a detailed map, preferably topographical, and on a regional map; and

(3)     The probable off-reservation environmental effects of the Project.

(b)     The Notice shall also inform Interested Persons of the preparation of the draft TEIR and shall inform them of the opportunity to provide comments to the Tribe within thirty (30) days of the date of the receipt

of the Notice by the State Clearinghouse and the County.  The Notice shall also request Interested Persons to identify in their comments the off-reservation environmental issues and reasonable mitigation measures that the Tribe will need to have explored in the draft TEIR.

**Sec. 11.3.  Notice of Completion of Draft TEIR.**

(a)     The Tribe shall file a copy of the draft TEIR and a Notice of Completion with the State Clearinghouse, the State Gaming Agency, the County, and the California Department of Justice, Office of the Attorney General.  The Tribe shall also post the Notice of Completion and a copy of the draft TEIR on its website.  The Notice of Completion shall include all of the following information:

(1)     A brief description of the Project;

(2)     The proposed location of the Project;

(3)     An address where copies of the draft TEIR are available; and

(4)     Notice of a period of forty-five (45) days during which the Tribe will receive comments on the draft TEIR.

(b)     The Tribe will submit ten (10) copies each of the draft TEIR and the Notice of Completion to the County, which will be asked to post public notice of the draft TEIR at the office of the County Board of Supervisors and to furnish the public notice to the public libraries serving the County.  The County shall also be asked to serve in a timely manner the Notice of Completion to all Interested Persons, which Interested Persons shall be identified by the Tribe for the County, to the extent it can identify them.  In addition, the Tribe will provide public notice by at least one (1) of the procedures specified below:

(1)     Publication at least one time by the Tribe in a newspaper of general circulation in the area affected by the Project.  If more than one area is affected, the notice shall be published in the newspaper of largest circulation from among the newspapers of general circulation in those areas; or

(2)    Direct mailing by the Tribe to the owners and occupants of property adjacent to, but outside, the Indian lands on which the Project is to be located.  Owners of such property shall be identified as shown on the latest equalization assessment roll.

**Sec. 11.4.  Issuance of Final TEIR.**

The Tribe shall prepare, certify and make available to the County, the State Clearinghouse, the State Gaming Agency, and the California Department of Justice, Office of the Attorney General, at least fifty-five (55) days before the completion of negotiations pursuant to section 11.7 a Final TEIR, which shall consist of:

(a)    The draft TEIR or a revision of the draft;

(b)    Comments and recommendations received on the draft TEIR either verbatim or in summary;

(c)    A list of persons, organizations, and public agencies commenting on the draft TEIR;

(d)    The responses, which shall include good faith, reasoned analyses, of the Tribe to significant environmental points raised in the review and consultation process; and

(e)    Any other information added by the Tribe.

**Sec. 11.5.  Cost Reimbursement to County.**

The Tribe shall reimburse the County for copying and mailing costs resulting from making the Notice of Preparation, Notice of Completion, and draft TEIR available to the public under this section 11.0.

**Sec. 11.6.  Failure to Prepare Adequate TEIR.**

The Tribe's failure to prepare an adequate TEIR when required shall be deemed a breach of this Compact and furthermore shall be grounds for issuance of an injunction or other appropriate equitable relief.  Notwithstanding anything to the contrary herein, the document entitled, Final Tribal Environmental Impact Report for the Buena Vista Rancheria of Me-Wuk Indians of California Gaming and

Entertainment Facility," dated May 2007 (2007 TEIR) is acceptable to the State as a TEIR under this Compact, provided that the size and scope of a Project is unchanged from, or is of a lesser size and scope than, the "proposed project" described in and evaluated by the 2007 TEIR.

### Sec. 11.7.  Intergovernmental Agreement.

(a)     Before the commencement of a Project, and no later than the issuance of the Final TEIR to the County, the Tribe shall offer to commence negotiations with the County, and upon the County's acceptance of the Tribe's offer, shall negotiate with the County and shall enter into enforceable written agreements (referred to herein as "intergovernmental agreements") with the County with respect to the matters set forth below:

(1)     Reasonable and timely mitigation of any Significant Effect on the Environment (which effects may include, but are not limited to, aesthetics, agricultural resources, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, water resources, land use, mineral resources, traffic, noise, utilities and service systems, and cumulative effects), where such effect is attributable, in whole or in part, to the Project unless the particular mitigation is infeasible, taking into account economic, environmental, social, technological, or other considerations.  The reference to "timely mitigation" should be interpreted in a manner consistent with general principles of environmental law in the specific factual context and is not intended to imply that any particular mitigation is, or is not, a pre-requisite to commencement of a Project or Gaming Activities.

(2)     Reasonable compensation for law enforcement, fire protection, emergency medical services and any other public services, to the extent such services are to be provided by the County and its special districts to the Tribe for the purposes of the Gaming Operation, including the Gaming Facility, as a consequence of the Project.

(3)     Reasonable compensation for programs designed to address gambling addiction.

(4)     Reasonable and feasible mitigation of any significant effect on
public safety attributable to the Project, including any
reasonable compensation to the County as a consequence
thereof, to the extent such effects are not mitigated pursuant to
subdivision (a)(2) above.

(b)     Except as provided in subdivision (d) below, the Tribe shall not
commence a Project until the intergovernmental agreements specified
in subdivisions (a) and (c) are executed by the parties or are
effectuated pursuant to section 11.8.

(c)     If the Final TEIR identifies traffic impacts to the state highway system
or facilities that are directly attributable in whole or in part to the
Project, then before the commencement of the Project, the Tribe shall
negotiate an intergovernmental agreement with the California
Department of Transportation that provides for timely mitigation of
all traffic impacts on the state highway system and facilities directly
attributable to the Project, and payment of the Tribe's fair share of
cumulative traffic impacts.  Alternatively, the California Department
of Transportation may agree in writing that the Tribe may negotiate
and conclude, prior to commencement of the Project, an
intergovernmental agreement with the County that mitigates the traffic
impacts to the state highway system or facilities.

(d)     Nothing in this section 11.7 requires the Tribe to enter into any other
intergovernmental agreements with a local governmental entity other
than as set forth in subdivisions (a) and (c).  To the extent that an
intergovernmental agreement that was negotiated or entered into
under terms of a prior compact remains in effect, the Tribe is not
obligated under this Compact to enter into any other
intergovernmental agreement unless the Tribe plans a Project that is
larger in size or scope than the "proposed project" described in and
evaluated by the 2007 TEIR.

(e)     No later than the September 1 following any Fiscal Year (ending the
previous June 30) in which funds were sent to the County pursuant to
an intergovernmental agreement with the Tribe, the County shall
furnish to the Tribe a report signed by both the County Administrator
and the Auditor/Controller identifying: (i) all of those funds that were

expended by the County, (ii) which County departments utilized/expended those funds, (iii) through which budgetary departments those funds were used/expended and (iv) any unspent funds and the intended future use of such unspent funds.  If any funds should be used to wholly make any capital purchases or complete any capital projects, those purchases or projects shall also be identified in the report.

### Sec. 11.8.  Arbitration.

To foster good government-to-government relationships and to assure that the Tribe is not unreasonably prevented from commencing a Project and benefiting therefrom, if an intergovernmental agreement with the County, or the California Department of Transportation if required by section 11.7, subdivision (c), is not entered within seventy-five (75) days of the submission of the Final TEIR, or such further time as the Tribe and the County, or the Tribe and the California Department of Transportation if required by section 11.7, subdivision (c) (for purposes of this section the "parties") may agree in writing, any party may demand binding arbitration before a JAMS arbitrator pursuant to JAMS Comprehensive Arbitration with respect to any remaining disputes arising from, connected with, or related to the negotiation:

(a)   The arbitration shall be conducted as follows:  Each party shall exchange with each other within five (5) days of the demand for arbitration its last, best written offer made during the negotiation pursuant to section 11.7.  The arbitrator shall schedule a hearing to be heard within thirty (30) days of his or her appointment unless the parties agree to a longer period.  The arbitrator shall be limited to awarding only one (1) of the offers submitted, without modification, based upon that proposal which best provides feasible mitigation of Significant Effects on the Environment and on public safety and most reasonably compensates for public services pursuant to section 11.7, without unduly interfering with the principal objectives of the Project or imposing environmental mitigation measures which are different in nature or scale from the type of measures that have been required to mitigate impacts of a similar scale of other projects in the surrounding area, to the extent there are such other projects.  The arbitrator shall take into consideration whether the Final TEIR provides the data and information necessary to enable the County, or the California Department of Transportation if required by section 11.7, subdivision

78

(c), to determine both whether the Project may result in a Significant Effect on the Environment and whether the proposed measures in mitigation are sufficient to mitigate any such effect. If the respondent does not participate in the arbitration, the arbitrator shall nonetheless conduct the arbitration and issue an award, and the claimant shall submit such evidence as the arbitrator may require therefore. Review of the resulting arbitration award is waived.

(b)     To effectuate this section 11.8, and in the exercise of its sovereignty, the Tribe agrees to expressly waive, and to waive its right to assert, sovereign immunity in connection with the arbitrator's jurisdiction and in any action to (i) enforce the other party's obligation to arbitrate, (ii) enforce or confirm any arbitral award rendered in the arbitration, or (iii) enforce or execute a judgment based upon the award.

(c)     The arbitral award will become part of the intergovernmental agreements with the County required under section 11.7.

(d)     An arbitral award entered pursuant to this section 11.8 as the result of arbitration between the Tribe and the California Department of Transportation, when an intergovernmental agreement is required by section 11.7, subdivision (c), will become the intergovernmental agreement with the California Department of Transportation.

## SECTION 12.0.  PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY.

### Sec. 12.1.  General Requirements.

The Tribe shall not conduct Class III Gaming in a manner that endangers the public health, safety, or welfare, provided, however, that nothing herein shall be construed to make applicable to the Tribe any State laws or regulations governing the use of tobacco.

### Sec. 12.2.  Tobacco Smoke.

Notwithstanding section 12.1, the Tribe agrees to provide a non-smoking area in the Gaming Facility and to utilize a ventilation system throughout the Gaming Facility that exhausts tobacco smoke to the extent reasonably feasible

79

under state-of-the-art technology existing as of the date of the construction or significant renovation of the Gaming Facility, and further agrees not to offer or sell tobacco products, including but not limited to smokeless tobacco products or e-cigarettes, to anyone younger than the minimum age specified in state law to legally purchase tobacco products.

**Sec. 12.3.  Health and Safety Standards.**

To protect the health and safety of patrons and employees of the Gaming Facility, the Tribe shall, for the Gaming Facility:

(a)     Adopt and comply with State public health standards for food and beverage handling.  The Tribe will allow, during normal hours of operation, inspection of food and beverage services in the Gaming Facility by State health inspectors, or County health inspectors if State inspectors are unavailable, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service.  Any report subsequent to an inspection or visit  by the State, County, or federal health inspectors shall be transmitted, within seventy-two (72) hours of its receipt by the Tribe, to the State Gaming Agency and the Tribal Gaming Agency.  This includes any document that includes a citation or finding.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those State or County health inspectors, but any violations of the standards may be the subject of dispute resolution pursuant to section 13.0.  The inspections shall be conducted in a manner that effectively and efficiently determines compliance with the standards while reasonably minimizing disruption to the Gaming Facility and Gaming Operation.

(b)     Adopt and comply with federal water quality and safe drinking water standards applicable in California.  The Tribe will allow, during normal hours of operation, inspection and testing of water quality at the Gaming Facility by State health inspectors, or County health inspectors if State inspectors are unavailable, to assess compliance with these standards, unless inspections and testing are routinely made by an agency of the United States pursuant to federal law to ensure compliance with federal water quality and safe drinking water standards.  Any report or other writings by the State, County, or

80

federal health inspectors shall be transmitted, within seventy-two (72) hours of its receipt by the Tribe, to the State Gaming Agency and the Tribal Gaming Agency.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those State, or County health inspectors, but any violations of the standards may be the subject of dispute resolution per section 13.0.  The inspections shall be conducted in a manner that effectively and efficiently determines compliance with the standards while reasonably minimizing disruption to the Gaming Facility and Gaming Operation.

(c)     Comply with the building and safety standards set forth in section 6.4.2.

(d)     Adopt and comply with federal workplace and occupational health and safety standards.  The Tribe will allow inspection of Gaming Facility workplaces by State inspectors, during normal hours of operation, to assess compliance with these standards; provided that there is no right to inspection by State inspectors where an inspection has been conducted by an agency of the United States pursuant to federal law during the previous calendar quarter and the Tribe has provided a copy of the federal agency's report to the State Gaming Agency within ten (10) days of the federal inspection.

(e)     Adopt and comply with tribal codes to the extent consistent with the provisions of this Compact and other applicable federal law regarding public health and safety.

(f)     Adopt and comply with federal laws and state laws forbidding harassment, including sexual harassment, in the workplace, forbidding employers from discrimination in connection with the employment of persons to work or working for the Gaming Operation or in the Gaming Facility on the basis of race, color, religion, ancestry, national origin, gender, marital status, medical condition, sexual orientation, age, or disability, and forbidding employers from retaliation against persons who oppose discrimination or participate in employment discrimination proceedings (hereinafter "harassment, retaliation, or employment discrimination"); provided that nothing herein shall preclude the Tribe from giving a preference in employment to members of federally recognized Indian tribes pursuant to a duly adopted tribal ordinance.

(1)    The Tribe shall obtain and maintain an employment practices liability insurance policy consistent with industry standards for non-tribal casinos and underwritten by an insurer with an A.M. Best rating of A or higher which provides coverage of at least three million dollars ($3,000,000) per occurrence for unlawful harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities.  To effectuate the insurance coverage, the Tribe, in the exercise of its sovereignty, shall expressly waive, and also waive its right to assert, sovereign immunity and any and all defenses based thereon up to the greater of three million dollars ($3,000,000) or the limits of the employment practices liability insurance policy, in accordance with the tribal ordinance referenced in subdivision (f)(2) below, in connection with any claim for harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities; provided, however, that nothing herein requires the Tribe to agree to liability for punitive damages or to waive its right to assert sovereign immunity in connection therewith. The employment practices liability insurance policy shall acknowledge in writing that the Tribe has expressly waived, and also waived its right to assert, sovereign immunity and any and all defenses based thereon for the purpose of arbitration of those claims for harassment, retaliation, or employment discrimination up to the limits of such policy and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of such policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds such policy limits or three million dollars ($3,000,000), whichever is greater.  Nothing in this provision shall be interpreted to supersede any requirement in the Tribe's employment discrimination complaint ordinance that a claimant must exhaust administrative remedies as a prerequisite to arbitration.

(2)     The Tribe's harassment, retaliation, or employment discrimination standards shall be subject to enforcement pursuant to an employment discrimination complaint ordinance which shall be adopted by the Tribe prior to the effective date of this Compact and made available to all employees and their legal representatives.  The ordinance shall continuously provide at least the following:

(A)     That California law shall govern all claims of harassment, retaliation, or employment discrimination arising out of the claimant's employment in, in connection with, or relating to the operation of, the Gaming Operation, Gaming Facility or Gaming Activities; provided that California law governing punitive damages need not be a part of the ordinance. Nothing in this provision shall be construed as a submission of the Tribe to the jurisdiction of the California Department of Fair Employment and Housing or the California Fair Employment and Housing Commission, or any successor agencies thereto.

(B)     That a claimant shall have one (1) year from the date that an alleged discriminatory act occurred to file a written notice with the Tribe that he or she has suffered prohibited harassment, retaliation, or employment discrimination.

(C)     That, in the exercise of its sovereignty, the Tribe expressly waives, and also waives its right to assert, sovereign immunity with respect to the dispute resolution processes expressly authorized in this section 12.3, subdivision (f) relating to claims for harassment, retaliation, or employment discrimination, as described in subdivision (f)(2)(D), below, but only up to the greater of three million dollars ($3,000,000) or the limits of the employment practices liability insurance policy referenced in subdivision (f)(1) above; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any

portion of the claim that exceeds three million dollars ($3,000,000) or the insurance policy limits, whichever is greater.

(D) That the Tribe consents to binding arbitration before a JAMS arbitrator in accordance with JAMS Comprehensive Arbitration, that discovery in the arbitration proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure, that the Tribe shall initially bear the cost of JAMS and the JAMS arbitrator, but the arbitrator may award costs to the prevailing party not to exceed those allowable in a suit in California superior court, and that any party dissatisfied with the award of the arbitrator may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that the party making such election must bear all costs and expenses of JAMS and the JAMS arbitrators associated with the Appeal Procedure, regardless of the outcome.  The arbitration shall take place within seventy-five (75) miles of the Gaming Facility, or as otherwise mutually agreed by the parties.  To effectuate its consent to the foregoing arbitration procedure, the Tribe shall, in the exercise of its sovereignty, expressly waive, and also waive its right to assert, sovereign immunity in connection with the arbitrator's jurisdiction and in any state or federal court action to (i) enforce the parties' obligation to arbitrate, (ii) confirm, correct, or vacate the arbitral award rendered in the arbitration in accordance with section 1285 et seq. of the California Code of Civil Procedure, or (iii) enforce or execute a judgment based upon the award.  The Tribe agrees not to assert, and will waive, any defense alleging improper venue or forum non conveniens as to any state court located within the County or any federal court located in the Eastern District of California in any such action brought with respect to the arbitration award.

(3) The employment discrimination complaint ordinance required under subdivision (f)(2) may require, as a prerequisite to

binding arbitration under subdivision (f)(2)(D), that the claimant exhaust the Tribe's administrative remedies, if any exist, in the form of a tribal employment discrimination complaint resolution process, for resolving the claim in accordance with the following standards:

(A)   Upon notice that the claimant alleges that he or she has suffered prohibited harassment, retaliation, or employment discrimination, the Tribe or its designee shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required to proceed with the Tribe's employment discrimination complaint resolution process in the event that the claimant wishes to pursue his or her claim.

(B)   The claimant must bring his or her claim within one hundred eighty (180) days of receipt of the written notice ("limitation period") of the Tribe's employment discrimination complaint resolution process as long as the notice thereof is served personally on the claimant or by certified mail with an executed return receipt by the claimant and the one hundred eighty (180)-day limitation period is prominently displayed on the front page of the notice.

(C)   The arbitration may be stayed until the completion of the Tribe's employment discrimination complaint resolution process or one hundred eighty (180) days from the date the claim was filed, whichever first occurs, unless the parties mutually agree upon a longer period.

(D)   The decision of the Tribe's employment discrimination complaint resolution process shall be in writing, shall be based on the facts surrounding the dispute, shall be a reasoned decision, and shall be rendered within one hundred eighty (180) days from the date the claim was filed, unless the parties mutually agree upon a longer period.

(4)     Within fourteen (14) days following notification that a claimant claims that he or she has suffered harassment, retaliation, or employment discrimination, the Tribe shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within the specified limitation period to first exhaust the Tribe's employment discrimination complaint resolution process, if any exists, and if dissatisfied with the resolution, is entitled to arbitrate his or her claim before a retired judge in a binding arbitration proceeding, at no cost to the claimant (except for the claimant's attorney's fees).

(5)     In the event the Tribe fails to adopt the ordinance specified in subdivision (f)(2), persons who claim they have suffered prohibited harassment, retaliation, or employment discrimination may proceed to arbitration as provided in this subdivision (f), in which case California employment discrimination law, including applicable statutes of limitations, shall apply to all such claims arising out of the claimant's employment in, in connection with, or relating to the operation of the Gaming Operation, Gaming Facility or Gaming Activities, and the Tribe shall be deemed to have expressly waived, and also waived its right to assert, sovereign immunity up to the greater of three million dollars ($3,000,000) or the limits of the employment practices insurance policy in connection with the arbitration of any such claims, any court proceedings based on such arbitration, including the arbitral award resulting therefrom, and any ensuing judgments. Nothing in this subdivision (f)(5), shall be interpreted as a waiver of the Tribe's sovereign immunity or consent to the jurisdiction of any court other than for the purposes set forth in this subdivision (f).

(6)     The Tribe shall provide written notice of the employment discrimination complaint ordinance and the procedures for bringing a complaint in its employee handbook.  The Tribe also shall post and keep posted in prominent and accessible places in the Gaming Facility where notices to employees and applicants for employment are customarily posted, a notice setting forth the pertinent provisions of the employment discrimination

complaint ordinance and information pertinent to the filing of a complaint.

(7)   Nothing herein shall be construed as authorization that resolution of employment discrimination complaints may be adjudicated by a tribal court system or intertribal court system as part of the Tribe's dispute resolution process or otherwise.

(g)   Adopt and comply with standards that are no less stringent than State laws prohibiting a gambling enterprise from cashing any check drawn against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

(h)   Adopt and comply with standards that are no less stringent than State laws, if any, prohibiting a gambling or other gaming enterprise from providing, allowing, contracting to provide, or arranging to provide alcoholic beverages, or food or lodging, for no charge or at reduced prices at a gambling establishment or lodging facility as an incentive or enticement.

(i)   Adopt and comply with standards that are no less stringent than State laws, if any, prohibiting extensions of credit.

(j)   Comply with provisions of the Bank Secrecy Act, P.L. 91-508, October 26, 1970, 31 U.S.C. §§ 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to gambling establishments.

(k)   Adopt and comply with the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the United States Department of Labor regulations implementing the Fair Labor Standards Act, 29 C.F.R. § 500 et seq., the State's minimum wage law set forth in California Labor Code section 1182.12, and the State Department of Industrial Relations regulations implementing the State's minimum wage law, California Code of Regulations, title 8, section 1100 et seq.  Notwithstanding the foregoing, only the federal minimum wage laws set forth in the Fair Labor Standards Act, 29 Code of Federal Regulations, part 500 et

seq., shall apply to tipped employees.  Nothing herein shall make applicable state law concerning overtime.

### Sec. 12.4.  Tribal Gaming Facility Standards Ordinance.

The Tribe shall adopt in the form of an ordinance the standards described in subdivisions (a) through (k) of section 12.3 to which the Gaming Operation and Gaming Facility are held, and shall transmit the ordinance to the State Gaming Agency not later than thirty (30) days after the effective date of this Compact.  In the absence of a promulgated tribal standard in respect to a matter identified in those subdivisions, or the express adoption of an applicable federal and/or State statute or regulation, as the case may be, in respect of any such matter, the otherwise applicable federal and/or State statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

### Sec. 12.5.  Insurance Coverage and Claims.

(a)     The Tribe shall obtain and maintain commercial general liability insurance consistent with industry standards for non-tribal casinos in the United States underwritten by an insurer with an A.M. Best rating of A or higher which provides coverage of no less than ten million dollars ($10,000,000) per occurrence for bodily injury, personal injury, and property damage arising out of, connected with, or relating to the operation of the Gaming Facility or Gaming Activities (Policy). To effectuate the insurance coverage, the Tribe shall expressly waive, and waive its right to assert, sovereign immunity up to the greater of ten million dollars ($10,000,000) or the limits of the Policy, in accordance with the tribal ordinance referenced in subdivision (b) below, in connection with any claim for bodily injury, personal injury, or property damage, arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including, but not limited to, injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility; provided, however, that nothing herein requires the Tribe to agree to liability for punitive damages or to waive its right to assert sovereign immunity in connection therewith.  The Policy shall acknowledge in writing that the Tribe has expressly waived, and waived its right to assert, sovereign immunity for the purpose of arbitration of those claims up to the greater of ten million dollars ($10,000,000) or the limits of the

Policy referred to above and for the purpose of enforcement of any ensuing award or judgment and shall include an endorsement providing that the insurer shall not invoke tribal sovereign immunity up to the limits of the Policy; however, such endorsement or acknowledgement shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds ten million dollars ($10,000,000) or the Policy limits, whichever is greater.

(b)    The Tribe shall adopt, and at all times hereinafter shall maintain in continuous force, an ordinance that provides for all of the following:

    (1)    The ordinance shall provide that California tort law shall govern all claims of bodily injury, personal injury, or property damage arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility, provided that California law governing punitive damages need not be a part of the ordinance. Further, the Tribe may include in the ordinance required by this subdivision a requirement that a person with claims for money damages against the Tribe file those claims within the time periods applicable for the filing of claims for money damages against public entities under California Government Code section 810, et seq.

    (2)    The ordinance shall also expressly provide for waiver of the Tribe's sovereign immunity and its right to assert sovereign immunity with respect to the arbitration or resolution of such claims in the Tribe's tribal court system, once a tribal court system is established, but only up to the greater of ten million dollars ($10,000,000) or the limits of the Policy; provided, however, such waiver shall not be deemed to waive or otherwise limit the Tribe's sovereign immunity for any portion of the claim that exceeds ten million dollars ($10,000,000) or the Policy limits, whichever is greater.

(3)     The ordinance shall allow for the dispute to be settled either in the Tribe's tribal court system, once a tribal court system is established, or by binding arbitration before a JAMS arbitrator, in accordance with JAMS Comprehensive Arbitration.  The decision to choose either the tribal court system or JAMS Comprehensive Arbitration shall be at the claimant's sole discretion.  Resolution of the dispute before the tribal court system shall be at no cost to the claimant (excluding claimant's attorney's fees).  The cost and expenses of the JAMS Comprehensive Arbitration shall be initially borne equally by the parties and the parties shall pay their share of the arbitration costs at the time of claimant's election of the arbitration option, but the arbitrator may award costs to the prevailing party not to exceed those allowable in a suit in California Superior Court.

(4)     The Tribe shall consent to tribal court adjudication or binding JAMS Comprehensive Arbitration before a JAMS arbitrator to the extent of the limits of the Policy, that discovery in the arbitration proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure, that the Tribe and the claimant shall initially bear the cost of JAMS and the JAMS arbitrator equally, to be paid at the time of election of arbitration but that the JAMS arbitrator may award costs to the prevailing party not to exceed those allowable in a suit in California Superior Court, and that any party dissatisfied with the award of the arbitrator may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent), provided that the party making such election must bear all costs and expenses of JAMS and the JAMS arbitrators associated with the Appeal Procedure, regardless of the outcome.

(5)     To effectuate its consent to the tribal court system or JAMS Comprehensive Arbitration, and JAMS Optional Arbitration Appeal Procedure in the ordinance, the Tribe shall, in the exercise of its sovereignty, expressly waive, and also waive its right to assert, sovereign immunity in connection with the arbitrator's jurisdiction and in any action to (i) enforce the parties' obligation to arbitrate, (ii) confirm, correct, modify, or

90

vacate the arbitral award rendered in the arbitration, or (iii) enforce or execute a judgment based upon the award.

(6)     The ordinance may also require that the claimant first exhaust the Tribe's administrative remedies for resolving the claim (hereinafter the "Tribal Dispute Process") in accordance with the following standards:  The claimant must bring his or her claim within one hundred eighty (180) days of receipt of written notice of the Tribal Dispute Process as long as notice thereof is served personally on the claimant or by certified mail with an executed return receipt by the claimant and the one hundred eighty (180)-day limitation period is prominently displayed on the front page of the notice.  The ordinance may provide that any arbitration shall be stayed until the completion of the Tribal Dispute Process or one hundred eighty (180) days from the date the claim is filed in the Tribal Dispute Process, whichever first occurs, unless the parties mutually agree to a longer period.

(c)     Upon notice that a claimant claims to have suffered an injury or damage covered by this section, the Tribe shall provide notice by personal service or certified mail, return receipt requested, that the claimant is required within the specified limitation period to first exhaust the Tribal Dispute Process, if any, and if dissatisfied with the resolution, entitled to arbitrate his or her claim de novo before a retired judge.

(d)     In the event the Tribe fails to adopt the ordinance specified in subdivision (b), the tort law of the State of California, including applicable statutes of limitations, shall apply to all claims of bodily injury, personal injury, and property damage arising out of, connected with, or relating to the operation of the Gaming Operation, Gaming Facility, or the Gaming Activities, including but not limited to injuries resulting from entry onto the Tribe's land for purposes of patronizing the Gaming Facility or providing goods or services to the Gaming Facility; and the Tribe shall be deemed to have expressly waived, and also waived its right to assert, sovereign immunity up to the greater of ten million dollars ($10,000,000) or the limits of the Policy in connection with the arbitration of any such claims, any court

proceedings based on such arbitration, including the arbitral award resulting therefrom, and any ensuing judgments.

(e)     The Tribe shall not invoke on behalf of any employee or agent, the Tribe's sovereign immunity in connection with any claim for, or any judgment based on any claim for, intentional injury to persons or property committed by the employee or agent, without regard to the Tribe's liability insurance limits.  Nothing in this subdivision prevents the Tribe from invoking sovereign immunity on its own behalf or authorizes a claim against the Tribe or a tribally owned entity.

**Sec. 12.6.  Participation in State Statutory Programs Related to Employment.**

(a)     The Tribe agrees that it will participate in the State's workers' compensation program with respect to employees employed at the Gaming Operation and the Gaming Facility.  The workers' compensation program includes, but is not limited to, state laws relating to the securing of payment of compensation through one or more insurers duly authorized to write workers' compensation insurance in this state or through self-insurance as permitted under the State's workers' compensation laws.  If the Tribe participates in the State's workers' compensation program, it agrees that all disputes arising from the workers' compensation laws shall be heard by the Workers' Compensation Appeals Board pursuant to the California Labor Code.  The Tribe hereby consents to the jurisdiction of the Workers' Compensation Appeals Board and the courts of the State of California for purposes of enforcement.  The parties agree that independent contractors doing business with the Tribe are bound by all state workers' compensation laws and obligations.

(b)     In lieu of participating in the State's statutory workers' compensation system, the Tribe may create and maintain a system that provides redress for Gaming Facility employees' work-related injuries through requiring insurance or self-insurance, which system must include a scope of coverage, provision of up to ten thousand dollars ($10,000) in medical treatment for an alleged injury until the date that liability for the claim is accepted or rejected, employee choice of physician (either after thirty (30) days from the date of the injury is reported or if a medical provider network has been established, within the medical

provider network), quality and timely medical treatment provided comparable to the state's medical treatment utilization schedule, availability of an independent medical examination to resolve disagreements on appropriate treatment (by an Independent Medical Reviewer on the state's approved list, a Qualified Medical Evaluator on the state's approved list, or an Agreed Medical Examiner upon mutual agreement of the employer and employee), the right to notice, hearings before an independent tribunal, a means of enforcement against the employer, and benefits (including, but not limited to, disability, rehabilitation and return to work) comparable to those mandated for comparable employees under state law.  Not later than the effective date of this Compact, or sixty (60) days prior to the commencement of Gaming Activities under this Compact, the Tribe will advise the State of its election to participate in the State's workers' compensation system or, alternatively, will forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standard set forth above.  The parties agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(c)     The Tribe agrees that it will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Operation or Gaming Facility, which participation shall include compliance with the provisions of the California Unemployment Insurance Code, and the Tribe consents to the jurisdiction of the State agencies charged with the enforcement of that code and of the courts of the State of California for purposes of enforcement.

(d)     As a matter of comity, with respect to persons, including nonresidents of California, employed at the Gaming Operation or Gaming Facility, the Tribe shall withhold all taxes due to the State as provided in the California Unemployment Insurance Code, and shall forward such amounts to the State.  The Tribe shall file with the Franchise Tax Board a copy of any information return filed with the Secretary of the Treasury, as provided in the California Revenue and Taxation Code and the regulations thereunder, except those pertaining to tribal

members living on the Tribe's reservation.  For purposes of this subdivision, "reservation" refers to the Tribe's Indian lands within the meaning of IGRA or lands otherwise held in trust for the Tribe by the United States, and "tribal members" refers to the enrolled members of the Tribe.

(e)   As a matter of comity, the Tribe shall, with respect to the earnings of any person employed at the Gaming Operation or Gaming Facility, comply with all earnings withholding orders for taxes, support of a child, or spouse or former spouse, and all other orders by which the earnings of an employee are required to be withheld by an employer pursuant to chapter 5 (commencing with section 706.010) of division 1 of title 9 of part 2 of the California Code of Civil Procedure, and with all earnings assignment orders for support made pursuant to chapter 8 (commencing with section 5200) of part 5 of division 9 of the California Family Code or section 3088 of the California Probate Code.

### Sec. 12.7.  Emergency Services Accessibility.

The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

### Sec. 12.8.  Alcoholic Beverage Service.

Purchase, sale, and service of alcoholic beverages by or to patrons shall be subject to state alcoholic beverage laws.

### Sec. 12.9.  Possession of Firearms.

The possession of firearms by any person in the Gaming Facility is prohibited at all times, except for federal, state, or local law enforcement personnel, or tribal law enforcement or security personnel authorized by tribal law and federal or state law to possess firearms at the Gaming Facility.

### Sec. 12.10.  Labor Relations.

The Gaming Activities authorized by this Compact may only commence after the Tribe has adopted an ordinance identical to the Tribal Labor Relations

Ordinance attached hereto as Appendix C, and the Gaming Activities may only continue as long as the Tribe maintains the ordinance.  The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance, before commencing the Gaming Activities authorized by this Compact.

## SECTION 13.0.  DISPUTE RESOLUTION PROVISIONS.

### Sec. 13.1.  Voluntary Resolution; Court Resolution.

In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by good faith negotiations whenever possible.  Therefore, except for the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the Tribe and the State shall seek to resolve disputes by first meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of the performance and compliance of the terms, provisions, and conditions of this Compact, as follows:

(a)     Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth the facts giving rise to the dispute and with specificity, the issues to be resolved.

(b)     The other party shall respond in writing to the facts and issues set forth in the notice within fifteen (15) days of receipt of the notice, unless both parties agree in writing to an extension of time.

(c)     The parties shall meet and confer in good faith by telephone or in person in an attempt to resolve the dispute through negotiation within thirty (30) days after receipt of the notice set forth in subdivision (a), unless both parties agree in writing to an extension of time.

(d)     If the dispute is not resolved to the satisfaction of the parties after the first meeting, either party may seek to have the dispute resolved by an arbitrator in accordance with this section, but neither party shall be required to agree to submit to arbitration.

(e)     Disputes that are not otherwise resolved by arbitration or other mutually agreed means may be resolved in the United States District Court in the judicial district where the Tribe's Gaming Facility is located, or if those federal courts lack jurisdiction, in any state court of competent jurisdiction located in the County of Sacramento.  The disputes to be submitted to court action include, but are not limited to, claims of breach of this Compact, provided that the remedies expressly provided in section 13.4, subdivision (a)(ii) are the sole and exclusive remedies available to either party for issues arising out of this Compact, and supersede any remedies otherwise available, whether at law, tort, contract, or in equity and, notwithstanding any other provision of law or this Compact, neither the State nor the Tribe shall be liable for damages or attorney fees in any action based in whole or in part on the fact that the parties have either entered into this Compact, or have obligations under this Compact.  The parties are entitled to all rights of appeal permitted by law in the court system in which the action is brought.

(f)     In no event may the Tribe be precluded from pursuing any arbitration or judicial remedy against the State on the ground that the Tribe has failed to exhaust its State administrative remedies, and in no event may the State be precluded from pursuing any arbitration or judicial remedy against the Tribe on the ground that the State has failed to exhaust any tribal administrative remedies.

**Sec. 13.2.  Arbitration Rules for the Tribe and the State.**

Arbitration between the Tribe and the State shall be conducted before a JAMS arbitrator in accordance with JAMS Comprehensive Arbitration.  Discovery in the arbitration proceedings shall be governed by section 1283.05 of the California Code of Civil Procedure, provided that no discovery authorized by that section may be conducted without leave of the arbitrator.  The parties shall equally bear the cost of JAMS and the JAMS arbitrator.  Either party dissatisfied with the award of the arbitrator may at the party's election invoke the JAMS Optional Arbitration Appeal Procedure (or if those rules no longer exist, the closest equivalent).  In any JAMS arbitration under this section 13.2, the parties will bear their own attorney's fees.  The arbitration shall take place within seventy-five (75) miles of the Gaming Facility, or as otherwise mutually agreed by the parties and the parties agree that either party may file a state or federal court action to (i) enforce the parties' obligation to arbitrate, (ii) confirm, correct, or vacate the

arbitral award rendered in the arbitration in accordance with section 1285 et seq. of the California Code of Civil Procedure, or (iii) enforce or execute a judgment based upon the award. In any such action brought with respect to the arbitration award, the parties agree that venue is proper in any state court located within the County of Sacramento or in any federal court located in the Eastern District of California.

**Sec. 13.3. No Waiver or Preclusion of Other Means of Dispute Resolution.**

This section 13.0 may not be construed to waive, limit, or restrict any remedy to address issues not arising out of this Compact that is otherwise available to either party, nor may this section be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement, any other method of Compact dispute resolution, including, but not limited to, mediation.

**Sec. 13.4. Limited Waiver of Sovereign Immunity.**

(a)     For the purpose of actions or arbitrations based on disputes between the State and the Tribe that arise under this Compact and the enforcement of any judgment or award resulting therefrom, the State and the Tribe expressly waive their right to assert their sovereign immunity from suit and enforcement of any ensuing judgment or arbitral award and consent to the arbitrator's jurisdiction and further consent to be sued in federal or state court, as the case may be, provided that (i) the dispute is limited solely to issues arising under this Compact, (ii) neither the Tribe nor the State makes any claim for restitution or monetary damages, except that payment of any money expressly required by the terms of this Compact may be sought, and solely injunctive relief, specific performance (including enforcement of a provision of this Compact expressly requiring the payment of money to one or another of the parties), and declaratory relief (limited to a determination of the respective obligations of the parties under the Compact) may be sought, and (iii) nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State with respect to any third party that is made a party or intervenes as a party to the action.

(b)     In the event that intervention, joinder, or other participation by any additional party in any action between the State and the Tribe would

result in the waiver of the Tribe's or the State's sovereign immunity as to that additional party, the waivers of either the Tribe or the State provided herein may be revoked, except where joinder is required to preserve the court's jurisdiction, in which case the State and the Tribe may not revoke their waivers of sovereign immunity as to each other.

(c)     The waivers and consents to jurisdiction expressly provided for under this section 13.0 and elsewhere in the Compact shall extend to all arbitrations and civil actions expressly authorized by this Compact, including, actions to compel arbitration, any arbitration proceeding herein, any action to confirm, modify, or vacate any arbitral award or to enforce any judgment, and any appellate proceeding emanating from any such proceedings, whether in state or federal court.

(d)     Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party, whether in state statute or otherwise, including but not limited to Government Code section 98005.

## SECTION 14.0.  EFFECTIVE DATE AND TERM OF COMPACT.

### Sec. 14.1.  Effective Date.

This Compact shall not be effective unless and until all of the following have occurred:

(a)     The Compact is ratified in accordance with State law; and

(b)     Notice of approval or constructive approval is published in the Federal Register as provided in 25 U.S.C. § 2710(d)(3)(B).

### Sec. 14.2.  Term of Compact; Termination.

(a)     Once effective, this Compact shall be in full force and effect for twenty-five (25) years following the effective date.

(b)     Either party may bring an action in federal court, after providing a thirty (30)-day written notice of an opportunity to cure any alleged breach of this Compact, for a declaration that the other party has materially breached this Compact or that a material part of this

Compact has been invalidated.  Unless the declaratory judgment is stayed, upon issuance of a final, non-appealable declaratory judgment by the court, and in the event that the acts or omissions that were the subject of the declaratory judgment continue after the declaratory judgment becomes final, then the complaining party may unilaterally terminate this Compact upon service of written notice on the other party.  In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the state court located in the County of Sacramento.  The parties expressly waive, and also waive their right to assert, sovereign immunity from suit for purposes of an action under this subdivision, subject to the qualifications stated in section 13.4.

(c)     If this Compact does not take effect by September 1, 2017, it shall be deemed null and void unless the Tribe and the State agree in writing to extend the date.

## SECTION 15.0.  AMENDMENTS; RENEGOTIATIONS.

### Sec. 15.1.  Amendment by Agreement.

The terms and conditions of this Compact may be amended at any time by the mutual and written agreement of both parties during the term of this Compact set forth in section 14.2, provided that each party voluntarily consents to such negotiations in writing.  Any amendments to this Compact shall be deemed to supersede, supplant and extinguish all previous understandings and agreements on the subject.

### Sec. 15.2.  Negotiations for a New Compact.

No sooner than eighteen (18) months before the termination date of this Compact set forth in section 14.2, either party may request the other party to enter into negotiations to extend the term of this Compact or to enter into a new Class III Gaming compact.  If the parties have not agreed to extend the term of this Compact or have not entered into a new compact by the termination date in section 14.2, this Compact shall automatically be extended for one (1) calendar year.  If the parties are engaged in negotiations that both parties agree in writing is proceeding towards conclusion of a new or amended compact, this Compact shall automatically extend for an additional two (2) years.

### Sec. 15.3.  Requests to Amend or to Negotiate a New Compact.

All requests to amend this Compact or to negotiate to extend the term of this Compact or to negotiate for a new Class III Gaming compact shall be in writing, addressed to the Tribal Chair or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request.  If the request meets both the requirements of this section and section 15.1 for an amendment to this Compact, or the requirements of this section and section 15.2 for a new Class III Gaming compact, and all parties agree in writing to negotiate, the parties shall confer promptly and determine within forty-five (45) days of the request a schedule for commencing negotiations, and both parties shall negotiate in good faith.  The Tribal Chair and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

## SECTION 16.0.  NOTICES.

Unless otherwise indicated by this Compact, all notices required or authorized to be served shall be served by first-class mail or facsimile transmission to the following addresses, or to such other address as either party may designate by written notice to the other:

| | |
|---|---|
| Governor | Tribal Chair |
| Governor's Office | Buena Vista Rancheria of Me-Wuk Indians |
| State Capitol | 1418 20th Street, Ste. 200 |
| Sacramento, CA 95814 | Sacramento, CA 95814 |

## SECTION 17.0.  CHANGES TO IGRA.

This Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Compact, and, when reference is made to IGRA or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full.  Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to alter the terms of this Compact, except to the extent that federal law validly mandates retroactive application without the State's or the Tribe's respective consent.

# SECTION 18.0.  MISCELLANEOUS.

### Sec. 18.1.  Third-Party Beneficiaries.

Notwithstanding any provision of law, this Compact is not intended to, and shall not be construed to, create any right on the part of a third party to bring an action to enforce any of its terms.

### Sec. 18.2.  Complete Agreement.

This Compact, together with all appendices, sets forth the full and complete agreement of the parties and supersedes any prior agreements or understandings with respect to the subject matter hereof.

### Sec. 18.3.  Construction.

Neither the presence in another tribal-state Class III Gaming compact of language that is not included in this Compact, nor the absence in another tribal-state Class III Gaming compact of language that is present in this Compact shall be a factor in construing the terms of this Compact.  In the event of a dispute between the parties as to the language of this Compact or the construction or meaning of any term hereof, this Compact will be deemed to have been drafted by the parties in equal parts so that no presumptions or inferences concerning its terms or interpretation may be construed against any party to this Compact.

### Sec. 18.4. Successor Provisions.

Wherever this Compact makes reference to a specific statutory provision, regulation, or set of rules, it also applies to the provision or rules, as they may be amended from time to time, and any successor provision or set of rules.

### Sec. 18.5.  Ordinances and Regulations.

Whenever the Tribe adopts or amends any ordinance or regulations required to be adopted and/or maintained under this Compact, in addition to any other Compact obligations to provide a copy to others, the Tribe shall provide a copy of such adopted or amended ordinance or regulations to the State Gaming Agency within thirty (30) days of the effective date of such ordinance or regulations.

**Sec. 18.6.  Calculation of Time.**

In computing any period of time prescribed by this Compact, the day of the event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday under the Tribe's laws, State law, or federal law.  Unless otherwise specifically provided herein, the term "days" shall be construed as calendar days.

**Sec. 18.7.  Representations.**

(a)     The Tribe expressly represents that as of the date of the undersigned's execution of this Compact the undersigned has the authority to execute this Compact on behalf of the Tribe, including any waiver of sovereign immunity and the right to assert sovereign immunity therein, and will provide written proof of such authority and of the ratification of this Compact by the tribal governing body to the Governor no later than thirty (30) days after the execution of this Compact by the undersigned.

(b)     The Tribe further represents that it is (i) recognized as eligible by the Secretary of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and (ii) recognized by the Secretary of the Interior as possessing powers of self-government.

(c)     In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact through the undersigned.  If the Tribe fails to timely provide written proof of the undersigned's aforesaid authority to execute this Compact or written proof of ratification by the Tribe's governing body, the Governor shall have the right to declare this Compact null and void.

102

(d)    This Compact shall not be presented to the California State Legislature for a ratification vote until the Tribe has provided the written proof required in subdivision (a) to the Governor.

IN WITNESS WHEREOF, the undersigned sign this Compact on behalf of the State of California and the Buena Vista Rancheria of Me-Wuk Indians of California.

STATE OF CALIFORNIA

By Edmund G. Brown Jr.
Governor of the State of California

Executed this 28 day of June, 2016, at Sacramento, California

BUENA VISTA RANCHERIA OF ME-WUK INDIANS OF CALIFORNIA

By Rhonda L. Morningstar Pope
Chairperson of the Buena Vista Rancheria of Me-Wuk Indians of California

Executed this 24 day of June, 2016, at Sacramento, California

**ATTEST:**

_____

Alex Padilla
Secretary of State, State of California

## APPENDICES

A.    Description and Map of Buena Vista Rancheria of Me-Wuk Indians
      Reservation
B.    Off-Reservation Environmental Impact Analysis Checklist
C.    Tribal Labor Relations Ordinance

# APPENDIX A

## Description and Map of Buena Vista Rancheria of Me-Wuk Indians Reservation

The land referred to herein is situated in the unincorporated area, County of Amador, State of California, and is described as follows:

COMMENCING AT THE NORTHEAST CORNER OF SECTION 19, TOWNSHIP 5 NORTH, RANGE 10 EAST, M.D.B. & M., AND THENCE RUNNING WEST ALONG SECTION LINE 578 FEET; THENCE AT RIGHT ANGLES SOUTH 5280 FEET; THENCE AT RIGHT ANGLES EAST 578 FEET; THENCE AT RIGHT ANGLES NORTH 5280 FEET TO A PLACE OF BEGINNING.

EXCEPTING THEREFROM THE FOLLOWING:

ALL THE PORTION OF THE NORTHEAST QUARTER OF SECTION 19, TOWNSHIP 5 NORTH, RANGE 10 EAST, M.D.B. & M., DESCRIBED AS FOLLOWS:

BEGINNING AT A 3 INCH IRON PIPE FENCE END POST AT THE SOUTHERLY END OF A NEW ROAD FENCE, FROM WHICH POINT A 1 1/2 INCH CAPPED IRON PIPE STAMPED "U.S.I.S. 1953 17, 18, 19 AND 20" FOUND MARKING THE NORTHEAST CORNER OF SAID SECTION 19, BEARS NORTH 30 DEG. 08' 30" EAST 1099.38 FEET DISTANT; THENCE, FROM SAID POINT OF BEGINNING, ALONG THE SOUTHERLY PROLONGATION OF SAID NEW ROAD FENCE, SOUTH 00 DEG. 39' 30" EAST 65.11 FEET TO A 3/4 INCH STEEL REINFORCING ROAD TAGGED R.C.E. 10761; THENCE SOUTH 01 DEG. 58' 50" WEST 385.29 FEET TO A SIMILAR STEEL ROAD; THENCE SOUTH 19 DEG. 02' 00" WEST 186.24 FEET TO A Z IRON FENCE POST; THENCE SOUTH 62 DEG. 22' 50" WEST 6.19 FEET TO A 3/4 INCH STEEL REINFORCING ROD TAGGED R.C.E. 10761 SET ON THE WESTERLY LINE OF THAT CERTAIN PARCEL OF LAND CONVEYED BY THE UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR TO LOUIS OLIVER AND HIS WIFE, ANNIE OLIVER, BY INSTRUMENT DATED OCTOBER 6, 1959, AND RECORDED IN THE OFFICE OF THE RECORDER OF AMADOR COUNTY ON OCTOBER 8, 1959, IN BOOK 86 OF OFFICIAL RECORDS AT PAGE 198; THENCE ALONG THE WESTERLY LINE OF SAID OLIVER PARCEL OF LAND, NORTH 01 DEG. 58' 50" EAST 481.11 FEET TO A SIMILAR STEEL ROAD, FROM WHICH POINT THE NORTHWEST CORNER OF SAID OLIVER PARCEL OF LAND, BEARS NORTH 01 DEG. 58' 50" EAST 1100.00 FEET DISTANT; THENCE SOUTH 88 DEG. 01' 10" EAST 40.00 FEET TO A SIMILAR STEEL ROAD; THENCE NORTH 08 DEG. 26' 00" EAST 151.30 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPTING THEREFROM ALL MINERALS AND METALS AS RESERVED BY B. ACCAMPO IN DEED FILED FOR RECORD OCTOBER 5, 1925 IN BOOK 45 OF DEEDS AT PAGE 43, RECORDS OF AMADOR COUNTY.

APN: 012-100-005-000



*POR. T. 5N., R. IOE., M.D.B.& M.*

12-10

07/26/2005

R.M. Bk. 10, Pg. 51
R.M. Bk. 14, Pg. 13
R.M. Bk. 26, Pg. 22
P.M. Bk. 29, Pg. 92
R.M. Bk. 30, Pg. 73
R.M. Bk. 31, Pg. 78
R.M. Bk. 35, Pg. 84 B.L.Adj.
R.M. Bk. 36, Pg. 79

3=R.M. Bk. 39, Pg. 1
←R.M.Bk. 47, Pg. 36 (3/16/93)
R.M. Bk. 58, Pg. 19 (8/31/2005)
Hidden Mesa Unit No. 2

Assessor's Map Bk. 12, Pg. 10
County of Amador, Calif.

Map changes become effective
with the 2000-2001 roll year.
Parcel numbers are subject
to change prior to adoption
of roll on each July 1.

IMPORTANT NOTE:  This map was
prepared for property tax assessment
purposes only.  It is assumed that
the property, as described in it's deed,
is the property being assessed.  No
liability is assumed for the accuracy
of the data delineated hereon.

# APPENDIX B

## Off-Reservation Environmental Impact Analysis Checklist

### I.      Aesthetics

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Have a substantial adverse effect on a scenic vista? | ☐ | ☐ | ☐ | ☐ |
| b)  Substantially damage off-reservation scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic highway? | ☐ | ☐ | ☐ | ☐ |
| c)  Create a new source of substantial light or glare, which would adversely affect day or nighttime views of historic buildings or views in the area? | ☐ | ☐ | ☐ | ☐ |

### II.      Agricultural and Forest Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Involve changes in the existing environment, which, due to their location or nature, could result in conversion of off-reservation farmland to non-agricultural use or conversion of off-reservation forest land to non-forest use? | ☐ | ☐ | ☐ | ☐ |

### III.      Air Quality

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Conflict with or obstruct implementation of the applicable air quality plan? | ☐ | ☐ | ☐ | ☐ |
| b)  Violate any air quality standard or contribute to an existing or projected air quality violation? | ☐ | ☐ | ☐ | ☐ |
| c)  Result in a cumulatively considerable net increase of any criteria pollutant for which the project region is non-attainment under an applicable federal or state ambient air quality standard (including releasing emissions, which exceed quantitative thresholds for ozone precursors)? | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| d) Expose off-reservation sensitive receptors to substantial pollutant concentrations? | ☐ | ☐ | ☐ | ☐ |
| e) Create objectionable odors affecting a substantial number of people off-reservation? | ☐ | ☐ | ☐ | ☐ |

### IV.   Biological Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have a substantial adverse impact, either directly or through habitat modifications, on any species in local or regional plans, policies, or regulations, or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| b) Have a substantial adverse effect on any off-reservation riparian habitat or other sensitive natural community identified in local or regional plans, policies, and regulations or by the California Department of Fish and Game or U.S. Fish and Wildlife Service? | ☐ | ☐ | ☐ | ☐ |
| c) Have a substantial adverse effect on federally protected off-reservation wetlands as defined by Section 404 of the Clean Water Act? | ☐ | ☐ | ☐ | ☐ |
| d) Interfere substantially with the movement of any native resident or migratory fish or wildlife species or with established native resident or migratory wildlife corridors, or impede the use of native wildlife nursery sites? | ☐ | ☐ | ☐ | ☐ |
| e) Conflict with the provisions of an adopted Habitat Conservation Plan, Natural Community Conservation Plan, or other approved local, regional, or state habitat conservation plan? | ☐ | ☐ | ☐ | ☐ |

### V.   Cultural Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Cause a substantial adverse change in the significance of an off-reservation historical or archeological resource? | ☐ | ☐ | ☐ | ☐ |
| b) Directly or indirectly destroy a unique off-reservation paleontological resource or site or unique off-reservation geologic feature? | ☐ | ☐ | ☐ | ☐ |
| c) Disturb any off-reservation human remains, including those interred outside of formal cemeteries? | ☐ | ☐ | ☐ | ☐ |

### VI.   Geology and Soils

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Expose off-reservation people or structures to potential substantial adverse effects, including the risk of loss, injury, or death involving: | | | | |
| i) Rupture of a known earthquake fault, as delineated on the most recent Alquist-Priolo Earthquake Fault Zoning Map issued by the State Geologist for the area or based on other substantial evidence of a known fault?  Refer to Division of Mines and Geology Special Publication 42. | ☐ | ☐ | ☐ | ☐ |
| ii) Strong seismic ground shaking? | ☐ | ☐ | ☐ | ☐ |
| iii) Seismic-related ground failure, including liquefaction? | ☐ | ☐ | ☐ | ☐ |
| iv) Landslides? | ☐ | ☐ | ☐ | ☐ |
| b) Result in substantial off-reservation soil erosion or the loss of topsoil? | ☐ | ☐ | ☐ | ☐ |

### VII.   Greenhouse Gas Emissions

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Generate greenhouse gas emissions, either directly or indirectly, that may have a significant impact on the off-reservation environment? | ☐ | ☐ | ☐ | ☐ |
| b) Conflict with any off-reservation plan, policy or regulation adopted for the purpose of reducing the emissions of greenhouse gases? | ☐ | ☐ | ☐ | ☐ |

## VIII.   Hazards and Hazardous Materials

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Create a significant hazard to the off-reservation public or the off-reservation environment through the routine transport, use, or disposal of hazardous materials? | ☐ | ☐ | ☐ | ☐ |
| b)  Create a significant hazard to the off-reservation public or the off-reservation environment through reasonably foreseeable upset and accident conditions involving the release of hazardous materials into the environment? | ☐ | ☐ | ☐ | ☐ |
| c)  Emit hazardous emissions or handle hazardous or acutely hazardous materials, substances, or waste within one-quarter mile of an existing or proposed off-reservation school? | ☐ | ☐ | ☐ | ☐ |
| d)  Expose off-reservation people or structures to a significant risk of loss, injury or death involving wildland fires. | ☐ | ☐ | ☐ | ☐ |

## IX.  Water Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a)  Violate any water quality standards or waste discharge requirements? | ☐ | ☐ | ☐ | ☐ |
| b)  Substantially deplete off-reservation groundwater supplies or interfere substantially with groundwater recharge such that there should be a net deficit in aquifer volume or a lowering of the local groundwater table level (e.g., the production rate of pre-existing nearby wells would drop to a level which would not support existing land uses or planned uses for which permits have been granted)? | ☐ | ☐ | ☐ | ☐ |
| c)  Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, in a manner which would result in substantial erosion of siltation off-site? | ☐ | ☐ | ☐ | ☐ |
| d)  Substantially alter the existing drainage pattern of the site or area, including through the alteration of the course of a stream or river, or substantially increase the rate or amount of surface runoff in a manner which would result in flooding off-site? | ☐ | ☐ | ☐ | ☐ |
| e)  Create or contribute runoff water which would exceed the capacity of existing or planned storm water drainage systems or provide substantial additional sources of polluted runoff off-reservation? | ☐ | ☐ | ☐ | ☐ |
| f)  Place within a 100-year flood hazard area structures, which would impede or redirect off-reservation flood flows? | ☐ | ☐ | ☐ | ☐ |

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| g) Expose off-reservation people or structures to a significant risk of loss, injury or death involving flooding, including flooding as a result of the failure of a levee or dam? | ☐ | ☐ | ☐ | ☐ |

## X.   Land Use

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Conflict with any off-reservation land use plan, policy, or regulation of an agency adopted for the purpose of avoiding or mitigating an environmental effect? | ☐ | ☐ | ☐ | ☐ |
| b) Conflict with any applicable habitat conservation plan or natural communities conservation plan covering off-reservation lands? | ☐ | ☐ | ☐ | ☐ |

## XI.   Mineral Resources

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Result in the loss of availability of a known off-reservation mineral resource classified MRZ-2 by the State Geologist that would be of value to the region and the residents of the state? | ☐ | ☐ | ☐ | ☐ |
| b) Result in the loss of availability of an off-reservation locally important mineral resource recovery site delineated on a local general plan, specific plan, or other land use plan? | ☐ | ☐ | ☐ | ☐ |

## XII.   Noise

| Would the project result in: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exposure of off-reservation persons to noise levels in excess of standards established in the local general plan or noise ordinance, or applicable standards of other agencies? | ☐ | ☐ | ☐ | ☐ |
| b) Exposure of off-reservation persons to excessive groundborne vibration or groundborne noise levels? | ☐ | ☐ | ☐ | ☐ |
| c) A substantial permanent increase in ambient noise levels in | ☐ | ☐ | ☐ | ☐ |

| Would the project result in: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|:---:|:---:|:---:|:---:|
| the off-reservation vicinity of the project? | | | | |
| d) A substantial temporary or periodic increase in ambient noise levels in the off-reservation vicinity of the project? | ☐ | ☐ | ☐ | ☐ |

## XIII.   Population and Housing

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|:---:|:---:|:---:|:---:|
| a) Induce substantial off-reservation population growth? | ☐ | ☐ | ☐ | ☐ |
| b) Displace substantial numbers of existing housing, necessitating the construction of replacement housing elsewhere off-reservation? | ☐ | ☐ | ☐ | ☐ |

## XIV.   Public Services

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|:---:|:---:|:---:|:---:|
| a) Result in substantial adverse physical impacts associated with the provision of new or physically altered off-reservation governmental facilities, the construction of which could cause significant environmental impacts, in order to maintain acceptable service ratios, response times, or other performance objectives for any of the off-reservation public services: | | | | |
| Fire protection? | ☐ | ☐ | ☐ | ☐ |
| Police protection? | ☐ | ☐ | ☐ | ☐ |
| Schools? | ☐ | ☐ | ☐ | ☐ |
| Parks? | ☐ | ☐ | ☐ | ☐ |
| Other public facilities? | ☐ | ☐ | ☐ | ☐ |

## XV.   Recreation

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|:---:|:---:|:---:|:---:|
| a) Increase the use of existing off-reservation neighborhood and regional parks or other recreational facilities such that substantial physical deterioration of the facility would occur or be accelerated? | ☐ | ☐ | ☐ | ☐ |

### XVI.   Transportation / Traffic

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Conflict with an applicable plan, ordinance or policy establishing measures of effectiveness for the performance of the off-reservation circulation system, taking into account all modes of transportation including mass transit and non-motorized travel and relevant components of the circulation system, including, but not limited to intersections, streets, highways and freeways, pedestrian and bicycle paths, and mass transit? | ☐ | ☐ | ☐ | ☐ |
| b) Conflict with an applicable congestion management program, including, but not limited to, level of service standards and travel demand measures, or other standards established by the county congestion management agency for designated off-reservation roads or highways? | ☐ | ☐ | ☐ | ☐ |
| c) Substantially increase hazards to an off-reservation design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)? | ☐ | ☐ | ☐ | ☐ |
| d) Result in inadequate emergency access for off-reservation responders? | ☐ | ☐ | ☐ | ☐ |

### XVII.  Utilities and Service Systems

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Exceed off-reservation wastewater treatment requirements of the applicable Regional Water Quality Control Board? | ☐ | ☐ | ☐ | ☐ |
| b) Require or result in the construction of new water or wastewater treatment facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| c) Require or result in the construction of new storm water drainage facilities or expansion of existing facilities, the construction of which could cause significant off-reservation environmental effects? | ☐ | ☐ | ☐ | ☐ |
| d) Result in a determination by an off-reservation wastewater treatment provider (if applicable), which serves or may serve the project that it has inadequate capacity to serve the project's projected demand in addition to the provider's existing commitments? | ☐ | ☐ | ☐ | ☐ |

## XVIII. Cumulative Effects

| Would the project: | Potentially Significant Impact | Less Than Significant With Mitigation Incorporation | Less than Significant Impact | No Impact |
|---|---|---|---|---|
| a) Have impacts that are individually limited, but cumulatively considerable off-reservation?  "Cumulatively considerable" means that the incremental effects of a project are considerable when viewed in connection with the effects of past, current, or probable future projects. | ☐ | ☐ | ☐ | ☐ |

## Appendix C

## Tribal Labor Relations Ordinance

## Section 1:  Threshold of Applicability

(a)    If the Buena Vista Rancheria of Me-Wuk Indians (Tribe) employs 250 or more persons in a tribal casino and related facility, it shall adopt this Tribal Labor Relations Ordinance (TLRO or Ordinance). For purposes of this Ordinance, a "tribal casino" is one in which class III gaming is conducted pursuant to the tribal-state compact.  A "related facility" is one for which the only significant purpose is to facilitate patronage of the class III gaming operations.  Even if this Ordinance is adopted, it shall not apply if the tribal casino and related facilities employ less than 250 people.

(b)    Upon the request of a labor union or organization (any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work), the Tribal Gaming Commission shall certify the number of employees in a tribal casino or other related facility as defined in subsection (a) of this Section 1.   Either party may dispute the certification of the Tribal Gaming Commission to the Tribal  Labor Panel, which is defined in Section 13 herein.

## Section 2:  Definition of Eligible Employees

(a)    The provisions of this ordinance shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which class III gaming is  conducted pursuant to a tribal-state compact or other related facility, the only significant purpose of which is to facilitate patronage of the class III gaming operations, except for any of the following:

(1)    any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or

responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

(2)     any employee of the Tribal Gaming Commission;

(3)     any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4)     any cash operations employee who is a "cage" employee or money counter; or

(5)     any dealer.

(6)     For clarification, Eligible Employees shall not include any representative, official, director, officer, or employee of the Tribal government, as distinct from the Tribal agency or enterprise with control over the casino, including any such person whose Tribal governmental duties may relate to the casino.

(b)     On [month] 1 of each year, the Tribal Gaming Commission shall certify the number of Eligible Employees employed by the Tribe to the administrator of the Tribal Labor Panel.

## Section 3:  Non-Interference with Regulatory or Security Activities

Operation of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission-approved gaming ordinance.  Furthermore, the  exercise of rights hereunder shall in no way interfere with the tribal casino's surveillance/security systems, or any other internal controls system designed to protect  the integrity of the Tribe's gaming operations.  The Tribal Gaming Commission is  specifically excluded from the definition of Tribe and its agents.

**Section 4:  Eligible Employees Free to Engage in or Refrain From Concerted Activity**

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

**Section 5:  Unfair Labor Practices for the Tribe**

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

(a)   to interfere with, restrain or coerce Eligible Employees in the exercise of the  rights guaranteed herein;

(b)   to dominate or interfere with the formation or administration of any labor  organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and a certified union from agreeing to union security or dues check off;

(c)   to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance; or

(d)   after certification of the labor organization pursuant to Section 10, to refuse to bargain collectively with the representatives of Eligible  Employees.

**Section 6:  Unfair Labor Practices for the Union**

It shall be an unfair labor practice for a labor organization or its agents:

(a)   to interfere, restrain or coerce Eligible Employees in the exercise of the rights  guaranteed herein;

(b)   to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a primary or secondary boycott or

a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment.  This section does not apply to Section 11(b);

(c)     to force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this TLRO;

(d)     to refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein; or

(e)     to attempt to influence the outcome of a tribal governmental election, provided, however, that this section does not apply to Tribal members.

**Section 7:  Tribe and Union Right to Free Speech**

(a)     The Tribe's and union's expression of any view, argument or opinion or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of interference with, restraint, or coercion if such expression contains no threat of reprisal or force or promise of benefit.

(b)     The Tribe agrees that if a union first offers in writing that it and its local affiliates will comply with (b)(1) and (b)(2), the Tribe shall comply with the provisions of (c) and (d).

(1)     For a period of three hundred sixty-five (365) days following delivery of a Notice of Intent to Organize (NOIO) to the Tribe:

(A)     not engage in strikes, picketing, boycotts, attack websites, or other economic activity at or in relation to the tribal casino or related facility; and refrain from

C-4

engaging in strike-related picketing on Indian lands as defined in 25 U.S.C. § 2703(4);

(B)    not disparage the Tribe for purposes of organizing Eligible Employees;

(C)    not attempt to influence the outcome of a tribal government election; and

(D)    during the three hundred sixty-five (365) days after the Tribe received the NOIO, the union must collect dated and signed authorization cards pursuant to Section 10 herein and complete the secret ballot election also in Section 10 herein.  Failure to complete the secret ballot election within the three hundred sixty five (365) days after the Tribe received the NOIO shall mean that the union shall not be permitted to deliver another NOIO for a period of two years (730 days).

(2)    Resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(c)    Upon receipt of a NOIO, the Tribe shall:

(1)    within two (2) days provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought-after bargaining unit and the Eligible Employees' last known addresses, telephone numbers and email addresses;

(2)    for period of three hundred sixty-five (365) days thereafter, not act in any way which is or could reasonably be perceived to be anti-union.  This includes refraining from making derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters or any other communication which should be interpreted as criticism of the union or advises Eligible Employees to vote "no" against the union.  However, the Tribe shall be free at all times to fully inform Eligible Employees about the terms and conditions of employment it

provides to employees and the advantages of working for the Tribe; and

(3)     resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(d)     The union's offer in subsection (b) of this Section 7 shall be deemed an offer to accept the entirety of this Ordinance as a bilateral contract between the Tribe and the union, and the Tribe agrees to accept such offer.  By entering into such bilateral contract, the union and Tribe mutually waive any right to file any form of action or proceeding with the National Labor Relations Board for the three hundred sixty-five (365)-day period following the NOIO.

(e)     The Tribe shall mandate that any entity responsible for all or part of the operation of the casino and related facility shall assume the obligations of the Tribe under this Ordinance.  If at the time of the management contract, the Tribe recognizes a labor organization as the representative of its employees, certified pursuant to this Ordinance, the labor organization will provide the contractor, upon request, the election officer's certification which constitutes evidence that the labor organization has been determined to be the majority representative of the Tribe's Eligible Employees.

## Section 8:  Access to Eligible Employees

(a)     Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public.  The Tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to  impede access.

(b)     The Tribe, in its discretion, may also designate additional voluntary access to the union in such areas as employee parking lots and non-casino facilities located on tribal lands.

(c)     In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be permitted if the Tribal Labor Panel determines that they compromise the operation of the casino:

(1)     security and surveillance systems throughout the casino, and reservation;

(2)     access limitations designed to ensure security;

(3)     internal controls designed to ensure security; or

(4)     other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of casino personnel, patrons, employees or tribal members, residents, guests or invitees.

(d)     The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the tribal casino by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees. Actual posting of such posters, notices, and other materials shall be by employees desiring to post such materials.

**Section 9:  Indian Preference Explicitly Permitted**

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs or retention to members of any federally recognized Indian tribe or shall in any way affect the Tribe's right to follow tribal law, ordinances, personnel policies or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs or retention. Moreover, in the event of a conflict between tribal law, tribal ordinance or the Tribe's customs and traditions regarding Indian preference and this Ordinance, other tribal law, tribal ordinance, or the Tribe's customs and traditions shall govern.

**Section 10:  Secret Ballot Elections**

(a)     The election officer shall be chosen within three (3) business days of notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside thereafter for all proceedings under the request for recognition; provided, however, that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.  Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)     Upon the showing of interest to the election officer pursuant to subsection (a), within two (2) working days the Tribe shall provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought after bargaining unit and the Eligible Employees' last known addresses, telephone numbers and email addresses.  Nothing herein shall preclude a Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign with or without an election.

(c)     The election shall be conducted by the election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  In the event either that a party refuses to enter into the consent election agreement or that the parties do not agree on the terms, the election officer shall issue an order that conforms to the terms of the form consent election agreement and shall have authority to decide any terms upon which the parties have not agreed, after giving the parties the opportunity to present their views in writing or in a telephonic

conference call. The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein. All questions concerning representation of the Tribe and/or Eligible Employees by a labor organization shall be resolved by the election officer.

(d)     The election officer shall certify the labor organization as the exclusive collective bargaining representative of a unit of employees if the labor organization has received the support of a majority of the Eligible Employees in a secret ballot election that the election officer determines to have been conducted fairly. The numerical threshold for certification is fifty percent (50%) of the Eligible Employees plus one. If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election. If the election officer determines that there was the commission of serious Unfair Labor Practices by the Tribe, or in the event the union made the offer provided for in Section 7(b) that the Tribe violated its obligations under Section 7(c), that interferes with the election process and precludes the holding of a fair election, and the labor organization is able to demonstrate that it had the support of a majority of the employees in the unit at any time before or during the course of the Tribe's misconduct, the election officer shall certify the labor organization as the exclusive bargaining representative.

(e)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties, provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

(f)     A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this ordinance at that particular casino or related facility until one (1) year after the election was lost.

**Section 11:  Collective Bargaining Impasse**

(a)    Upon recognition, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union.

(b)    Except where the union has made the written offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the union shall have the right to strike.  Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. § 2703(4).

(c)    Where the union makes the offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the matter shall be resolved as set forth in Section 13(c).

**Section 12:  Decertification of Bargaining Agent**

(a)    The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union, will result  in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)    The election shall be conducted by an election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  The election officer shall be a member of the Tribal Labor Panel chosen pursuant to the dispute resolution provisions herein.  All questions concerning the decertification of the union shall be resolved by an election officer.  The election officer shall be chosen upon notification to the Tribe and the union of the intent of the Eligible Employees to present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request for  decertification; provided however that if the election officer resigns, dies or is  incapacitated for any other reason from

performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein.

(c)     The election officer shall order the labor organization decertified as the exclusive collective bargaining representative if a majority of the Eligible Employees support decertification of the labor organization in a secret ballot election that the election officer determines to have been conducted fairly. The numerical threshold for decertification is fifty percent (50%) of the Eligible Employees plus one (1). If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

(d)     A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement. Where there is a collective bargaining agreement, a decertification petition may only be filed no more than ninety (90) days and no less than sixty (60) days prior to the expiration of a collective bargaining agreement. A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

(e)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel chosen in accordance with Section 13(c), provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

## Section 13:  Binding Dispute Resolution Mechanism

(a)     All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein.

(b)     The method of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all tribes that have adopted this ordinance. The Tribal Labor Panel shall have

authority to hire staff and take other actions necessary to conduct elections, determine units, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this Ordinance.

(1)     Each member of the Tribal Labor Panel shall have relevant experience in federal labor law and/or federal Indian law with preference given to those with experience in both.  Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Resolution Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

(2)     One arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance.  Five (5) Tribal Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names.  A coin toss shall determine which party may strike the first name.  The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution.  The arbitrator must render a written, binding decision that complies in all respects with the provisions of this Ordinance within thirty (30) days after a hearing.

(c)     (1)     Upon certification of a union in accordance with Section 10 of this Ordinance, the Tribe and union shall negotiate for a period of ninety (90) days after certification.  If, at the conclusion of the ninety (90)-day period, no collective bargaining agreement is reached and either the union and/or the Tribe believes negotiations are at an impasse, at the request of either party, the matter shall be submitted to mediation with the Federal Mediation and Conciliation Service.  The costs of mediation and conciliation shall be borne equally by the parties.

(2)     Upon appointment, the mediator shall immediately schedule meetings at a time and location reasonably accessible to the parties.  Mediation shall proceed for a period of thirty (30) days.  Upon expiration of the thirty (30)-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been

exhausted.  Upon mutual agreement of the parties, the mediator may extend the mediation period.

(3)     Within twenty-one (21) days after the conclusion of mediation, the mediator shall file a report that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process. With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination. The mediator's determination shall be supported by the record.

(d)     In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings.

(e)     Either party may seek a motion to compel arbitration or a motion to confirm or vacate an arbitration award, under this Section 13, in the appropriate state superior court, unless a bilateral contract has been created in accordance with Section 7, in which case either party may proceed in federal court.  The Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming or vacating an arbitration award issued pursuant to the Ordinance in the appropriate state  superior court or in federal court. The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.

Attachment 1

## CONSENT ELECTION AGREEMENT PROCEDURES

Pursuant to the Tribal Labor Relations Ordinance adopted pursuant to section 10.7 of the compact, the undersigned parties hereby agree as follows:

1.    Jurisdiction.  The Buena Vista Rancheria of Me-Wuk Indians (Tribe) is an employer within the meaning of the Ordinance; and each employee organization named on the ballot is an employee organization within the meaning of the Ordinance; and the employees described in the voting unit are Eligible Employees within the meaning of the Ordinance.

2.    Election.  An election by secret ballot shall be held under the supervision of the elections officer among the Eligible Employees of the Tribe named above, and in the manner described below, to determine which employee organization, if any, shall be certified to represent such employees pursuant to the Ordinance.

3.    Voter Eligibility.  Unless otherwise indicated below, the eligible voters shall be all Eligible Employees who were employed on the eligibility cutoff date indicated below, and who are still employed on the date they cast their ballots in the election, i.e., the date the voted ballot is received by the elections officer. Eligible Employees who are ill, on vacation, on leave of absence or sabbatical, temporarily laid off, and employees who are in the military service of the United States shall be eligible to vote.

4.    Voter Lists.  The Tribe shall electronically file with the elections officer a list of eligible voters within two (2) business days after receipt of a Notice of Election.

5.    Notice of Election.  The elections officer shall serve Notices of Election on the Tribe and on each party to the election.  The Notice shall contain a sample ballot, a description of the voting unit and information regarding the balloting process.  Upon receipt, the Tribe shall post such Notice of Election conspicuously on all employee bulletin boards in each facility of the employer in which members of the voting unit are employed.  Once a Notice of Election is posted, where the union has made the written offer set forth in Section 7(b) of the Tribal Labor Relations Ordinance, the Tribe shall continue to refrain from publishing or posting pamphlets, fliers, letters, posters or any other communication

which should be interpreted as criticism of the union or advises employees to vote "no" against the union.  The Tribe shall be free at all times to fully inform employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe.

6.     Challenges.  The elections officer or an authorized agent of any party to the election may challenge, for good cause, the eligibility of a voter.  Any challenges shall be made prior to the tally of the ballots.

7.     Tally of Ballots.  At the time and place indicated below, ballots shall be co-mingled and tabulated by the elections officer.  Each party shall be allowed to station an authorized agent at the ballot count to verify the tally of ballots.  At the conclusion of the counting, the elections officer shall serve a Tally of Ballots on each party.

8.     Objections and Post-election Procedures.  Objections to the conduct of the election may be filed with the elections officer within five (5) calendar days following the service of the Tally of Ballots.  Service and proof of service is required.

9.     Runoff Election.  In the event a runoff election is necessary, it shall be conducted at the direction of the elections officer.

10.     Wording on Ballot.  The choices on the ballot shall appear in the wording and order enumerated below.

FIRST:       [***]
SECOND:    [***]
THIRD:       [***]

11.     Cutoff Date for Voter Eligibility:  [***]

12.     Description of the Balloting Process.  A secret ballot election will take place within thirty (30) days after delivery of the voter list referenced in paragraph 4.  The employer will determine the location or locations of the polling places for the election.  There must be at least one (1) neutral location (such as a high school, senior center, or similar facility) which is not within the gaming facility and employees must also be afforded the option of voting by mail through procedures established by the elections officer.  Only voters, designated observers and the election officer or supporting staff can be present in the polling area.  Neither

employer nor union representatives may campaign in or near the polling area.  If the election officer or supporting staff questions an employee's eligibility to vote in the election, the ballot will be placed in a sealed envelope until your eligibility is determined.  The box will be opened under the supervision of the election officer when voting is finished.  Ballots submitted by mail must be received by the elections officer no later than the day of the election in order to be counted in the official tally of ballots.

13.    Voter List Format and Filing Deadline:  Not later than two (2) business days after receipt of the Notice of Election, the Tribe shall file with the elections officer, at [**address**], an alphabetical list of all eligible voters including their job titles, work locations and home addresses.

Copies of the list shall be served concurrently on the designated representative for the [***]; proof of service must be concurrently filed with elections officer.

In addition, the Tribe shall submit to the elections officer on or before [***], by electronic mail, a copy of the voter list in an Excel spreadsheet format, with columns labeled as follows: First Name, Last Name, Street Address, City, State, and Zip Code.  Work locations and job titles need not be included in the electronic file.  The file shall be sent to [***].

14.    Notices of Election:  Shall be posted by the Tribe no later than [***].

15.    Date, Time and Location of Counting of Ballots:  Beginning at [**time**] on [**date**], at the [**address**].

16.    Each signatory to this Agreement hereby declares under penalty of perjury that s/he is a duly authorized agent empowered to enter into this Consent Election Agreement.

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

Date approved: _____

[**Author**]
Elections Officer

# EXHIBIT B

# TRIBAL-STATE GAMING COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND

# THE BLUE LAKE RANCHERIA,

# CALIFORNIA

# TABLE OF CONTENTS

PREAMBLE                                                                        1

Sec. 1.0.      Purposes and Objectives.                                          1

Sec. 2.0.      Definitions.                                                      2

Sec. 3.0.      Scope of Class III Gaming Authorized.                             5

Sec. 4.0.      Authorized Number of Gaming Devices, Location of Gaming
               Facilities, and Cost Reimbursement.                              6

Sec. 4.1.      Authorized Number of Gaming Devices.                             6

Sec. 4.2.      Authorized Gaming Facilities.                                    6

Sec. 4.3.      Special Distribution Fund.                                       6

Sec. 4.4.      Use of Special Distribution Funds.                               9

Sec. 4.5.      Quarterly Payments and Quarterly Contribution Report.            9

Sec. 4.6.      Exclusivity.                                                     12

Sec. 5.0.      Revenue Sharing With Non-Gaming and Limited-Gaming
               Tribes.                                                          13

Sec. 5.1.      Definitions.                                                     13

Sec. 5.2.      Payments to the Revenue Sharing Trust Fund or the Tribal
               Nation Grant Fund.                                               15

Sec. 5.3.      Credits Related to Payments Due Under Section 5.2.               16

Sec. 6.0.      Licensing.                                                       21

Sec. 6.1.      Gaming Ordinance and Regulations.                               21

Sec. 6.2.      Tribal Ownership, Management, and Control of Gaming
               Operation.                                              21

Sec. 6.3.      Prohibitions Regarding Minors.                          22

Sec. 6.4.      Licensing Requirements and Procedures.                  22

Sec. 6.4.1.    Summary of Licensing Principles.                        22

Sec. 6.4.2.    Gaming Facility.                                        22

Sec. 6.4.3.    Gaming Employees.                                       27

Sec. 6.4.4.    Gaming Resource Suppliers.                              30

Sec. 6.4.5.    Financial Sources.                                      32

Sec. 6.4.6.    Processing Tribal Gaming License Applications.          37

Sec. 6.4.7.    Suitability Standard Regarding Gaming Licenses.         38

Sec. 6.4.8.    Background Investigations of Applicants.                39

Sec. 6.4.9.    Temporary Licensing.                                    40

Sec. 6.5.      Tribal Gaming License Issuance.                         41

Sec. 6.5.1.    Denial, Suspension, or Revocation of Licenses.          42

Sec. 6.5.2.    Renewal of Licenses; Extensions; Further Investigation. 42

Sec. 6.5.3.    Identification Cards.                                   43

Sec. 6.5.4.    Fees for Tribal Gaming License.                         44

Sec. 6.5.5.    Summary Suspension of Tribal Gaming License.            44

Sec. 6.5.6.    State Determination of Suitability Process.             44

Sec. 6.6.      Submission of New Application.                          48

Sec. 7.0.        Approval and Testing of Gaming Devices.                    48

Sec. 7.1.        Gaming Device Approval.                                    48

Sec. 7.2.        Gaming Test Laboratory Selection.                          49

Sec. 7.3.        Maintenance of Records of Testing Compliance.             50

Sec. 7.4.        State Gaming Agency Inspections.                          50

Sec. 7.5.        Technical Standards.                                       53

Sec. 7.6.        Transportation of Gaming Devices.                          54

Sec. 8.0.        Inspections.                                               54

Sec. 8.1.        On-Site Regulation.                                        54

Sec. 8.1.1.      Investigation and Sanctions.                              55

Sec. 8.2.        Assistance by State Gaming Agency.                         55

Sec. 8.3.        Access to Premises by State Gaming Agency; Notification;
                 Inspections.                                               55

Sec. 8.4.        Inspection, Copying, and Confidentiality of Documents.    57

Sec. 8.5.        Cooperation with Tribal Gaming Agency.                     60

Sec. 8.6.        Compact Compliance Review.                                 60

Sec. 8.7.        Waiver of Materials.                                       60

Sec. 9.0.        Rules and Regulations for the Operation and Management
                 of the Gaming Operation and Facility.                      60

Sec. 9.1.        Adoption of Regulations for Operation and Management;
                 Minimum Standards.                                         60

iii

Sec. 9.2.     Manner in Which Incidents are Reported.                    62

Sec. 9.3.     Minimum Internal Control Standards (MICS).                 63

Sec. 9.4.     Program to Mitigate Problem Gambling.                      64

Sec. 9.5.     Enforcement of Regulations.                               66

Sec. 9.6.     State Civil and Criminal Jurisdiction.                    66

Sec. 9.7.     Tribal Gaming Agency Members.                             66

Sec. 9.8.     RESERVED.                                                 67

Sec. 9.9.     Uniform Statewide Tribal Gaming Regulations.              67

Sec. 10.0.    Patron Disputes.                                         68

Sec. 11.0.    Tribal Distributions to Mitigate Impacts of Gaming
              on Local Governments.                                    70

Sec. 11.1.    Distributions by Tribe to Local Governments.             70

Sec. 11.2.    Tracking of Tribal Distributions from the Impact Mitigation
              Fund.                                                    70

Sec. 12.0.    Public and Workplace Health, Safety, and Liability.      71

Sec. 12.1.    General Requirements.                                    71

Sec. 12.2.    Tobacco Smoke.                                           71

Sec. 12.3.    Health and Safety Standards.                             71

Sec. 12.4.    Prohibited Discrimination, Harassment and
              Retaliation Standards.                                   73

Sec. 12.5.    Tribal Gaming Facility Standards.                        74

Sec. 12.6.    Insurance Coverage and Claims.                           74

Sec. 12.7.    Participation in State Programs Related to Employment.    75

Sec. 12.8.    Emergency Services Accessibility.    78

Sec. 12.9.    Alcoholic Beverage Service.    78

Sec. 12.10.  Possession of Firearms.    78

Sec. 12.11.  Labor Relations.    78

Sec. 13.0.    Dispute Resolution Provisions.    78

Sec. 13.1.    Voluntary Resolution; Court Resolution.    78

Sec. 13.2.    No Waiver or Preclusion of Other Means of Dispute
Resolution.    80

Sec. 13.3.    Limited Waiver of Sovereign Immunity.    80

Sec. 13.4.    Judicial Remedies for Material Breach.    81

Sec. 14.0.    Effective Date and Term of Compact.    82

Sec. 14.1.    Effective Date.    82

Sec. 14.2.    Term of Compact.    82

Sec. 15.0.    Amendments; Renegotiations.    82

Sec. 15.1.    Amendment by Agreement.    82

Sec. 15.2.    Negotiations for a New Compact.    82

Sec. 15.3.    Changes in the Law.    83

Sec. 15.4.    Entitlement to Renegotiate Compact Based on Changed
Market Conditions.    83

Sec. 15.5.   Entitlement to Renegotiate Compact Based on State
Authorization of New Forms of Class III Gaming.                       83

Sec. 15.6.   Entitlement to Renegotiate for Gaming on Newly Acquired
Indian Lands.                                                         84

Sec. 15.7.   Requests to Amend or to Negotiate a New Compact.          84

Sec. 16.0.   Notices.                                                  84

Sec. 17.0.   Changes to IGRA.                                          84

Sec. 18.0.   Miscellaneous.                                            85

Sec. 18.1.   Third Party Beneficiaries.                                85

Sec. 18.2.   Complete Agreement.                                       85

Sec. 18.3.   Construction.                                             85

Sec. 18.4.   Successor Provisions.                                     85

Sec. 18.5.   Ordinances and Regulations.                               86

Sec. 18.6.   Calculation of Time.                                      86

Sec. 18.7.   Force Majeure.                                            86

Sec. 18.8.   Representations.                                          87

APPENDICES

A.    Tribal Labor Relations Ordinance                    A-1

B.    Off-Track Satellite Wagering                        B-1

# TRIBAL-STATE GAMING COMPACT
# BETWEEN THE STATE OF CALIFORNIA
# AND THE BLUE LAKE RANCHERIA, CALIFORNIA

The Blue Lake Rancheria, California (Tribe), a federally recognized Indian tribe, and the State of California (State) enter into this Tribal-State Gaming Compact Between the State of California and the Blue Lake Rancheria, California (Compact) pursuant to the Indian Gaming Regulatory Act of 1988 (IGRA).

## PREAMBLE

**WHEREAS**, in 1999, the Tribe and the State entered into the Tribal-State Compact Between the State of California and the Blue Lake Rancheria (1999 Compact), which enabled the Tribe, through revenues generated by its Gaming Operation, to improve the governance, environment, education, health, safety, and general welfare of its citizens, and to promote a strong tribal government, self-sufficiency, and to provide essential government services to its citizens; and

**WHEREAS**, the State and the Tribe agree that all terms of this Compact are intended to be binding and enforceable.

**NOW, THEREFORE**, the Tribe and the State agree as set forth herein:

## SECTION 1.0.  PURPOSES AND OBJECTIVES.

The terms of this Compact are designed and intended to:

(a)   Evidence the goodwill and cooperation of the Tribe and the State in fostering a mutually respectful government-to-government relationship that will serve the mutual interests of the parties.

(b)   Develop, enhance and implement a means of regulating Class III Gaming, and only Class III Gaming, on the Tribe's Indian lands to ensure its fair and honest operation in accordance with IGRA, and through that regulated Class III Gaming, enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and its governmental services and programs.

(c)   Promote ethical practices in conjunction with Class III Gaming, through the licensing and control of persons and entities employed in, or providing goods and services to, the Gaming Operation, protect

1

against the presence or participation of persons whose criminal backgrounds, reputations, character, or associations make them unsuitable for participation in gaming, thereby maintaining a high level of integrity in tribal government gaming, and protect the patrons and employees of the Gaming Operation and Gaming Facility, and the local communities.

## SECTION 2.0.  DEFINITIONS.

**Sec. 2.1.**  "Applicable Codes" means the California Building Standards Code and the California Public Safety Code applicable to the County, as set forth in titles 19 and 24 of the California Code of Regulations, as those regulations may be amended during the term of this Compact, including, but not limited to, codes for building, electrical, energy, mechanical, plumbing, fire, and safety.

**Sec. 2.2.**  "Applicant" means an individual or entity that applies for a tribal gaming license or State determination of suitability.

**Sec. 2.3.**  "Association" means an association of California tribal and state gaming regulators, the membership of which comprises up to two (2) representatives from each tribal gaming agency of those tribes with whom the State has a Class III Gaming compact or which possess Secretarial Procedures under IGRA, and up to two (2) delegates each from the California Department of Justice, Bureau of Gambling Control and the California Gambling Control Commission.

**Sec. 2.4.**  "Class III Gaming" means the forms of class III gaming defined as such in 25 U.S.C. § 2703(8) and by the regulations of the National Indian Gaming Commission.

**Sec. 2.5.**  "Commission" means the California Gambling Control Commission, or any successor agency of the State.

**Sec. 2.6.**  "Compact" means this Tribal-State Gaming Compact Between the State of California and the Blue Lake Rancheria, California.

**Sec. 2.7.**  "County" means the County of Humboldt, California, a political subdivision of the State.

**Sec. 2.8.**  "Financial Source" means any person or entity who, directly or indirectly, extends financing in connection with the Tribe's Gaming Facility or Gaming Operation.

2

**Sec. 2.9.**  "Gaming Activity" or "Gaming Activities" means the Class III Gaming activities authorized under this Compact.

**Sec. 2.10.**  "Gaming Device" means any slot machine within the meaning of article IV, section 19, subdivision (f) of the California Constitution.  For purposes of calculating the number of Gaming Devices, each player station or terminal on which a game is played constitutes a separate Gaming Device, irrespective of whether it is part of an interconnected system to such terminals or stations. "Gaming Device" includes, but is not limited to, video poker, but does not include electronic, computer, or other technological aids that qualify as class II gaming (as defined under IGRA).

**Sec. 2.11.**  "Gaming Employee" means any natural person who is an employee of the Gaming Operation and (i) conducts, operates, maintains, repairs, accounts for, or assists in any Gaming Activities, or is in any way responsible for supervising such Gaming Activities or persons who conduct, operate, maintain, repair, account for, assist, or supervise any such Gaming Activities, (ii) is in a category under federal or tribal gaming law requiring licensing, or (iii) is a person whose employment duties require or authorize access to restricted areas of the Gaming Facility that are not open to the public.  The definition of Gaming Employee does not include members or employees of the Tribal Gaming Agency.

**Sec. 2.12.**  "Gaming Facility" or "Facility" means the buildings or structures in which Class III Gaming, as authorized by this Compact, is conducted.

**Sec. 2.13.**  "Gaming Operation" means the business enterprise that offers and operates Gaming Activities, whether exclusively or otherwise, but does not include the Tribe's governmental or other business activities unrelated to operation of the Gaming Facility.

**Sec. 2.14.**  "Gaming Ordinance" means a tribal ordinance or resolution duly authorizing the conduct of Gaming Activities on the Tribe's Indian lands in California and approved under IGRA.

**Sec. 2.15.**  "Gaming Resources" means any goods or services provided or used in connection with Gaming Activities, whether exclusively or otherwise, including, but not limited to, equipment, furniture, Gaming Devices and ancillary equipment, implements of Gaming Activities such as playing cards, furniture designed primarily for Gaming Activities, maintenance or security equipment and services, and Class III Gaming management or consulting services.  "Gaming Resources" does not include professional accounting and legal services.

3

**Sec. 2.16.**  "Gaming Resource Supplier" means any person or entity who, directly or indirectly, does, or is deemed likely to, manufacture, distribute, supply, vend, lease, purvey, or otherwise provide, to the Gaming Operation or Gaming Facility at least twenty-five thousand dollars ($25,000) in Gaming Resources in any twelve (12)-month period, or who, directly or indirectly, receives, or is deemed likely to receive, in connection with the Gaming Operation or Gaming Facility, at least twenty-five thousand dollars ($25,000) in any consecutive twelve (12)-month period, provided that the Tribal Gaming Agency may exclude a purveyor of equipment or furniture that is not specifically designed for, and is distributed generally for use other than in connection with, Gaming Activities, if, but for the purveyance, the purveyor is not otherwise a Gaming Resource Supplier as defined herein, the compensation received by the purveyor is not grossly disproportionate to the value of the goods or services provided, and the purveyor is not otherwise a person who exercises a significant influence over the Gaming Operation.

**Sec. 2.17.**  "IGRA" means the Indian Gaming Regulatory Act of 1988 (18 U.S.C. §§ 1166-1168; 25 U.S.C. § 2701 et seq.), and any amendments thereto, as interpreted by all regulations promulgated thereunder.

**Sec. 2.18.**  "Management Contractor" means any Gaming Resource Supplier with whom the Tribe has contracted for the management of any Gaming Activity or Gaming Facility, including, but not limited to, any person who would be regarded as a management contractor under IGRA.

**Sec. 2.19.**  "Net Win" means drop from Gaming Devices, plus the redemption value of expired tickets, less fills, less free play, less payouts, less that portion of the Gaming Operation's payments to a third-party wide-area progressive jackpot system provider that is contributed only to the progressive jackpot amount.

**Sec. 2.20.**  "NIGC" means the National Indian Gaming Commission.

**Sec. 2.21.**  "Secretarial Procedures" means procedures prescribed by the Secretary of the Department of the Interior pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii) of IGRA.

**Sec. 2.22.**  "State" means the State of California or an authorized official or agency thereof designated by this Compact or by the Governor.

**Sec. 2.23.**  "State Designated Agency" means the entity or entities designated or to be designated by the Governor to exercise rights and fulfill responsibilities established by this Compact.

4

**Sec. 2.24.**  "State Gaming Agency" means the entities authorized to investigate, approve, regulate and license gaming pursuant to the Gambling Control Act (chapter 5 (commencing with section 19800) of division 8 of the California Business and Professions Code), or any successor statutory scheme, and any entity or entities in which that authority may hereafter be vested.

**Sec. 2.25.**  "Tribal Chair" or "Tribal Chairperson" means the person duly elected under the Tribe's Constitution to perform the duties specified therein, including serving as the Tribe's official representative.

**Sec. 2.26.**  RESERVED

**Sec. 2.27.**  "Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law, including, but not limited to, an intertribal gaming regulatory agency approved to fulfill those functions by the NIGC, primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribe's Gaming Ordinance.  No person employed in, or in connection with, the management, supervision, or conduct of any Gaming Activity may be a member or employee of the Tribal Gaming Agency.

**Sec. 2.28.**  "Tribe" means the Blue Lake Rancheria, California, an Indian tribe listed in the Federal Register as a federally recognized tribe.

## SECTION 3.0.  SCOPE OF CLASS III GAMING AUTHORIZED.

(a)     The Tribe is hereby authorized and permitted to operate only the following Gaming Activities under the terms and conditions set forth in the Compact:

(1)     Gaming Devices.

(2)     Any banking or percentage card game.

(3)     Any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet, unless any other person, organization, or entity in the state is permitted to do so under state and federal law.

(4)     Off-track wagering on horse races at a satellite wagering facility pursuant to the requirements in the document attached hereto as Appendix B.

(b)     Nothing herein shall be construed to authorize or permit the operation of any Class III Gaming that the State lacks the power to authorize or permit under article IV, section 19, subdivision (f) of the California Constitution.

(c)     The Tribe shall not engage in Class III Gaming that is not expressly authorized in this Compact.

## SECTION 4.0.  AUTHORIZED NUMBER OF GAMING DEVICES, LOCATION OF GAMING FACILITIES, AND COST REIMBURSEMENT.

### Sec. 4.1.  Authorized Number of Gaming Devices.

The Tribe is entitled to operate up to a total of two thousand, two hundred and fifty (2,250) Gaming Devices pursuant to the conditions set forth in section 3.0 and sections 4.2 through and including section 5.3.

### Sec. 4.2.  Authorized Gaming Facilities.

The Tribe may establish and operate not more than three (3) Gaming Facilities, one (1) of which has a primary purpose other than gaming and operates no more than fifty (50) Gaming Devices, and engage in Class III Gaming only on the Tribe's eligible Indian lands on which Class III Gaming may lawfully be conducted under IGRA as of the execution date of this Compact.  The Tribe may combine and operate in its Gaming Facilities any forms and kinds of gaming permitted under law, except to the extent limited under IGRA, this Compact, or the Tribe's Gaming Ordinance.

### Sec. 4.3.  Special Distribution Fund.

(a)     The Tribe shall pay to the State on a pro rata basis the State's 25 U.S.C. § 2710(d)(3)(C) costs incurred for purposes consistent with IGRA, including the performance of all its duties under this Compact, the administration and implementation of tribal-state Class III Gaming compacts and Secretarial Procedures, and funding for the Office of Problem Gambling, as determined by the monies appropriated in the annual Budget Act each fiscal year to carry out those purposes (Appropriation).  The Appropriation and the maximum number of

6

Gaming Devices operated by all federally recognized tribes in California determined to be in operation during the previous State fiscal year shall be reported annually by the State Gaming Agency to the Tribe on or before December 15.  The term "operated" or "operation" as used in this Compact in relation to Gaming Devices describes each and every Gaming Device available to patrons (including slot tournament contestants) for play at any given time.

(b)     The Tribe's pro rata share of the State's 25 U.S.C. § 2710(d)(3)(C) costs in any given year this Compact is in effect shall be calculated by the following equation:

>    The maximum number of Gaming Devices operated in the Tribe's Gaming Facility(ies) during the previous State fiscal year as determined by the State Gaming Agency, divided by the maximum number of Gaming Devices operated by all federally recognized tribes in California pursuant to tribal-state Class III Gaming compacts or Secretarial Procedures during the previous State fiscal year, multiplied by the Appropriation, equals the Tribe's pro rata share.

(1)     Beginning the first full quarter after the commencement of Gaming Activities under this Compact, the Tribe shall pay its pro rata share to the State Gaming Agency for deposit into the Indian Gaming Special Distribution Fund established by the Legislature (Special Distribution Fund).  The payment shall be made in four (4) equal quarterly installments due on the thirtieth (30th) day following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second quarter, October 30 for the third quarter, and January 30 for the fourth quarter); provided, however, that in the event the Gaming Activities authorized by this Compact commence during a calendar quarter, payment shall be prorated for the number of days remaining in that initial quarter, in addition to any remaining full quarters in the first calendar year of operation to obtain a full year of full quarterly payments of the Tribe's pro rata share specified above.  A payment year will run from January through December.  If any portion of the Tribe's quarterly pro rata share payment or payment pursuant to section

7

4.3, subdivision (b) or section 5.2 is overdue the Tribe shall pay to the State for purposes of deposit into the appropriate fund, the amount overdue plus interest accrued thereon at the rate of one percent (1%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less.  All quarterly payments shall be accompanied by the report specified in section 4.5.

(2)    If the Tribe objects to the State's determination of the Tribe's pro rata share, or to the amount of the Appropriation as including matters not consistent with IGRA, the matter shall be resolved in accordance with the dispute resolution provisions of section 13.0.  Any State determination of the Tribe's pro rata share challenged by the Tribe shall govern and must be paid by the Tribe to the State when due, and the Tribe's payment is a condition precedent to invoking the section 13.0 dispute resolution provisions.

(3)    Only for purposes of calculating the Tribe's annual pro rata share under section 4.3, subdivision (a), any increase in the Appropriation for the current year shall be capped at an amount equal to five percent (5%) from the Appropriation used to calculate the Tribe's pro rata share in the immediately preceding year.  The Appropriation, so capped, will be used to calculate the Tribe's pro rata share under the equation set forth in section 4.3, subdivision (b).  The Tribe and the State anticipate and intend that annual increases in the Tribe's pro rata share payment will be significantly less than five percent (5%) annually on an ongoing basis, and that this five percent (5%) cap will be rarely, if ever, implemented.

(4)    The foregoing payments have been negotiated between the parties as a fair and reasonable contribution, based upon the State's costs of regulating and mitigating certain impacts of tribal Class III Gaming Activities, as well as the Tribe's market conditions, its circumstances, and the rights afforded and consideration provided by this Compact.

(c)    In any given State fiscal year, to the extent permissible and only as may be provided under state law, the State Gaming Agency may

8

reduce, or eliminate, the Tribe's pro rata share payment obligation to the Special Distribution Fund.

**Sec. 4.4.  Use of Special Distribution Funds.**

Revenue placed in the Special Distribution Fund shall be available for appropriation by the Legislature for the purposes specified in California Government Code section 12012.85.

**Sec. 4.5.  Quarterly Payments and Quarterly Contribution Report.**

(a)  (1)  The Tribe shall remit quarterly to the State Gaming Agency (i) the payments described in section 4.3, for deposit into the Special Distribution Fund and (ii) the payments described in section 5.2, for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.  The Tribe and State have negotiated a fair and equitable framework for revenue sharing for the benefit of the Revenue Sharing Trust Fund eligible tribes and the Tribe's agreement to contribute to the Tribal Nation Grant Fund does not increase the Tribe's revenue sharing payment.

(2)  If the Gaming Activities authorized by this Compact commence during a calendar quarter, the first payment shall be due on the thirtieth (30th) day following the end of the first full quarter of the Gaming Activities and shall cover the period from the commencement of the Gaming Activities to the end of the first full calendar quarter.

(3)  All quarterly payments shall be accompanied by the certification specified in subdivision (b).

(b)  At the time each quarterly payment is due, regardless of whether any monies are owed, the Tribe shall submit to the State Gaming Agency a certification (the "Quarterly Contribution Report") prepared by the chief financial officer of the Gaming Operation that specifies the following:

(1)  The calculation of the maximum number of Gaming Devices operated in the Gaming Facility for each day during the given quarter;

9

(2)     The amount due pursuant to section 4.3;

(3)     The calculation of the amount due pursuant to section 5.2; and

(4)     The total amount of the quarterly payment paid to the State.

(c)     The following shall also be included in the Quarterly Contribution Report:

(1)     At any time after the fourth quarter, but in no event later than April 30 of the following calendar year, the Tribe shall provide to the State Gaming Agency an audited annual certification of its Net Win calculation from the operation of Gaming Devices. The audit shall be conducted in accordance with generally accepted auditing standards, as applied to audits for the gaming industry, by an independent certified public accountant (auditor) who is not employed by the Tribe, the Tribal Gaming Agency, the Management Contractor, or the Gaming Operation, is only otherwise retained by any of these entities to conduct regulatory audits or independent audits of the Gaming Operation, and has no financial interest in any of these entities. The auditor used by the Tribe for this purpose shall be approved by the State Gaming Agency, or other State Designated Agency, but the State shall not unreasonably withhold its consent.

(2)     If the audit shows that the Tribe made an overpayment to the State based on its Net Win during the year covered by the audit, the Tribe's next quarterly payment may be reduced by the amount of the overage.  If the audit shows that the Tribe made an underpayment to the State during the year covered by the audit, the Tribe's next quarterly payment shall be increased by the amount of the underpayment.

(3)     The State Gaming Agency shall be authorized to confer with the auditor at the conclusion of the audit process and to review all of the auditor's final work papers and documentation relating to the audit.  The Tribal Gaming Agency shall be notified of and provided the opportunity to participate in and attend any such conference or document review.

10

(d)     The State Gaming Agency may audit the calculations in subdivision (b) and, if applicable, the Net Win calculations specified in the audit provided pursuant to subdivision (c).  The State Gaming Agency shall have access to all records deemed necessary by the State Gaming Agency to verify the calculations in subdivision (b) and, if applicable, the Net Win calculations, including access to the Gaming Device accounting systems and server-based systems and software, and to the data contained therein on a read only basis.  If the State Gaming Agency determines that the Net Win is understated or the deductions overstated, it will promptly notify the Tribe and provide a copy of the State Gaming Agency's audit.  The Tribe within twenty (20) days will either accept the difference or provide a reconciliation satisfactory to the State Gaming Agency.  If the Tribe accepts the difference or does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe must immediately pay the amount of the resulting deficiency, plus accrued interest thereon at the rate of one percent (1%) per month or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less.  If the Tribe does not accept the difference but does not provide a reconciliation satisfactory to the State Gaming Agency, the Tribe, once payment is made, may commence dispute resolution under section 13.0.  The parties expressly acknowledge that the Quarterly Contribution Reports provided for in subdivision (b) are subject to section 8.4, subdivision (g).

(e)     Notwithstanding anything to the contrary in section 13.0, any failure of the Tribe to remit the payments referenced in subdivision (a) will entitle the State to immediately seek injunctive relief in federal or state court, at the State's election, to compel the payments, plus accrued interest thereon at the rate of one percent (1%) per month, or the maximum rate permitted by state law for delinquent payments owed to the State, whichever is less; and further, the Tribe expressly consents to be sued in either court and hereby waives its sovereign immunity and its right to assert sovereign immunity against the State in any such proceeding.  Failure to make timely payment shall be deemed a material breach of this Compact.

(f)     If any portion of the payments under subdivision (a) of this section is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least

11

fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

**Sec. 4.6.  Exclusivity.**

In recognition of the Tribe's agreement to make the payments specified in sections 4.3 and 5.2, the Tribe shall have the following rights:

(a)     In the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a state statute or constitutional provision, or the conclusive and dispositive judicial construction of a statute or the State Constitution by a California appellate court after the effective date of this Compact that Gaming Devices may lawfully be operated by another person, organization, or entity (other than an Indian tribe operating pursuant to a Class III Gaming compact or Secretarial Procedures) within California, the Tribe shall have the right to exercise one (1) of the following options:

   (1)     Terminate this Compact, in which case the Tribe will lose the right to operate Gaming Devices and other Class III Gaming authorized by this Compact; or

   (2)     Continue under this Compact following the conclusion of negotiations with the State for Compact amendments that provide for the following:  (i) an entitlement to a reduction of the rates specified in section 5.2; (ii) compensation to the State for the costs of regulation, as set forth in section 4.3, subdivision (a); (iii) distributions under section 11.1; (iv) grants for programs designed to address and treat gambling addiction; and (v) such assessments as may be permissible at that time under federal law.  The negotiations shall commence within thirty (30) days after receipt of a written request by either the Tribe or the State to enter into negotiations, unless both parties agree in writing to an extension of time.  If the Tribe and the State fail to reach agreement on the amount of the reduction of such payments within sixty (60) days following commencement of the negotiations specified in this subdivision (a)(2), the amount shall be determined by the dispute resolution provisions of section 13.0.

12

(b)     Nothing in this section is intended to preclude the California State Lottery from offering any lottery games or devices that are currently or may hereafter be authorized by state law.

(c)     Nothing in this section precludes the Tribe from discussing with the State the issue of whether any person or entity (other than an Indian tribe pursuant to a Class III Gaming compact or Secretarial Procedures) is engaging in the Gaming Activities specified in subdivision (a) of section 3.0 of this Compact.

## SECTION 5.0.  REVENUE SHARING WITH NON-GAMING AND LIMITED-GAMING TRIBES.

### Sec. 5.1.  Definitions.

For purposes of this section 5.0, the following definitions apply:

(a)     The "Revenue Sharing Trust Fund" is a fund created by the Legislature and administered by the State Gaming Agency that, as limited trustee, is not a trustee subject to the duties and liabilities contained in the California Probate Code, similar state or federal statutes, rules or regulations, or under California state or federal common law or equitable principles, and has no duties, responsibilities, or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes.  The State Gaming Agency shall allocate and disburse the Revenue Sharing Trust Fund monies on a quarterly basis as specified by the Legislature. Each eligible Non-Gaming Tribe and Limited-Gaming Tribe in the state shall receive the sum of one million one hundred thousand dollars ($1,100,000) per year from the Revenue Sharing Trust Fund. In the event there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, any available monies in that fund shall be distributed to eligible Non-Gaming Tribes and Limited-Gaming Tribes in equal shares.  Monies deposited into the Revenue Sharing Trust Fund in excess of the amount necessary to distribute one million one hundred thousand dollars ($1,100,000) to each eligible Non-Gaming Tribe and Limited-Gaming Tribe shall remain in the Revenue Sharing Trust Fund available for disbursement in future years, or

13

deposited into the Tribal Nation Grant Fund, but shall not be used for purposes other than the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.  In no event shall the State's general fund be obligated to make up any shortfall in the Revenue Sharing Trust Fund or to pay any unpaid claims connected therewith and, notwithstanding any provision of law, including any existing provision of law implementing the State Gaming Agency's obligations related to the Revenue Sharing Trust Fund under any Class III Gaming compact or Secretarial Procedures.  Non-Gaming Tribes and Limited-Gaming Tribes are not third-party beneficiaries of this Compact and shall have no right to seek any judicial order compelling disbursement of any Revenue Sharing Trust Fund monies to them.

(b)     The "Tribal Nation Grant Fund" is a fund created by the Legislature to make discretionary distribution of funds to Non-Gaming Tribes and Limited-Gaming Tribes upon application of such tribes for purposes related to effective self-governance, self-determined community, and economic development.  The fiscal operations of the Tribal Nation Grant Fund are administered by the State Gaming Agency, which acts as a limited trustee, not subject to the duties and liabilities contained in the California Probate Code, similar California or federal statutes, rules or regulations, or under California or federal common law or equitable principles, and with no duties or obligations hereunder except for the receipt, deposit, and distribution of monies paid by gaming tribes for the benefit of Non-Gaming Tribes and Limited-Gaming Tribes, as those payments are directed by a State Designated Agency.  The State Gaming Agency shall allocate and disburse the Tribal Nation Grant Fund monies as specified by a State Designated Agency to one (1) or more eligible Non-Gaming Tribe or Limited-Gaming Tribe upon a competitive application basis.  The State Gaming Agency shall exercise no discretion or control over, nor bear any responsibility arising from, the recipient tribes' use or disbursement of Tribal Nation Grant Fund monies.  The State Designated Agency shall perform any necessary audits to ensure that monies awarded to any tribe are being used in accordance with their disbursement in relation to the purpose of the Tribal Nation Grant Fund.  In no event shall the State's general fund be obligated to pay any monies into the Tribal Nation Grant Fund or to pay any unpaid claims connected therewith and, notwithstanding any provision of law, including any existing provision of law implementing the State's

14

obligations related to the Tribal Nation Grant Fund or the Revenue Sharing Trust Fund under any Class III Gaming compact or Secretarial Procedures.  Non-Gaming Tribes and Limited-Gaming Tribes shall have no right to seek any judicial order compelling disbursement of any Tribal Nation Grant Fund monies to them.

(c)     A "Non-Gaming Tribe" is a federally recognized tribe in California, with or without a tribal-state Class III Gaming compact or Secretarial Procedures that, as of the date of the last distribution to such tribe from the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund, and during the immediately preceding three hundred sixty-five (365) days, has not engaged in, or offered, class II gaming or Class III Gaming in any location whether within or without California.

(d)     A "Limited-Gaming Tribe" is a federally recognized tribe in California that has a Class III Gaming compact with the State or Secretarial Procedures but is operating and has operated fewer than a combined total of three hundred fifty (350) Gaming Devices in all of its gaming operations wherever located, or does not have a Class III Gaming compact or Secretarial Procedures but is engaged in class II gaming, whether within or without California, during the immediately preceding three hundred sixty-five (365) days.

**Sec. 5.2.  Payments to the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.**

(a)     If the Tribe operates up to one thousand, two hundred (1,200) Gaming Devices, the Tribe shall have no obligation to pay any amount to the State Gaming Agency for deposit into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund.

(b)     If the Tribe operates one thousand, two hundred one (1,201) Gaming Devices or more, the Tribe shall pay into the Revenue Sharing Trust Fund or the Tribal Nation Grant Fund six percent (6%) of the Net Win generated from the operation of all Gaming Devices in excess of three hundred and fifty (350) Gaming Devices.

(c)     The Tribe shall remit the payments referenced in subdivision (b) to the State Gaming Agency in quarterly payments, which payments shall be due thirty (30) days following the end of each calendar quarter (i.e., by April 30 for the first quarter, July 30 for the second

15

quarter, October 30 for the third quarter, and January 30 for the fourth quarter).

(d)     The quarterly payments required in subdivision (b) shall be determined by first determining the total number of all Gaming Devices operated by the Tribe during a given quarter (Quarterly Device Base).  The Quarterly Device Base is equal to the sum total of the maximum number of Gaming Devices in operation for each day of the calendar quarter, divided by the number of days in the calendar quarter that the Gaming Operation operates any Gaming Devices during the given calendar quarter.

(e)     If any portion of the payments under subdivision (b) is overdue after the State Gaming Agency has provided written notice to the Tribe of the overdue amount with an opportunity to cure of at least fifteen (15) business days, and if more than sixty (60) calendar days have passed from the due date, then the Tribe shall cease operating all of its Gaming Devices until full payment is made.

(f)     All payments made by the Tribe to the State Gaming Agency pursuant to subdivision (b) shall be deposited into the Revenue Sharing Trust Fund and the Tribal Nation Grant Fund in a proportion to be determined by the Legislature, provided that if there are insufficient monies in the Revenue Sharing Trust Fund to pay one million one hundred thousand dollars ($1,100,000) per year to each eligible Non-Gaming Tribe and Limited-Gaming Tribe, the State Gaming Agency shall deposit all payments into the Revenue Sharing Trust Fund.

**Sec. 5.3.  Credits Related to Payments Due Under Section 5.2.**

(a)     Notwithstanding anything to the contrary in section 5.2, the State agrees to provide the Tribe with annual credits to the payments otherwise due under section 5.2 for the purposes itemized in subdivision (b) below.  The highest Gaming Device count during a calendar year shall be the Gaming Device count used to determine the annual credit percentage applicable for that calendar year.  The annual credits to be applied to the section 5.2 payments are based upon the number of Gaming Devices operated by the Tribe as provided in the following formula:

If the Tribe operates in excess of one thousand, two hundred (1,200) Gaming Devices, the Tribe may take annual credits up to sixty-five percent (65%) of the payments otherwise due under section 5.2, subdivision (b).

(b)     The credits provided by this subdivision shall not derive from a direct or indirect state or federal funding source, shall not be available for costs or payments remitted pursuant to section 11.0, and shall be available to the Tribe for the following purposes:

(1)     The cost of payments made or services provided by the Tribe to the County, local jurisdictions, school or water districts, charter schools, and non-profit and civic organizations for operating facilities or providing services within the County for purposes of fire, emergency medical services, law enforcement, public transit, education, tourism, youth athletics or other youth programs, cultural, health care, transit, road improvements, or other services, facilities or infrastructure improvements that in part serve off-reservation needs of County residents. This includes the cost of providing cultural, educational, and recreational programs and services offered by the Tribe that benefit the community. At least twenty percent (20%) of the annual credits authorized by this section 5.3 shall be utilized for the purposes described in this subdivision (b)(1);

(2)     Payments by the Tribe to reimburse the County for any loss of property tax revenues, sales tax revenues for retail sales, or transient occupancy taxes that would otherwise be due to the County if the Gaming Facility was not located on Indian lands. No more than fifteen percent (15%) of the annual credits authorized by this section 5.3 shall be utilized for the purposes described in this subdivision (b)(2);

(3)     Payments by the Tribe for non-gaming related capital investments and economic development, including costs to support and expand the tribal agriculture program, and infrastructure improvement projects such as financing costs for the construction of a fire department or public safety substation, that the State or State Designated Agency agrees provide mutual benefits to the Tribe and the County or State because, for instance, they have particular cultural, social, educational,

public safety or environmental value, or diversify the sources of revenue for the Tribe's general fund;

(4)     Investments by the Tribe in and any funds paid to the State or County for renewable energy or energy conservation projects, such as a solar farm, that, in part, serve the Gaming Facility or other tribal facilities, or projects that incorporate charging stations for electric or other zero-emission vehicles that are available to patrons and employees of the Gaming Facility or the Tribe and its members.  For purposes of this subdivision (b)(4), "renewable energy project" means a project that utilizes a technology other than a conventional power source, as defined in section 2805 of the California Public Utilities Code, as it may be amended, including, without limitation, renewable energy sources identified in section 1391, subdivision (c), of title 20 of the California Code of Regulations or section 25741 of the California Public Resources Code, as they may be amended, such as biomass, solar thermal, photovoltaic, wind, geothermal, fuel cells using renewable fuel, small hydroelectric, digester gas, solid waste conversion, landfill gas, and any related additions or enhancements.  The renewable energy power source must not utilize more than twenty-five percent (25%) fossil fuel;

(5)     Costs, payments or donations by the Tribe to support capital improvements and operating expenses for facilities or programs located within California providing health care, cultural, educational, youth, senior, disabled, and recreational services with respect to tribal members, Indians, or non-Indians;

(6)     Payments by the Tribe towards the principal amount of the Tribe's debt services secured by the assets of the Gaming Operation, which promote economic growth that benefits the Tribe and the surrounding community through the Tribe's investments in facilities, infrastructure, or other projects that contribute to sustaining jobs and ensuring the financial stability of the Tribe.  No more than twenty percent (20%) of the annual credits authorized by this section 5.3 shall be utilized for the purposes described in this subdivision (b)(6);

(7)     Costs incurred by the Tribe to purchase property for, and fund the construction and operation of, a museum or cultural center or cultural site, or costs and payments to support the awareness and preservation of native cultures, cultural resources, or historical buildings, landmarks or objects within California that have cultural significance to the Tribe, or to promote the awareness and understanding of California native cultures;

(8)     The costs to the Tribe of providing general welfare benefits for, among other things, educational, health care, cultural or vocational purposes to non-Indians or Indians who are not members of the Tribe;

(9)     Payments or capital costs incurred by the Tribe to provide or support housing, including but not limited to mortgage assistance, for the Tribe's elders or members, Indian and/or non-Indian people who are determined by the Tribe to be financially in need, taking into account federal poverty guidelines and local conditions, including the cost of living;

(10)    Costs and payments by the Tribe to purchase property, support the construction and capital improvement, and provide operating expenses for facilities located within California (including facilities located on or off tribal trust land) that provide health care, including alcohol and drug abuse prevention programs and services, or assisted living services to tribal members, Indians, and non-Indians;

(11)    The costs to the Tribe associated with improving the protection of wildlife and habitat (e.g., property purchase costs, environmental studies, permits, construction, maintenance, and other related expenses), including but not limited to those associated with protecting, raising awareness, and educating the public about migratory birds or other species of significance;

(12)    Costs and payments by the Tribe for delivery of potable water, water treatment or water conservation projects that primarily serve the surrounding community including the school district and other on- and off-reservation needs within the County; and

19

(13)  Costs and payments by the Tribe for the cost of recycling programs, and any improvements incorporating recycling technology, that, in part, serve the Gaming Facility, or other on- or off-reservation needs within the County.

(c)  On or before March 30 of each year, the Tribe shall provide to the State its annual budget for items eligible for credits under this section 5.3.  Upon receipt, the State shall have ninety (90) days within which to review the items proposed and object if they do not meet the purposes set out in this section.  If the State does not object to the items proposed within ninety (90) days, the State shall not later seek to disallow those credits except as provided below.  The State's intent is to encourage the Tribe to make full use of the credits as specifically defined and articulated under this section 5.3.

(d)  During the year, the Tribe shall take such credits during the first three (3) quarters in prorated amounts based on the annual budget, but during the fourth quarter shall take an adjusted amount based on actual amounts spent.  At the end of each year, the Tribe shall submit to the State a budget reconciliation, reflecting the actual amounts expended compared to the budgeted numbers.  The State shall have the right to review the credits taken and, if necessary, request additional information from the Tribe.  If the State determines that the information provided does not substantiate the amount of credits taken, the State may reduce or disallow such credits.

(e)  Any disputes shall be subject to the dispute resolution provisions of section 13.0 of this Compact.  All excess credits that cannot be applied in any one (1) year shall carry forward to all following years until completely exhausted.  If in any year during the term of this Compact the Tribe is unable to take the full amount of the credits and all carry-forward credits have been exhausted, the Tribe may request and the State shall agree to, a reopening of negotiations, limited to section 5.2, subdivision (b).

(f)  On or before January 31 of each year, or other date as otherwise may be agreed to by the parties, the Tribe shall provide to the State a report of annual credits taken and contributions made pursuant to sections 5.2 and 5.3.  The reporting will include sufficient detail to enable the Tribe and the State to ensure that the funds are being used in a manner consistent with the purposes set forth above.

20

## SECTION 6.0.  LICENSING.

### Sec. 6.1.  Gaming Ordinance and Regulations.

(a)  All Gaming Activities authorized to be conducted under this Compact shall comply with (i) a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA, (ii) all applicable rules, regulations, procedures, specifications, and standards duly adopted by the NIGC, the Tribal Gaming Agency, and the State Gaming Agency, and (iii) the provisions of this Compact.

(b)  Upon request the Tribal Gaming Agency will make the following documents available for inspection by the State Gaming Agency:  a copy of the Gaming Ordinance, and all of its rules, regulations, procedures, specifications, ordinances, or standards applicable to the Gaming Activities and Gaming Operation.  This provision excludes the Tribal Gaming Agency's internal policies and procedures.

(c)  The Tribal Gaming Agency agrees to make the following documents available to Gaming Operation patrons or their legal representatives, through electronic means or otherwise in its discretion:  the Gaming Ordinance; the rules of each Class III Gaming game operated by the Tribe, to the extent that such rules are not available for display on the Gaming Device or the table on which the game is played; rules governing promotions; rules governing points and the player's club program, including rules regarding confidentiality of the player information, if any; the tribal law specified in section 12.6; and the regulations promulgated by the Tribal Gaming Agency concerning patron disputes pursuant to section 10.0.  To the extent that any of the foregoing are available to the public on a website maintained by an agency of the State or the federal government, or by the Tribe or the Gaming Operation, the Tribal Gaming Agency may refer requesters to such website(s) for the requested information.

### Sec. 6.2.  Tribal Ownership, Management, and Control of Gaming Operation.

The Gaming Operation authorized under this Compact is owned solely by the Tribe as required by IGRA.

21

**Sec. 6.3.  Prohibitions Regarding Minors.**

(a)     The Tribe has decided not to permit persons under the age of twenty-one (21) years to participate in Gaming Activities, or to loiter in the vicinity of the Gaming Facility where Gaming Activities are conducted.  Persons under the age of twenty-one (21) years may be employed by the Gaming Operation in a non-gaming capacity.  This decision of the Tribe shall be maintained for the duration of this Compact.

(b)     If the Tribe permits the consumption of alcoholic beverages in the Gaming Facility, the Tribe agrees to prohibit persons under the age of twenty-one (21) years from being present in any area in which alcoholic beverages may be consumed, except to the extent permitted by the Gaming Facility's California Department of Alcoholic Beverage Control license(s).

**Sec. 6.4.  Licensing Requirements and Procedures.**

**Sec. 6.4.1.  Summary of Licensing Principles.**

The Tribe agrees to require a tribal gaming license for all persons in any way connected with the Gaming Operation or Gaming Facility who are required to be licensed or to submit to a background investigation under IGRA, any others required to be licensed under this Compact, including, without limitation, all Gaming Employees, Gaming Resource Suppliers, Financial Sources not otherwise exempt from licensing requirements, and any other person having a significant influence over the Gaming Operation.  Each person or entity must be licensed by the Tribal Gaming Agency and, except as otherwise provided, cannot have had any determination of suitability denied or revoked by the State Gaming Agency.  The Tribe and the State intend that the licensing process provided for in this Compact shall involve mutual cooperation between the Tribal Gaming Agency and the State Gaming Agency, as more particularly described herein.

**Sec. 6.4.2.  Gaming Facility.**

(a)     Each Gaming Facility authorized by this Compact is licensed by the Tribal Gaming Agency in conformity with the requirements of the Gaming Ordinance, IGRA, any applicable regulations adopted by the NIGC, as well as this Compact.  The license shall be reviewed and renewed every two (2) years thereafter.  The Tribe agrees to provide verification that this requirement has been met to the State by sending,

either electronically or by hard copy, a copy of the initial license and each renewal license to the State Gaming Agency within twenty (20) days after issuance of the license or renewal.  The Tribal Gaming Agency's certification that the Gaming Facility is being operated in conformity with these requirements will be posted in a conspicuous and public place in the Gaming Facility.

(b)     To assure the protection of the health and safety of all Gaming Facility patrons, guests, and employees, the Tribe shall adopt and maintain throughout the term of this Compact, an ordinance that requires any Gaming Facility construction to meet or exceed the standards in the Applicable Codes.  The Gaming Facility and all construction, expansion, improvement, modification, or renovation to the Gaming Facility will also comply with title III of the federal Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. Notwithstanding the foregoing, the Tribe need not comply with any state standard that specifically applies in name or in fact only to tribal facilities.  Without limiting the rights of the State under this section, reference to Applicable Codes is not intended to confer code enforcement jurisdiction upon the State or its political subdivisions. For purposes of this section, the terms "building official" and "code enforcement agency" as used in titles 19 and 24 of the California Code of Regulations mean the Tribal Gaming Agency or such other tribal government agency or official as may be designated by the Tribe's law.  The building official and code enforcement agency designated by the Tribe's law may exercise authority granted to such individuals and entities as specified within the Applicable Codes with regard to the Gaming Facility.

(c)     The Tribe shall require inspections of all new construction and the Tribe will engage qualified plan checkers or review firms to ensure compliance with the Applicable Codes.  To be qualified as a plan checker or review firm for purposes of this Compact, plan checkers or review firms must be either California licensed architects, engineers or International Code Council (ICC)-certified building inspectors with relevant experience, or California licensed architects, engineers or ICC-certified building inspectors on the list, if any, of approved plan checkers or review firms provided by the city or County in which the Gaming Facility is located.  The Tribe shall also employ qualified project inspectors.  To be qualified as a project inspector for purposes

23

of this Compact, project inspectors must possess the same qualifications and certifications as project inspectors utilized by the County in which the Gaming Facility is located. The same persons or firms may serve as both plan checkers/reviewers and project inspectors. The plan checkers, review firms, and project inspectors shall hereinafter be referred to as "Inspectors." The Tribe agrees to report any failure to comply with the Applicable Codes to the State Gaming Agency, in writing and within thirty (30) days after the discovery thereof. The Tribe agrees to correct any Gaming Facility condition noted in the inspections that does not meet the Applicable Codes (hereinafter "deficiency").

(d)     The Tribe shall make the design and construction calculations, and plans and specifications that form the basis for the Gaming Facility construction (hereinafter "Design and Building Plans") to be available to the State Gaming Agency for inspection and copying by the State Gaming Agency, upon its request.

(e)     In the event that material changes to a structural detail of the Design and Building Plans will result from contract change orders or any other changes in the Design and Building Plans, such changes shall be reviewed and field-verified by the Inspectors for compliance with the Applicable Codes.

(f)     The Tribe shall maintain during construction all structural contract change orders for inspection and copying by the State Gaming Agency upon its request.

(g)     The Tribe shall maintain the Design and Building Plans depicting the as-built Gaming Facility, unless and until superseded by subsequent as-built Design and Building Plans upon which the superseding construction was based, and shall make them available to the State Gaming Agency for inspection and copying by the State Gaming Agency upon its request, for the term of this Compact.

(h)     Upon final certification by the Inspectors that the Gaming Facility meets the Applicable Codes, the Tribe agrees that the Tribal Gaming Agency will forward the Inspectors' certification to the State Gaming Agency within ten (10) days of issuance. If the State Gaming Agency objects to that certification, the Tribe shall make a good-faith effort to address the State's concerns, but if the State Gaming Agency does not

24

withdraw its objection, the matter will be resolved in accordance with the dispute resolution provisions of section 13.0.

(i)     Any failure to remedy within a reasonable period of time any material and timely raised deficiency shall be deemed a violation of this Compact, and furthermore, any deficiency that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State, pursuant to court order, to prohibit occupancy of the affected portion of the Gaming Facility until the deficiency is corrected.  The Tribe agrees and asserts that it will not allow occupancy of any portion of the Gaming Facility that is constructed or maintained in a manner that endangers the health or safety of the occupants.

(j)     The Tribe shall take all necessary steps to reasonably ensure the ongoing availability of sufficient and qualified fire suppression services to the Gaming Facility, and to reasonably ensure that the Gaming Facility satisfies all requirements of the Applicable Codes, as set forth below:

(1)     Within thirty (30) days prior to commencing Gaming Activities under this Compact, and not less than biennially thereafter, and upon at least ten (10) days' notice to the State Gaming Agency, the Gaming Facility shall be inspected, at the Tribe's expense, by an independent fire inspector certified by the ICC or the National Fire Protection Association for purposes of certifying that the Gaming Facility meets a reasonable standard of fire safety and life safety.

(2)     The State Gaming Agency shall be entitled to designate and have a qualified representative or representatives, which may include local fire suppression entities, present during the inspection.  During such inspection, the State Gaming Agency's representative(s) shall specify to the independent fire inspector any condition that the representative(s) reasonably believes would preclude certification of the Gaming Facility as meeting a reasonable standard of fire safety and life safety.

(3)     The independent fire inspector shall issue to the Tribal Gaming Agency and the State Gaming Agency a report on the inspection within fifteen (15) days after its completion, or

25

within thirty (30) days after commencement of the inspection, whichever first occurs, identifying any deficiency in fire safety or life safety at the Gaming Facility or in the ability of the Tribe to meet reasonably expected fire suppression needs of the Gaming Facility.

(4)     Within twenty-one (21) days after the issuance of the report, the independent fire inspector shall also require and approve a specific plan for correcting deficiencies, whether in fire safety or life safety, at the Gaming Facility or in the Tribe's ability to meet the reasonably expected fire suppression needs of the Gaming Facility, including deficiencies identified by the State Gaming Agency's representative.  A copy of the report and plan of correction shall be delivered to the State Gaming Agency and the Tribal Gaming Agency.  If the independent fire inspector disagrees with an allegation of deficiency by the State Gaming Agency's representative, the Tribe may take the matter to dispute resolution pursuant to section 13.0.

(5)     Immediately upon correction of all deficiencies identified in the report and plan of correction, the independent fire inspector shall certify in writing to the Tribal Gaming Agency and the State Gaming Agency that all deficiencies have been corrected.

(6)     Any failure to correct all deficiencies identified in the report and plan of correction within a reasonable period of time shall be a violation of this Compact, and any failure to promptly correct those deficiencies that pose a serious or significant risk to the health or safety of any occupants shall be a violation of this Compact and grounds for the State to prohibit, pursuant to court order, occupancy of the affected portion of the Gaming Facility until the deficiency is corrected.

(7)     Consistent with its obligation to ensure the safety of those within the Gaming Facility, the Tribe agrees to promptly notify the State Gaming Agency of circumstances that it reasonably believes pose a serious or significant risk to the health or safety of any occupants, and take prompt action to correct such circumstances.  Any failure to remedy within a reasonable period of time any serious or significant risk to health or safety shall be deemed a violation of this Compact, and furthermore,

26

any circumstance that poses a serious or significant risk to the health or safety of any occupant shall be grounds for the State to seek a court order prohibiting occupancy of the affected portion of the Gaming Facility until the deficiency is corrected.

(k)   Notwithstanding anything in section 6.4.2 or elsewhere in this Compact, the construction requirements of any Gaming Facility that has taken place or has commenced prior to the effective date of this Compact shall be subject to the Gaming Facility license rules in section 6.4.2 of the 1999 Compact.

### Sec. 6.4.3.  Gaming Employees.

(a)   Every Gaming Employee shall obtain, and thereafter maintain current, a valid tribal gaming license and, except as provided in subdivision (b), shall obtain, and thereafter maintain current, a State Gaming Agency determination of suitability, which license and determination shall be subject to biennial renewal; provided that in accordance with section 6.4.9, those persons may be employed on a temporary or conditional basis pending completion of the licensing process and the State Gaming Agency determination of suitability.

(b)   The State Gaming Agency and the Tribal Gaming Agency shall identify those Gaming Employees who, in addition to a tribal gaming license, must also apply for, obtain, and maintain, a finding of suitability from the State Gaming Agency.  The general principles governing those Gaming Employees who must have both a tribal gaming license and a finding of suitability from the State Gaming Agency are set forth below.  Position titles of those Gaming Employees who must have both a tribal gaming license and a finding of suitability are to be negotiated between the State Gaming Agency and the Tribal Gaming Agency and placed on what is referred to as the Compact Key Employee Position List.  A Gaming Employee who is required to obtain and maintain current a valid tribal gaming license under subdivision (a) is not required to obtain or maintain a State Gaming Agency determination of suitability if any of the following applies:

(1)   A Gaming Employee shall not be placed on the Compact Key Employee Position List if the employee's position title is subject to the licensing requirement of subdivision (a) solely

27

because he or she is a person who conducts, operates, maintains, repairs, or assists in Gaming Activities, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, and is empowered to make discretionary decisions affecting the conduct or operation of the Gaming Activities.

(2)    A Gaming Employee shall not be placed on the Compact Key Employee Position List if the employee's position title is subject to the licensing requirement of subdivision (a) solely because he or she is a person whose employment duties require or authorize access to areas of the Gaming Facility that are not open to the public, provided that this exception shall not apply if he or she supervises Gaming Activities or persons who conduct, operate, maintain, repair, assist, account for or supervise any such Gaming Activity, and is empowered to make discretionary decisions affecting the conduct or operation of the Gaming Activities.

(3)    Members and employees of the Tribal Gaming Agency are not subject to a finding of suitability from the State Gaming Agency.

(4)    The State Gaming Agency and the Tribal Gaming Agency agree to exempt a Gaming Employee from the requirement to obtain or maintain current a State Gaming Agency determination of suitability.

(c)    For those position titles not included on the Compact Key Employee Position List, notwithstanding subdivision (b), where the State Gaming Agency reasonably believes that licensure of an individual may pose a threat to gaming integrity or public safety, the State Gaming Agency may notify the Tribal Gaming Agency of its concerns and request a meeting with the Tribal Gaming Agency to review the tribal license application, and all materials and information received by the Tribal Gaming Agency in connection therewith, for any person whom the Tribal Gaming Agency has licensed, or proposes to license, as a Gaming Employee.  Upon that request, the Tribal Gaming Agency shall meet with the State Gaming Agency and discuss such application and materials.  If after the meeting the State Gaming

28

Agency continues to believe that the person would be unsuitable for issuance of a license or permit for a similar level of employment in a gambling establishment subject to the jurisdiction of the State, it shall notify the Tribal Gaming Agency of its determination and the reasons supporting its determination.  The Tribal Gaming Agency shall thereafter conduct a hearing in accordance with section 6.5.5 to reconsider issuance of the tribal gaming license and shall notify the State Gaming Agency of its determination immediately upon issuing its decision following conclusion of the hearing, which decision shall be final unless the State Gaming Agency requests within thirty (30) days of such notification that the decision be made the subject of dispute resolution pursuant to section 13.0.  This subdivision (c) is intended and anticipated to be exercised infrequently, if at all, on a case-by-case basis.  Nothing in this subdivision (c) shall require the Tribal Gaming Agency to disclose or discuss any materials or information which are otherwise prohibited or restricted from disclosure under applicable federal law or regulation.

(d)     Except as provided in subdivision (e), the Tribe shall not employ, or continue to employ, any person whose application to the State Gaming Agency for a determination of suitability or for a renewal of such a determination has been denied or withdrawn, or whose determination of suitability has expired without renewal.

(e)     Notwithstanding subdivisions (b) and (c), the Tribe may employ or retain in its employ a person whose application for a determination of suitability, or for a renewal of such a determination, has been denied by the State Gaming Agency, if the person is an enrolled member of the Tribe (defined for purposes of this subdivision as a person who is a member of the Tribe as determined by the Tribe's law), and if:

(1)     The enrolled member of the Tribe holds a valid and current license issued by the Tribal Gaming Agency that must be renewed at least biennially;

(2)     The enrolled member of the Tribe is not an employee or agent of any other gaming operation; and

(3)     The denial of the application by the State Gaming Agency is based solely on activities, conduct, or associations that antedate, by at least five (5) years, the filing of the enrolled member of

29

the Tribe's initial application to the State Gaming Agency for a determination of suitability.

(f)     At any time after five (5) years following the effective date of this Compact, either the Tribal Gaming Agency or the State Gaming Agency may request to amend the position titles identified on the Compact Key Employee Position List.

### Sec. 6.4.4.  Gaming Resource Suppliers.

(a)     Every Gaming Resource Supplier shall be licensed by the Tribal Gaming Agency prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility.  Unless the Tribal Gaming Agency licenses the Gaming Resource Supplier pursuant to subdivision (d), the Gaming Resource Supplier shall also apply to the State Gaming Agency for a determination of suitability at least thirty (30) days prior to the sale, lease, or distribution, or further sale, lease, or distribution, of any Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility, except that for Gaming Devices the period specified under section 7.1, subdivision (a)(1) shall govern. The period during which a determination of suitability as a Gaming Resource Supplier is valid expires on the earlier of (i) the date two (2) years following the date on which the determination is issued, unless a different expiration date is specified by the State Gaming Agency, or (ii) the date of its revocation by the State Gaming Agency.  If the State Gaming Agency denies or revokes a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency within seven (7) days of taking such action, and the Gaming Resource Supplier shall no longer be authorized to perform any work within or provide any goods or services to, in support of, or in connection with, the Tribe's Gaming Operation or Facility thirty (30) days from the date on which the State Gaming Agency's decision takes effect under State law.  The license and determination of suitability shall be reviewed at least every two (2) years for continuing compliance.  In connection with such a review, the Tribal Gaming Agency shall require the Gaming Resource Supplier to update all information provided in the previous application.  For purposes of section 6.5.2, such a review shall be deemed to constitute an application for renewal.

30

(b)     Any agreement between the Tribe and a Gaming Resource Supplier shall be deemed to include a provision for its termination without further liability on the part of the Tribe, except for the bona fide payment of all outstanding sums (exclusive of interest) owed as of, or payment for services or materials received up to, the date of termination, upon revocation or nonrenewal of the Gaming Resource Supplier's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  Except as set forth above, the Tribe shall not enter into, or continue to make payments to a Gaming Resource Supplier pursuant to, any contract or agreement for the provision of Gaming Resources with any person or entity whose application to the State Gaming Agency for a determination of suitability has been denied or revoked or whose determination of suitability has expired without renewal.

(c)     Notwithstanding subdivision (a), the Tribal Gaming Agency may license a Management Contractor for a period of no more than seven (7) years, but the Management Contractor must still apply for renewal of a determination of suitability by the State Gaming Agency at least every two (2) years and where the State Gaming Agency denies or revokes a determination of suitability, the State Gaming Agency shall notify the Tribal Gaming Agency within seven (7) days of taking such action, and the Management Contractor shall no longer be authorized to perform any work within or provide any goods or services to, in support of, or in connection with the Tribe's Gaming Operation thirty (30) days from the date on which the State Gaming Agency's decision takes effect under state law.  Except where the State Gaming Agency has determined a Management Contractor to be unsuitable, nothing in this subdivision shall be construed to bar the Tribal Gaming Agency from issuing additional new licenses to the same Management Contractor following the expiration of a seven (7)-year license.

(d)     The Tribal Gaming Agency may elect to license a person or entity as a Gaming Resource Supplier without requiring it to apply to the State Gaming Agency for a determination of suitability under subdivision (a) if the Gaming Resource Supplier has already been issued a determination of suitability that is then valid.  In that case, and within seven (7) days of the issuance of the license, the Tribal Gaming Agency shall notify the State Gaming Agency of its licensure of the person or entity as a Gaming Resource Supplier, and shall identify in

31

its notification the State Gaming Agency determination of suitability on which the Tribal Gaming Agency has relied in proceeding under this subdivision (d). Subject to the Tribal Gaming Agency's compliance with the requirements of this subdivision, a Gaming Resource Supplier licensed under this subdivision may, during and only during the period in which the determination of suitability remains valid, engage in the sale, lease, or distribution of Gaming Resources to or in connection with the Tribe's Gaming Operation or Facility, without applying to the State Gaming Agency for a determination of suitability. The issuance of a license under this subdivision is in all cases subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier is not suitable or to a tribal gaming license suspension or revocation pursuant to section 6.5.1, and does not extend the time during which the determination of suitability relied on by the Tribal Gaming Agency is valid. In the event the State Gaming Agency later revokes the determination of suitability relied on by the Tribal Gaming Agency, the State Gaming Agency shall notify the Tribal Gaming Agency of such revocation. Nothing in this subdivision affects the obligations of the Tribal Gaming Agency, or of the Gaming Resource Supplier, under sections 6.5.2 and 6.5.6 of this Compact.

(e)     Except where subdivision (d) applies, within twenty-one (21) days of the issuance of a license to a Gaming Resource Supplier, the Tribal Gaming Agency shall provide to the State Gaming Agency summary reports, including any derogatory information, of the background investigations conducted by the Tribal Gaming Agency and written statements by the Applicant.

**Sec. 6.4.5.  Financial Sources.**

(a)     Subject to subdivision (h) of this section, each Financial Source shall be licensed by the Tribal Gaming Agency prior to the Financial Source extending financing in connection with the Tribe's Gaming Facility or Gaming Operation.

(b)     Every Financial Source required to be licensed by the Tribal Gaming Agency shall, contemporaneously with the filing of its tribal license application, apply to the State Gaming Agency for a determination of suitability. In the event the State Gaming Agency denies or revokes the determination of suitability, the Tribal Gaming Agency shall deny

32

or revoke the Financial Source's license within thirty (30) days of receiving notice of denial or revocation from the State Gaming Agency.

(c)     A license issued under this section shall be reviewed at least every two (2) years for continuing compliance.  In connection with that review, the Tribal Gaming Agency shall require the Financial Source to update all information provided in the Financial Source's previous application.  For purposes of this section, that review shall be deemed to constitute an application for renewal.

(d)     Any agreement between the Tribe and a Financial Source shall include, and shall be deemed to include, a provision for its termination without further liability on the part of the Tribe, except for the bona fide repayment of all outstanding sums (exclusive of interest) owed as of the date of termination upon revocation or non-renewal of the Financial Source's license by the Tribal Gaming Agency based on a determination of unsuitability by the State Gaming Agency.  The Tribe shall not enter into, or continue to make payments to a Financial Source pursuant to, any contract or agreement for the provision of financing with any person or entity whose application to the State Gaming Agency for a determination of suitability has been denied or whose determination of suitability has been revoked or has expired without renewal.

(e)     A Gaming Resource Supplier who provides financing exclusively in connection with the provision, sale, or lease of Gaming Resources obtained from that Gaming Resource Supplier may be licensed solely in accordance with the licensing procedures applicable, if at all, to Gaming Resource Suppliers, and need not be separately licensed as a Financial Source under this section.

(f)     The Tribal Gaming Agency may elect to license a person or entity as a Financial Source without requiring it to apply to the State Gaming Agency for a determination of suitability under subdivision (b) if the Financial Source has already been issued a determination of suitability that is then valid.  In that case, the Tribal Gaming Agency shall immediately notify the State Gaming Agency of its licensure of the person or entity as a Financial Source, and shall identify in its notification the State Gaming Agency determination of suitability on which the Tribal Gaming Agency has relied in proceeding under this

33

subdivision (f).  Subject to the Tribal Gaming Agency's compliance with the requirements of this subdivision, a Financial Source licensed under this subdivision may, during and only during the period in which the determination of suitability remains valid, engage in financing in connection with the Tribe's Gaming Operation or Facility, without applying to the State Gaming Agency for a determination of suitability.  The issuance of a license under this subdivision is in all cases subject to any later determination by the State Gaming Agency that the Financial Source is not suitable or to a tribal gaming license suspension or revocation pursuant to section 6.5.1, and does not extend the time during which the determination of suitability relied on by the Tribal Gaming Agency is valid.  A license issued under this subdivision expires upon the revocation or expiration of the determination of suitability relied on by the Tribal Gaming Agency.  Nothing in this subdivision affects the obligations of the Tribal Gaming Agency, or of the Financial Source, under section 6.5.2 and section 6.5.6 of this Compact.

(g)   Except where subdivision (f) applies, within twenty-one (21) days of the issuance of a license to a Financial Source, the Tribal Gaming Agency shall transmit to the State Gaming Agency a copy of the license and a copy of all tribal license application materials and information received by it from the Applicant that is not otherwise prohibited or restricted from disclosure under applicable federal law or regulation.

(h)   (1)   The Tribal Gaming Agency may, at its discretion, exclude from the licensing requirements of this section the following Financial Sources under the circumstances stated:

(A)   Any federally-regulated or state-regulated bank, savings and loan association, or other federally- or state-regulated lending institution and any fund or other investment vehicle, including, without limitation, a bond indenture or syndicated loan, which is administered or managed by any such entity.

(B)   An entity identified by the Commission's Uniform Statewide Tribal Gaming Regulation CGCC-2, subdivision (f) (as in effect on the date the parties execute this Compact), when that entity is a Financial

34

Source solely by reason of being (i) a purchaser or a holder of debt securities or other forms of indebtedness issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation or (ii) the owner of a participation interest in any amount of indebtedness for which a Financial Source described in subdivision (h)(l)(A), or any fund or other investment vehicle that is administered or managed by any such Financial Source, is the creditor.

(C)    Any investor who, alone or together with any person(s) controlling, controlled by or under common control with such investor, holds less than ten percent (10%) of all outstanding debt securities or other forms of indebtedness issued directly or indirectly by the Tribe for a Gaming Facility or for the Gaming Operation.

(D)    Any agency of the federal government, or of a tribal, state or local government providing financing, together with any person purchasing any debt securities or other forms of indebtedness of the agency to provide such financing.

(E)    A real estate investment trust (as defined in 26 U.S.C. § 856(a)) that is publicly traded on a stock exchange, registered with the Securities and Exchange Commission, and subject to the regulatory oversight of the Securities and Exchange Commission.

(F)    An entity or category of entities that the State Gaming Agency and the Tribal Gaming Agency jointly determine can be excluded from the licensing requirements of this section without posing a threat to the public interest or the integrity of the Gaming Operation.

(2)    In any case where the Tribal Gaming Agency elects pursuant to subdivision (h)(1) to exclude a Financial Source from the licensing requirements of this section, the Tribal Gaming Agency shall give thirty (30) days' notice thereof to the State Gaming Agency, and shall give the State Gaming Agency reasonable advance notice of any extension of financing by the

35

Financial Source in connection with the Tribe's Gaming Operation or Facility, and upon request of the State Gaming Agency, shall provide it with sufficient documentation to support the Tribal Gaming Agency's exclusion of the Financial Source from the licensing requirements of this section.  If the thirty (30)-day notice period required under this subdivision would have the potential to inhibit the ability of the Tribe to access financing by an excluded Financial Source, the Tribe may request a waiver of this notice period, which the State Gaming Agency shall have the authority to grant.

(3)     The Tribal Gaming Agency and the State Gaming Agency shall work collaboratively to resolve any reasonable concerns regarding the initial or ongoing excludability of an individual or entity as a Financial Source.  If the State Gaming Agency finds that an investigation of any Financial Source is warranted, the Financial Source shall be required to submit an application for a determination of suitability to the State Gaming Agency and shall pay the costs and charges incurred in the investigation and processing of the application, in accordance with the provisions set forth in California Business and Professions Code sections 19867 and 19951.  Any dispute between the Tribal Gaming Agency and the State Gaming Agency pertaining to the excludability of an individual or entity as a Financial Source shall be resolved by the dispute resolution provisions in section 13.0.

(4)     The following are not Financial Sources for purposes of this section.

(A)     An entity identified by the Commission's Uniform Statewide Tribal Gaming Regulation CGCC-2, subdivision (h) (as in effect on the effective date of this Compact).

(B)     A person or entity whose sole connection with a provision or extension of financing to the Tribe is to provide loan brokerage or debt servicing for a Financial Source at no cost to the Tribe or the Gaming Operation, provided that no portion of any financing provided is an

36

extension of credit to the Tribe or the Gaming Operation by that person or entity.

    (C)    A person or entity that the State Gaming Agency has determined does not require licensure pursuant to any process the State Gaming Agency deems necessary due to the nature of financing services provided, the existence of current and effective federal or state agency oversight or licensure, attenuated interests of the person or entity as passive investors without the ability to exert significant influence over the Gaming Operation, or other grounds that alleviate the need for licensure that, subject to its responsibilities under state law, the State Gaming Agency determines are appropriate.

(i)    In recognition of changing financial circumstances, this section shall be subject to good-faith renegotiation by the Tribe and the State, upon the request of either party; provided that the renegotiation shall not retroactively affect transactions that have already taken place where the Financial Source has been excluded or exempted from licensing requirements.

**Sec. 6.4.6.  Processing Tribal Gaming License Applications.**

(a)    Each Applicant for a tribal gaming license shall submit the completed application along with the required information and an application fee, if required, to the Tribal Gaming Agency in accordance with the rules and regulations of that agency.

(b)    At a minimum, the Tribal Gaming Agency shall require submission and consideration of all information required under IGRA, including part 556.4 of title 25 of the Code of Federal Regulations, for licensing primary management officials and key employees.

(c)    For Applicants that are business entities, these licensing provisions shall apply to the entity as well as:  (i) each of its officers, limited liability company members, and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, and general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who owns more than ten percent (10%) of the

37

shares of the corporation, if a corporation, or who has a direct controlling interest in the Applicant; and (v) each person or entity (other than a Financial Source that the Tribal Gaming Agency has determined does not require a license under section 6.4.5) that, alone or in combination with others, has provided financing in connection with any Gaming Operation or Class III Gaming authorized under this Compact, if that person or entity provided more than ten percent (10%) of either the start-up capital or the operating capital, or of a combination thereof, over a twelve (12)-month period.  For purposes of this subdivision, where there is any commonality of the characteristics identified in this section 6.4.6, subdivision (c)(i) through (v), inclusive, between any two (2) or more entities, those entities may be deemed to be a single entity.  For purposes of this subdivision, a direct controlling interest in the Applicant referred to in subdivision (c)(iv) excludes any passive investor or anyone who has an indirect or only a financial interest and does not have the ability to control, manage, or direct the management decisions of the Applicant.

(d)     Nothing herein precludes the Tribe or Tribal Gaming Agency from requiring more stringent licensing requirements.

**Sec. 6.4.7.  Suitability Standard Regarding Gaming Licenses.**

(a)     In reviewing an application for a tribal gaming license, and in addition to any standards set forth in the Gaming Ordinance, the Tribal Gaming Agency shall consider whether issuance of the license is inimical to public health, safety, or welfare, and whether issuance of the license will undermine public trust that the Gaming Operation is free from criminal and dishonest elements and would be conducted honestly.

(b)     A license may not be issued unless, based on all information and documents submitted, the Tribal Gaming Agency is satisfied that the Applicant, and in the case of an entity, each individual identified in section 6.4.6, subdivision (c), meets all of the following requirements:

(1)     The person is of good character, honesty, and integrity.

(2)     The person's prior activities, criminal record (if any), reputation, habits, and associations do not pose a threat to the public interest or to the effective regulation and control of

38

gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, or activities in the conduct of gaming, or in the carrying on of the business and financial arrangements incidental thereto.

(3)     The person is in all other respects qualified to be licensed as provided, and meets the criteria established in this Compact, IGRA, NIGC regulations, the Gaming Ordinance, and any other criteria adopted by the Tribal Gaming Agency or the Tribe; provided, however, an Applicant shall not be found to be unsuitable solely on the ground that the Applicant was an employee of a tribal gaming operation in California that was conducted prior to May 16, 2000.

**Sec. 6.4.8.  Background Investigations of Applicants.**

(a)     As set forth in the Tribe's Gaming Ordinance, the Tribal Gaming Agency is responsible for conducting and the Tribe agrees that the Tribal Gaming Agency shall conduct or cause to be conducted all necessary background investigations reasonably required to determine that the Applicant is qualified for a gaming license under the standards set forth in section 6.4.7, and to fulfill all applicable requirements for licensing under IGRA, NIGC regulations, the Gaming Ordinance, and this Compact.  The Tribal Gaming Agency may issue a temporary license pursuant to section 6.4.9, until a determination is made that those qualifications have been met, at which time a license may be issued under this provision.

(b)     In lieu of obtaining summary criminal history information from the NIGC, the Tribal Gaming Agency may, pursuant to the provisions in subdivisions (b) through (h), obtain such information from the California Department of Justice.  If the Tribe adopts an ordinance confirming that article 6 (commencing with section 11140) of chapter 1 of title 1 of part 4 of the California Penal Code is applicable to members, investigators, and staff of the Tribal Gaming Agency, and those members, investigators, and staff thereafter comply with that ordinance, then, for purposes of carrying out its obligations under this section, the Tribal Gaming Agency shall be eligible to be considered an entity entitled to request and receive state summary criminal history information, within the meaning of subdivision (b)(13) of section 11105 of the California Penal Code.

39

(c)     The information received shall be used by the Tribal Gaming Agency solely for the purpose for which it was requested and shall not be reproduced for secondary dissemination to any other employment or licensing agency.  Additionally, any person intentionally disclosing information obtained from personal or confidential records maintained by a state agency or from records within a system of records maintained by a government agency may be subject to prosecution.

(d)     For purposes of subdivision (b), the Tribal Gaming Agency shall submit to the California Department of Justice fingerprint images and related information required by the California Department of Justice of all Applicants for the purposes of obtaining information as to the existence and content of a record of state or federal convictions and state or federal arrests and also information as to the existence and content of a record of state or federal arrests for which the California Department of Justice establishes that the person is free on bail or on his or her recognizance pending trial or appeal.

(e)     When received, the California Department of Justice shall forward to the Federal Bureau of Investigation requests for federal summary criminal history information received pursuant to this section.  The California Department of Justice shall review the information returned from the Federal Bureau of Investigation and compile and disseminate a response to the Tribal Gaming Agency.

(f)     The California Department of Justice shall provide a state or federal level response to the Tribal Gaming Agency pursuant to California Penal Code section 11105, subdivision (p)(1).

(g)     For persons described in subdivision (d), the Tribal Gaming Agency shall request from the California Department of Justice subsequent notification service, as provided pursuant to section 11105.2 of the California Penal Code.

(h)     The California Department of Justice shall charge a fee sufficient to cover the cost of processing the request described in this section.

**Sec. 6.4.9.  Temporary Licensing.**

(a)     If the Applicant has completed a license application in a manner satisfactory to the Tribal Gaming Agency, and that agency has conducted a preliminary background investigation, and the

investigation or other information held by that agency does not indicate that the Applicant has a criminal history or other information in his or her background that would either automatically disqualify the Applicant from obtaining a tribal gaming license or cause a reasonable person to investigate further before issuing a license, or that the Applicant is otherwise unsuitable for licensing, the Tribal Gaming Agency may issue a temporary tribal gaming license and may impose such specific conditions thereon pending completion of the Applicant's background investigation, as the Tribal Gaming Agency in its sole discretion shall determine.

(b) Special fees may be required by the Tribal Gaming Agency to issue or maintain a temporary tribal gaming license.

(c) A temporary tribal gaming license, issued in accordance with the Tribal Gaming Ordinance, shall remain in effect until suspended or revoked, or a final determination is made on the application by the Tribal Gaming Agency, or for a period of up to one (1) year, whichever comes first.

(d) At any time after issuance of a temporary tribal gaming license, the Tribal Gaming Agency shall or may, as the case may be, suspend or revoke it in accordance with the provisions of sections 6.5.1 or 6.5.5, and the State Gaming Agency may request suspension or revocation before making a determination of unsuitability.

(e) Nothing herein shall be construed to relieve the Tribe of any obligation under part 558 of title 25 of the Code of Federal Regulations.

**Sec. 6.5.  Tribal Gaming License Issuance.**

Upon completion of the necessary background investigation, the Tribal Gaming Agency may issue a tribal gaming license on a conditional or unconditional basis.  Nothing herein shall create a property or other right of an Applicant in an opportunity to be licensed, or in a tribal gaming license itself, both of which shall be considered to be privileges granted to the Applicant in the sole discretion of the Tribal Gaming Agency.

### Sec. 6.5.1.  Denial, Suspension, or Revocation of Licenses.

(a)     Any Applicant's application for a tribal gaming license may be denied, and any license issued may be revoked, if the Tribal Gaming Agency determines that the application is incomplete or deficient, or if the Applicant is determined to be unsuitable or otherwise unqualified for a tribal gaming license.

(b)     Pending consideration of revocation, the Tribal Gaming Agency may suspend a tribal gaming license in accordance with section 6.5.5.

(c)     All rights to notice and hearing shall be governed by tribal law.  The Applicant shall be notified in writing of any hearing and given notice of any intent to suspend or revoke the tribal gaming license.

(d)     Except as provided in subdivision (e), upon receipt of notice that the State Gaming Agency has determined that a person would be unsuitable for licensure in a gambling establishment subject to the jurisdiction of the State Gaming Agency, the Tribal Gaming Agency shall deny that person a tribal gaming license and promptly, and in no event more than sixty (60) days from the State Gaming Agency notification, revoke any tribal gaming license that has theretofore been issued to that person; provided that the Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding between the Applicant and the State Gaming Agency in state court conducted pursuant to section 1085 or 1094.5 of the California Code of Civil Procedure, as provided by the California Gambling Control Act.

(e)     Notwithstanding a determination of unsuitability by the State Gaming Agency, the Tribal Gaming Agency may, in its discretion, decline to revoke a tribal gaming license issued to a person employed by the Tribe pursuant to section 6.4.3, subdivision (e).

### Sec. 6.5.2.  Renewal of Licenses; Extensions; Further Investigation.

(a)     Except as provided in section 6.4.4, subdivision (c), the term of a tribal gaming license shall not exceed two (2) years, and application for renewal of a license must be made prior to its expiration. Applicants for renewal of a tribal gaming license shall provide updated material, as requested, on the appropriate renewal forms, but,

42

at the discretion of the Tribal Gaming Agency, may not be required to resubmit historical data previously submitted or that is otherwise available to the Tribal Gaming Agency.  At the discretion of the Tribal Gaming Agency, an additional background investigation may be required at any time if the Tribal Gaming Agency determines the need for further information concerning the Applicant's continuing suitability or eligibility for a license.

(b)     To assist the State Gaming Agency with its consideration of renewal of its determination of suitability of all those on the Compact Key Employee Position List, a Gaming Resource Supplier, or a Financial Source, before renewing that Applicant's tribal gaming license the Tribal Gaming Agency will provide the State Gaming Agency copies of all information and documents received in connection with the application for renewal of the tribal gaming license that is not otherwise prohibited or restricted from disclosure under applicable federal law or regulation, including the federal Criminal Justice Information Services (CJIS) Security Policy, Version 5.9, dated June 1, 2020, as it may be amended, for purposes of the State Gaming Agency's review of such Applicants.

(c)     For those Applicants for a position identified on the Compact Key Employee Position List who are currently employed by the Tribe pursuant to section 6.4.3, subdivision (e), after the State Gaming Agency receives the information required by subdivision (b) and informs the Tribal Gaming Agency that the employee still meets the requirements of section 6.4.3, subdivision (e), the Applicant shall not be subject to the State Gaming Agency's consideration of renewal of its determination of suitability.

**Sec. 6.5.3.  Identification Cards.**

(a)     The Tribe agrees that the Tribal Gaming Agency will require that all persons who are required to be licensed wear, in plain view at all times while in the Gaming Facility, identification badges issued by the Tribal Gaming Agency.  The Tribal Gaming Agency may allow temporary exceptions to this provision for the purposes of authorizing investigators who are actively investigating a matter within the Gaming Facility to monitor Gaming Activities.

(b)     Identification badges must display information, including, but not limited to, a photograph and an identification number that is adequate to enable agents of the Tribal Gaming Agency to readily identify the person and determine the validity and date of expiration of his or her license.

(c)     The Tribe shall upon request provide the State Gaming Agency with the name, badge identification number, and job title of all Gaming Employees.

### Sec. 6.5.4.  Fees for Tribal Gaming License.

As a matter of tribal law, the fees for all tribal gaming licenses shall be set by the Tribal Gaming Agency.

### Sec. 6.5.5.  Summary Suspension of Tribal Gaming License.

The Tribal Gaming Agency may summarily suspend the tribal gaming license of any licensee if the Tribal Gaming Agency determines that the continued licensing of the person could constitute a threat to the public health or safety or may violate the Tribal Gaming Agency's licensing or other standards.  The Tribe agrees that the Tribal Gaming Agency shall notify the State Gaming Agency within seven (7) days of any such determination.  Any right to notice or hearing in regard thereto shall be governed by tribal law.

### Sec. 6.5.6.  State Determination of Suitability Process.

(a)     The Tribe agrees that the State has its own interests in ensuring that certain Applicants be found suitable.  For those Applicants as to whom or which a determination of suitability is required, the Tribe agrees to direct the Tribal Gaming Agency to transmit to the State Gaming Agency the Applicant's completed license application within sixty (60) days of the Tribal Gaming Agency's finding of suitability. The Tribal Gaming Agency will provide the State Gaming Agency with a notice of intent to license the Applicant, together with all of the following:

(1)     A copy of all tribal license application materials and information received by the Tribal Gaming Agency from the Applicant that is not otherwise prohibited or restricted from disclosure under applicable federal law or regulation;

(2)    An original, complete set of fingerprint impressions, rolled by a California state-certified fingerprint roller or by a person exempt from state certification pursuant to California Penal Code section 11102.1, subdivision (a)(2), and which may be on a fingerprint card or obtained and transmitted electronically;

(3)    A current photograph; and

(4)    Except to the extent waived by the State Gaming Agency, such releases of information, waivers, and other completed and executed forms as have been obtained by the Tribal Gaming Agency.

(b)    Upon receipt of a written request from a Gaming Resource Supplier or a Financial Source for a determination of suitability, the State Gaming Agency shall transmit an application package to the Applicant to be completed and returned to the State Gaming Agency for purposes of allowing it to make a determination of suitability for licensure.

(c)    Investigation and disposition of applications for a determination of suitability by the State Gaming Agency shall be governed entirely by California state law, and the State Gaming Agency shall determine whether the Applicant would be found suitable for licensure in a gambling establishment subject to the State Gaming Agency's jurisdiction.  Additional information may be required from the Applicant by the State Gaming Agency to assist it in its background investigation, to the extent permitted under state law for licensure in a gambling establishment subject to the State Gaming Agency's jurisdiction.

(d)    The Tribal Gaming Agency shall require a licensee required by this Compact to obtain a State Gaming Agency determination of suitability to apply for renewal of a determination of suitability by the State Gaming Agency at such time as the licensee applies for renewal of a tribal gaming license.

(e)    Upon receipt of completed license or license renewal application information from the Applicant or the Tribal Gaming Agency, the State Gaming Agency may conduct a background investigation pursuant to state law to determine whether the Applicant is suitable to be licensed.  The Tribal Gaming Agency agrees to provide to the State

45

Gaming Agency summary reports, including any derogatory information, of the background investigations conducted by the Tribal Gaming Agency, written statements by the Applicant and any related applications.  While the Tribal Gaming Agency shall ordinarily be the primary source of application information, the State Gaming Agency is authorized to directly seek application information from the Applicant.  If further investigation is required to supplement the investigation conducted by the Tribal Gaming Agency, and the Applicant is a Gaming Resource Supplier or a Financial Source, the Applicant will be required to pay the application fee charged by the State Gaming Agency pursuant to California Business and Professions Code section 19951, subdivision (a), but any deposit requested by the State Gaming Agency pursuant to section 19867 of that code shall take into account reports of the background investigation already conducted by the Tribal Gaming Agency and the NIGC, if any.  Failure to provide information reasonably required by the State Gaming Agency to complete its investigation under California law or failure to pay the application fee or deposit can constitute grounds for denial of the application by the State Gaming Agency.  The State Gaming Agency and Tribal Gaming Agency shall cooperate in sharing as much background information as possible, both to maximize investigative efficiency and thoroughness, and to minimize investigative costs.

(f)     Upon completion of the necessary background investigation or other verification of suitability, the State Gaming Agency shall issue a notice to the Tribal Gaming Agency certifying that the State has determined that the Applicant is suitable, or that the Applicant is unsuitable, for licensure and, if unsuitable, stating the reasons therefore.  Issuance of a determination of suitability does not preclude the State Gaming Agency from a subsequent determination based on newly discovered information that a person or entity is unsuitable for the purpose for which the person or entity is licensed.

(g)     Prior to denying an application for a determination of suitability, or to issuing notice to the Tribal Gaming Agency that a person or entity previously determined to be suitable has been determined unsuitable for licensure, the State Gaming Agency shall notify the Tribal Gaming Agency and afford the Tribe an opportunity to be heard before any decision is made.  If the State Gaming Agency denies an application

46

for a determination of suitability, or issues notice that a person or entity previously determined suitable has been determined unsuitable for licensure, the State Gaming Agency shall provide that person or entity with written notice of all appeal rights available under state law.

(h)     Upon receipt of notice that the State Gaming Agency has determined that a person or entity is or would be unsuitable for licensure, except as provided in section 6.4.3, subdivision (e), the Tribal Gaming Agency shall deny that person or entity a license, or immediately suspend or revoke that person's or entity's license, as provided in section 6.5.1.  Any right to notice or hearing in regard thereto shall be governed by tribal law.  Thereafter, the Tribal Gaming Agency shall revoke any tribal gaming license that has theretofore been issued to that person.

(i)     The Tribal Gaming Agency may, in its discretion, reissue a tribal gaming license to the person or entity following entry of a final judgment reversing the determination of the State Gaming Agency in a proceeding in state court between the Applicant and the State Gaming Agency conducted pursuant to section 1085 or 1094.5 of the California Code of Civil Procedure, as provided by the California Gambling Control Act.

(j)     The Commission, or its successor, shall maintain a roster of Gaming Resource Suppliers and Financial Sources that it has determined to be suitable pursuant to the provisions of this section, or through separate procedures to be adopted by the Commission.  Upon application to the Tribal Gaming Agency for a tribal gaming license, a Gaming Resource Supplier that appears on the Commission's suitability roster may be licensed by the Tribal Gaming Agency under section 6.4.4, subdivision (d), and a Financial Source that appears on the Commission's suitability roster may be licensed by the Tribal Gaming Agency under section 6.4.5, subdivision (f), subject to any later determination by the State Gaming Agency that the Gaming Resource Supplier or Financial Source is not suitable or to a tribal gaming license suspension or revocation pursuant to sections 6.5.1 or 6.5.5; provided that nothing in this subdivision exempts the Gaming Resource Supplier or Financial Source from applying for a renewal of a State Gaming Agency determination of suitability.

47

### Sec. 6.6.  Submission of New Application.

Nothing in section 6.0 shall be construed to preclude an Applicant who has been determined to be unsuitable for licensure by the State Gaming Agency, or the Tribe on behalf of such Applicant, from later submitting a new application for a determination of suitability by the State Gaming Agency in accordance with section 6.0, provided that the Applicant may not commence duties or activities until found suitable by the State Gaming Agency.

## SECTION 7.0.  APPROVAL AND TESTING OF GAMING DEVICES.

### Sec. 7.1.  Gaming Device Approval.

(a)     No Gaming Device may be offered for play unless all of the following occurs:

    (1)     The manufacturer or distributor that sells, leases, or distributes such Gaming Device (i) has applied for a determination of suitability by the State Gaming Agency at least fifteen (15) days before it is offered for play, (ii) has not been found to be unsuitable by the State Gaming Agency, and (iii) has been licensed by the Tribal Gaming Agency;

    (2)     The software for each game authorized for play on the Gaming Device has been tested, approved and certified by an independent gaming test laboratory or state or national governmental gaming test laboratory (Gaming Test Laboratory) as operating in accordance with technical standards that meet or exceed industry standards;

    (3)     A copy of the certification by the Gaming Test Laboratory, specified in subdivision (a)(2), is provided to the State Gaming Agency by electronic transmission or by mail, unless the State Gaming Agency waives receipt of copies of the certification;

    (4)     The software for the games authorized for play on the Gaming Device is tested by the Tribal Gaming Agency to ensure each game authorized for play on the Gaming Device has the correct electronic signature prior to insertion into the Gaming Device, or if the software is to be installed on a server to which one (1) or more Gaming Devices will be connected, prior to the connection of any Gaming Devices to the server;

(5)     The hardware and associated equipment for each type of Gaming Device has been tested by the Gaming Test Laboratory prior to operation by the public to ensure operation in accordance with the standards established by the Tribal Gaming Agency that meet or exceed industry standards; and

(6)     The hardware and associated equipment for the Gaming Device has been tested by the Tribal Gaming Agency to confirm operation in accordance with the manufacturer's specifications.

(b)     If either the Tribal Gaming Agency or the State Gaming Agency requests new standards for testing, approval, and certification of the software for the game authorized for play on the Gaming Device pursuant to subdivision (a)(2), the party requesting the new standards shall provide the other party with a detailed explanation of the reason(s) for the request.  If the party to which the request is made disagrees with the request, the State Gaming Agency and the Tribal Gaming Agency shall meet and confer in a good-faith effort to resolve the disagreement, which meeting and conferring shall include consultation with a Gaming Test Laboratory.  If the disagreement is not resolved within one hundred twenty (120) days after the initial meeting between the regulators to discuss the matter, either the Tribe or the State may submit the matter to dispute resolution under section 13.0 of this Compact.

## Sec. 7.2.  Gaming Test Laboratory Selection.

(a)     The Gaming Test Laboratory shall be an independent commercial gaming test laboratory that is (i) recognized in the gaming industry as competent and qualified to conduct scientific tests and evaluations of Gaming Devices, and (ii) licensed or approved by any state or tribal government within the jurisdiction of which the operation of Gaming Devices is authorized.  At least thirty (30) days before the commencement of Gaming Activities pursuant to this Compact, or if such use follows the commencement of Gaming Activities, at least fifteen (15) days prior to reliance thereon, the Tribal Gaming Agency shall submit to the State Gaming Agency documentation that demonstrates the Gaming Test Laboratory satisfies (i) and (ii) herein.  If, at any time, the Gaming Test Laboratory license and/or approval required by (ii) is suspended or revoked by any of those jurisdictions or the Gaming Test Laboratory is found unsuitable by the State

49

Gaming Agency, then the State Gaming Agency may reject the use of that Gaming Test Laboratory, and upon such rejection, the Tribal Gaming Agency shall ensure that the Gaming Test Laboratory discontinues its responsibilities under section 7.0.  Any such suspension, revocation, or determination of unsuitability shall not affect the Tribe's right to continue operating Gaming Devices that had been tested and evaluated by that Gaming Test Laboratory, but Gaming Devices tested, evaluated and approved by that Gaming Test Laboratory shall be re-tested, re-evaluated and re-approved by a substitute Gaming Test Laboratory within sixty (60) days from the date on which the Tribal Gaming Agency is notified of the suspension, revocation, or determination of unsuitability, or if circumstances require, any other reasonable timeframe as may be mutually agreed to by the Tribal Gaming Agency and the State Gaming Agency.

(b)     The Tribe and the State Gaming Agency shall inform the Gaming Test Laboratory in writing that, irrespective of the source of payment of its fees, the Gaming Test Laboratory's duty of loyalty runs equally to the State and the Tribe; provided, that if the State Gaming Agency requests that the Gaming Test Laboratory perform additional work, the State Gaming Agency shall be solely responsible for the cost of such additional work.

**Sec. 7.3.  Maintenance of Records of Testing Compliance.**

The Tribal Gaming Agency agrees to prepare and maintain records of its compliance with section 7.1 while any Gaming Device is on the gaming floor and for a period of one (1) year after the Gaming Device is removed from the gaming floor, and make those records available for inspection by the State Gaming Agency upon request.

**Sec. 7.4.  State Gaming Agency Inspections.**

(a)     The State Gaming Agency may inspect the Gaming Devices in operation at a Gaming Facility on a random basis to confirm that they operate and play properly pursuant to applicable technical standards. The inspection may be conducted onsite or remotely as a desk audit and include all Gaming Device software, hardware, associated equipment, software maintenance records, and components critical to the operation of the Gaming Device.  The State Gaming Agency shall

50

make a good-faith effort to work with the Tribal Gaming Agency to minimize unnecessary disruption to the Gaming Operation including, where appropriate, performing desk audits rather than onsite physical inspections.  If the State Gaming Agency determines that an irregularity or finding in a prior inspection establishes a basis to return to the Gaming Facility for additional inspections, it shall immediately provide the Tribal Gaming Agency the basis for such finding and an opportunity for the issue to be resolved without an additional inspection.  The State Gaming Agency may conduct up to two (2) additional inspections if a proper basis for such inspections has been established through a record of irregularities or negative findings in prior inspections.  If the Tribal Gaming Agency does not agree with the State's allegations of an irregularity or negative finding arising from a prior inspection, the matter shall be resolved in accordance with the dispute resolution provisions of section 13.0.

(b)     The Tribal Gaming Agency shall cooperate with the State Gaming Agency's reasonable efforts to obtain information that facilitates the conduct of remote but effective inspections that minimize disruption to Gaming Activities.  If the State Gaming Agency determines that more than one (1) annual onsite inspection is necessary or appropriate, it will provide the Tribal Gaming Agency with the basis for its determination that additional onsite inspections are justified, as set forth above.  If the State Gaming Agency requires more than one (1) annual onsite inspection in successive years, the State and the Tribe may meet and confer to discuss the basis for such determinations. During each random inspection, the State Gaming Agency may not remove a Gaming Device from play, except during inspection or testing, unless it obtains the concurrence of the Tribal Gaming Agency, which shall not be unreasonably withheld.

(c)     Whenever practicable, the State Gaming Agency shall not require removal from play any Gaming Device that the State Gaming Agency determines may be fully and adequately tested while still in play.  The inspections may include all Gaming Device software, hardware, associated equipment, software and hardware maintenance and testing records, and components critical to the operation of the Gaming Device.  The random inspections conducted pursuant to this section shall occur during normal business hours outside of weekends and holidays and shall not remove from play more than five percent (5%)

51

of the Gaming Devices then in operation at the Gaming Facility, provided that the five percent (5%) limitation on removal of Gaming Devices shall not apply where a Gaming Device, including but not limited to a progressive controller, makes limiting removal from play to no more than five percent (5%) infeasible or impossible.

(d)     To minimize unnecessary disruption to the Gaming Operation, rather than conducting on-site inspections, the State Gaming Agency may perform desk audits of the Tribe's Gaming Devices currently in operation.  Upon receipt of notice from the State Gaming Agency of the intent to conduct a desk audit, the Tribal Gaming Agency shall provide the State Gaming Agency with a list of all of the Tribe's Gaming Devices currently in operation, together with the information for each such Gaming Device that supports a desk audit.  This information shall include, but is not limited to, the following:

(1)     Manufacturer;

(2)     Game name or theme;

(3)     Serial number;

(4)     Machine or asset number;

(5)     Location;

(6)     Denomination;

(7)     Slot type (e.g., video, reel);

(8)     Progressive type (e.g., stand alone, linked, wide area progressive);

(9)     Software ID number for all certified software in the Gaming Device, including game, base or system, boot chips and communication chip; and

(10)    Any other information deemed relevant and appropriate by the State Gaming Agency and the Tribal Gaming Agency.

(e)     The State Gaming Agency shall provide notice to the Tribal Gaming Agency of its intent to conduct any on-site Gaming Device inspection with prior notice sufficient to afford the presence of proper staffing

and, where applicable, manufacturer's representatives, to ensure the overall efficiency of the inspection process.  The inspection shall not be unreasonably delayed and must take place within thirty (30) days of notification unless the Tribal Gaming Agency and the State Gaming Agency agree otherwise.

(f)    The State Gaming Agency may retain and use qualified consultants to perform the functions authorized or specified herein but any such consultants shall be bound by the confidentiality and information use and disclosure provisions applicable to the State Gaming Agency and its employees.  The State Gaming Agency shall ensure that any consultants retained by it have met the standards and requirements, including any background investigations, established by applicable regulations governing contract employees prior to participating in any matter under this Compact.  The State Gaming Agency shall also take all reasonable steps to ensure that consultants are free from conflicting interests in the conduct of their duties under this Compact.  The Tribal Gaming Agency, in its sole discretion, may require a member or staff of the Tribal Gaming Agency or a representative of the State Gaming Agency to accompany any consultant at all times that the consultant is in a non-public area of the Gaming Facility.

(g)    The State Gaming Agency promptly shall consult with the Tribal Gaming Agency concerning any material discrepancies noted and whether those discrepancies continue to exist.

**Sec. 7.5.  Technical Standards.**

The Tribal Gaming Agency shall provide to the State Gaming Agency copies of its regulations for technical standards applicable to the Tribe's Gaming Devices at least thirty (30) days before the commencement of Gaming Activities or within thirty (30) days after the effective date of this Compact, whichever is later, and thereafter at least thirty (30) days before the effective date of any revisions to the regulations, unless exigent circumstances require that any revisions to the regulations take effect sooner to ensure game integrity or otherwise to protect the public or the Gaming Operation, in which event the revisions to the regulations shall be provided to the State Gaming Agency as soon as reasonably practicable.

**Sec. 7.6.  Transportation of Gaming Devices.**

(a)      Subject to the provisions of subdivision (b), the Tribal Gaming Agency shall not permit any Gaming Device to be transported to or from the Tribe's Indian lands except in accordance with procedures established by agreement between the State Gaming Agency and the Tribal Gaming Agency and upon at least ten (10) days' notice to the Sheriff's Department for the County.

(b)      Transportation of a Gaming Device from a Gaming Facility within California is permissible only if:

(1)      The final destination of the Gaming Device is a gaming facility of any tribe in California that has a Class III Gaming compact with the State or Secretarial Procedures that makes lawful the operation of Gaming Devices;

(2)      The final destination of the Gaming Device is any other state in which possession of the Gaming Device is made lawful by that state's law, tribal-state compact, or Secretarial Procedures;

(3)      The final destination of the Gaming Device is another country, or any state or province of another country, wherein possession of Gaming Devices is lawful; or

(4)      The final destination is a location within California for testing, repair, maintenance, or storage by a person or entity that has been licensed by the Tribal Gaming Agency and has been found suitable for licensure by the State Gaming Agency.

(c)      Any Gaming Device transported from or to the Tribe's Indian lands in violation of this section 7.6 or in violation of any permit issued pursuant thereto, is subject to summary seizure by California peace officers in accordance with California law.

## SECTION 8.0.  INSPECTIONS.

**Sec. 8.1.  On-Site Regulation.**

This Compact recognizes and respects the primary role of the Tribal Gaming Agency to perform on-site regulation and to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and

54

fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of regulation and internal controls. This Compact also acknowledges and affords the State with the authority and responsibility to ensure that the Tribe complies with all of the terms of this Compact and that gaming is conducted with integrity and in a manner that protects the health, safety and other interests of the people of California.

### Sec. 8.1.1.  Investigation and Sanctions.

(a)     The Tribal Gaming Agency shall investigate any reported violation of this Compact and shall require the Gaming Operation to correct the violation upon such terms and conditions as the Tribal Gaming Agency determines are necessary.

(b)     The Tribal Gaming Agency shall be empowered by the Gaming Ordinance to impose fines or other sanctions within the jurisdiction of the Tribe against tribal gaming licensees who interfere with or violate the Tribe's gaming regulatory requirements and obligations under IGRA, the Gaming Ordinance, or this Compact.  Any right to notice or hearing in regard thereto shall be governed by tribal law.  Nothing in this Compact expands, modifies, or impairs the jurisdiction of the Tribal Gaming Agency under IGRA, the Tribal Gaming Ordinance or other applicable tribal law.

(c)     The Tribal Gaming Agency shall report individual or continuing violations of this Compact that pose a significant threat to gaming integrity or public health and safety, and any failures to comply with the Tribal Gaming Agency's orders, to the State Gaming Agency within ten (10) days of discovery.

### Sec. 8.2.  Assistance by State Gaming Agency.

The Tribe may request the assistance of the State Gaming Agency whenever it reasonably appears that such assistance may be necessary to carry out the purposes described in section 8.1.1, or otherwise to protect public health, safety, or welfare.

### Sec. 8.3.  Access to Premises by State Gaming Agency; Notification; Inspections.

(a)     Notwithstanding that the Tribe and its Tribal Gaming Agency have the primary responsibility to administer and enforce the regulatory

55

requirements of this Compact, the State Gaming Agency, including any consultant retained by it, shall have the right to inspect the Tribe's Gaming Facility, and all Gaming Operation or Gaming Facility records relating thereto as is reasonably necessary to ensure Compact compliance, including with adequate notice such records located in off-site facilities dedicated to their storage, subject to the conditions in subdivisions (b), (c), and (d).  If the Tribe objects to the State's determination of the areas included within any inspection, the matter shall be resolved in accordance with the dispute resolution provisions of section 13.0.  The State Gaming Agency shall ensure that any consultants retained by it have met the standards and requirements, including any background investigations, established by applicable regulations governing contract employees prior to participating in any matter under this Compact.  The State Gaming Agency shall also take all reasonable steps to ensure that consultants are free from conflicting interests in the conduct of their duties under this Compact and shall provide the Tribal Gaming Agency with prior notice of the use of any consultant.  The Tribal Gaming Agency, in its sole discretion, may require a member or staff of the Tribal Gaming Agency or a representative of the State Gaming Agency to accompany any consultant at all times that the consultant is in a non-public area of the Gaming Facility.

(b)    Except as provided in section 7.4, the State Gaming Agency may inspect public areas of the Gaming Facility at any time without prior notice during normal Gaming Facility business hours.

(c)    Inspection of areas of the Gaming Facility not normally accessible to the public may be made at any time during the normal administrative hours of the Tribal Gaming Agency, immediately after the State Gaming Agency's authorized inspector notifies the Tribal Gaming Agency of his or her presence on the premises, presents proper identification, and requests access to the non-public areas of the Gaming Facility.  Inspection of areas of the Gaming Facility not normally accessible to the public may be made at any time outside the normal administrative hours of the Tribal Gaming Agency with fourteen (14) days' notice to the Tribal Gaming Agency, except that fourteen (14) days' notice is not required upon the existence of exigent circumstances that the State Gaming Agency reasonably determines may be a threat to gaming integrity or public safety.  The

Tribal Gaming Agency, in its sole discretion, may require a member or staff of the Tribal Gaming Agency to accompany the State Gaming Agency inspector at all times that the State Gaming Agency inspector is in a non-public area of the Gaming Facility.  If the Tribal Gaming Agency imposes such a requirement, it shall require such member or staff to be available at appropriate times for those purposes and shall ensure that the member or staff has the ability to gain immediate access to all non-public areas of the Gaming Facility.

(d)     Nothing in this Compact shall be construed to limit the State Gaming Agency to one (1) inspector during inspections.

**Sec. 8.4.  Inspection, Copying, and Confidentiality of Documents.**

(a)     Inspection and copying of Gaming Operation papers, books, and records that the State Gaming Agency reasonably deems necessary to ensure compliance with the terms of this Compact, may occur at any time after the State Gaming Agency gives notice to the Tribal Gaming Agency during the normal administrative hours of the Tribal Gaming Agency, provided that the State Gaming Agency inspectors cannot require copies of papers, books, or records:  (i) that are unrelated to Gaming Activities, or any matters beyond the scope of authority under this Compact; or (ii) in such manner or volume that it unreasonably interferes with the normal functioning of the Gaming Operation or Gaming Facility, or with the operation of the Tribal Gaming Agency.

(b)     In lieu of onsite inspection and copying of Gaming Operation papers, books, and records by its inspectors, the State Gaming Agency may request in writing that the Tribal Gaming Agency provide copies of such papers, books, and records as the State Gaming Agency reasonably deems necessary to ensure compliance with the terms of this Compact; provided, the State Gaming Agency inspectors cannot require copies of papers, books, or records:  (i) that are unrelated to Gaming Activities, or any matters beyond the scope of authority under this Compact; or (ii) in such volume that it unreasonably interferes with the normal functioning of the Gaming Operation or Gaming Facility, or with the operation of the Tribal Gaming Agency.  The State Gaming Agency's written request shall describe those papers, books, and records requested to be copied with sufficient specificity to reasonably identify the requested documents.  Within ten (10) days after it receives the request, or such other time as the State Gaming

57

Agency may agree in writing, the Tribal Gaming Agency shall provide one (1) copy of the requested papers, books, and records to the requesting State Gaming Agency.  An electronic version of the requested papers, books, and records may be submitted to the State Gaming Agency in lieu of a paper copy so long as the software required to access the electronic version is reasonably available to the State Gaming Agency.

(c)     Notwithstanding any other provision of California law, any confidential information and records, as defined in this subdivision, that the State Gaming Agency obtains or copies pursuant to this Compact shall be, and remain, the property solely of the Tribe; provided that such confidential information and records and copies may be retained by the State Gaming Agency as is reasonably necessary to assure the Tribe's compliance with this Compact.  The State Gaming Agency may provide such confidential information and records and copies to federal law enforcement and other state agencies or consultants that the State deems reasonably necessary in order to assure the Tribe's compliance with this Compact; provided that to the extent reasonably feasible, the State Gaming Agency will consult with representatives of the Tribe prior to such disclosure.  Upon request, the State Gaming Agency shall provide the Tribal Gaming Agency with information regarding its relevant confidentiality policies.  For the purposes of this section 8.4, "confidential information and records" means any and all information and records received from the Tribe pursuant to the Compact, except for information and documents that are in the public domain.

(d)     The State Gaming Agency and all other state agencies and consultants to which it provides information and records obtained pursuant to subdivisions (a) or (b) of this section, which are confidential pursuant to subdivision (c), will exercise utmost care in the preservation of the confidentiality of such information and records and will apply the highest standards of confidentiality provided under California state law to preserve such information and records from disclosure until such time as the information or record is no longer confidential or disclosure is authorized by the Tribe, by mutual agreement of the Tribe and the State, or pursuant to the dispute resolution provisions of section 13.0.  The State Gaming Agency and all other state agencies and consultants may disclose confidential information or records as

58

necessary to fully adjudicate or resolve a dispute arising pursuant to the Compact, in which case the State Gaming Agency and all other state agencies and consultants agree to preserve confidentiality to the greatest extent feasible and available.  Before the State Gaming Agency provides confidential information and records to a consultant as authorized under subdivision (c), it shall enter into a confidentiality agreement with that consultant that meets the standards of this subdivision.

(e)     The Tribe may avail itself of any and all remedies under state law for the improper disclosure of confidential information and records.  In the case of any disclosure of confidential information and records compelled by judicial process, the State Gaming Agency will endeavor to give the Tribe prompt notice of the order compelling disclosure and a reasonable opportunity to interpose an objection thereto with the court.

(f)     Except as otherwise provided in any regulation approved by the Association, the Tribal Gaming Agency and the State Gaming Agency shall confer and agree regarding protocols for the release to law enforcement agencies of information obtained during the course of background investigations.

(g)     Confidential information and records received by the State Gaming Agency from the Tribe in compliance with this Compact, or information compiled by the State Gaming Agency from those confidential records, shall be exempt from disclosure under the California Public Records Act, California Government Code section 6250 et seq.

(h)     Notwithstanding any other provision of this Compact, the State Gaming Agency shall not be denied access to papers, books, records, equipment, or places where such access is reasonably necessary to ensure compliance with this Compact or to conduct or complete an investigation of suspected criminal activity in connection with the Gaming Activities or the operation of the Gaming Facility or the Gaming Operation.

(i)     Upon request, the State Gaming Agency shall provide the Tribal Gaming Agency with a current copy of its records retention and destruction policy.

### Sec. 8.5.  Cooperation with Tribal Gaming Agency.

The State Gaming Agency shall meet periodically with the Tribal Gaming Agency and cooperate in all matters relating to the enforcement of the provisions of this Compact.

### Sec. 8.6.  Compact Compliance Review.

The State Gaming Agency is authorized to conduct an annual Compact compliance review (also known as a "site visit") to ensure compliance with all provisions of this Compact and any appendices hereto.  The Tribal Gaming Agency will coordinate with the State Gaming Agency to address any irregularity that the State Gaming Agency reasonably determines may be a threat to gaming integrity or public safety.  If a disagreement arises between the Tribal Gaming Agency and the State Gaming Agency and the issue is not resolved within one hundred twenty (120) days after the initial meeting between the regulators to discuss the matter, either the Tribe or the State may submit the matter to dispute resolution under section 13.0 of this Compact.  Nothing in this section shall be construed to supersede any other audits, inspections, investigations, and monitoring authorized by this Compact.

### Sec. 8.7.  Waiver of Materials.

The State Gaming Agency shall retain the discretion to waive, in whole or in part, receipt of materials otherwise required by this Compact to be provided to the State Gaming Agency by the Tribal Gaming Agency or the Tribe.

## SECTION 9.0.  RULES AND REGULATIONS FOR THE OPERATION AND MANAGEMENT OF THE GAMING OPERATION AND FACILITY.

### Sec. 9.1.  Adoption of Regulations for Operation and Management; Minimum Standards.

The State recognizes that the Tribe is the primary regulator of its Gaming Operation and that is the responsibility of the Tribal Gaming Agency to conduct on-site gaming regulation and control in order to enforce the terms of this Compact, IGRA, NIGC gaming regulations, State Gaming Agency regulations, and the Gaming Ordinance, to protect the integrity of the Gaming Activities, the reputation of the Tribe and the Gaming Operation for honesty and fairness, and to maintain the confidence of patrons that tribal governmental gaming in California meets the highest standards of fairness and internal controls.  To meet those responsibilities, the Tribal Gaming Agency is vested with the authority to

promulgate, and shall promulgate and enforce, rules and regulations governing, at a minimum, the following subjects pursuant to the standards and conditions set forth therein:

(a)     The enforcement of all relevant laws and rules with respect to the Gaming Activities, Gaming Operation, and Gaming Facility, and the conduct of investigations and hearings with respect thereto, and any other subject within its jurisdiction.

(b)     The physical safety of Gaming Operation and Gaming Facility patrons and employees, and any other person while in the Gaming Facility. Except as provided in section 12.2, nothing herein shall be construed, however, to make applicable to the Tribe state laws, regulations, or standards governing the use of tobacco.

(c)     The physical safeguarding of assets transported to, within, and from the Gaming Facility.

(d)     The prevention of illegal activity within the Gaming Facility or with regard to the Gaming Operation or Gaming Activities, including, but not limited to, the maintenance of employee procedures and a surveillance system as provided in subdivision (e).

(e)     Maintenance of an internal video surveillance system consistent with industry standards for gaming facilities of the type and scale operated by the Tribe, which system shall be approved by, and may not be modified without the approval of, the Tribal Gaming Agency.  The Tribal Gaming Agency shall have current copies of the Gaming Facility floor plan and internal video surveillance system at all times, and any modifications thereof first shall be approved by the Tribal Gaming Agency.

(f)     The establishment of employee procedures designed to permit detection of any irregularities, theft, cheating, fraud, or the like, consistent with industry practice.

(g)     Maintenance of a list of persons permanently excluded from the Gaming Facility who, because of their past behavior, criminal history, or association with persons or organizations, pose a threat to the integrity of the Gaming Activities of the Tribe or to the integrity of regulated gambling within California.  The Tribal Gaming Agency and the State Gaming Agency shall make a good-faith effort to share

information regarding such permanent exclusions.  Nothing herein is intended to grant any third party the right to sue based upon any sharing of information.

(h)   The conduct of an audit of the Gaming Operation, not less than annually, by an independent certified public accountant, in accordance with industry standards.

(i)   Submission to, and prior approval by, the Tribal Gaming Agency of the rules and regulations of each Class III Gaming game to be operated by the Tribe, and of any changes in those rules and regulations.  No Class III Gaming game may be offered for play that has not received Tribal Gaming Agency approval.

(j)   The obligation of the Gaming Facility and the Gaming Operation to maintain a copy of the rules, regulations, and procedures for each game as played, including, but not limited to, the method of play and the odds and method of determining amounts paid to winners.

(k)   Specifications and standards to ensure that information regarding the method of play, odds, and payoff determinations is visibly displayed or available to patrons in written form in the Gaming Facility and to ensure that betting limits applicable to any gaming station are displayed at that gaming station.

(l)   Maintenance of a cashier's cage in accordance with tribal internal control standards that meet or exceed industry standards for such facilities.

(m)   Specification of minimum staff and supervisory requirements for each Gaming Activity to be conducted.

(n)   Technical standards and specifications in conformity with the requirements of this Compact for the operation of Gaming Devices and other games authorized herein or as provided in any regulation approved by the Association.

**Sec. 9.2.  Manner in Which Incidents Are Reported.**

The Tribe agrees that the Tribal Gaming Agency shall require the recording of any and all occurrences within the Gaming Facility that deviate from normal operating policies and procedures (hereinafter "incident(s)").  The

Tribe agrees that the Tribal Gaming Agency shall transmit copies of incident reports that it reasonably believes concern a significant or continued threat to public safety or gaming integrity to the State Gaming Agency within a reasonable period of time, not to exceed seven (7) days, after the incident.  The procedure for recording incidents pursuant to this section shall also do all of the following:

(a)     Specify that security personnel record all incidents, regardless of an employee's determination that the incident may be immaterial (and all incidents shall be identified in writing).

(b)     Require the assignment of a sequential number to each incident report.

(c)     Provide for permanent reporting in indelible ink in a bound notebook from which pages cannot be removed and in which entries are made on each side of each page and/or in electronic form, provided the information is recorded in a manner so that, once the information is entered, it cannot be deleted or altered and is available to the State Gaming Agency pursuant to sections 8.3 and 8.4.

(d)     Require that each report include, at a minimum, all of the following:

(1)     The record number.

(2)     The date.

(3)     The time.

(4)     The location of the incident.

(5)     A detailed description of the incident.

(6)     The persons involved in the incident.

(7)     The security department employee assigned to the incident.

**Sec. 9.3.  Minimum Internal Control Standards (MICS).**

(a)     The Tribe agrees that it will conduct its Gaming Activities pursuant to an internal control system that implements minimum internal control standards for Class III Gaming that are no less stringent than those contained in (i) the Minimum Internal Control Standards of the NIGC (25 C.F.R. § 542), as they existed on October 20, 2006,

and as they have been or may be amended from time to time, without regard to the NIGC's authority to promulgate, enforce, or audit the standards, or (ii) any subsequent NIGC regulation or NIGC guidance that is at least as stringent as the Minimum Internal Control Standards of the NIGC, including the August 14, 2018 NIGC Guidance on the Class III Minimum Internal Control Standards.  These standards are posted on the State Gaming Agency website(s) and are referred to herein as the "Compact MICS."  This requirement is met through compliance with the provisions set forth in this section and sections 9.1 and 9.2 of this Compact, or in the alternative, by compliance with the Commission's Uniform Statewide Tribal Gaming Regulation CGCC-8, as it exists currently and as it may hereafter be amended.

(b)     In the event the Commission's Uniform Statewide Tribal Gaming Regulation CGCC-8 is rescinded or otherwise ceases to exist, or if the NIGC withdraws its regulations at 25 C.F.R. part 542, the Compact MICS, as they may be amended from time to time, shall continue to serve as the minimum internal control standards for the purposes of this Compact.  Any change, modification, or amendment thereto shall be effected by action of the Association.

(c)     The minimum internal control standards set forth in the Compact MICS shall apply to all Gaming Activities, Gaming Facilities, and the Gaming Operation; however, the Compact MICS are not applicable to any class II gaming activities.  Should the terms in the Compact MICS be inconsistent with this Compact, the terms in this Compact shall prevail.

**Sec. 9.4.  Program to Mitigate Problem Gambling.**

The Gaming Operation will establish and maintain a program, approved by the Tribal Gaming Agency, to mitigate pathological and problem gambling by implementing the following measures:

(a)     Training Gaming Facility supervisors and gaming floor employees on responsible gaming and to identify and manage problem gambling.

(b)     Making available to patrons at conspicuous locations and ATMs in the Gaming Facility educational and informational materials that

aim at the prevention of problem gambling and that specify where to find assistance, and shall display at conspicuous locations and at ATMs within the Gaming Facility signage bearing a toll-free help-line number where patrons may obtain assistance for gambling problems.

(c)     Establishing self-exclusion measures whereby a self-identified problem gambler may request the halt of promotional mailings, the revocation of privileges for casino services, the denial or restraint on the issuance of credit and check cashing services, and exclusion from  the Gaming Facility.

(d)     Establishing involuntary exclusion measures that allow the Gaming Operation to halt promotional mailings, deny or restrain the issuance of credit and check-cashing services, and deny access to the Gaming Facility to patrons who have exhibited signs of problem gambling.  No person involuntarily excluded under such measures shall be entitled to assert any claim whatsoever against the Tribe, the Gaming Operation or any official, employee or agent of the Tribe or the Gaming Operation as the result of such exclusion.

(e)     Making diligent efforts to prevent underage individuals from loitering in the area of the Gaming Facility where the Gaming Activities take place.

(f)     Assuring that advertising and marketing of the Gaming Facility's Gaming Activities contain a responsible gambling message and a toll- free help-line number for problem gamblers, where practical, and that they make no false or misleading claims.

Any deficiency in the effectiveness of these measures or standards, as opposed to compliance with the program and measures specified above, does not constitute a material breach of this Compact.

Nothing herein is intended to grant any third party the right to sue based upon any alleged deficiency or violation of these measures.

### Sec. 9.5.  Enforcement of Regulations.

The Tribe agrees that the Tribal Gaming Agency shall ensure the enforcement of the rules, regulations, and specifications promulgated under this Compact.

### Sec. 9.6.  State Civil and Criminal Jurisdiction.

Nothing in this Compact expands, modifies or impairs the civil or criminal jurisdiction of the State, local law enforcement agencies and state courts under Public Law 280 (18 U.S.C. § 1162; 28 U.S.C. § 1360) or IGRA. Except as provided below, all state and local law enforcement agencies and state courts shall exercise jurisdiction to enforce the State's criminal laws on the Tribe's Indian lands, including the Gaming Facility and all related structures, in the same manner and to the same extent, and subject to the same restraints and limitations, imposed by the laws of the State and the United States, as is exercised by state and local law enforcement agencies and state courts elsewhere in the state.  However, no Gaming Activity conducted by the Tribe pursuant to this Compact may be deemed to be a civil or criminal violation of any law of the State.  Except for Gaming Activity conducted pursuant to this Compact, criminal jurisdiction to enforce the State's gambling laws on the Tribe's Indian lands, and to adjudicate alleged violations thereof, is hereby transferred to the State pursuant to 18 U.S.C. § 1166(d).

### Sec. 9.7.  Tribal Gaming Agency Members.

(a)     The Tribe is obligated under its own laws and IGRA, and agrees to take reasonable steps, to ensure that members of the Tribal Gaming Agency are free from corruption, undue influence, compromise, and conflicting interests in the conduct of their duties under this Compact; and agrees to adopt a conflict-of-interest code to that end; and shall ensure the prompt removal of any member of the Tribal Gaming Agency who is found to have acted in a corrupt or compromised manner, or is found to have violated the conflict-of-interest code.

(b)     The Tribe's Gaming Ordinance and this Compact require and the Tribe agrees that the Tribal Gaming Agency shall conduct a background investigation on each prospective member of the Tribal Gaming Agency; provided that if such member is elected through a tribal election process, that member may not participate

in any Tribal Gaming Agency matters under this Compact unless a background investigation has been concluded and the member has been found to be suitable.

(c)     The Tribe shall conduct a background investigation on each prospective employee of the Tribal Gaming Agency to ensure that he or she satisfies the requirements of section 6.4.7.

**Sec. 9.8.  RESERVED.**

**Sec. 9.9.  Uniform Statewide Tribal Gaming Regulations.**

(a)     The Uniform Statewide Tribal Gaming Regulations CGCC-1, CGCC- 2, CGCC-7, and CGCC-8 (as in effect on the date the parties execute this Compact), adopted by the State Gaming Agency and approved by the Association, shall apply to the Gaming Operation until amended or repealed, without further action by the State Gaming Agency, the Tribe, the Tribal Gaming Agency or the Association.

(b)     Any subsequent Uniform Statewide Tribal Gaming Regulations adopted by the State Gaming Agency and approved by the Association shall apply to the Gaming Operation until amended or repealed.

(c)     No State Gaming Agency regulation adopted pursuant to this section shall be effective with respect to the Tribe's Gaming Operation unless it has first been approved by the Association and the Tribe has had an opportunity to review and comment on the proposed regulation, except as provided in subdivision (f).

(d)     Every State Gaming Agency regulation adopted pursuant to this section that is intended to apply to the Tribe (other than a regulation proposed or previously approved by the Association) shall be submitted to the Association for consideration prior to submission of the regulation to the Tribe for comment as provided in subdivision (c).  A regulation adopted pursuant to this section that is disapproved by the Association shall not be submitted to the Tribe for comment unless it is re-adopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections.

(e)     Except as provided in subdivision (f), no regulation of the State Gaming Agency adopted pursuant to this section shall be adopted as a final regulation with respect to the Tribe's Gaming Operation before the expiration of thirty (30) days after submission of the proposed regulation to the Tribe for comment as a proposed regulation, and after consideration of the Tribe's comments, if any.

(f)     In exigent circumstances (e.g., imminent threat to public health and safety), the State Gaming Agency may adopt a regulation that becomes effective immediately.  Any such regulation shall be accompanied by a detailed, written description of the exigent circumstances, and shall be submitted immediately to the Association for consideration.  If the regulation is disapproved by the Association, it shall cease to be effective, but may be readopted by the State Gaming Agency as a proposed regulation, in its original or amended form, with a detailed, written response to the Association's objections, and thereafter submitted to the Tribe for comment as provided in subdivision (e).

(g)     The Tribe may object to a State Gaming Agency regulation adopted pursuant to this section on the ground that it is unnecessary, unduly burdensome, or unfairly discriminatory, and may seek repeal or amendment of the regulation through the dispute resolution process of section 13.0.

(h)     Chapter 3.5 (commencing with section 11340) of part 1 of division 3 of title 2 of the California Government Code does not apply to regulations adopted by the State Gaming Agency pursuant to this section.

## SECTION 10.0.  PATRON DISPUTES.

The Tribal Gaming Agency shall promulgate regulations governing patron disputes over the play or operation of any game, including any refusal to pay to a patron any alleged winnings from any Gaming Activities, which regulations must meet the following minimum standards:

(a)     A patron who makes an oral or written complaint to personnel of the Gaming Operation over the play or operation of any game within three (3) days of the play or operation at issue shall be notified in writing of the patron's right to request in writing, within fifteen (15)

68

days of the Gaming Operation's written notification to the patron of that right, resolution of the dispute by the Tribal Gaming Agency, and if dissatisfied with the Tribal Gaming Agency's resolution of the dispute, the right to seek resolution before the Tribe's tribal court (Tribal Court). If the patron is not provided with the aforesaid notification within thirty (30) days of the patron's complaint, the deadlines herein shall be removed, leaving only the relevant statutes of limitations under State law that would otherwise apply.

(b)  Upon receipt of the patron's written request for a resolution of the patron's complaint pursuant to subdivision (a), the Tribal Gaming Agency shall conduct an appropriate investigation, shall provide to the patron a copy of its regulations concerning patron complaints, and shall render a decision in accordance with industry practice. The decision shall be issued within sixty (60) days of the patron's written request, shall be in writing, shall be based on the facts surrounding the dispute, and shall set forth the reasons for the decision.

(c)  If the patron is dissatisfied with the decision of the Tribal Gaming Agency issued pursuant to subdivision (b), or no decision is issued within the sixty (60)-day period, the patron may request that the dispute be resolved in the Tribal Court. The Tribal Court must afford the patron with a dispute resolution process that incorporates the essential elements of fairness and due process. Resolution of the dispute before the Tribal Court shall be at no cost to the patron (excluding patron's attorney's fees and court filing fees).

(d)  Consistent with industry practice, if any alleged winnings are found to be a result of a mechanical, electronic or electromechanical failure and not due to the intentional acts or gross negligence of the Tribe or its agents, the patron's claim for the winnings shall be denied but the patron shall be awarded reimbursements of the amount wagered by the patron that were lost as a result of any mechanical, electronic or electromechanical failure.

(e)  Any party dissatisfied with the award of the Tribal Court may invoke the jurisdiction of the applicable tribal appellate court.

(f)  To effectuate its consent to the Tribal Court and the tribal appellate court in this section 10.0, the Tribe shall, in the exercise of its sovereignty, waive its right to assert sovereign immunity in

connection with the jurisdiction of the Tribal Court and the tribal appellate court and in any action to (i) enforce the Tribe's or the patron's obligation under this section 10.0, or (ii) enforce or execute a judgment based upon the award of the Tribal Court or the tribal appellate court, to the extent of the amount of winnings in controversy.

## SECTION 11.0.  TRIBAL DISTRIBUTIONS TO MITIGATE IMPACTS OF GAMING ON LOCAL GOVERNMENTS.

### Sec. 11.1.  Distributions by Tribe to Local Governments.

The Tribe recognizes that activities associated with operation of its Gaming Facilities may impact law enforcement, emergency services, and other public services of neighboring jurisdictions and place an increased burden on them.  The Tribe agrees to establish an Impact Mitigation Fund for purposes of providing assistance to non-tribal law enforcement, emergency services, and service agencies with demonstrated impacts from the Gaming Facilities.  The Tribe shall withhold one percent (1%) of Net Win for deposit into the Impact Mitigation Fund and distribute those funds to neighboring jurisdictions to mitigate impacts upon those jurisdictions resulting from the operation of the Gaming Facility, or other purposes as the Tribe and a jurisdiction may agree.

### Sec. 11.2.  Tracking of Tribal Distributions from the Impact Mitigation Fund.

(a)     On or before April 1 of each year, the Tribe shall prepare a report for the State for distributions made pursuant to section 11.1, stating for the prior calendar year the Impact Mitigation Fund's starting and ending balance, the total amount distributed to each neighboring jurisdiction receiving funds, and the purposes for which the Tribe made those distributions.

(b)     The Tribe will manage the distribution of funds from the Impact Mitigation Fund to ensure that the Impact Mitigation Fund's balance does not exceed the total amount contributed by the Tribe to the Impact Mitigation Fund for the prior two (2) years.

## SECTION 12.0.  PUBLIC AND WORKPLACE HEALTH, SAFETY, AND LIABILITY.

### Sec. 12.1.  General Requirements.

The Tribe shall not conduct Class III Gaming in a manner that endangers the public health, safety, or welfare, provided, however, that nothing herein shall be construed to make applicable to the Tribe any state laws or regulations governing the use of tobacco.

### Sec. 12.2.  Tobacco Smoke.

Notwithstanding section 12.1, in the interest of public health, including the health of tribal members who may enter the Gaming Facility, the Tribe will provide a non-smoking area in the Gaming Facility and utilize a ventilation system throughout the Gaming Facility that exhausts tobacco smoke to the extent reasonably feasible under state-of-the-art technology existing as of the date of the construction or significant renovation of the Gaming Facility.

### Sec. 12.3.  Health and Safety Standards.

To protect the health and safety of patrons and employees of the Gaming Facility, the Tribe shall, for the Gaming Facility:

(a)     Adopt and comply with standards no less stringent than state public health standards for food and beverage handling.  The Gaming Operation will allow inspection of food and beverage services by state or county health inspectors, during normal hours of operation, to assess compliance with these standards, unless inspections are routinely made by an agency of the United States government to ensure compliance with equivalent standards of the United States Public Health Service.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(b)     Adopt and comply with standards no less stringent than federal water quality and safe drinking water standards applicable in California; the Gaming Operation will allow for inspection and testing of water quality by state or county health inspectors, as applicable, during normal hours of operation, to assess compliance with these standards, unless inspections and testing are made by an agency of the United

71

States pursuant to, or by the Tribe under express authorization of federal law, to ensure compliance with federal water quality and safe drinking water standards.  Nothing herein shall be construed as submission of the Tribe to the jurisdiction of those state or county health inspectors, but any alleged violations of the standards shall be treated as alleged violations of this Compact.

(c)     Comply with the building and safety standards set forth in section 6.4.2.

(d)     Adopt and comply with federal workplace and occupational health and safety standards.  The Tribe will allow inspection of Gaming Facility workplaces by State inspectors, during normal hours of operation, to assess compliance with these standards, provided that there is no right to inspection by State inspectors where an inspection to assess compliance has been conducted by an agency of the United States pursuant to federal law during the previous calendar quarter and the Tribe has provided a copy of the federal agency's report to the State Gaming Agency within ten (10) days of the federal inspection.

(e)     Adopt and comply with tribal codes to the extent consistent with the provisions of this Compact and other applicable federal law regarding public health and safety.

(f)     Adopt and comply with standards that are no less stringent than California state laws prohibiting a gambling enterprise from cashing any check drawn against a federal, state, county, or city fund, including but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

(g)     Adopt and comply with, as a matter of tribal law, standards that are no less stringent than California state laws, if any, governing the terms of extension of credit to patrons by gambling enterprises.

(h)     Comply with provisions of the Bank Secrecy Act, 31 U.S.C. §§ 5311-5314, as amended, and all reporting requirements of the Internal Revenue Service, insofar as such provisions and reporting requirements are applicable to gambling establishments.

(i)     Adopt and comply with ordinances or policies no less stringent than (i) the minimum wage, maximum hour, child labor, and overtime standards set forth in the Fair Labor Standards Act, 29 U.S.C. §§ 206,

72

207 and 212, subject to 29 U.S.C. §§ 213 and 214; (ii) the United States Department of Labor regulations implementing the foregoing sections of the Fair Labor Standards Act, appearing at 29 Code of Federal Regulations, part 500 et seq.; (iii) the State's minimum wage law set forth in California Labor Code section 1182.12; and (iv) the State Department of Industrial Relations regulations implementing the State's minimum wage law contained at California Code of Regulations, title 8, sections 11000 to 11170.  Notwithstanding the foregoing, only the federal minimum wage laws set forth in the Fair Labor Standards Act, 29 U.S.C. § 206 et seq., shall apply to tipped employees.  Nothing herein shall make applicable state law concerning overtime, or be construed as authorizing or creating any private cause of action against the Tribe or the Gaming Operation based upon an alleged violation of any of the foregoing standards.

**Sec. 12.4.  Prohibited Discrimination, Harassment and Retaliation Standards.**

(a)　　Before the effective date of this Compact, the Tribe shall establish written procedures forbidding harassment, including sexual harassment, in the workplace; forbidding employers from discrimination in connection with the employment of persons to work or working for the Gaming Operation or in the Gaming Facility on the basis of race and any other protected groups under federal or California law; and forbidding employers from retaliation against persons who oppose harassment or discrimination or participate in proceedings arising out of allegations of harassment or discrimination (prohibited discrimination, harassment or retaliation).  The procedures shall include all time limits applicable to the disposition of an alleged incident of prohibited discrimination, harassment or retaliation (Employment-Related Claim) and a provision that, upon request, the employee, or employee's designated representative, shall be provided with a copy of the procedures as well as the name, address and telephone number of the Gaming Operation and the appropriate contact information for the employee to provide any required document or materials to initiate or process the Employment-Related Claim.  The Tribe shall not be deemed to have waived its sovereign immunity from suit with respect to such claims by establishing such procedures or by any provision of this Compact, but agrees not to assert such immunity as provided in subdivision (b) of this section.

73

(b)     During the term of this Compact, the Gaming Operation shall maintain an employment practices liability insurance policy consistent with industry standards for non-tribal casinos in the United States underwritten by an insurer with an AM Best rating of A or higher that provides coverage of no less than three million dollars ($3,000,000) per occurrence (Employment Practices Policy Limit) for prohibited discrimination, harassment or retaliation (Employment Practices Policy).  The Employment Practices Policy shall include an endorsement providing that neither the insurer nor the Gaming Operation may invoke tribal sovereign immunity up to the limits of the policy set forth above with respect to any claim covered under the policy and disposed of in accordance with the Tribe's Employment-Related Claim procedures.  Neither the insurer nor the Gaming Operation shall be precluded from asserting any other statutory or common law defense and provided further that any award or judgment rendered in favor of the employee shall be satisfied solely from insurance proceeds.

(c)     The Tribe shall provide written notice of its procedures for bringing an Employment-Related Claim in its employee handbook.

### Sec. 12.5.  Tribal Gaming Facility Standards.

The Tribe shall adopt in the form of an ordinance or ordinances the standards and obligations described in sections 12.3 and 12.4 to which the Gaming Operation and Gaming Facility are held, and shall transmit the ordinance(s) to the State Gaming Agency not later than sixty (60) days prior to the commencement of Gaming Activities under this Compact.  In the absence of a promulgated tribal standard in respect to a matter identified in sections 12.3 or 12.4 or the express adoption of an applicable federal and/or state statute or regulation, as the case may be, in respect of any such matter, the otherwise applicable federal and/or California state statute or regulation shall be deemed to have been adopted by the Tribe as the applicable standard.

### Sec. 12.6.  Insurance Coverage and Claims.

(a)     Before the effective date of this Compact, the Tribe shall establish written procedures for the disposition of tort claims arising from personal injury or property damage alleged to have been suffered by any person who is a patron of the Gaming Facility or who is otherwise lawfully on the premises of the Gaming Facility (collectively,

74

Claimant).  The Tribe shall enact such tribal law as is necessary to implement these procedures.  The procedures shall include all time limits applicable to the disposition of the tort claim and a provision that, upon request, the Claimant, or the Claimant's designated representative, shall be provided with a copy of the procedures as well as the name, address and telephone number of the Gaming Operation and the appropriate contact information for the Claimant to provide any required document or materials to initiate or process the tort claim.  The Tribe shall not be deemed to have waived its sovereign immunity from suit with respect to such claims by establishing such procedures or by any provision of this Compact, but agrees not to assert such immunity as provided in subsection (b) of this section.

(b)     During the term of this Compact, the Gaming Operation shall maintain a policy of commercial general liability insurance consistent with industry standards for non-tribal casinos in the United States underwritten by an insurer with an AM Best rating of A or higher that provides coverage of no less than ten million dollars ($10,000,000) per occurrence.  The insurance policy shall include an endorsement providing that neither the insurer nor the Gaming Operation may invoke tribal sovereign immunity up to the limits of the policy set forth above with respect to any claim covered under the policy and disposed of in accordance with the Tribe's tort claim procedures, provided, that the policy shall not exclude all claims made by a Claimant for personal injury or property damage.  Neither the insurer nor the Gaming Operation shall be precluded from asserting any other statutory or common law defense and provided further that any award or judgment rendered in favor of the Claimant shall be satisfied solely from insurance proceeds.

## Sec. 12.7.  Participation in State Programs Related to Employment.

(a)     Within sixty (60) days prior to the commencement of Gaming Activities under this Compact, the Tribe will advise the State of its election to participate in the statutory workers' compensation system as provided in subdivision (a)(l) below or, alternatively, will forward to the State all relevant ordinances that have been adopted and all other documents establishing the system and demonstrating that the system is fully operational and compliant with the comparability standards set forth in subdivision (a)(2), including such waivers of the

Tribe's sovereign immunity as are necessary to allow Gaming Operation and Gaming Facility employees to enforce the Tribe's workers' compensation system.  The Tribe and the State agree that independent contractors doing business with the Tribe must comply with all state workers' compensation laws and obligations.

(1)     The Tribe agrees that it will participate in the State's workers' compensation program with respect to employees employed at the Gaming Operation or Gaming Facility.  The workers' compensation program includes, but is not limited to, state laws relating to the securing of payment of compensation through one (1) or more insurers duly authorized to write workers' compensation insurance in this state or through self-insurance as permitted under the State's workers' compensation laws.  All disputes arising from the workers' compensation laws shall be heard by the Workers' Compensation Appeals Board pursuant to the California Labor Code.  The Tribe hereby consents to the jurisdiction of the State Workers' Compensation Appeals Board and the courts of the State of California for purposes of enforcement of this subdivision (a)(1).

(2)     In lieu of participating in the State's statutory workers' compensation system, the Tribe, in its sole and absolute discretion, may create and maintain a system that provides redress for Gaming Operation and Gaming Facility employees' work-related injuries through requiring insurance or self-insurance.  This system must include a scope of coverage, provision of up to ten thousand dollars ($10,000) in medical treatment for an alleged injury until the date that liability for the claim is accepted or rejected, employee choice of physician provisions comparable to those mandated for comparable employees under state law, quality and timely medical treatment provided comparable to the state's medical treatment utilization schedule, availability of an independent medical examination to resolve disagreements on appropriate treatment (by an Independent Medical Reviewer on the state-approved list, a Qualified Medical Evaluator on the state-approved list, or an Agreed Medical Examiner upon mutual agreement of the employer and employee), the right to notice, hearings before an independent tribunal, a means of enforcement against the

76

employer, and benefits (including, but not limited to, temporary and permanent disability, death, supplemental job displacement, and return to work supplement), comparable to those mandated for comparable employees under state law.

(b)     The Tribe agrees that it will participate in the State's program for providing unemployment compensation benefits and unemployment compensation disability benefits with respect to employees employed at the Gaming Operation or Gaming Facility, which participation shall include compliance with the provisions of the California Unemployment Insurance Code, and the Tribe agrees to waive its right to assert sovereign immunity in connection with the enforcement of the Tribe's obligations under the California Unemployment Insurance Code.

(c)     As a matter of comity, the Tribe shall, with respect to all persons employed at the Gaming Operation or Gaming Facility, including nonresidents of California, but excluding California Indian tribal members who are exempt pursuant to California Revenue and Tax Code section 17131.7, withhold all amounts due to the State as provided in the California Unemployment Insurance Code and the California Revenue and Taxation Code and the regulations thereunder, as may be amended, and shall forward such amounts to the State.  The Tribe shall file with the Franchise Tax Board a copy of any information return filed with the Secretary of the Treasury, as provided in the California Revenue and Taxation Code and the regulations thereunder, except those pertaining to California Indian tribal members who are exempt pursuant to California Revenue and Tax Code section 17131.7.  Any subsequent applicable changes to the California Revenue and Taxation Code and the regulations thereunder regarding the income tax withholding of tribal members shall supersede the tax withholding requirements of this subdivision.  The Tribe shall notify the State prior to implementing any changes to the tax-withholding requirements of this subdivision.  Any disagreement regarding the Tribe's proposed change in tax withholding shall be

subject to the dispute resolution provisions of section 13.0 of this Compact.

### Sec. 12.8.  Emergency Services Accessibility.

The Tribe shall make reasonable provisions for adequate emergency fire, medical, and related relief and disaster services for patrons and employees of the Gaming Facility.

### Sec. 12.9.  Alcoholic Beverage Service.

Purchase, sale, and service of alcoholic beverages shall be subject to state alcoholic beverage laws.

### Sec. 12.10.  Possession of Firearms.

The possession of firearms by any person in the Gaming Facility is prohibited at all times, except for federal, state, or local law enforcement personnel, or tribal law enforcement or security personnel authorized by tribal law and federal or state law to possess firearms at the Gaming Facility.

### Sec. 12.11.  Labor Relations.

The Gaming Activities authorized by this Compact may commence only after the Tribe has adopted an ordinance identical to the Tribal Labor Relations Ordinance attached hereto as Appendix A, and the Gaming Activities may continue only as long as the Tribe maintains the ordinance which, for the avoidance of doubt, includes compliance with the ordinance.  The Tribe shall provide written notice to the State that it has adopted the ordinance, along with a copy of the ordinance, before the effective date of this Compact.

## SECTION 13.0.  DISPUTE RESOLUTION PROVISIONS.

### Sec. 13.1.  Voluntary Resolution; Court Resolution.

In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by good-faith negotiations whenever possible.  Therefore, except for the right of either party to seek injunctive relief against the other when circumstances are deemed to require immediate relief, the Tribe and the State (for purposes of this section 13.0 also referred to as the "party" or "parties") shall seek to resolve disputes by first meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of the

performance and compliance of the terms, provisions, and conditions of this Compact, as follows:

(a)    Either party shall give the other, as soon as possible after the event giving rise to the concern, a written notice setting forth the facts giving rise to the dispute and with specificity, the issues to be resolved.

(b)    The other party shall respond in writing to the facts and issues set forth in the notice within fifteen (15) days of receipt of the notice, unless both parties agree in writing to an extension of time.

(c)    The parties shall meet and confer in good faith by telephone or in person in an attempt to resolve the dispute through negotiation within thirty (30) days after receipt of the notice set forth in subdivision (a), unless both parties agree in writing to an extension of time.

(d)    Disputes that are not otherwise resolved by mutually agreed means may be resolved in the United States District Court in the judicial district where the Tribe's Gaming Facility is located, or if the federal court lacks jurisdiction, in any state court of competent jurisdiction in or over the County.  The disputes to be submitted to court action include, but are not limited to, claims of breach of this Compact, and failure to negotiate in good faith as required by the terms of the Compact, provided that the remedies expressly provided in section 13.3, subdivision (a)(ii) are the sole and exclusive remedies available to either party for issues arising out of this Compact, and supersede any remedies otherwise available, whether at law, tort, contract, or in equity and, notwithstanding any other provision of law or this Compact, neither the State nor the Tribe shall be liable for damages or attorney fees in any action based in whole or in part on issues arising out of this Compact, or based in whole or in part on the fact that the parties have either entered into this Compact, or have obligations under this Compact.  The parties are entitled to all rights of appeal permitted by law in the court system in which the action is brought.

(e)    In no event may the Tribe be precluded from pursuing any judicial remedy against the State on the ground that the Tribe has failed to exhaust state administrative remedies, and in no event may the State be precluded from pursuing any judicial remedy against the Tribe on

the ground that the State has failed to exhaust any tribal administrative remedies.

**Sec. 13.2.  No Waiver or Preclusion of Other Means of Dispute Resolution.**

This section 13.0 may not be construed to waive, limit, or restrict any remedy to address issues not arising out of this Compact that is otherwise available to either the Tribe or the State, nor may this section 13.0 be construed to preclude, limit, or restrict the ability of the parties to pursue, by mutual agreement in writing, any other method of Compact dispute resolution, including, but not limited to, mediation.

**Sec. 13.3.  Limited Waiver of Sovereign Immunity.**

(a)   For the purpose of actions based on disputes between the State and the Tribe that arise under this Compact and the judicial enforcement of any judgment or award resulting therefrom, the State and the Tribe expressly waive their right to assert any and all sovereign immunity from suit and enforcement of any ensuing judgment and further consent to be sued in federal or state court, as the case may be, provided that (i) the dispute is limited solely to issues arising under this Compact, (ii) neither the Tribe nor the State makes any claim for restitution or monetary damages (except that payment of any money expressly required by the terms of this Compact may be sought), and solely injunctive relief, specific performance (including enforcement of a provision of this Compact expressly requiring the payment of money to one or another of the parties), and declaratory relief (limited to a determination of the respective obligations of the parties under the Compact) may be sought, and (iii) nothing herein shall be construed to constitute a waiver of the sovereign immunity of either the Tribe or the State with respect to any third party that is made a party or intervenes as a party to the action.

(b)   In the event that intervention, joinder, or other participation by any additional party in any action between the State and the Tribe would result in the waiver of the Tribe's or the State's sovereign immunity as to that additional party, the waivers of either the Tribe or the State provided herein may be revoked, except where joinder is required, as determined by the court, to preserve the court's jurisdiction, in which

80

case the State and the Tribe may not revoke their waivers of sovereign immunity as to each other.

(c)     The waivers and consents to jurisdiction expressly provided for under this section 13.0 and elsewhere in the Compact shall extend to all civil actions expressly authorized by this Compact, including, but not limited to, any action to enforce any judgment, and any appellate proceeding emanating from any such proceedings, whether in state or federal court.

(d)     Except as stated herein or elsewhere in this Compact, no other waivers or consents to be sued, either express or implied, are granted by either party, whether in state statute or otherwise, including but not limited to California Government Code section 98005.

**Sec. 13.4.  Judicial Remedies for Material Breach.**

(a)     Subsequent to exhausting the section 13.0 dispute resolution provisions, after providing a thirty (30)-day written notice of an opportunity to cure any alleged breach of this Compact, unless the circumstances are deemed to require immediate relief, either the Tribe or the State may bring an action in federal court for a declaration that the other party has materially breached this Compact.  If the federal court rules that a party has materially breached this Compact, then the party found to have committed the breach shall have thirty (30) days to cure the material breach after a final decision has been issued by the court after any appeals.  The court may order additional time to cure the breach if the material breach cannot be cured within thirty (30) days even in good faith and with due diligence.

(b)     If the material breach is not cured within the time allowed by the court, then in addition to the declaration of material breach and any equitable remedies explicitly identified in section 13.0 that may have been awarded, the non-breaching party may seek, in the same federal court action, termination of the Compact as a further judicially imposed remedy.  The court may order termination based on a finding (i) that the respondent party has breached its Compact obligations, and (ii) that the respondent party failed to cure the material breach within the time allowed.  In the event a federal court determines that it lacks jurisdiction over such an action, the action may be brought in the superior court for the County, and any finding that termination is

81

warranted shall be effective thirty (30) days after issuance of the termination order by the federal district court or superior court, as the case may be.

(c)     The parties expressly waive, and also waive their right to assert, their sovereign immunity from suit for purposes of an action under this section, subject to the waiver qualifications stated in section 13.3.

## SECTION 14.0.  EFFECTIVE DATE AND TERM OF COMPACT.

### Sec. 14.1.  Effective Date.

This Compact shall be effective upon the occurrence of both of the following:

(a)     The Compact is ratified in accordance with the Tribe's law and State law; and

(b)     Notice that the Compact has been approved or deemed approved is published in the Federal Register as provided in 25 U.S.C. § 2710(d)(3)(B).

### Sec. 14.2.  Term of Compact.

Once effective, this Compact shall be in full force and effect for State law purposes for twenty-five (25) years following the effective date.

## SECTION 15.0.  AMENDMENTS; RENEGOTIATIONS.

### Sec. 15.1.  Amendment by Agreement.

The terms and conditions of this Compact may be amended at any time by the mutual and written agreement of the Tribe and the State (also referred to in section 15.0 as "party" or "parties") during the term of this Compact set forth in section 14.2, provided that each party voluntarily consents to such negotiations, including the scope of such negotiations, in writing.

### Sec. 15.2.  Negotiations for a New Compact.

No sooner than eighteen (18) months before the termination date of this Compact set forth in section 14.2, either party may request the other party to enter into negotiations to extend the term of this Compact or to enter into a new Class III Gaming compact.  If the parties have not agreed to extend the term of this Compact

or have not entered into a new compact by the termination date in section 14.2, this Compact shall automatically be extended for eighteen (18) months.  If, at the conclusion of that extended eighteen (18) month period, the parties are engaged in negotiations that both parties agree in writing are proceeding towards conclusion of a new or amended Class III Gaming compact, this Compact shall automatically be extended for an additional two (2) years.

### Sec. 15.3.  Changes in the Law.

If a federal or state court decides that, as a result of a change in the law, a provision of the Compact is invalid or inoperable but also decides that the Compact remains valid and the court's judgment is not stayed pending appeal, the parties shall meet and negotiate in good faith a replacement for that Compact provision and other appropriate related amendments.  The parties shall meet within thirty (30) days after the ruling of invalidity or inoperability becomes effective.

### Sec. 15.4.  Entitlement to Renegotiate Compact Based on Changed Market Conditions.

Notwithstanding the foregoing sections 15.1 through 15.3, the State shall, within forty-five (45) days of the Tribe's written request, enter into good-faith negotiations with the Tribe to amend the Compact where the stated basis for the Tribe's request is changed conditions that either (i) materially and adversely affect the Tribe's Gaming Operation such that the Tribe no longer enjoys the benefits otherwise provided by this Compact and the Tribe's obligations under this Compact therefore become unduly onerous, or (ii) create new opportunities to expand its Gaming Operation beyond the limitations on Gaming Devices or Gaming Facilities of this Compact.  The State has no obligation to enter into negotiations unless the Tribe provides information adequate to prove that its request meets the required basis for negotiations pursuant to this section.

### Sec. 15.5.  Entitlement to Renegotiate Compact Based on State Authorization of New Forms of Class III Gaming.

If the State authorizes Class III Gaming activities not expressly authorized in this Compact, the parties shall, at the Tribe's request, enter into good-faith negotiations pursuant to IGRA to amend section 3.0 of this Compact for the purpose of adding the newly authorized Class III Gaming activity and making other appropriate related Compact amendments.

**Sec. 15.6.  Entitlement to Renegotiate for Gaming on Newly Acquired Indian Lands.**

The Tribe retains the right to acquire additional eligible Indian lands under IGRA and, subject to the provisions of section 15.0, to request negotiation of an amendment to this Compact to authorize Class III Gaming on the subsequently acquired eligible Indian lands.

**Sec. 15.7.  Requests to Amend or to Negotiate a New Compact.**

All requests to amend this Compact or to negotiate to extend the term of this Compact or to negotiate for a new Class III Gaming compact shall be in writing, addressed to the Tribal Chair or the Governor, as the case may be, and shall include the activities or circumstances to be negotiated, together with a statement of the basis supporting the request.  If the request meets both the requirements of this section and either section 15.1, 15.2, 15.3, 15.4, 15.5 or 15.6, the parties shall confer within forty-five (45) days of the request to determine (i) whether the request meets the requirements of section 15.0 and, if so, (ii) the scope of negotiations, and (iii) a schedule for commencing negotiations, and thereafter both parties shall negotiate in good faith.  The Tribal Chair and the Governor of the State are hereby authorized to designate the person or agency responsible for conducting the negotiations, and shall execute any documents necessary to do so.

## SECTION 16.0.  NOTICES.

Unless otherwise indicated by this Compact, all notices required or authorized to be served shall be served by first-class mail at the following addresses, or to such other address as either party may designate by written notice to the other:

Governor                                    Tribal Chairperson
Governor's Office                           Blue Lake Rancheria, California
State Capitol                               P.O. Box 428
Sacramento, CA 95814                        Blue Lake, CA 95525

## SECTION 17.0.  CHANGES TO IGRA.

This Compact is intended to meet the requirements of IGRA as it reads on the effective date of this Compact, and when reference is made to IGRA or to an implementing regulation thereof, the referenced provision is deemed to have been incorporated into this Compact as if set out in full.  Subsequent changes to IGRA that diminish the rights of the State or the Tribe may not be applied retroactively to

alter the terms of this Compact, except to the extent that federal law validly mandates retroactive application without the State's or the Tribe's respective consent.

## SECTION 18.0.  MISCELLANEOUS.

### Sec. 18.1.  Third-Party Beneficiaries.

Notwithstanding any provision of law, this Compact is not intended to, and shall not be construed to, create any right on the part of a third party or third-party beneficiary to bring an action to enforce any of its terms.

### Sec. 18.2.  Complete Agreement.

This Compact, together with all appendices, sets forth the full and complete agreement of the Tribe and the State and supersedes, supplants, and extinguishes any prior agreements or understandings with respect to the subject matter hereof.

### Sec. 18.3.  Construction.

Neither the presence in another tribal-state Class III Gaming compact of language that is not included in this Compact, nor the absence in another tribal-state Class III Gaming compact of language that is present in this Compact shall be a factor in construing the terms of this Compact.  In the event of a dispute between the Tribe and the State as to the language of this Compact or the construction or meaning of any term hereof, this Compact will be deemed to have been drafted by the Tribe and the State in equal parts so that no presumptions or inferences concerning its terms or interpretation may be construed against either party to this Compact.

### Sec. 18.4.  Successor Provisions.

Wherever this Compact makes reference to a specific statutory provision, regulation, or set of rules, it also applies to the provision, regulation or rules, as they may be amended from time to time, and any successor provision, regulation, or set of rules.  Within thirty (30) days of discovery of the adoption of any subsequent amendment of such statutory provision, regulation, or rules or any successor provision (for purposes of this section "Amendment") either the Tribe or the State may give notice of its position that the Amendment does not apply to the Compact.  If the Tribe and the State agree that the Amendment applies or does not apply to the Compact, that agreement shall be memorialized in a document endorsed by the Tribe and the State.  If the parties do not agree that the

Amendment applies or does not apply to the Compact, the parties shall resolve the dispute in accordance with section 13.0 of this Compact.

### Sec. 18.5.  Ordinances and Regulations.

Whenever the Tribe adopts or materially amends any ordinance or regulations required to be adopted and/or maintained under this Compact, in addition to any other Compact obligations to provide a copy to others, the Tribe shall provide a copy of such adopted or materially amended ordinance or regulations to the State Gaming Agency within thirty (30) days of the effective date of such ordinance or regulations and the State Gaming Agency shall provide the Tribe with written confirmation of receipt of the ordinance or regulations within thirty (30) days of receipt thereof.

### Sec. 18.6.  Calculation of Time.

In computing any period of time prescribed by this Compact, the day of the event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday under the Tribe's laws, the State's law, or federal law. Unless otherwise specifically provided herein, the term "days" shall be construed as calendar days.

### Sec. 18.7.  Force Majeure.

In the event of a force majeure event, including but not limited to:  an act of God; accident; fire; flood; earthquake; or other natural disaster; strike or other labor dispute; epidemic or pandemic; riot or civil commotion; act of public enemy; enactment of any rule, order or act of a government or governmental instrumentality; effects of an extended restriction of energy use; or other causes of a similar nature beyond the Tribe's control that cause the Tribe's Gaming Operation or Facility to be inoperable or operate at significantly less capacity, or be unable to meet one (1) or more of its obligations under this Compact; the Tribe and the State agree to meet and confer for the purpose of discussing the event and appropriate actions, if any, given the circumstances.  In the instance that a force majeure event impacts more than fifty percent (50%) of tribal gaming operations located in California, the State and the Tribe agree to allow the State to elect to meet and confer with several or all gaming tribes that have been impacted by the force majeure event for the purpose of discussing the event and appropriate actions, if any, given the circumstances.

**Sec. 18.8.   Representations.**

(a)     The Tribe expressly represents that as of the date of the undersigned's execution of this Compact the undersigned has the authority to execute this Compact on behalf of the Tribe, including any waiver of sovereign immunity and the right to assert sovereign immunity therein, and will provide written proof of such authority and of the ratification of this Compact by the tribal governing body to the Governor no later than thirty (30) days after the execution of this Compact by the undersigned.

(b)     The Tribe further represents that it is (i) recognized as eligible by the Secretary of the Department of the Interior for special programs and services provided by the United States to Indians because of their status as Indians, and (ii) recognized by the Secretary of the Department of the Interior as possessing powers of self-government.

(c)     In entering into this Compact, the State expressly relies upon the foregoing representations by the Tribe, and the State's entry into the Compact is expressly made contingent upon the truth of those representations as of the date of the Tribe's execution of this Compact through the undersigned.  If the Tribe fails to timely provide written proof of the undersigned's aforesaid authority to execute this Compact or written proof of ratification by the Tribe's governing body, the Governor shall have the right to declare this Compact null and void.

(d)     In the event the Tribe (i) asserts in any dispute between the Tribe and the State that the undersigned lacked the authority to execute this Compact on behalf of the Tribe, or (ii) in any Compact-related dispute in the limited contexts set forth in this Compact, including, but not limited to, the Compact provisions governing tort, workers' compensation, patron, or employment discrimination claims, whether or not involving the State, asserts that its waiver of sovereign immunity is not valid based upon a claim by the Tribe that the representations regarding the authority to waive or the waiver did not comply with the Tribe's laws, then the State and the Tribe agree that the Tribe shall lose all rights to conduct Class III Gaming under the terms of this Compact.  If the Tribe otherwise identifies a potential defect regarding the authority of the undersigned to execute this Compact or the effectiveness of the limited waivers of the Tribe's sovereign immunity, and takes action to resolve the defect, the Tribe's

right to conduct Class III Gaming under the terms of this Compact are not implicated unless and until the Tribe makes the assertions specified in (i) or (ii) above.

(1)    The Tribe shall give written notice to the State of its intent to assert either that the undersigned lacked authority to execute this Compact on behalf of the Tribe or that its waiver of sovereign immunity is not valid for the reasons stated in this subdivision at least fourteen (14) days before making that assertion, and shall cease conducting Class III Gaming within thirty (30) days of making the assertion.

(2)    Within fourteen (14) days after identifying a potential defect regarding the authority of the undersigned to execute this Compact or the effectiveness of the limited waivers of the Tribe's sovereign immunity as stated in the Compact, the Tribe shall give written notice to the State of the facts related to the potential defect and the specific actions the Tribe is taking to cure the potential defect.

(e)     This Compact shall not be presented to the California State
        Legislature for a ratification vote until the Tribe has provided the
        written proof required in subdivision (a) to the Governor.

IN WITNESS WHEREOF, the undersigned sign this Compact on behalf of
the State of California and the Blue Lake Rancheria, California.

STATE OF CALIFORNIA                    BLUE LAKE RANCHERIA,
                                       CALIFORNIA


_____              _____

By Gavin Newsom                        By Claudia Brundin
Governor of the State of California    Chairperson of the Blue Lake
                                       Rancheria, California


Executed this ___ day of _____,    Executed this ___ day of _____,
2023, at Sacramento, California        2023, at _____, California



**ATTEST:**


_____

Shirley N. Weber, Ph.D.
Secretary of State, State of California

APPENDICES

A.    Tribal Labor Relations Ordinance                    A-1

B.    Off-Track Satellite Wagering                        B-1

# APPENDIX A

## Tribal Labor Relations Ordinance

## Section 1:  Threshold of Applicability

(a)     If the Tribe employs 250 or more persons in a tribal casino and related facility, not including enrolled members of the Tribe, it shall adopt this Tribal Labor Relations Ordinance (TLRO or Ordinance).  For purposes of this Ordinance, a "tribal casino" is one in which class III gaming is conducted pursuant to the tribal-state compact.  A "related facility" is one for which the only significant purpose is to facilitate patronage of the class III gaming operations.

(b)     Upon the request of a labor union or organization which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work, the Tribal Gaming Commission shall certify the number of employees, not including enrolled members of the Tribe, in a tribal casino or other related facility as defined in subsection (a) of this Section 1.  Either party may dispute the certification of the Tribal Gaming Commission to the Tribal Labor Panel, which is defined in Section 13 herein.

## Section 2:  Definition of Eligible Employees

(a)     The provisions of this Ordinance shall apply to any person (hereinafter "Eligible Employee") who is employed within a tribal casino in which class III gaming is conducted pursuant to a tribal-state compact, or other related facility, the only significant purpose of which is to facilitate patronage of the class III gaming operations, except for any of the following:

(1)     any employee who is a supervisor, defined as any individual having authority, in the interest of the Tribe and/or employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the

exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment;

(2)     any employee of the Tribal Gaming Commission;

(3)     any employee of the security or surveillance department, other than those who are responsible for the technical repair and maintenance of equipment;

(4)     any cash operations employee who is a "cage" employee or money counter; or

(5)     any dealer.

(b)     On [month] 1 of each year, the Tribal Gaming Agency shall certify the number of Eligible Employees employed by the Tribe to the administrator of the Tribal Labor Panel.

## Section 3:  Non-Interference with Regulatory or Security Activities

Operation of this Ordinance shall not interfere in any way with the duty of the Tribal Gaming Commission to regulate the gaming operation in accordance with the Tribe's National Indian Gaming Commission - approved gaming ordinance.  Furthermore, the exercise of rights hereunder shall in no way interfere with the tribal casino's surveillance/security systems, or any other internal controls system designed to protect the integrity of the Tribe's gaming operations.  The Tribal Gaming Commission is specifically excluded from the definition of Eligible Employees.

## Section 4:  Eligible Employees Free to Engage in or Refrain From Concerted Activity

Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

## Section 5:  Unfair Labor Practices for the Tribe

It shall be an unfair labor practice for the Tribe and/or employer or their agents:

(a)    to interfere with, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(b)    to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it, but this does not restrict the Tribe and/or employer and a certified union from agreeing to union security or dues check off;

(c)    to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance; or

(d)    after certification of the labor organization pursuant to Section 10, to refuse to bargain collectively with the representatives of Eligible Employees.

## Section 6:  Unfair Labor Practices for the Union

It shall be an unfair labor practice for a labor organization or its agents:

(a)    to interfere, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;

(b)    to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a primary or secondary boycott or a refusal in the course of his employment to use, manufacture, process, transport or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce or other terms and conditions of employment. This section does not apply to Section 11;

(c)    to force or require the Tribe and/or employer to recognize or bargain with a particular labor organization as the representative of Eligible

Employees if another labor organization has been certified as the representative of such Eligible Employees under the provisions of this TLRO;

(d)     to refuse to bargain collectively with the Tribe and/or employer, provided it is the representative of Eligible Employees subject to the provisions herein; or

(e)     to attempt to influence the outcome of a tribal governmental election, provided, however, that this section does not apply to tribal members.

**Section 7:  Tribe and Union Right to Free Speech**

(a)     The Tribe's and union's expression of any view, argument or opinion or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of interference with, restraint, or coercion if such expression contains no threat of reprisal or force or promise of benefit.

(b)     The Tribe agrees that if a union first offers in writing that it and its local affiliates will comply with (b)(1) and (b)(2), the Tribe shall comply with the provisions of (c) and (d).

(1)     For a period of three hundred sixty-five (365) days following delivery of a Notice of Intent to Organize ("NOIO") to the Tribe:

(A)     not engage in strikes, picketing, boycotts, attack websites, or other economic activity at or in relation to the tribal casino or related facility; and refrain from engaging in strike-related picketing on Indian lands as defined in 25 U.S.C. § 2703(4);

(B)     not disparage the Tribe for purposes of organizing Eligible Employees;

(C)     not attempt to influence the outcome of a tribal government election; and

A-4

(D)     during the three hundred sixty-five (365) days after the Tribe received the NOIO, the Union must collect dated and signed authorization cards pursuant to Section 10 herein and complete the secret ballot election also in Section 10 herein.  Failure to complete the secret ballot election within the three hundred sixty-five (365) days after the Tribe received the NOIO shall mean that the union shall not be permitted to deliver another NOIO for a period of two years (730 days).

(2)     Resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(c)     Upon receipt of a NOIO, the Tribe shall:

(1)     within two (2) days provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought-after bargaining unit and the Eligible Employees' last known addresses and telephone numbers and email addresses;

(2)     for period of three hundred sixty-five (365) days thereafter, Tribe will not do any action nor make any statement that directly or indirectly states or implies any opposition by the Tribe to the selection by such employees of a collective bargaining agent, or preference for or opposition to any particular union as a bargaining agent.  This includes refraining from making derisive comments about unions; publishing or posting pamphlets, fliers, letters, posters, or any other communication which could reasonably be interpreted as criticizing the union or advising Eligible Employees to vote "no" against the union.  However, the Tribe shall be free at all times to fully inform Eligible Employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe; and

(3)     resolve all issues, including collective bargaining impasses, through the binding dispute resolution mechanisms set forth in Section 13 herein.

(d)    The union's offer in subsection (b) of this Section 7 shall be deemed an offer to accept the entirety of this Ordinance as a bilateral contract between the Tribe and the union, and the Tribe agrees to accept such offer.  By entering into such bilateral contract, the union and Tribe mutually waive any right to file any form of action or proceeding with the National Labor Relations Board for the three hundred sixty-five (365)-day period following the NOIO.

(e)    The Tribe shall mandate that any entity responsible for all or part of the operation of the casino and related facility shall assume the obligations of the Tribe under this Ordinance.  If at the time of the management contract, the Tribe recognizes a labor organization as the representative of its employees, certified pursuant to this Ordinance, the labor organization will provide the contractor, upon request, the election officer's certification which constitutes evidence that the labor organization has been determined to be the majority representative of the Tribe's Eligible Employees.

## Section 8:  Access to Eligible Employees

(a)    Access shall be granted to the union for the purposes of organizing Eligible Employees, provided that such organizing activity shall not interfere with patronage of the casino or related facility or with the normal work routine of the Eligible Employees and shall be done on non-work time in non-work areas that are designated as employee break rooms or locker rooms that are not open to the public.  The Tribe may require the union and or union organizers to be subject to the same licensing rules applied to individuals or entities with similar levels of access to the casino or related facility, provided that such licensing shall not be unreasonable, discriminatory, or designed to impede access.

(b)    The Tribe, in its discretion, may also designate additional voluntary access to the Union in such areas as employee parking lots and non-casino facilities located on tribal lands.

(c)    In determining whether organizing activities potentially interfere with normal tribal work routines, the union's activities shall not be

permitted if the Tribal Labor Panel determines that they compromise the operation of the casino:

(1)     security and surveillance systems throughout the casino, and reservation;

(2)     access limitations designed to ensure security;

(3)     internal controls designed to ensure security; or

(4)     other systems designed to protect the integrity of the Tribe's gaming operations, tribal property and/or safety of casino personnel, patrons, employees or tribal members, residents, guests or invitees.

(d)     The Tribe agrees to facilitate the dissemination of information from the union to Eligible Employees at the tribal casino by allowing posters, leaflets and other written materials to be posted in non-public employee break areas where the Tribe already posts announcements pertaining to Eligible Employees.  Actual posting of such posters, notices, and other materials shall be by employees desiring to post such materials.

## Section 9:  Indian Preference Explicitly Permitted

Nothing herein shall preclude the Tribe from giving Indian preference in employment, promotion, seniority, lay-offs or retention to members of any federally recognized Indian tribe or shall in any way affect the Tribe's right to follow tribal law, ordinances, personnel policies or the Tribe's customs or traditions regarding Indian preference in employment, promotion, seniority, lay-offs or retention.  Moreover, in the event of a conflict between tribal law, tribal ordinance or the Tribe's customs and traditions regarding Indian preference and this Ordinance, the tribal law, tribal ordinance, or the Tribe's customs and traditions shall govern.

## Section 10:  Secret Ballot Elections

(a)     The election officer shall be chosen within three (3) business days of notification by the labor organization to the Tribe of its intention to present authorization cards, and the same election officer shall preside

thereafter for all proceedings under the request for recognition; provided, however, that if the election officer resigns, dies, or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the dispute resolution provisions herein. Dated and signed authorized cards from thirty percent (30%) or more of the Eligible Employees within the bargaining unit verified by the elections officer will result in a secret ballot election. The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards. If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election. The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)     Upon the showing of interest to the election officer pursuant to subsection (a), within two (2) working days the Tribe shall provide to the union an election eligibility list containing the full first and last names of the Eligible Employees within the sought after bargaining unit and the Eligible Employees' last known addresses and telephone numbers and email addresses. Nothing herein shall preclude a Tribe from voluntarily providing an election eligibility list at an earlier point of a union organizing campaign with or without an election. The election shall be conducted by the election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1. In the event either that a party refuses to enter into the consent election agreement or that the parties do not agree on the terms, the election officer shall issue an order that conforms to the terms of the form consent election agreement and shall have authority to decide any terms upon which the parties have not agreed, after giving the parties the opportunity to present their views in writing or in a telephonic conference call. The election officer shall be a member of the Tribal Labor Panel chosen in the same manner as a single arbitrator pursuant to the dispute resolution provisions herein at Section 13(b)(2). All questions concerning representation of the Tribe and/or Eligible Employees by a labor organization shall be resolved by the election officer.

(c)     The election officer shall certify the labor organization as the exclusive collective bargaining representative of a unit of employees if the labor organization has received the support of a majority of the Eligible Employees in a secret ballot election that the election officer determines to have been conducted fairly.  The numerical threshold for certification is fifty percent (50%) of the Eligible Employees plus one.  If the election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or union, the election officer may order a re-run election.  If the election officer determines that there was the commission of serious Unfair Labor Practices by the Tribe, or in the event the union made the offer provided for in Section 7(b) that the Tribe violated its obligations under Section 7(c), that interferes with the election process and precludes the holding of a fair election, and the labor organization is able to demonstrate that it had the support of a majority of the employees in the unit at any time before or during the course of the Tribe's misconduct, the election officer shall certify the labor organization as the exclusive bargaining representative.

(d)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel mutually chosen by both parties, provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

(e)     A union which loses an election and has exhausted all dispute remedies related to the election may not invoke any provisions of this ordinance at that particular casino or related facility until one (1) year after the election was lost.

**Section 11:  Collective Bargaining Impasse**

(a)     Upon recognition, the Tribe and the union will negotiate in good faith for a collective bargaining agreement covering bargaining unit employees represented by the union.

(b)     Except where the union has made the written offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the union shall have the right to strike.  Strike-related picketing shall not be conducted on Indian lands as defined in 25 U.S.C. § 2703(4).

(c)     Where the union makes the offer set forth in Section 7(b), if collective bargaining negotiations result in impasse, the matter shall be resolved as set forth in Section 13(c).

**Section 12:  Decertification of Bargaining Agent**

(a)     The filing of a petition signed by thirty percent (30%) or more of the Eligible Employees in a bargaining unit seeking the decertification of a certified union will result in a secret ballot election.  The election officer shall make a determination as to whether the required thirty percent (30%) showing has been made within one (1) working day after the submission of authorization cards.  If the election officer determines the required thirty percent (30%) showing of interest has been made, the election officer shall issue a notice of election.  The election shall be concluded within thirty (30) calendar days of the issuance of the notice of election.

(b)     The election shall be conducted by an election officer by secret ballot pursuant to procedures set forth in a consent election agreement in substantially the same form as Attachment 1.  The election officer shall be a member of the Tribal Labor Panel chosen in the same manner as a single arbitrator pursuant to the dispute resolution provisions herein at Section 13(b)(2).  All questions concerning the decertification of the union shall be resolved by an election officer.  The election officer shall be chosen upon notification to the Tribe and the union of the intent of the Eligible Employees to  present a decertification petition, and the same election officer shall preside thereafter for all proceedings under the request  for decertification; provided however that if the election officer resigns, dies or is incapacitated for any other reason from performing the functions of this office, a substitute election officer shall be selected in accordance with the  dispute resolution provisions herein.

(c)     The election officer shall order the labor organization decertified as the exclusive collective bargaining representative if a majority of the Eligible Employees support decertification of the labor organization in a secret ballot election that the election officer determines to have been conducted fairly.  The numerical threshold for decertification is fifty percent (50%) of the Eligible Employees plus one (1).  If the

election officer determines that the election was conducted unfairly due to misconduct by the Tribe and/or employer or the union the election officer may order a re-run election or dismiss the decertification petition.

(d)     A decertification proceeding may not begin until one (1) year after the certification of a labor union if there is no collective bargaining agreement.  Where there is a collective bargaining agreement, a decertification petition may only be filed no more than ninety (90) days and no less than sixty (60) days prior to the expiration of a collective bargaining agreement.  A decertification petition may be filed any time after the expiration of a collective bargaining agreement.

(e)     The Tribe or the union may appeal within five (5) days any decision rendered after the date of the election by the election officer to a three (3) member panel of the Tribal Labor Panel chosen in accordance with Section 13(c), provided that the Tribal Labor Panel must issue a decision within thirty (30) days after receiving the appeal.

## Section 13:  Binding Dispute Resolution Mechanism

(a)     All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein.

(b)     The method of binding dispute resolution shall be a resolution by the Tribal Labor Panel, consisting of ten (10) arbitrators appointed by mutual selection of the parties which panel shall serve all tribes that have adopted this Ordinance.  The Tribal Labor Panel shall have authority to hire staff and take other actions necessary to conduct elections, determine units, determine scope of negotiations, hold hearings, subpoena witnesses, take testimony, and conduct all other activities needed to fulfill its obligations under this ordinance.

(1)     Each member of the Tribal Labor Panel shall have relevant experience in federal labor law and/or federal Indian law with preference given to those with experience in both.  Names of individuals may be provided by such sources as, but not limited to, Indian Dispute Services, Federal Mediation and Conciliation Service, and the American Academy of Arbitrators.

A-11

(2)     Unless either party objects, one (1) arbitrator from the Tribal Labor Panel will render a binding decision on the dispute under the Ordinance.  If either party objects, the dispute will be decided by a three (3)-member panel, unless arbitrator scheduling conflicts prevent the arbitration from occurring within thirty (30) days of selection of the arbitrators, in which case a single arbitrator shall render a decision.  If one (1) arbitrator will be rendering a decision, five (5) Tribal Labor Panel names shall be submitted to the parties and each party may strike no more than two (2) names.  If the dispute will be decided by a three (3)-member panel, seven (7) Tribal Labor Panel names will be submitted and each party can strike no more than two (2) names.  A coin toss shall determine which party may strike the first name.  The arbitrator will generally follow the American Arbitration Association's procedural rules relating to labor dispute resolution.  The arbitrator must render a written, binding decision that complies in all respects with the provisions of this Ordinance within thirty (30) days after a hearing.

(c)     (1)     Upon certification of a union in accordance with Section 10 of this Ordinance, the Tribe and union shall negotiate for a period of ninety (90) days after certification.  If, at the conclusion of the ninety (90)-day period, no collective bargaining agreement is reached and either the union and/or the Tribe believes negotiations are at an impasse, at the request of either party, the matter shall be submitted to mediation with the Federal Mediation and Conciliation Service.  The costs of mediation and conciliation shall be borne equally by the parties.

(2)     Upon appointment, the mediator shall immediately schedule meetings at a time and location reasonably accessible to the parties.  Mediation shall proceed for a period of thirty (30) days.  Upon expiration of the thirty (30)-day period, if the parties do not resolve the issues to their mutual satisfaction, the mediator shall certify that the mediation process has been exhausted.  Upon mutual agreement of the parties, the mediator may extend the mediation period.

(3)     Within twenty-one (21) days after the conclusion of mediation, the mediator shall file a report that resolves all of the issues between the parties and establishes the final terms of a collective bargaining agreement, including all issues subject to mediation and all issues resolved by the parties prior to the certification of the exhaustion of the mediation process.  With respect to any issues in dispute between the parties, the report shall include the basis for the mediator's determination.  The mediator's determination shall be supported by the record.

(d)     In resolving the issues in dispute, the mediator may consider those factors commonly considered in similar proceedings.

(e)     Either party may seek a motion to compel arbitration or a motion to confirm or vacate an arbitration award, under this Section 13, in the appropriate state superior court, unless a bilateral contract has been created in accordance with Section 7, in which case either party may proceed in federal court.  The Tribe agrees to a limited waiver of its sovereign immunity for the sole purpose of compelling arbitration or confirming or vacating an arbitration award issued pursuant to the Ordinance in the appropriate state superior court or in federal court. The parties are free to put at issue whether or not the arbitration award exceeds the authority of the Tribal Labor Panel.

<u>Attachment</u> 1

CONSENT ELECTION AGREEMENT PROCEDURES

Pursuant to the Tribal Labor Relations Ordinance adopted pursuant to section 12.11 of the compact, the undersigned parties hereby agree as follows:

1.      Jurisdiction.   Tribe is a federally recognized Indian tribal government subject to the Ordinance; and each employee organization named on the ballot is an employee organization within the meaning of the Ordinance; and the employees described in the voting unit are Eligible Employees within the meaning of the Ordinance.

2.      Election.   An election by secret ballot shall be held under the supervision of the elections officer among the Eligible Employees as defined in Section 2 of the Ordinance of the Tribe named above, and in the manner described below, to determine which employee organization, if any, shall be certified to represent such employees pursuant to the Ordinance.

3.      Voter Eligibility.   Unless otherwise indicated below, the eligible voters shall be all Eligible Employees who were employed on the eligibility cutoff date indicated below, and who are still employed on the date they cast their ballots in the election, i.e., the date the voted ballot is received by the elections officer. Eligible Employees who are ill, on vacation, on leave of absence or sabbatical, temporarily laid off, and employees who are in the military service of the United States shall be eligible to vote.

4.      Voter Lists.   The Tribe shall electronically file with the elections officer a list of eligible voters within two (2) business days after receipt of a Notice of Election.

5.      Notice of Election.   The elections officer shall serve Notices of Election on the Tribe and on each party to the election.  The Notice shall contain a sample ballot, a description of the voting unit and information regarding the balloting process.  Upon receipt, the Tribe shall post such Notice of Election conspicuously on all employee bulletin boards in each facility of the employer in which members of the voting unit are employed.  Once a Notice of Election is posted, where the union has made the written offer set forth in Section 7(b) of the Tribal Labor Relations Ordinance, the Tribe shall continue to refrain from

publishing or posting pamphlets, fliers, letters, posters or any other communication which should be interpreted as criticism of the union or advises employees to vote "no" against the union.  The Tribe shall be free at all times to fully inform employees about the terms and conditions of employment it provides to employees and the advantages of working for the Tribe.

6.      Challenges.   The elections officer or an authorized agent of any party to the election may challenge, for good cause, the eligibility of a voter.  Any challenges shall be made prior to the tally of the ballots.

7.      Tally of Ballots.   At the time and place indicated below, ballots shall be co-mingled and tabulated by the elections officer.  Each party shall be allowed to station an authorized agent at the ballot count to verify the tally of ballots.  At the conclusion of the counting, the elections officer shall serve a Tally of Ballots on each party.

8.      Objections and Post-election Procedures.   Objections to the conduct of the election may be filed with the elections officer within five (5) calendar days following the service of the Tally of Ballots.  Service and proof of service is required.

9.      Runoff Election.   In the event a runoff election is necessary, it shall be conducted at the direction of the elections officer.

10.      Wording on Ballot.   The choices on the ballot shall appear in the wording and order enumerated below.

FIRST:       [***]
SECOND:   [***]
THIRD:      [***]

11.      Cutoff Date for Voter Eligibility:   [***]

12.      Description of the Balloting Process.   A secret ballot election will take place within thirty (30) days after delivery of the voter list referenced in paragraph 4.  The employer will determine the location or locations of the polling places for the election.  There must be at least one (1) neutral location (such as a high school, senior center, or similar facility) which is not within the gaming facility and employees must also be afforded the option of voting by mail through procedures established by the elections officer.  Such procedures must include

provisions that provide meaningful protection for each employee's ability to make an informed and voluntary individual choice on the issue of whether to accept or reject a union.  Such procedures must also ensure that neither employer nor union representatives shall observe employees personally marking, signing, and placing their ballot in the envelope.  Only voters, designated observers and the election officer or supporting staff can be present in the polling area.  Neither employer nor union representatives may campaign in or near the polling area.  If the election officer or supporting staff questions an employee's eligibility to vote in the election, the ballot will be placed in a sealed envelope until eligibility is determined.  The box will be opened under the supervision of the election officer when voting is finished.  Ballots submitted by mail must be received by the elections officer no later than the day of the election in order to be counted in the official tally of ballots.

13.     Voter List Format and Filing Deadline.   Not later than two (2) business days after receipt of the Notice of Election, the Tribe shall file with the elections officer, at [**address**], an alphabetical list of all eligible voters including their job titles, work locations and home addresses.

Copies of the list shall be served concurrently on the designated representative for the [***]; proof of service must be concurrently filed with elections officer.

In addition, the Tribe shall submit to the election officer on or before [***], by electronic mail, a copy of the voter list in an Excel spreadsheet format, with columns labeled as follows:  First Name, Last Name, Street Address, City, State, and Zip Code.  Work locations and job titles need not be included in the electronic file.  The file shall be sent to [***].

14.     Notices of Election shall be posted by the Tribe no later than [***].

15.     Date, Time and Location of Counting of Ballots.   Beginning at [**time**] on [**date**], at the [**address**].

16.    Each signatory to this Agreement hereby declares under penalty of perjury that s/he is a duly authorized agent empowered to enter into this Consent Election Agreement.

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

| (Name of Party) |
| --- |
| By |
| (Title)<br>(Date) |

Date approved: _____

[**Author**]
Elections Officer

# APPENDIX B

## Off-Track Satellite Wagering

**WHEREAS**, the State of California (State) permits and regulates pari-mutuel wagering on horse racing (also known as off-track wagering) at authorized satellite wagering facilities (also known as simulcast wagering facilities) at various locations within the State, under the terms of California Business and Professions Code section 19400 et seq. (California Horse Racing Law); and

**WHEREAS**, the California Horse Racing Board (Board) is the agency established under California state law to administer and enforce all laws, rules, and regulations affecting horse racing and pari-mutuel wagering within the state and has enacted regulations that appear at title 4, division 4 of the California Code of Regulations, regulating the conduct of pari-mutuel and simulcast wagering on the results of horse races (Board Rules and Regulations); and

**WHEREAS**, operation of a satellite wagering facility is a Class III Gaming activity under IGRA; and

**WHEREAS**, the Blue Lake Rancheria, California (Tribe) has duly enacted its Gaming Ordinance, which permits Class III Gaming on and within the Tribe's Indian lands if conducted in conformity with an applicable tribal-state compact; and

**WHEREAS**, section 3.0, subdivision (a)(4), of the Compact authorizes and permits the Tribe to offer off-track wagering on horse races at a satellite wagering facility pursuant to the requirements of this Appendix; and

**WHEREAS**, the Tribe and the State each recognize the sovereign authority and interests of the other in regulating gaming activities within their respective areas of jurisdiction and in ensuring that off-track wagering on horse races is conducted fairly, honestly, professionally and in a manner that promotes the California horse racing industry.

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, the Tribe and the State agree as follows:

### Sec. 1.0.  Definitions.

Except where the context otherwise requires, the terms employed in this Appendix shall have the same meanings ascribed to them in the California Horse

Racing Law, the Board Rules and Regulations, and in the Compact, as they may be modified or amended from time to time during the term of the Compact. Whenever reference to the Compact is made in this Appendix, that reference shall be understood to also include any Class III Gaming compact between the Tribe and the State to amend or replace the Compact that may hereafter be entered into and that is in effect.  A satellite wagering machine is a device used solely to conduct off-track wagering on horse races authorized by this Appendix, and such a machine shall not be treated as a Gaming Device as defined in the Compact, including for the purpose of calculating the number of Gaming Devices operated by the Tribe under the Compact.

**Sec. 2.0.  Purpose**.

The purpose of this Appendix is to establish and declare the terms upon which off-track wagering in a satellite wagering facility may be established and operated by the Tribe in its Gaming Facility as a means of developing self-sufficiency and generating additional revenues necessary to provide tribal services and programs, while providing the State and the Tribe with an effective means of regulating such activities in accordance with IGRA.

**Sec. 3.0.  Authorization to Operate Satellite Wagering Facility**.

The Tribe is authorized to establish and operate off-track wagering on horse races in a satellite wagering facility (Satellite Facility) upon the Tribe's Indian lands within its Gaming Facility, provided that the Tribe completes and submits to the Board an Application for Authorization to Operate a Simulcast Wagering Facility (Form CHRB-25, or such form as may be revised), and such Satellite Facility is operated in conformity with IGRA, this Appendix, and the Compact.  To the extent there may be provisions in the Compact that are in conflict with provisions in the California Horse Racing Law or the Board Rules and Regulations that are specific to the conduct of off-track wagering on horse races at a satellite wagering facility, the California Horse Racing Law and the Board Rules and Regulations, and the terms of this Appendix, shall control.

    (a)    <u>Satellite Facility</u>.  For purposes of this Appendix, a site within a Gaming Facility authorized under Compact section 4.2, which shall be clearly demarcated, shall be approved as the Tribe's Satellite Facility, provided that, upon inspection by the Board, the Board finds that the Satellite Facility complies with the substantive requirements of the California Horse Racing Law and the Board Rules and Regulations. References to the Satellite Facility in this Appendix shall refer only to

the portion of the Gaming Facility that has been demarcated as the Satellite Facility and shall not refer to any other portion of the Gaming Facility.

(b)   <u>Continuing Obligation to Maintain Satellite Facility</u>.  The Tribe agrees to maintain its Satellite Facility in a manner that complies with all applicable satellite wagering facility requirements made applicable by this Appendix at all times; provided, however, that the Tribe retains sole discretion to cease operation of the Satellite Facility.

(c)   Except as provided in this Appendix, no prohibition upon, or regulation of, the establishment or operation of the Satellite Facility will be imposed upon the Tribe by the State.

**Sec. 4.0.  Agreements with Satellite Operating Organizations**.

In order to permit the conduct of off-track wagering on horse races through intrastate satellite wagering and out-of-state satellite wagering at the Satellite Facility, the Tribe is hereby authorized to enter into agreements with any satellite operating organization that is established pursuant to Business and Professions Code section 19608.2, subdivision (a) or other provision of the California Horse Racing Law or the Board's Rules and Regulations, and which organization provides the audiovisual signal of, and operates satellite wagering on, racing events authorized to be received in the northern zone.  No such satellite operating organization shall refuse to enter into such an agreement with the Tribe on the ground that the Tribe is not an entity eligible to be authorized to operate a satellite wagering facility under state law, or that the proposed agreement with the Tribe is otherwise inconsistent with any other provision of state law, or with the Board Rules and Regulations, as long as the proposed agreement between the Tribe and the satellite operating organization complies with federal law and with the terms of this Appendix.  A copy of any such agreement entered into by the Tribe shall be provided to the Board at the location of the Board's headquarters within thirty (30) days after its execution.  Except as herein provided, nothing in this Appendix is intended to alter in any way the rights of the satellite operating organization under state law.

**Sec. 5.0.  Distribution of Handle**.

(a)   (1)   <u>Generally</u>.  The amounts deducted from pari-mutuel wagers at the Satellite Facility, and the distribution of such amounts, shall be the same as those provided for under the California Horse

Racing Law and the Board Rules and Regulations for satellite wagering facilities, other than fairs, in the northern zone.

(2)     <u>State License Fee</u>.  In the event that during the term of the Compact, California law is amended to authorize the State to collect a state license fee, or a fee equivalent thereto, from the wagers placed at the Satellite Facility, the Tribe and the State shall promptly meet and confer as to whether that state license fee may be imposed on the Tribe under federal law.  Any dispute as to this issue shall be resolved under the dispute resolutions provisions of section 13.0 of the Compact.

(b)     <u>Additional Provisions for Purposes of Business and Professions Code Section 19605.7.</u>

(1)     The Tribe and the satellite operating organization may agree between them and may specify by incorporating into the agreement described in this Appendix, section 4.0, how the percentages of the handle specified in Business and Professions Code section 19605.7, subdivision (c), and designated for promotion of the program at the Satellite Facility, shall be distributed and expended; and

(2)     The Tribe shall be deemed to be the equivalent of the county and entitled to the 0.33% of the handle distributed to the local government within which the Satellite Facility is located, as specified in Business and Professions Code section 19605.7, subdivision (d), and the Tribe shall receive that distribution instead of Humboldt County.

**Sec. 6.0.  Right of Entry**.

The Tribe hereby grants the Board a right of entry onto the Tribe's land solely for purposes of inspecting its Satellite Facility and monitoring compliance with this Appendix.  Such inspection or other site visits shall be conducted by the Board in accordance with the same schedules, policies, and procedures that the Board customarily applies to satellite wagering facilities licensed under state law. Except when entering, leaving, or remaining in the public areas of the Satellite Facility during normal operating hours, Board members or personnel shall notify the Tribal Gaming Agency, as defined in the Compact, when they seek access to the restricted (i.e., non-public) areas of the Satellite Facility.  Inspections of the

non-public areas of the Satellite Facility and inspections, copying, and maintenance of papers, books and records, which shall remain the property of the Tribe, shall be conducted in accordance with the Compact. Nothing in this Appendix shall preclude the State Gaming Agency, as defined in the Compact, from entry into the Satellite Facility to carry out all activities, rights, and duties provided to the State Gaming Agency by the Compact.

### Sec. 7.0.  Concurrent Tribal Authority.

Nothing contained herein shall operate to preclude the Tribe from exercising such additional and concurrent regulatory authority as it may otherwise possess over the Gaming Activities authorized under this Appendix; provided, however, that any regulatory authority exercised by the Tribe over the Gaming Activities authorized in this Appendix shall be no less stringent than that which the Board would exercise over off-track wagering on horse races at satellite wagering facilities approved under state law.

### Sec. 8.0.  Consent Under Interstate Horse Racing Act.

To the extent that acceptance of interstate off-track wagers on horse races is authorized by California state law and the Board, the execution of the Compact by the State shall constitute consent to acceptance of interstate off-track wagers by the satellite operating organization at the Satellite Facility, as required under 15 U.S.C. § 3004(a)(3). Either the State, or the Board or its successor, if requested, shall acknowledge in writing the consent given herein.

### Sec. 9.0.  Licenses Generally.

Subject to compliance with the terms of this Appendix, the Tribe shall not be required to obtain or possess a license from the Board in order to establish and operate a satellite wagering facility within its Gaming Facility, and shall not be required to obtain any other license under state law in connection with its operation of its Satellite Facility, except as may be required under the Compact.

### Sec. 10.0.  Licensing of Employees.

(a)   Administrative and managerial personnel who exercise control over other persons licensed by the Board or the operation of satellite wagering, or whose duties routinely require access to restricted areas of the Satellite Facility, and clerical and other employees employed in a restricted area of the Satellite Facility, shall hold a valid license issued by the Board, if the person is required to be licensed pursuant

to section 1481 of the Board Rules and Regulations; provided that this requirement shall not apply to tribal public safety officers and security personnel of the Gaming Facility who regularly patrol the Satellite Facility in the course of performing their normal, assigned duties, but who are not assigned to remain therein continuously; and provided further that for the purposes of this Appendix, the restricted area of the Satellite Facility shall mean those areas within the Satellite Facility where admission can be obtained only upon presentation of authorized credentials or proper license, including those areas designated as the pari-mutuel department.

(b)     If required by any of the Tribe's ordinances, regulations, or rules, every person employed at the Satellite Facility on the Tribe's Indian lands shall:

    (1)     Hold a valid license issued by the Tribal Gaming Agency; or

    (2)     Be approved by the Tribal Gaming Agency for such employment.

**Sec. 11.0.  Security Control Over Satellite Facility**.

The Tribe shall maintain such security controls over its Satellite Facility and premises, including the presence of licensed security personnel, as the Board's Chief Investigator shall direct; and shall remove, deny access to, eject, or exclude persons whose presence within the Satellite Facility is inimical to the interests of the State as provided by sections 1980 and 1989 of the Board Rules and Regulations, or to the interests of the Tribe in operating an honest, legitimate satellite facility.  Persons prohibited from wagering or excluded from the Satellite Facility pursuant to sections 1980 through 1989 of the Rules and Regulations shall have the right to a hearing thereon pursuant to the Board Rules and Regulations, and the Tribe shall abide by the Board's decision following such hearing; however, nothing in this section shall affect the Tribe's power to exclude or remove persons from the Tribe's land, Gaming Facility, or Satellite Facility pursuant to federal law and the Tribe's laws, regulations, rules, or policies.

**Sec. 12.0.  Civil Regulation**.

(a)     <u>Generally</u>.  Except as modified by this Appendix, and except to the extent that they are in conflict with federal law, all provisions of the California Constitution and all provisions of California Horse Racing Law that specifically and directly pertain to the conduct of off-track

wagering on horse races at a satellite wagering facility, and all rules, regulations, policies, and regulatory and enforcement practices of the Board or its successor, which are now in existence or which may hereafter be enacted, adopted or from time to time amended, and that apply generally to satellite wagering facilities within the State, are hereby incorporated into this Appendix and shall be applicable to the Satellite Facility authorized by this Appendix to the same extent and in the same manner as they apply to satellite wagering facilities in operation within the state generally.

(b)   <u>Non-Discrimination in Enforcement</u>.  In exercising the regulatory enforcement authority granted herein, such authority and the application of the Board Rules and Regulations and procedures shall not be exercised by the Board in a manner that discriminates against the Tribe or is more stringent than that applied to state-licensed satellite wagering facilities in operation within the State generally.

### Sec. 13.0.  Suitability Standard Regarding Licensing.

It is the Tribe's and the State's intent that the licensing of persons, entities, and financial sources directly providing services or materials to the Tribe's Satellite Facility shall involve joint cooperation between the Tribal Gaming Agency and the Board.  Except as modified by this Appendix, the Tribe agrees to comply with all licensing requirements, procedures, and standards relevant to satellite wagering facilities that are set forth in the California Horse Racing Law and the Board's Rules and Regulations.

### Sec. 14.0.  Governing Law.

This Appendix shall be governed by and construed in accordance with federal law (including but not limited to IGRA) and the laws of the State of California to the extent those laws are not inconsistent with federal law; provided, however, that provisions of state laws and regulations expressly incorporated into this Appendix shall be construed in accordance with the laws of the State of California.

# EXHIBIT C

Law Offices Of

# RAPPORT AND MARSTON

An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

January 31, 2023

*Transmitted Via Email: Nathan.Vogeli@gov.ca.gov*

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento CA 95814

Re:   Request of the Buena Vista Rancheria for Compact Negotiations

Dear Senior Advisor, Voegeli:

I am writing on behalf of my client, the Buena Vista Rancheria ("Tribe"), to request that the Governor ("Governor") of the State of California ("State"), pursuant to section 11.2.1, subdivision (a) of the Tribe's 1999 Tribal State Compact ('Compact") with the State, as modified by Addendum A, Modification No. 4, enter into good faith negotiations with the Tribe to conclude a new Tribal-State compact with the Tribe, that will allow the Tribe to engage in class III gaming on its Indian lands.

Section 15.1 of the Tribe's compact provides: "The terms and conditions of this Compact may be amended at any time by the mutual and written agreement of both parties during the term of this Compact set forth in section 14.2, provided that each party voluntarily consents to such negotiations in writing. Any amendments to this Compact shall be deemed to supersede, supplant and extinguish all previous understandings and agreements on the subject." Since there are several provisions in the Tribe's current compact that violate the IGRA and are inconsistent with the Ninth Circuit Court of Appeals decision in *Chicken Ranch Rancheria v. State of California*, 42 F. 4th 1024 (9th Cir.), the Tribe gives its consent to enter into compact negotiations with the Governor to amended the existing compact or negotiate a new one, and requests that the Governor, likewise give his consent in writing to engage in negotiations with the Tribe as requested in the Tribe's attached Resolution.

Attached to this letter is a resolution of the Tribal Council of the Tribe requesting that the Governor enter formal compact negotiations with the Tribe. Please present the Resolution to the

**Letter to Senior Advisor Nathan Voegeli** **Page 2**
**December 31, 2023**
**Re:   Tribe's Request for Compact Negotiations**

---

Governor on behalf of the Tribal Council for the Governor's records.

Also attached to this letter is a proposed set of ground rules for conducting the negotiations. Please send me a letter confirming receipt of this letter and advising me whether the ground rules I have proposed are acceptable to the Governor and his negotiating team. Prior to commencing negotiations, I will provide you with a list of the names, addresses and email addresses of the people that are identified in the Resolution and who will be representing the Tribe in the negotiations. I would request that you do the same and provide me with the names, addresses and email addresses of the people who will be representing the Governor in these negotiations.

Also, as you know, the Ninth Circuit Court of Appeals rendered its decision in *Chicken Ranch Rancheria v. State of California*, 42 F. 4th 1024 (9th Cir.) ("*Chicken Ranch*"). In that decision the Court of Appeals determined what were the permissible topics of negotiation for a class III gaming compact under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et. seq. ("IGRA").

In addition, the Assistant Secretary of Indian Affairs ("ASIA") for the Department of the Interior ("DOI"), based upon the *Chicken Ranch* decision affirmatively disapproved the Santa Rosa and Tejon November 23, 2021, and July 22, 2022, compact submissions because they contained provisions that violated the provisions of the IGRA as interpreted by the Court of Appeals in *Chicken Ranch.* Based upon the ASIA disapproval letters the Tribe has concerns that in the upcoming negotiations, the State will propose provisions that violate the IGRA. The Tribe does not know what the State will propose to the Tribe to overcome the ASIA disapproval letters and the *Chicken Ranch* decision but it's the Tribe's position that a demand for inclusion of any of the following provisions would violate the IGRA for the following reasons:

Definitions:

    A.  Definitions that implicate environmental mitigation obligations.

The ASIA November 23, 2021, and July 22, 2022, disapproval letters ("ASIA Letters") determined that the Tejon and Santa Rosa compact definitions for "Gaming Facility," "Gaming Operation," "Initial Study," "Interested Persons," and "Project," when coupled with the expansive Section 11 regarding assessment and mitigation of off-reservation impacts, impermissibly interfered "with the Tribe's authority to govern itself, start a project or otherwise use its lands" and therefore, violated the IGRA.

In addition, the ASIA Letters and the *Chicken Ranch* decision found that the State's demand for environmental assessments, mitigation and Intergovernmental Agreements violate the IGRA. Therefore, any provision requiring the Tribe to enter into an Intergovernmental Agreement with a local government or any similar collateral agreement, as a precondition to entering a compact, would, likewise, constitute a violation of the IGRA.

    B.  Overly broad definition of "Gaming Employee."

In compact negotiations with other tribes, the State has also insisted on including within the

Case 2:23-cv-01790-KJM-DB  Document 1  Filed 08/22/23  Page 288 of 340

**Letter to Senior Advisor Nathan Voegeli**            **Page 3**
**December 31, 2023**
**Re:  Tribe's Request for Compact Negotiations**

definition of "Gaming Employee" and "Gaming Operation", employees who have no involvement in the operation of class III gaming activities and imposed on the tribes' significant obligations relating to such employees, thus violating 25 U.S.C. § 2710(d)(3)(C)(i)-(vii).

### C. Overly broad definitions of "Gaming Facility" and "Gaming Operation."

In previous compact negotiations, the State has insisted on defining "Gaming Facility" as "the buildings or structures in which Class III Gaming, … is conducted [,]" and using the "but-for" test to determine what's included in this definition. This definition is broader than "gaming spaces" as defined in the ASIA Letters. The Tribe's position is that this definition of Gaming Facility coupled with the definition of Gaming Operation is too broad and encompasses activities and functions that are amenities, such as the operation of restaurants and gift shops, none of which are directly related to the actual operation of gaming activities and thus exceed the permissible scope of negotiation under 25 U.S.C. § 2710(d)(3)(C)(i)-(vii).

### D. Cost reimbursement to the State.

In all of the State's recent compact negotiations with other tribes, the State has insisted on using a "pro rata share" formula for payments into the Special Distribution Fund ("SDF") to reimburse the State for its "costs incurred for purposes consistent with IGRA, including the performance of all its duties under compacts, the administration and implementation of tribal-state Class III Gaming compacts and Secretarial procedures prescribed by the Secretary of the DOI, pursuant to 25 U.S.C. § 2710(d)(7)(B)(vii) ("Secretarial Procedures"), and funding for the Office of Problem Gambling, as determined by the monies appropriated in the State's annual Budget Act each fiscal year to carry out those purposes ("Appropriation")." It's the Tribe's position that such a provision violates IGRA because it requires tribes to pay the State amounts determined unilaterally by the State Legislature that are not necessarily related to the actual regulation of tribal gaming. Under the State's proposed provision, a tribe's "pro rata share" will *not* be based on what the State actually and reasonably spends in regulating either the specific tribe's (or even all California tribes') class III gaming activities. Rather, it will be based on whatever the Legislature may unilaterally — without tribal consent or even consultation — appropriate for the State Gaming Agency in any given year, limited only by a 5% year over year cap, and entirely unmoored from the State's "necessary … costs of regulating" tribal gaming. 25 U.S.C. § 2710(d)(3)(C)(iii).

The State's provision regarding tribal payments is impermissible for yet another reason. The Legislature's allocation to its own internal agencies for an upcoming fiscal year is made without regard to the amount of money already in the SDF—money left over from tribes' contributions in previous years, as well as ongoing payments. An August 25, 2022 report by the California State Auditor determined that the State is currently requiring tribes to pay far more into the SDF than is needed to reimburse the State for its legitimate regulatory costs, as evidenced by the fact that the SDF now contains nearly *four times* the annual amount budgeted by the Legislature, with no means for refunding excesses to the tribes, and no constraint on future increases without

Case 2:23-cv-01790-KJM-DB   Document 1   Filed 08/22/23   Page 289 of 340
Letter to Senior Advisor Nathan Voegeli                                        Page 4
December 31, 2023
Re:   Tribe's Request for Compact Negotiations

regard to what the State actually may spend.[1] Moreover, the report determined that the State has used and continues to use the SDF to fund regulation of non-tribal gambling operations and that the State Department of Public Health's Office of Problem Gambling cannot properly account for money allocated from the SDF to problem gambling mitigation. Thus, the provision the State seeks to impose on tribes would force tribes to pay more than is necessary to regulate tribal gaming, and, furthermore, to fund State activities wholly unrelated to the regulation or operation of tribal gaming activities.

The State's previous proposals to other tribes also impermissibly intrude on tribal self-governance in a number of other ways. They require payment of interest on underpayments.[2] They allow the State to seek injunctive relief and interest for non-payment and make failure to pay a material breach of the compact for which the tribe can be enjoined from operating class III gaming until payment is made, even if the State's regulatory costs are fully funded. With an SDF currently overfunded by 400%, these provisions are not necessary for and directly related to the regulation, licensing, or operation of class III gaming activities, and thus exceed what is permissible under 25 U.S.C. § 2710(d)(3)(C)(i)-(vii).

      E. Exclusivity.

Cases such as *Coyote Valley II*, 331 F.3d 1094 (9th Cir. 2003), and *Rincon v. Schwarzenegger*, 602 F. 3d 1019 (9th Cir. 2010), as well as previous DOI decisions on compacts,[3] have permitted a state to propose payment obligations, but only if the state offers a meaningful concession in return. "Meaningful concessions" have been interpreted to mean concessions about which the State is not otherwise obligated to negotiate and are of value to the tribe. *Rincon v. Schwarzenegger* held that because the State Constitution already grants all California tribes the exclusive right to operate slot machines and banked and percentage card games, the State cannot reassert that exclusive right to exact additional monetary concessions.

In previous compact negotiations with other tribes, the State has insisted on illusory "exclusivity" provisions: *i.e.*, if tribal exclusivity on slot machines is lost,[4] the tribe can choose either to terminate the compact and cease class III gaming or negotiate a reduction in some — but not all — compact fees, excluding payment obligations under an Intergovernmental Agreement regarding mitigation of off-reservation impacts from "Projects." This is no grant of exclusivity at all, and the State has not offered any other meaningful concessions in return for its

---

[1] A copy of the August 25, 2022, California State Auditor's Report is attached hereto as **Exhibit A.**

[2] DOI has orally stated that requiring payment of interest on overdue payments is a penalty, not directly related to the operation of gaming activities, but that was not mentioned in the ASIA disapproval Letters.

[3] *See, e.g.*, the August 6, 2021 "Deemed Approved" Letter from then-Principal Deputy Assistant Secretary – Indian Affairs, Bryan Newland to the Honorable Marcellus W. Osceola, Jr., Chairman, Seminole Tribe of Florida, pp. 8-10.

[4] The compacts do not provide any relief for loss of exclusivity on banked/percentage card games.

financial demands. Thus, the State's previously proposed "exclusivity" language offered to other tribes does not constitute a meaningful concession for the State's financial demands. Any requests that the Tribe pay any fee to the State other than reimbursement of its actual costs to regulate must be accompanied by a meaningful concession offer.

F. Revenue sharing with non-gaming and limited-gaming tribes.

The concept of the Revenue Sharing Trust Fund ("RSTF") originated with the tribes in the "1999 Compacts." Brown and Newsom administration compacts require tribes to pay not only into the RSTF, but also into the State-imposed Tribal Nations Grant Fund ("TNGF"). Further, they specify that non- and limited-gaming tribes are not third-party beneficiaries to the TNGF and cannot sue to compel distributions. The State retains full control over these funds. In addition, the State has proposed to waive payments to the RSTF if a tribe operates no more than 1,200 Gaming Devices.[5] The fact that the State is willing to waive payments into the RSTF calls into question whether the State is requiring payments into the RSTF of more than is needed to ensure the distribution of $1.1 million/year to each eligible tribe. The State's proposals include interest penalties for untimely or non-payment, something that IGRA doesn't permit because it isn't directly related to the operation of gaming activities and isn't accompanied by a meaningful concession.[6]

Despite continued tribal objections, the State continued to offer "credits" against RSTF payments for expenditures on an array of State-approved purposes, but subject to prior State review and subsequent State disallowance. Almost none of the projects or activities that the State requires tribes to fund to qualify for offsets are even tangentially related to the operation of class III gaming activities, much less *directly* related to such activities. The only relationship of the credits to the operation of class III gaming activities is that the money used to pay for the projects the State seeks to promote, and for which it offers the tribes offsets, comes from gaming. Yet both *Chicken Ranch* and *Rincon Band v. Schwarzenegger* held that this is not a sufficient connection. Thus, any similar State "credit" proposal made to the Tribe would violate IGRA.

Moreover, whether a tribe elects to pay into the RSTF or to fund a project or activity that the State seeks to promote to qualify for an offset, the State's proposed provision would require tribes to spend specified percentages of their respective Gross Gaming Revenue each year, even if the RSTF is fully funded, and even if the tribes would prefer not to spend the money at all. This credit provision, which constitutes a deep and direct infringement on tribal self-government, not only violates 25 U.S.C. § 2710(d)(3)(C)(i) -(vii), but also, by forcing the tribe to spend money each year whether or not it wants to spend the money, it constitutes a tax, fee, or other assessment that violates 25 U.S.C. § 2710(d)(4), unless the State offers the Tribe a meaningful concession in return for this requirement.

---

[5] Tejon's proposed compact waives RSTF payments for the first seven years of operation.

[6] During previous technical assistance provided to the CTSC Tribes, the Office of Indian Gaming informed the Tribes that the DOI's position is that interest on late payments is a penalty that is not directly related to the regulation, licensing or operation of class III gaming activities, and thus is not consistent with IGRA.

H. Workplace health and safety and tort liability.

The U.S. Occupational Safety and Health Administration has full authority over tribal workplaces. *Donovan v. Coeur d'Alene Tribal Farms*, 751 F.2d 1113 (9th Cir. 1985). Nonetheless, the State's previous compact proposals obligate the tribes to allow State inspections of all Gaming Facility workplaces, not just gaming spaces, unless a federal agency has conducted an inspection during the previous calendar quarter and the tribe has provided the State with a report of that inspection. This is problematic because, historically, OSHA does not routinely conduct quarterly inspections.

The State's previous compact proposals require, *inter alia*, maintaining $3 million in employment practices liability insurance (self-insurance is not an option), enacting ordinances and/or procedures prohibiting workplace discrimination involving all Gaming Operation employees (not just class III gaming employees that work in Gaming Spaces) under both federal and state protected classes, and rendering the tribe liable in money damages for such conduct. However, both the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, and Title VII 42 U.S.C. § 2000e, *et seq.*, specifically exclude tribes from the definition of "employer". Federal courts have consistently held that these and various other federal employment laws do not abrogate tribal sovereign immunity from private actions thereunder. At least to the extent that these requirements apply to employees who are not involved in the actual operation of class III gaming activities, thus, including these requirements in a compact is inconsistent with IGRA, however laudable the policies sought to be advanced by them might be.

The State's proposals also prohibit, to the extent required by State law, cashing checks drawn against government accounts, which is unrelated to the operation of gaming activities. Likewise, the State requires adherence to State laws regarding the extension of credit.  They also require adoption of ordinances or policies requiring compliance with both the Fair Labor Standards Act and regulations, and the State's minimum wage laws and regulations, for all Gaming Operation employees, not just those employees directly engaged in the operation of class III gaming activities.

The State's proposals continue to require that the tribes provide Workers Compensation and unemployment insurance coverage comparable to what is required by State law for all Gaming Operation and Gaming Facility employees. They also require the tribes to comply with State income tax withholding requirements, except for tribal members expressly exempted by California law. These requirements do not distinguish between employees who are engaged in the operation of class III gaming activities and those who are not so engaged, and in any event, are not directly related to and necessary for the regulation, licensing, or operation of class III gaming activities.

Although the National Labor Relations Act now protects the organizational and representational rights of tribal gaming operation employees, the State has continued to require the adoption and maintenance in effect of the State's discriminatory new Tribal Labor Relations Ordinance ("TLRO") proposed in other compacts. The State's new TLRO continues to include employees in another "related facility, the only significant purpose of which is to facilitate patronage of the

class III gaming operations." The new TLRO subjects the tribe to binding interest arbitration of collective bargaining impasses, something that the State cannot require of its own political subdivisions,[7] and that does not apply to any other California employer subject to the NLRB's jurisdiction, including State-licensed gambling establishments.

The State's new TLRO, the terms of which the State consistently refused to negotiate with other tribes, goes far beyond securing the basic organizational and representational rights approved in *Coyote Valley II*. The State should not allow to use the compact negotiation process as a means of allowing a non-governmental third party to impose binding interest arbitration on a sovereign tribal government.

CONCLUSION

The Tribe hopes that you will take the issues raised in this letter into consideration in developing the State's offers and counteroffers to the Tribe to conclude a new class III compact to replace the Tribe's existing compact.

I and the Tribes' negotiating team look forward to beginning the compact negotiation process with you and the State's team. Please get back to me as soon as possible and let me know your availability to meet over the next ninety days.  The Tribe would like to establish a schedule for the negotiations that will allow the parties to conclude negotiations well before the June 30, 2023, deadline.

If you have any questions regarding this letter, please direct then to me, rather than my client, at the address, telephone number or email address on the above letterhead. Your quick reply to this letter is greatly appreciated.

Yours very truly,

LESTER J. MARSTON,
Attorney for Buena Vista Rancheria,

Enclosure(s)
cc: Ronda Hope Flores, Chair
     Wayne Smith, Tribal Administrator

---

[7] *Cty. of Riverside v. Superior Court*, 30 Cal. 4th 278, 132 Cal. Rptr. 2d 713, 66 P.3d 718 (2003).

**Letter to Senior Advisor Nathan Voegeli**                                        **Page 8**
**December 31, 2023**
**Re:  Tribe's Request for Compact Negotiations**

# EXHIBIT D



# OFFICE OF THE GOVERNOR

March 20, 2023

*Via Electronic Mail and US Mail*

Honorable Rhonda L. Morningstar Pope Flores
Chairperson, Buena Vista Rancheria of Me-Wuk Indians
1418 20th Street, Suite 200
Sacramento, CA 95811
rhonda@bvtribe.com

Dear Chairperson Pope Flores:

On January 21, 2023, the Governor received Resolution No. 2022-024 from the Tribal Council of the Buena Vista Rancheria of Me-Wuk Indians (Tribe) requesting to commence negotiations with the State of California (State) to amend or replace the Tribe's June 28, 2016 tribal-state class III gaming compact (2016 Compact). Notice of the 2016 Compact was published in the Federal Register on December 5, 2016. (81 Fed.Reg. 87585.) Under section 14.2, the Tribe's 2016 Compact terminates after 25 years on December 5, 2041.

The State and the Tribe agreed to specific provisions regarding amendments or negotiations for a new compact in section 15.0 of the 2016 Compact. Section 15.1 provides that the Tribe and the State may voluntarily consent to amend the 2016 Compact through a mutual and written agreement. The 2016 Compact is less than a quarter through its 25-year term and the State does not consent to amend it at this time. Under section 15.2, the Tribe or the State may request to enter negotiations for a new tribal-state class III gaming compact no sooner than 18 months before the termination date of the 2016 Compact. Because it is not within 18 months of December 5, 2041, the State is not required to enter into negotiations for a new compact with the Tribe.

None of the conditions under section 15.3 are met and the State respectfully declines to enter into negotiations to amend or replace the 2016 Compact.

Sincerely,

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom

ec:     Wayne Smith, Tribal Administrator
        wayne@bvtribe.com

        Les Marston, Attorney
        ljmarston@rmlawoffice.net

# EXHIBIT E

Law Offices Of

# RAPPORT AND MARSTON

An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

March 30, 2023

*Transmitted Via Email: Nathan.Vogeli@gov.ca.gov*

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento CA 95814

> Re:   Response to the State's Refusal to Engage in Compact Negotiations With the
>         Buena Vista Rancheria.
> Our File No.: 22-2-3.1.1

Dear Senior Advisor, Voegeli:

I write in response to your letter, dated March 20, 2023, denying the Buena Vista Rancheria's ("Tribe") request to engage in good faith compact negotiations to amend its class III gaming Compact with the State to remove the illegal provisions in the compact so that it comports with the 9th Circuit's decision in *Chicken Ranch Rancheria of Mewuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022) ("*Chicken Ranch*").

The Tribe's position is that the Governor, on behalf of the State, and the State have an obligation to "make their best efforts to resolve disputes that arise under this Compact by good faith negotiations whenever possible." Compact, Section 13.1. As established in the Tribe's January 31, 2023, letter[1] ("Request for Negotiations"), certain terms, provisions, and conditions of the

---

[1] The Tribe sent the State and the Governor both a letter and a resolution requesting negotiations. The letter requested negotiations and expressly referenced section 15 of the Compact because the Tribe assumed the Governor would be anxious to renegotiate provisions in the compact that *Chicken Ranch* invalidated. Obviously, that is not the case. However, under the resolution the Tribe requested negotiations for the purpose of renegotiating the illegal provisions contained in the compact after the *Chicken Ranch* decision without referencing any provision of its compact or the IGRA. So, let us be clear, it is the Tribe's position that, in conformity with the law, all the Tribe needs to do is request negotiations and state the purpose of the negotiations. If the State believes that it does not have an obligation to negotiate, the burden is on the State to cite to the applicable provisions of the law or the compact that relieve it of its obligation to negotiate. Be advised that the Tribe's previous request to negotiate was made under the applicable provisions of the IGRA and the Tribe's compact. Therefore, the time periods for the State

Tribe's Compact are inconsistent with the *Chicken Ranch* decision. Thus, a dispute exists concerning the legality and enforceability of those terms, provisions, and conditions identified in the Request for Negotiations.

Under Section 13.1(a) the Tribe has provided "written notice setting forth the facts giving rise to the dispute and with specificity, the issues to be resolved." The Tribe has made a request to meet and confer for the purpose of amending the Compact as a means of resolving the disputed terms, provisions, and conditions. Under Section 13.1(b) of the Compact, the State had fifteen (15) days to respond to the Tribe's request. The State's response came more than 30 days after the Tribe's request.[2] Section 13.1(c) obligates the State to meet and confer with the Tribe within thirty (30) days after receiving the request to meet and confer.

**PLEASE TAKE NOTICE**, if the State does not respond to the Tribe's request to meet and confer pursuant to Section 13 of the Compact within fifteen (15) days of the date of receipt of this second request for negotiations (April 14, 2023), or the State refuses to meet and confer with the Tribe within thirty (30) days of the date of receipt of this letter (April 29,2023), it is the Tribe's position that the State is in breach of the Compact. If the State's position remains consistent with the State's March 20, 2023, response, namely, that the State is not obligated to meet and confer with the Tribe in good faith to find a mutually beneficial solution under Section 15 of the Compact, then the State has breached its duty to exercise its best efforts to resolve disputes arising under the Compact in good faith.

To be clear, the Tribe has enacted Resolution No 2022-024, authorizing the Tribe to request negotiations and the Tribe requested negotiations on January 31, 2023. In addition, pursuant to 25 U.S.C. § 2710(d)(7)(B)(i), 180 days from the date of the Tribe's request, the Tribe may initiate an action against the State for failure to negotiate a compact. Thus, if the State does not make a good faith attempt to negotiate amendments to the Tribe's Compact, thereby bringing the Compact into compliance with federal law, the Tribe can initiate an action under IGRA after July 30, 2023.

However, the Tribe desires to resolve the dispute by meeting and conferring in good faith to amend the terms, provisions, and conditions of the Tribe's Compact. Therefore, pursuant to the Tribe's Request for Negotiations, the Tribe seeks to meet with the State to establish a schedule for negotiations that will allow the parties to complete the amendments before June 30, 2023.

The Tribe hopes that Governor Newsom, as the chief law enforcement official of the State of California, will welcome the opportunity to negotiate substitute provisions in an effort to bring the Tribe's Compact into compliance with the 9th Circuit's decision in *Chicken Ranch*, which reflects the current state of the law.

---

to come to the table and begin to negotiate with the Tribe under the compact and the IGRA began to run on the date that the State/Governor received the Tribe's request as set forth in its letter and resolution.

[2] Arguably, the State's denial already breached Section 13 of the Compact. However, in an effort to resolve the dispute in good faith, the Tribe is willing to overlook the outright denial of a request to negotiate and allow the State to meet and confer before April 28, 2023.

**Letter to Senior Advisor Nathan Voegeli** **Page 3**
**March 30, 2023**
**Re:   Tribe's Response to State's Refusal to Engage in Compact Negotiations**

---

If you have any questions, please direct them to me rather than my client or if you would like to meet to schedule negotiations, please do not hesitate to contact me. I look forward to your prompt response.

Yours very truly,

LESTER J. MARSTON,
Attorney for Buena Vista Rancheria,

Enclosure(s)
cc: Ronda Pope-Flores, Chair
     Wayne Smith, Chief of Staff

# EXHIBIT F



# OFFICE OF THE GOVERNOR

April 14, 2023

*Via Electronic Mail*

Les Marston
Rapport and Marston
405 W. Perkins Street
Ukiah, CA 95482
ljmarston@rmlawoffice.net

RE:   Response to March 30, 2023 Meet and Confer Request under Section 13.1
      of the 2016 Tribal-State Compact Between the State of California and the
      Buena Vista Rancheria of Me-Wuk Indians of California

Dear Mr. Marston:

Thank you for your March 30, 2023, letter on behalf of the Buena Vista Rancheria of Me-Wuk Indians (Tribe) by which the Tribe requests to meet and confer with the State of California (State) pursuant to section 13.1, subdivision (b) of the Tribe's June 28, 2016 tribal-state class III gaming compact (2016 Compact). The State understands from your letter that the Tribe wishes to dispute certain provisions of the 2016 Compact that it believes to be inconsistent with the Ninth Circuit Court of Appeals decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California* (*Chicken Ranch*), 42 F.4th 1024 (9th Cir. 2022). The State agrees to dispute resolution under section 13.0 of the 2016 Compact as the appropriate way to address any issues regarding provisions in the 2016 Compact that may be inconsistent with the *Chicken Ranch* decision.

*Chicken Ranch* determined that "IGRA strictly limits the topics that states may include in tribal-state Class III compacts to those directly related to the operation of gaming activities." *Chicken Ranch*, 42 F.4th at 1029. The specific provisions addressed by the Ninth Circuit concerned tribal recognition of spousal and child support orders for all gaming facility employees, environmental review and mitigation for a broadly defined set of projects, and broad tort claims coverage. *Id.* at 1037-39. The *Chicken Ranch* court held that under 25 U.S.C. §

2710(d)(3)(C)(vii), "these family, environmental, and tort law provisions are not 'directly related to the operation of gaming activities.'" *Id.* at 1038.

Your March 30, 2023 letter references your January 31, 2023 letter for the Tribe's position that the inclusion in a new compact of any of the following provisions would violate IGRA: definitions that implicate environmental mitigation obligations; overly broad definitions of Gaming Employee, Gaming Facility, and Gaming Operation; cost reimbursement to the State; exclusivity; revenue sharing with non- and limited-gaming tribes; and workplace health and safety and tort liability. It is unclear to the State if the Tribe is disputing all of these provisions for purposes of its meet and confer request under section 13.1 of the 2016 Compact.

The State's position is that the provisions decided by *Chicken Ranch* circumscribe the 2016 Compact terms subject to dispute. Those terms are limited to the Gaming Facility definition in section 2.12, section 11.0 environmental review requirements, section 12.5 tort protections, and recognition of child and spousal support orders under section 12.6, subdivision (e). The other provisions cited in your January 31, 2023 letter—the definitions of Gaming Employee and Gaming Operation, State regulatory costs, revenue sharing, exclusivity, and workplace health and safety protections—were not addressed by the *Chicken Ranch* holding.

Further, the Assistant Secretary—Indian Affairs (AS-IA) disapproval letters dated November 23, 2021, and July 22, 2022, mentioned in your January 31, 2023 letter,[1] do not note any concerns with the definitions of Gaming Employee and Gaming Operation, State regulatory costs, revenue sharing, exclusivity, or workplace health and safety protections. Additionally, the fact that the AS-IA on November 17, 2022, after the *Chicken Ranch* decision, affirmatively approved compacts between the State and the Santa Rosa Indian Community of the Santa Rosa Rancheria and the Tejon Indian Tribe that included provisions on these topics substantially similar to those in the 2016 Compact supports the State's position.

---

[1] Your letter refers to the AS-IA disapproving the "Santa Rosa and Tejon November 23, 2021, and July 22, 2022, compact submissions." The State's compact with the Tejon Indian Tribe was affirmatively approved by the AS-IA. The AS-IA issued letters on November 23, 2021, and July 22, 2022, disapproving two different compacts with the Santa Rosa Indian Community of the Santa Rosa Rancheria that were signed, respectively, in April 2021 and March 2022.

Page 3

The State is available on April 21, 2023, from 11:00 a.m. to 12:30 p.m. or April 26, 2023, from 1:00 to 2:30 p.m. to meet and confer with the Tribe pursuant to section 13.1 of the 2016 Compact to resolve the disputes regarding the provisions that may be inconsistent with the *Chicken Ranch* decision. The State is willing to meet with the Tribe by telephone, by videoconference, or in person at the Tribe's rancheria or in Sacramento. Please let me know if the Tribe is available to meet on either of these dates or if the State should look for alternative times for this meet and confer.

Sincerely,

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom

ec:   Honorable Rhonda L. Morningstar Pope Flores, Chairperson
      Buena Vista Rancheria of Me-Wuk Indians
      rhonda@bvtribe.com

      Wayne Smith, Tribal Administrator
      Buena Vista Rancheria of Me-Wuk Indians
      wayne@bvtribe.com

# EXHIBIT G



# OFFICE OF THE GOVERNOR

May 26, 2023

*Via Electronic Mail and US Mail*

Les Marston
Rapport and Marston
405 W. Perkins Street
Ukiah, CA 95482
ljmarston@rmlawoffice.net

Dear Mr. Marston:

Thank you for facilitating the meet and confer on May 16, 2023, pursuant to the section 13.0 dispute resolution provisions of the 2016 compact (2016 Compact) between the State of California (State) and the Buena Vista Rancheria of Me-Wuk Indians (Tribe). As I indicated during the meet and confer, and in my prior April 14, 2023 letter, the State's position is that the 2016 Compact terms subject to dispute are limited to those addressed by the Ninth Circuit's holding in *Chicken Ranch Rancheria of Me-Wuk Indians v. California* (*Chicken Ranch*), 42 F.4th 1024 (9th Cir. 2022) involving family, environmental, and tort law provisions.

At the meet and confer, the Tribe provided the State a list of provisions in the Tribe's 2016 Compact that the Tribe considers invalid. After the State and Tribe went through that list, I agreed to confirm by letter the provisions the State considers to be implicated by the *Chicken Ranch* decision. The State agreed only to identify implicated provisions. It did not agree that any particular provision was invalidated or to any specific approach for resolving an issue.

As indicated at the meet and confer, the State considers the following 2016 Compact terms to be reasonably subject to dispute as a result of *Chicken Ranch*:

- § 2.12 Gaming Facility definition;
- § 2.18 Interested Persons definition;
- § 2.22 Project definition;
- § 2.24 Significant Effects on the Off-Reservation Environment definition;
- § 4.5, subdivision (a)(2)(B) reference to any intergovernmental agreement pursuant to section 11.7;
- § 5.3, subdivision (a) reference to payments under section 11.0;
- § 11.0 environmental review and intergovernmental agreement requirements;
- § 12.5 broad scope of tort claim coverage; and
- § 12.6, subdivision (e) child and spousal support orders.

In addition to those provisions the State agrees are reasonably implicated by *Chicken Ranch* and accordingly subject to dispute, the State identified terms that it may be willing to revisit if the Tribe and State are able to reach agreement on the scope of disputed provisions. Those provisions are the sale of tobacco products to minors under section 12.2 and the procedures for handling workplace claims of discrimination, harassment, or retaliation under section 12.3, subdivision (f)(2).

Finally, the State and Tribe discussed scheduling another meet and confer after confirming the terms each considered to be implicated by the *Chicken Ranch* decision. That now being accomplished, the State is available for a videoconference meet and confer on either June 7, 2023 from 10:30 a.m. to 1 p.m. or June 15, 2023 from 10:30 a.m. to 1 p.m. Please let me know if either of those times will work for the Tribe or if the State should propose alternative dates.

Sincerely,

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom

ec:   Honorable Rhonda L. Morningstar Pope Flores, Chairperson
      Buena Vista Rancheria of Me-Wuk Indians
      rhonda@bvtribe.com

      Wayne Smith, Tribal Administrator
      Buena Vista Rancheria of Me-Wuk Indians
      wayne@bvtribe.com

      Padraic McCoy
      mccoy@olp-partners.com

# EXHIBIT H

Law Offices Of

# RAPPORT AND MARSTON

### An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

June 2, 2023

*Transmitted Via Email: Nathan.Vogeli@gov.ca.gov*

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1303 10th, Suite 1173
Sacramento CA 95814

      Re:    Tribal Response to State's Letter of May 26, 2023
              Our File No.: 22-2.3.1.1

Dear Mr. Voegeli:

I am in receipt of your letter to me dated May 26, 2023, identifying those provisions in the 2016 Compact ("Compact") of the Buena Vista Rancheria ("Tribe") that the State of California ("State") considers "to be reasonably subject to dispute" as a result of the Ninth Circuit's decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F. 4th 1024 (9th Cir. 2022) ("*Chicken Ranch*").

In your letter, the nine provisions you identified to be reasonably subject to dispute are all related to the family, environmental, and tort law provisions that, in the Tribe's opinion, were invalidated by the Ninth Circuit in *Chicken Ranch*. In addition, you agreed to revisit Compact provisions 12.2 and 12.3(f)(2) "if the Tribe and State are able to reach agreement on the scope of disputed provisions." Finally, you stated in the letter that the State is available for a "videoconference meet and confer" on either June 7, 2023, or June 15, 2023.

I have reviewed your letter with the Tribe and the Tribe wishes to confirm for the June 15, 2023, date, beginning at 10:30 a.m., for another meet and confer with the State by Zoom call to further discuss the provisions identified by the State.

However, the Tribe strongly disagrees with your statement that the 2016 Compact terms subject to dispute are limited to those explicitly addressed by the Ninth Circuit in *Chicken Ranch* "involving family, environmental, and tort provisions." The Tribe's position is that the holding in *Chicken Ranch* is broader than just those three subjects and that the State has an obligation to meet

Case 2:23-cv-01790-KJM-DB   Document 1   Filed 08/22/23   Page 310 of 340
**Letter to Senior Advisor Nathan Voegeli**                                              **Page 2**
**June 2, 2023**
**Re:   Tribe's Response to State's May 26, 2023 Letter**

and confer with the Tribe over: (1) all of the fee provisions contained in the Compact, with the exception of the payment into the Revenue Sharing Trust Fund, because the Tribe never received any meaningful concession from the State in exchange for the payment of the fees; and (2) any subject in the 2016 Compact that is not directly connected to the playing of the games on the Tribe's Casino floor.

Despite the State's narrow reading of *Chicken Ranch*, the Ninth Circuit made it very clear:

> . . . that courts "**shall consider** any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith." [citation omitted] Some assessments are within the permitted topics of negotiation, *see id.* § 2710(d)(3)(c)(ii), but another provisions states that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe."

> Bound by *Coyote Valley II* and its treatment of revenue-sharing provisions, *Rincon Band* explained that "IGRA requires courts to consider a state's demand for taxation as evidence of bad faith, not conclusive proof." [citation omitted]. *Rincon Band* thus analyzed at length whether the State had provided "meaningful concessions" for a revenue-sharing requirement. [citation omitted]. As we will explain in detail below,  a "meaningful concessions" analysis only applies within the context of § 2710(d)(4), to revenue sharing demands (a point the dissent does not dispute).

*Chicken Ranch*, 42 F. 4th at 1044-45.

A review of the Tribe's Compact reveals that the Tribe is obligated to pay three fees under its 2016 Compact: (1) a fee to the State that goes well beyond reimbursing the State for its actual costs to regulate the Tribe's gaming facility; (2) a fee to the State to fund the State's Tribal Nation Grant Fund; and (3) fees to the County of Amador to mitigate off-reservation environmental impacts.

Even under the narrowest reading of the *Chicken Ranch* decision, all of the fees that the Tribe is required to pay to the State and County under its 2016 Compact are invalid because there are no "meaningful concessions" in the Compact in exchange for the payment of the fees beyond what the Tribe received from the State in its 1999 Compact. In fact, the only "right" the Tribe received under its 2016 Compact was the right to engage in class III gaming, which can never be a "meaningful concession":

> Therefore, gaming rights that tribes are entitled to negotiate for under IGRA, like device licensing and time, *see* § 2710(d)(3)(c)(vi), cannot serve as consideration for general fund revenue sharing, the consideration must be for something "separate" than basic gaming rights.

*Rincon Band*, 602 F.3d at 1040.

Case 2:23-cv-01790-KJM-DB   Document 1   Filed 08/22/23   Page 311 of 340
**Letter to Senior Advisor Nathan Voegeli**                                                        **Page 3**
**June 2, 2023**
**Re:   Tribe's Response to State's May 26, 2023 Letter**

Likewise, the State's position that *Chicken Ranch's* holding only implicated the family, environmental, and tort subjects struck down by the Court is also misplaced. The Court made it clear that its holding invalidated any compact provision that was not "directly" connected to the playing of the games on the Tribe's Casino floor.

> The phrase [d]irectly related to the operation of gaming activity is narrower than directly related to the operation of the Casino.

*Chicken Ranch*, at 1037 (internal citations omitted).

> The catch-all language in § 2710(d)(3)(c)(vii) requires an affirmative showing that the state is seeking to negotiate over a subject that has a direct relationship to the operation of gaming activities. That showing is not made simply because gaming activities through some claim of causation produced a situation or event that the state now believes it imperative to regulate. The logic of California's argument is essential limitless, and it would enable states to force tribes to agree to all manner of state regulations, contrary to IGRA's text, structure, and objectives.

*Chicken Ranch*, at 1039.

Thus, the holding in *Chicken Ranch* is clear and unambiguous — any provision in the Tribe's 2016 Compact that is not directly connected to the playing of the Tribe's class III games on the Casino floor violates the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701, *et. seq*.

Finally, please send me an email confirming June 15, 2023, from 10:30 a.m. to 1 p.m., for our next meet and confer. I will have my office send out a Zoom invite for the meeting once you have confirmed.

I look forward to discussing these and the other issues set forth in your May 26, 2023, letter. If you have any questions regarding this letter, please do not hesitate to give me a call.

Yours very truly,

LESTER J. MARSTON,
Attorney for Buena Vista Rancheria,

cc:    Ronda Pope-Flores, Chair
        Wayne Smith, Chief of Staff
        Padraic McCoy, Tribal Attorney

# EXHIBIT I

Law Offices Of

# RAPPORT AND MARSTON

An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

July 12, 2023

*Transmitted Via Email: Nathan.Vogeli@gov.ca.gov*

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1303 10th, Suite 1173
Sacramento CA 95814

Re:     Tribal Request for State to Clarify Its Position
         Our File No.: 22-2.3.1.1

Dear Mr. Voegeli:

The purpose of this letter is to clarify the legal position of the State of California regarding the requirements of the dispute resolution process for issues arising under the Buena Vista Rancheria of Me-Wuk Indians' (Tribe) 2016 class III gaming compact (Compact) with the State. It is the Tribe's hope that the clarification of the State's position will allow the parties to resolve the current dispute relating to the impact of the Ninth Circuit Court of Appeals' decision in *Chicken Ranch Rancheria v. Gavin Newsom*, 42 F.4th 1024 (9th Cir, 2022) (*Chicken Ranch*) on the validity of provisions of the Compact and to make the necessary modifications to the Compact to make it consistent with both *Chicken Ranch* and the requirements of the Indian Gaming Regulatory Act, 25 U.S.C. 2701 *et seq.* (IGRA).

During the most recent dispute resolution meeting on June 15, 2023, discussions foundered on a disagreement about the nature and scope of the negotiations that are being conducted and how to address that disagreement. State representatives repeatedly stressed the need for an agreement on the "scope of negotiations," and asserted that the State would not engage in substantive dispute resolution negotiations until the scope of negotiations was agreed too. As a result, the parties never engaged in a discussion of any of the issues arising under the Compact or any potential resolution of those issues.

For purposes of the Tribe's upcoming meeting with the State, I believe that it would be helpful to briefly summarize the parties' communications concerning the current dispute in order to move discussions forward.  On January 21, 2023, the Tribe requested renegotiation of certain

provisions of the Tribes compact based on their inconsistency with *Chicken Ranch* and the IGRA. The Tribe made that request, pursuant to Section 15 of the Compact and the provisions of the IGRA. On March 20, 2023, the State informed the Tribe that the State was not required to engage in negotiations to amend the Compact under Section 15 until 18 months before the date of termination of the Compact and, for that reason, refused to conduct negotiations with the Tribe. In a letter dated March 30, 2023, the Tribe informed the State that it was also initiating the dispute resolution process pursuant to Section 13 of the Compact and specifically identified what the Tribe regarded as the issues that arose under the Compact.  Those issues are based on the Tribe's contention that numerous provisions of the Compact were rendered invalid by the *Chicken Ranch* decision. The State responded in a letter dated April 14, 2023, stating: "The State agrees to dispute resolution under section 13.0 of the 2016 Compact as the appropriate way to address any issues regarding provisions in the 2016 Compact that may be inconsistent with the *Chicken Ranch* decision." The State further stated that representatives of the State were available to "meet and confer with the Tribe pursuant to section 13.1 of the 2016 Compact to resolve the disputes regarding the provisions that may be inconsistent with the *Chicken Ranch* decision."

On May 16, 2023, the parties met to address the dispute.  At the meeting, the Tribe presented the State with a list of compact provisions that the Tribe believes are subject to the dispute resolution process.  In a letter dated May 26, 2023, the State identified the provisions of the Compact that the State contends are implicated by *Chicken Ranch* and stated that it was the State's  position that the other provisions identified by the Tribe were not implicated by *Chicken Ranch* and therefore, are not subject to dispute.

The parties met again on June 15, 2023. That meeting was taken up almost entirely with the State's position that it would not negotiate with the Tribe over what provisions the parties agreed were implicated by the *Chicken Ranch* decision until the parties reached an agreement on what provisions were impacted by *Chicken Ranch*. The State made it clear that the scope of any negotiations would be restricted to only those provisions that the parties mutually  agreed were implicated by *Chicken Ranch*, exchanges about whether the negotiations were being conducted pursuant to Section 13 or Section 15 of the Compact, and the State's refusal to address or negotiate over the substance of the issues in dispute and the potential resolution of those issues.

To move the dispute resolution negotiations forward and to establish whether the State is willing to meaningfully attempt to resolve the substantive issues in dispute, the Tribe offers the following statement of its position on the requirements of the dispute resolution provisions of the Compact.

Section 13 imposes an unequivocal duty to negotiate to resolve disputes arising under the Compact. "In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by good faith negotiations whenever possible." Compact, Section 13.1. Negotiations must take place within thirty days after receipt of the notice of a dispute. "The parties shall meet and confer in good faith by telephone or in person in an attempt to resolve the dispute through negotiation within thirty (30) days after receipt of the notice set forth in subdivision (a) . . . ." Compact, Section 13.1(c).

Nothing in the language of Section 13 requires agreement, in writing or otherwise, on the "scope" of disputed provisions before negotiations can go forward. Even if such a requirement was imposed by the Compact, the State's May 26, 2023, letter identified nine provisions that "the State agrees are reasonably implicated by *Chicken Ranch* and accordingly subject to dispute . . . ." May 26 Letter, p. 1. At the June 15 meet and confer, nevertheless, the State demanded agreement on which provisions are in dispute before engaging in substantive negotiations. The State's refusal to negotiate the substance of the issues in dispute during the June 15 meet and confer violates Section 13 of the Compact and constitutes a breach of the Compact. Requiring the Tribe to agree to the "scope" of all disputed provisions rather than engage in negotiations that could resolve at least those provisions that the State and the Tribe agree are in dispute violates the State's obligation to make its "best efforts to resolve disputes that arise under this Compact by good faith **negotiations** whenever possible . . . **within thirty (30) days** after receipt of the notice set forth in subdivision (a) . . . ." Compact, Section 13.1. The State's refusal to negotiate until the "scope" of all disputed provisions is agreed upon, furthermore, could be interpreted to be a dilatory tactic, which violates the good faith standard of conduct required by Section 13.

As a result of the State's conduct during the June 15 meet and confer, the State is in breach of Section 13 of the Compact by: (1) refusing to negotiate when an affirmative duty to negotiate exists; and (2) falling short of its duty to act in accordance with the good faith standard of conduct by arbitrarily placing barriers to the Tribe's right to negotiate to resolve disputes both parties have identified. The Tribe therefore notifies the State, pursuant to Section 14.2 of the Compact,[1] that the State is in breach of the Compact and has thirty days to cure the breach.[2]

A related issue that arises from the June 15 meet and confer is a disagreement as to the proper mechanism for resolving disputes under Section 13 of the Compact. Based on statements the State made during the June 15 meet and confer – that amendment is the proper means of resolving disputed provisions and that agreement in writing to negotiate is a necessary precondition to negotiation – it  appears that the State contends that amendment pursuant to Section 15[3] is the applicable mechanism for resolving disputes arising under Section 13. If, in fact, this is the State's position, the Tribe rejects the State's interpretation.

Nothing in Section 13 incorporates or references Section 15. Nothing in Section 15 references

---

[1] "Either party may bring an action in federal court, after providing a thirty (30)-day written notice of an opportunity to cure any alleged breach of this Compact, for a declaration that the other party has materially breached this Compact or that a material part of this Compact has been invalidated." Compact, Section 14.2(b).

[2] Arguably, the Tribe has no obligation to exhaust the thirty-day notice of breach and opportunity to cure, because Section 14.2 governs termination of the Compact and the Tribe does not seek to terminate the Compact. The Tribe is providing notice in a good faith attempt to spur meaningful negotiations over modified provisions, as well as provide an opportunity for the State to act in compliance with its obligations under the Compact.

[3] "The terms and conditions of this Compact may be amended at any time by the mutual and written agreement of both parties . . . ." Compact, Section 15.1; see also discussion of Section 15.3, below.

Section 13. Even if the State were to argue that, from a practical perspective, the procedure for resolving disputes is through amendment of the Compact, Section 13 does not impose the constraints and conditions required for amendment under Section 15, nor does any other provision of the Compact support an interpretation that use of the term "negotiations" in Section 13 triggers the conditions precedent to "negotiations" in Section 15.3. In fact, the language of Section 15 militates against such an interpretation. Section 15 references Section 14.2 three times[4] but includes no mention of Section 13. If the parties intended to apply the prerequisites to negotiation in Sections 15.1 and 15.3 to Section 13, the parties would have done so explicitly. Moreover, the State has explicitly refused to enter negotiations to amend the Compact by mutual agreement pursuant to Section 15. In the State's March 20, 2023, letter responding to the Tribe's request to amend or replace provisions of the Compact in conflict with *Chicken Ranch*, the State asserted: "The 2016 Compact is less than a quarter through its 25-year term and the State does not consent to amend it at this time." The State further stated: "Because it is not within 18 months of December 5, 2041, the State is not required to enter into negotiations for a new compact with the Tribe." March 20 Letter, p. 1. The State, thus, chose to forego the opportunity to mutually amend the Compact to bring it into conformity with the *Chicken Ranch* decision pursuant to Section 15. The Tribe was, therefore, compelled to address the legality and enforceability of those provisions through the dispute resolution process under Section 13. The State cannot now seek to circumvent its obligations under the dispute resolution process in Section 13 by asserting that Section 15 is the proper procedural mechanism for resolving disputes.

The language of Section 13 is clear. Disputes arising from the Compact are resolved through good faith negotiations. Negotiations are to commence within thirty days of receipt of the notice of dispute. There are no constraints, conditions precedent, or other procedural or substantive hurdles triggering the State's obligation to negotiate to resolve the dispute in good faith. There is no foundation for the assertion that there is any connection, procedural or substantive, between the dispute resolution provisions in Section 13 and the provisions for amending, extending, or renegotiating the Compact in Section 15.

Despite the State's previous statements, the Tribe remains open to good faith negotiations to resolve the current dispute. It is the Tribe's sincere hope that, on July 13, 2023, the State's representatives will be willing and able to engage in substantive, good faith negotiations concerning the impact of *Chicken Ranch* on the validity of the provisions of the Compact. Those negotiations should begin with the provisions that both the State and the Tribe agree are implicated by *Chicken Ranch*. Once those provisions are addressed, the parties can address the other provisions that the Tribe believe are implicated by *Chicken Ranch*.

I look forward to discussing these and the other issues with you at our July 13, 2023, meeting. If you have any questions regarding this letter, please do not hesitate to give me a call.

---

[4] Section 15 references Section 14.2, however, Section 14.2 concerns termination of the Compact and the Tribe does not intend to terminate the Compact. Section 14.2 references the waiver provision in Section 13.4, but nothing in Section 15 or 14.2 references the terms and conditions of the dispute resolution provisions of Section 13.

**Letter to Senior Advisor Nathan Voegeli**                                                    **Page 5**
**July 12, 2023**
**Re: Tribal Request for State to Clarify Its Position**

Yours very truly,

LESTER J. MARSTON,
Special Counsel for Buena Vista Rancheria,

cc:   Ronda Pope-Flores, Chair
      Wayne Smith, Chief of Staff
      Padraic McCoy, Tribal Attorney

# EXHIBIT J



# OFFICE OF THE GOVERNOR

July 28, 2023

*Via Email and US Mail*

Les Marston
Rapport and Marston
405 W. Perkins Street
Ukiah, CA 95482
ljmarston@rmlawoffice.net

RE:   Dispute Regarding Scope of Compact Provisions Reasonably Implicated
      by *Chicken Ranch Rancheria of Me-Wuk Indians v. California*

Dear Mr. Marston:

 Thank you for your July 12, 2023, letter and the opportunity for the State to reiterate its position to the Buena Vista Rancheria of Me-Wuk Indians (Tribe) regarding our dispute under the Tribe's 2016 tribal-state class III gaming compact (Compact). As I stated on July 13, 2023, during our third meet and confer meeting under section 13.0 of the compact, the fundamental dispute between the State and the Tribe is this: which provisions of the Compact are reasonably implicated by the Ninth Circuit Court of Appeals' holding in *Chicken Ranch Rancheria of Me-Wuk Indians v. California* (*Chicken Ranch*), 42 F.4th 1024 (9th Cir. 2022). Although there was an abrupt end to our last meeting when you stated your belief that the parties are at impasse, the State is hopeful that the parties can forge a path forward to address this dispute.

 The State and the Tribe have exchanged correspondence detailing Compact provisions each considers to be implicated by the *Chicken Ranch* decision. In the State's April 14, 2023, letter, I specified the State's position that the terms subject to dispute are circumscribed by the *Chicken Ranch* decision and are limited to four provisions: the Gaming Facility definition in section 2.12, section 11.0 environmental review requirements, section 12.5 tort protections, and recognition of child and spousal support orders under section 12.6(e). During the State and Tribe's first meet and confer meeting on May 16, 2023, the

Tribe provided the State with its list of 39 "invalid provisions" (Tribe's list), which the State and Tribe reviewed together. As a result of that meeting, in your May 17, 2023 email you identified 14 provisions from the Tribe's list that are not implicated by the *Chicken Ranch* decision. The State agrees with the Tribe that sections 2.10, 2.30, 3.1(b), 3.1(c), 4.1, 4.2, 7.4, 12.5, 12.5(b), 13.1, 13.4, 14.2, 15.2, and 18.1 identified in your May 17, 2023 email are not implicated by the *Chicken Ranch* decision.

In my May 26, 2023, letter, I specified eight provisions on the Tribe's list and one not on the Tribe's list that the State considers to be reasonably implicated by the *Chicken Ranch* decision. I also noted two provisions the State was willing to revisit if the State and Tribe could agree on the appropriate scope of disputed provisions. In response, the Tribe, on page two of your June 2, 2023, letter, took the position that the *Chicken Ranch* decision extended to all of the Compact fee provisions, except the Revenue Sharing Trust Fund, and any subject "not directly connected to the playing of the games on the Tribe's Casino floor." As we discussed during the second meet and confer meeting on June 15, 2023, the State disagrees with the Tribe's position as overly broad.

From a review of the exchanged lists, the parties appear to agree that the following Compact sections are reasonably implicated by the *Chicken Ranch* decision: 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e). The State believes substantive negotiations to amend the Compact pursuant to section 15.1 on the topics both parties agree are reasonably implicated would alleviate concerns regarding *Chicken Ranch*.  Additionally, the State believes that the Assistant Secretary—Indian Affairs' affirmative approval of several California compacts with revised provisions substantially similar to those the parties agree are reasonably subject to dispute[1] provide a clear path forward to address these issues in accordance with the Indian Gaming Regulatory Act and the *Chicken Ranch* decision.

As a result of our meet and confer efforts, it appears that the remaining scope of disputed provisions from the Tribe's list is limited to sections 2.1, 2.7, 2.20, 4.3, 4.3(c), 4.3.1, 4.4(a)(1), 4.4(d), 4.4(e), 4.5(a)(1), 5.1(a), 5.1(b), 5.2(a), 5.3, 10.0, 12.3(e), 12.3(f), and 12.10. During our third meet and confer meeting on July 12, 2023, the Tribe said it was not willing to limit substantive negotiations to

---

[1] The Assistant Secretary—Indian Affairs has approved three California compacts subsequent to the *Chicken* Ranch decision. Those compacts are with the Tejon Indian Tribe, approved on November 17, 2022, with the Santa Rosa Indian Community of the Santa Rosa Rancheria, approved on November 17, 2022, and with the Federated Indians of Graton Rancheria, approved on July 14, 2023. While representing the *Chicken Ranch* tribes, you argued that these types of decision letters by the Assistant Secretary—Indian Affairs should be given deference. *Chicken Ranch*, Plaintiffs' Answering Brief, Doc. 41, at p. 13; *Chicken Ranch*, Appellees' Request for Judicial Notice, Doc. 57-1, pp. 3-4.

the set of provisions the parties agree are reasonably implicated by the *Chicken Ranch* decision. The State asks that the Tribe reconsider and agree to negotiate Compact amendments pursuant to section 15.1 for those Compact provisions that the parties jointly identified as reasonably implicated by *Chicken Ranch*. If the negotiations on Compact sections 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e) are successful, then the parties could reevaluate whether additional negotiations on topics the parties do not agree are implicated by the *Chicken Ranch* decision should take place in light of the completed negotiations.

The State appreciates the time and effort the Tribe has put into this meet and confer process and is hopeful that the Tribe will agree to formal substantive negotiations pursuant to section 15.1 to amend Compact sections 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e).

Sincerely,

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom

ec:

Honorable Rhonda L. Morningstar Pope Flores, Chairperson
Buena Vista Rancheria of Me-Wuk Indians
rhonda@bvtribe.com

Wayne Smith, Tribal Administrator
Buena Vista Rancheria of Me-Wuk Indians
wayne@bvtribe.com

Padraic McCoy
mccoy@olp-partners.com

# EXHIBIT K

Law Offices Of

# RAPPORT AND MARSTON

### An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

August 3, 2023

*Transmitted Via Email: Nathan.Vogeli@gov.ca.gov*

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento CA 95814

> Re:   Response to the State's Compact Section 15.1 Request to Engage in Compact Negotiations with the  Buena Vista Rancheria.

Our File No.: 22-2-3.1.1

Dear Senior Advisor, Voegeli:

I write to respond to your letter dated July 28, 2023 ("July Letter"), in which you completely mischaracterize and misrepresent the discussions that occurred during the third meet and confer with the Tribe, which took place on July 13, 2023. The Tribe rejects the State's contention that the Tribe created an impasse.[1]

The Tribe sees the State's request to move forward with negotiations under Section 15 of the Compact, as nothing more than gamesmanship and further indicia of bad faith by the State. It is a continuation of the bad faith negotiations that led to the decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir. 2022) ("*Chicken Ranch*").

Initially, the Tribe requested that the State voluntarily enter negotiations to amend the Compact back on January 21, 2023. Your letter, dated March 20, 2023 ("March Letter"), unequivocally refused to enter to such negotiations. "The 2016 Compact is less than a quarter through its 25-year term and the State does not consent to amend it at this time." March Letter, p. 1. Thus, "the State respectfully decline[d] to enter into negotiations to amend" the Compact under Section 15 . *Id.* p. 2.

---

[1] I attach my office notes from the July 13, 2023, meet and confer, which do not support the contention that the Tribe prevented negotiations from proceeding.

**Letter to Nathan Voegeli**                                                      **Page 2**
**August 3, 2023**
**Re: Response to the State's Compact Section 15.1 Request to Engage**
**in Compact Negotiations with the Buena Vista Rancheria.**

The Tribe then compelled you to come to the table by identifying provisions in the Compact that directly conflict with *Chicken Ranch* and could only have been the product of negotiating "well beyond IGRA's permitted list . . . ." *Chicken Ranch*, 42 F.4th at 1048. At the first meet and confer you explicitly acknowledged that *Chicken Ranch* had an effect on the Compact. You memorialized that position in your letter, dated April 14, 2023 ("April Letter"), and agreed that the Dispute Resolution process in the Compact ("Section 13") was the proper procedural mechanism for resolution: "The State agrees to dispute resolution under section 13.0 of the 2016 Compact as the appropriate way to address any issues regarding provisions in the 2016 Compact that may be inconsistent with the *Chicken Ranch* decision." April Letter, p. 1. Your letter, dated May 26, 2023 ("May Letter"), explicitly outlined nine provisions both the State and Tribe agreed were affected by *Chicken Ranch*.

Despite being compelled to negotiate in good faith to resolve, at a minimum, the disputed provisions identified in your May Letter, you refused to negotiate during the second meet and confer on June 15, 2023. During the meeting you became fixated on addressing and resolving the "scope" of the disputed provisions as a precondition to addressing the effect of *Chicken Ranch* on the Compact. You demanded resolution of the "scope" without identifying any contractual or legal foundation for placing a procedural requirement on substantive negotiations. Not only did you refuse to negotiate concerning the effect of *Chicken Ranch* on specific provisions enumerated in your May Letter, but you refused to continue the meet and confer if the Tribe and I referred to the discussion as "negotiations." The posture of the State was so irrational and frustrating that members of the Tribal Council walked out of the meeting.

On July 12, 2023, I sent you another letter clarifying the parties' obligations under Section 13 of the Compact and rejecting your assertion during the June 15 meeting that the proper procedural mechanism for resolving disputes under Section 13 of the Compact would be by mutual amendment ("Section 15").[2] My letter provided the legal support for the Tribe's position that Section 15 is not the proper procedural mechanism for resolving disputes and that Section 13 is the proper mechanism.[3] To reiterate, Section 13 imposes an unequivocal duty to negotiate to resolve disputes arising under the Compact. "In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that arise under this Compact by **good faith negotiations** whenever possible." Compact, Section 13.1. (Emphasis added). My July 12 Letter also provided you with notice that your failure to negotiate pursuant to your contractual obligation constituted a breach of the Compact which could only be cured by engaging in "good faith negotiations" at the third scheduled meet and confer.

Contrary to the account in your July Letter, the following is what happened during the third meet and confer on July 13, 2023. Just like the June 15 meeting, you refused to engage in good

---

[2] To date, I have not received a response to the legal issues raised in my July 12, 2023, letter.
[3] As you, yourself, stated in your April Letter.

Letter to Nathan Voegeli                                                                                                  **Page 3**
August 3, 2023
Re: Response to the State's Compact Section 15.1 Request to Engage
in Compact Negotiations with the  Buena Vista Rancheria.

faith negotiations over the substance of provisions we both agree are reasonably subject to dispute after the decision in *Chicken Ranch*. Your refusal was, again, predicated on settling a dispute concerning the scope[4] of the provisions implicated by *Chicken Ranch*. My position was that we could address the validity and enforceability of the disputed provisions in a piecemeal fashion that would result in identifying the full range of provisions implicated by *Chicken Ranch*. My contention was that whether we addressed the scope of provisions affected by *Chicken Ranch* at the outset, or whether we arrived at the scope of provisions organically was a distinction without a difference. However, you stated, "to put it bluntly," that the "dispute" is that we do not agree on the scope of the issues that should be addressed and you believed that was "fundamental before we get into the substance."

I then asked you to identify provisions of Section 13 that state that resolution concerning the "scope" of the disputed provisions is a necessary condition precedent for addressing disputed provisions we agree were affected by *Chicken Ranch*. You did not identify a legal basis for your position. (That's because there is no legal basis for such a position.) Although you acknowledged that, consistent with the "Tribe's perspective," it would be useful to sort out the provisions of the compact that both sides recognize are "implicated" by *Chicken Ranch*, you took the position that there was no use in jumping into the substance of the negotiations if we could not reach agreement on what provisions were to be negotiated. I then pointed out that we agreed on a number of provisions that were subject to negotiation.

We agreed, for example, that Section 11.7 of the Compact was reasonably in dispute, and we could begin by negotiating over whether 11.7 was rendered void, *ab initio*, by *Chicken Ranch*, in light of the fact that the Tribe's compact was deemed approved by the Secretary of the Interior, pursuant to 25 U.S.C. § 2710(d)(8)(C). You stated that you already said Section 11 was reasonably implicated by the *Chicken Ranch* decision, but that was not the issue; the issue is the scope, and which other provisions the parties have not reached agreement on. I maintained that we already identified the scope. You disagreed on the scope of provisions identified by the Tribe, refused to define what you meant by scope and stated that there is "no next step" in the process without knowing which provisions we are negotiating.

It quickly became clear that further attempts to invite substantive negotiations were futile. However, before the meeting ended, I specifically asked you how we could get beyond this issue and move forward. You just restated your position that we needed to define the "scope" of the negotiations and that we had not reached agreement on that issue. I then said: "OK" and ended the meeting.

---

[4] The issue of "scope" was raised twice in your correspondence, first in the May Letter, p. 2, and again in the July Letter, p. 2 ("I also noted two provisions the State was willing to revisit if the State and Tribe could agree on the appropriate scope of disputed provisions."). Clearly, the issue of "scope" is relegated to Sections 12.2 and 12.3(f)(2) and was used as a strawman tactic to block negotiations over the effect of *Chicken Ranch* on the substance of the Compact.

Letter to Nathan Voegeli                                                      Page 4
August 3, 2023
Re: Response to the State's Compact Section 15.1 Request to Engage
in Compact Negotiations with the  Buena Vista Rancheria.

Now, after eight (8) months of trying to get the State to negotiate in good faith, after three meet and confers, after the State initially refused to agree to negotiate under Section 15, then agreed that Section 13 was the proper procedure to negotiate under, and after reaching impasse with the State on the issue regarding what provisions of the Compact fell within the State's "scope of negotiations," you want to go all the way back to January, wipe the slate clean, as if nothing has happened and begin new negotiations under Section 15? You are attempting to rewrite history, to rewrite your refusal to negotiate pursuant to Section 15 back in March, to rewrite your bad faith conduct on two occasions notwithstanding your obligations under Section 13, erase your breach of Compact, and act as if you were willing to negotiate all along.

It is ironic that during the second and third meet and confer, the Tribe sought to negotiate and reach agreement on the effect of *Chicken Ranch* concerning Sections 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e) of the Compact ("enumerated provisions" in the May Letter) under the terms and conditions of Section 13, which imposes more robust obligations on the State than Section 15. You blatantly refused. Yet, here you are, attempting to shift the burden back to the Tribe, attempting to appear willing to engage in "formal substantive negotiations," July Letter, p. 3, as long as the Tribe proceeds under Section 15 (contrary to your contention in April that the "State agrees to dispute resolution under section 13.0 of the 2016 Compact as the appropriate way to address any issues regarding provisions in the 2016 Compact that may be inconsistent with the *Chicken Ranch* decision."). The State's attempt to evade its contractual obligations under the explicit terms and conditions of the Compact while attempting to appear willing to negotiate under terms the State already rejected, namely, Section 15, is an extraordinary display of what constitutes "bad faith" conduct. It is *Chicken Ranch* all over again.

To recapitulate, you rejected the Tribe's offer to amend the Compact pursuant to Section 15 in January. The Tribe subsequently compelled you to negotiate under Section 13 of the Compact and you twice refused. Now, you pretend that none of that happened and invite the Tribe to negotiate under Section 15? The Tribe views the account of negotiations and the offer contained in your July Letter as a continuation of the State's bad faith conduct, designed to dupe the Tribe into negotiating under provisions of the Compact that impose far fewer obligations on the State, and a dilatory tactic designed to run out the clock on the forbearance of the Tribe's payment to Amador County under the Intergovernmental Agreement executed pursuant to Section 11.7 of the Compact, which we both agree is void as a result of *Chicken Ranch*.

You have wasted seven months of the Tribe's time and money without legal justification, without justification of any sort, and without so much as a coherent rationale for your conduct. At this point, the Tribe has no reason to believe that you genuinely desire to negotiate nor does the Tribe have any legal obligation to meet with the State any further under Section 13 or for that matter Section 15. However, as a sign of the Tribe's good faith the Tribe would be willing to resume negotiations, under Section 13, not Section 15, if the State agrees to pay the Tribe's legal fees that it has incurred to date to participate in the three (3) meet and confer sessions with the State. Please contact me immediately to let me know if the State is willing to pay the Tribe's

**Letter to Nathan Voegeli**                                                              **Page 5**
**August 3, 2023**
**Re: Response to the State's Compact Section 15.1 Request to Engage**
**in Compact Negotiations with the  Buena Vista Rancheria.**


attorney's fees and continue the negotiations under Section 13. If not, then you and the State, given your conduct, leave the Tribe with no choice but to file suit against the State, pursuant to Sections 13.1(d)-(e) of the Compact, and seek a declaration from the Court as to which provisions in the Tribe's 2016 Compact violate the IGRA.

Please get back to me with your response as soon as possible. If I do not hear from you on or before Monday, August 11, 2023, I will assume that the State is not going to pay the Tribe's attorney's fees and resume negotiations under Section 13 of the Compact and will advise the Tribe to proceed accordingly.

Yours Very Truly

Lester J. Marston,
Special Council to the Buena
Vista Rancheria

cc: Rhonda Pope-Flores, Chairwoman
     Wayne Smith, Executive Director
     Padraic McCoy, Tribal Attorney

# EXHIBIT L



# OFFICE OF THE GOVERNOR

August 11, 2023

*Via Email*

Les Marston
Rapport and Marston
405 W. Perkins Street
Ukiah, CA 95482
ljmarston@rmlawoffice.net

RE:    Rejection of Tribe's Requirement that State Pay Tribe's Attorney's Fees in
       order to Continue Dispute Resolution

Dear Mr. Marston:

I have received your August 3, 2023 letter[1] in which you ask whether the State of California (State) is willing to pay the attorney's fees of the Buena Vista Rancheria of Me-Wuk Indians (Tribe) for its participation in the dispute resolution meet and confer process and continue the negotiations under section 13.0 of the Tribe's 2016 tribal-state class III gaming compact (Compact).

As I stated in my July 28, 2023 letter, the Tribe and State have a dispute regarding the scope of Compact provisions reasonably implicated by the Ninth Circuit's decision in *Chicken Ranch Rancheria of Me-Wuk Indians v. California (Chicken Ranch)*, 42 F.4th 1024 (9th Cir. 2022). The State is prepared to engage in substantive negotiations to amend the Compact pursuant to section 15.1 on those provisions the parties agree are reasonably implicated by the *Chicken Ranch* decision. The State does not agree to the Tribe's precondition that the State must pay the Tribe's attorney's fees in order to continue the dispute resolution meet and confer process under section 13.0 of the Compact.

---

[1] Your office notes from the July 13, 2023, meet and confer meeting, referenced in footnote one of your letter, were not attached or provided. However, the State has reviewed its notes from that and prior meetings.

Page 2

The State requests the Tribe reconsider whether it is willing to agree to negotiate sections 2.12, 2.18, 2.22, 2.24, 4.5(a)(2), 5.3(a), 11.0, 12.5, and 12.6(e), which the parties agreed as a result of the dispute resolution process are reasonably implicated by *Chicken Ranch*. If the parties reach agreement on appropriate negotiated amendments for those provisions, then the State and Tribe can reevaluate whether to engage in substantive negotiations on additional topics.

If the Tribe wishes to move forward with the proposed substantive negotiations, please let me know.

Sincerely,

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom

ec:

Honorable Rhonda L. Morningstar Pope Flores, Chairperson
Buena Vista Rancheria of Me-Wuk Indians
rhonda@bvtribe.com

Wayne Smith, Tribal Administrator
Buena Vista Rancheria of Me-Wuk Indians
wayne@bvtribe.com

Padraic McCoy
mccoy@olp-partners.com

# EXHIBIT M

Law Offices Of

# RAPPORT AND MARSTON

An Association of Sole Practitioners

405 W. Perkins Street
Ukiah, California 95482
e-mail: ljmarston@rmlawoffice.net

Lester J. Marston

Phone (707) 462-6846
Facsimile (707) 462-4235

August 14, 2023

*Transmitted Via Email:* Nathan.Vogeli@gov.ca.gov

Nathan Voegeli
Senior Advisor for Tribal Negotiations
Office of Governor Gavin Newsom
1021 O Street, Suite 9000
Sacramento CA 95814

> Re:   Response to the State's Renewed Request to Engage in Compact Negotiations with
> the  Buena Vista Rancheria.

> Our File No.: 22-2-3.1.1

Dear Senior Advisor, Voegeli:

I am in receipt of your letter dated August 11, 2023 ("August Letter"). I have spoken with the Tribe and, although the Tribe believes it should be reimbursed for, what the Tribe believes is, a clear violation of the State's good faith and fair dealing obligation in Section 13 of the Compact, the Tribe is willing to forego reimbursement of its lost attorney's fees and continue efforts to resolve existing disputes under Section 13 of the Compact.

If you genuinely desire to resolve the dispute out of court, then you will agree to proceed pursuant to Section 13. As you know, the Tribe is seeking a remedy from the State under the dispute resolution process, which only concludes upon agreement that the disputes have been resolved to the parties' satisfaction or when parties seek resolution in court. As you point out in your August Letter "the Tribe and the State have a dispute . . . ." August Letter, p. 1. The fact that there is a "dispute" means there is no "agreement" and, thus, no basis for proceeding under Section 15.1, which is appropriate for amendment when the Tribe and the State mutually agree to amend. We do not agree that the dispute has been resolved, and we do not mutually agree on the form of resolution. Therefore, disputes continue to exist and the proper means for resolving the disputes is under Section 13 of the Compact.

In addition, it is the Tribe's position that your August Letter, in and of itself, constitutes "bad faith" negotiations under Section 13 of the Tribe's 2016 compact for the following reasons.

**Letter to Nathan Voegeli**                                                                 **Page 2**
**August 14, 2023**
**Re: Response to the State's Rejection of Tribe's Requirement that State Pay Tribe's
Attorney's Fees and Renewal of Request to Engage in Compact Negotiations with the Buena
Vista Rancheria Under Section 15 of the Compact.**

First, the State has already engaged in bad faith negotiations under Section 13 of the Compact.
By agreeing to restart negotiations under Section 15 of the Compact, the Tribe would waive any
cause of action that it had against the State for its prior conduct that violated Section 13. Rather
than a good faith offer to negotiate, the State's offer to engage in Section 15.1 negotiations to
amend the Compact appears to be a ploy to diminish the State's obligations in negotiations and
the Tribe's right to a remedy.

Second, unlike Section 13, the State is under no obligation to negotiate with the Tribe under
Section 15 of the Compact. The parties would be negotiating by mutual agreement and if the
parties reach an impasse, the State can break off those negotiations at any time with no
requirement that it engage in future negotiations. Under Section 15, unlike Section 13, there is no
mechanism for compelling the State to negotiate to resolve cognizable disputes.

Third, Section 13 compels the State to negotiate under a "good faith" standard. While Section
15.3 of the Compact imposes a good faith standard of conduct in negotiations, the standard of
conduct is subject to the caveat that negotiations are mutually agreed upon and voluntary. The
voluntary nature of negotiations under Section 15 does not prohibit the style of surface
bargaining exhibited by the State during Compact negotiations at issue in the *Chicken Ranch*
litigation.

Fourth, Section 13 provides a specific remedy, if the parties cannot reach resolution. Section 13
allows the party initiating the dispute resolution procedure to seek relief in the district court. No
such remedy is set forth in Section 15.

Finally, by allowing the parties to seek relief in the district court, a prevailing party can obtain
appropriate relief, whether it be declaratory or injunctive, including a declaration that certain
provisions in the 2016 Compact violate the IGRA, are void and never took effect. Section 15, on
the other hand, does not specify what happens and what the appropriate remedy is if the parties
fail to reach agreement resolving their dispute.

The Buena Vista Rancheria, therefore, respectfully rejects the Governor's and the State's offer to
voluntarily waive its right to a judicial remedy under the dispute resolution process and begin,
afresh, negotiations under section 15.1 of the Compact.

If the "State is prepared to engage in substantive negotiations to amend the Compact pursuant to
section 15.1 on those provisions the parties agree are reasonably implicated by the *Chicken
Ranch* decision," then it stands to reason that the State is prepared to engage in substantive
negotiations concerning those same provisions under Section 13, which remain ongoing.

However, the Tribe has identified other disputes unrelated to *Chicken Ranch*. The Tribe is happy
to reach resolution over the provisions of the Compact affected by *Chicken Ranch*, but that will
not fully resolve the dispute and conclude the dispute resolution process. If the State seeks to

**Letter to Nathan Voegeli** **Page 3**
**August 14, 2023**
**Re: Response to the State's Rejection of Tribe's Requirement that State Pay Tribe's Attorney's Fees and Renewal of Request to Engage in Compact Negotiations with the Buena Vista Rancheria Under Section 15 of the Compact.**

reach agreement on the nine provisions the State has enumerated in previous correspondence, great, the Tribe is willing to prioritize those issues pursuant to Section 13 of the Compact.

Otherwise, the State leaves the Tribe with no other alternative but to seek resolution of the dispute in federal court, as provided under Section 13 of the Compact.

You have until the close of business on Wednesday to respond to the Tribe's invitation to continue to resolve the disputes under Section 13 of the Compact, waiving the Tribe's prior condition of payment of fees. If you do not respond before 5:00 PM, on August 16, 2023, the offer is hereby revoked.

I look forward to hearing from you before 5:00 PM on Wednesday, August 16, 2023. If you have any questions regarding this letter, please do not hesitate to give me a call.

Yours Very Truly

Lester J. Marston,
Special Council to the Buena
Vista Rancheria

cc: Rhonda Pope-Flores, Chairwoman
    Wayne Smith, Executive Director
    Padraic McCoy, Tribal Attorney

# EXHIBIT N

## Lester Marston

| | |
|---|---|
| **From:** | Nathan Voegeli <Nathan.Voegeli@GOV.CA.GOV> |
| **Sent:** | Wednesday, August 16, 2023 11:37 AM |
| **To:** | Lester Marston; Noel A. Fischer; Michelle Laird |
| **Cc:** | Rhonda Pope; Wayne Smith; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com |
| **Subject:** | RE: Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact |

Les,

Thank you for the letter. The State of California will not be able to respond by your 5:00 pm deadline today, but I expect to have a response to you this Friday, August 18, 2023.

Best,
Nathan

**From:** Nathan Voegeli <Nathan.Voegeli@gov.ca.gov>
**Sent:** Tuesday, August 15, 2023 9:20 AM
**To:** Lester Marston <ljmarston@rmlawoffice.net>; Noel A. Fischer <Noel.Fischer@doj.ca.gov>; Michelle Laird <Michelle.Laird@doj.ca.gov>
**Cc:** Rhonda Pope <rhonda@bvtribe.com>; Wayne Smith <wayne@bvtribe.com>; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com
**Subject:** RE: Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact

Thank you, Les

**From:** Lester Marston <ljmarston@rmlawoffice.net>
**Sent:** Monday, August 14, 2023 5:55 PM
**To:** Nathan Voegeli <Nathan.Voegeli@gov.ca.gov>; Noel A. Fischer <Noel.Fischer@doj.ca.gov>; Michelle Laird <Michelle.Laird@doj.ca.gov>
**Cc:** Rhonda Pope <rhonda@bvtribe.com>; Wayne Smith <wayne@bvtribe.com>; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com
**Subject:** Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact

Nathan:
Attached please find my letter on behalf of the Buena Vista Rancheria rejecting the State's latest offer to negotiate under Section 15 of the Compact. Please confirm receipt.
I look forward to your immediate reply.
Les Marston 707-462-6846

LESTER J. MARSTON
Attorney at Law
RAPPORT AND MARSTON
Sole Practitioner
405 West Perkins Street
Ukiah CA 95482
Tel.: (707) 462-6846

Fax: (707) 462-4235
Email: ljmarston@rmlawoffice.net

# EXHIBIT O

## Lester Marston

| | |
|---|---|
| **From:** | Lester Marston |
| **Sent:** | Wednesday, August 16, 2023 12:23 PM |
| **To:** | Nathan Voegeli; Noel A. Fischer; Michelle Laird |
| **Cc:** | Rhonda Pope; Wayne Smith; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com |
| **Subject:** | RE: Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact |

Nathan:
The Tribal Council has authorized me to file suit against the State. I am in the process of preparing a federal court complaint. If you get me a response prior to filing suit, I will review it with my client, have them consider it and will get back to you.
Les

**From:** Nathan Voegeli <Nathan.Voegeli@GOV.CA.GOV>
**Sent:** Wednesday, August 16, 2023 11:37 AM
**To:** Lester Marston <ljmarston@rmlawoffice.net>; Noel A. Fischer <Noel.Fischer@doj.ca.gov>; Michelle Laird <Michelle.Laird@doj.ca.gov>
**Cc:** Rhonda Pope <rhonda@bvtribe.com>; Wayne Smith <wayne@bvtribe.com>; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com
**Subject:** RE: Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact

Les,

Thank you for the letter. The State of California will not be able to respond by your 5:00 pm deadline today, but I expect to have a response to you this Friday, August 18, 2023.

Best,
Nathan

**From:** Nathan Voegeli <Nathan.Voegeli@gov.ca.gov>
**Sent:** Tuesday, August 15, 2023 9:20 AM
**To:** Lester Marston <ljmarston@rmlawoffice.net>; Noel A. Fischer <Noel.Fischer@doj.ca.gov>; Michelle Laird <Michelle.Laird@doj.ca.gov>
**Cc:** Rhonda Pope <rhonda@bvtribe.com>; Wayne Smith <wayne@bvtribe.com>; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com
**Subject:** RE: Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact

Thank you, Les

**From:** Lester Marston <ljmarston@rmlawoffice.net>
**Sent:** Monday, August 14, 2023 5:55 PM
**To:** Nathan Voegeli <Nathan.Voegeli@gov.ca.gov>; Noel A. Fischer <Noel.Fischer@doj.ca.gov>; Michelle Laird <Michelle.Laird@doj.ca.gov>
**Cc:** Rhonda Pope <rhonda@bvtribe.com>; Wayne Smith <wayne@bvtribe.com>; scottrap@pacbell.net; nomarston@gmail.com; mccoy@olp-partners.com
**Subject:** Tribe's Rejection of Offer to Negotiate Under Section 15 of Compact

Nathan:

Attached please find my letter on behalf of the Buena Vista Rancheria rejecting the State's latest offer to negotiate under Section 15 of the Compact. Please confirm receipt.

I look forward to your immediate reply.

Les Marston 707-462-6846

LESTER J. MARSTON
Attorney at Law
RAPPORT AND MARSTON
Sole Practitioner
405 West Perkins Street
Ukiah CA 95482
Tel.: (707) 462-6846
Fax: (707) 462-4235
Email: ljmarston@rmlawoffice.net